```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW JERSEY
 2                    CIVIL ACTION   2:07-cv-3770-DMC-MF

 3

      ELI LILLY AND COMPANY,        : TRANSCRIPT OF PROCEEDINGS
 4                                   :
                                     :        M O T I O N
 5                    Plaintiff,     :
                                     :        Pages  1 - 95
 6            -vs-                   :
                                     :
 7    ACTAVIS ELIZABETH, LLC, et     :
      als,                           :
 8              Defendants.          :
      - - - - - - - - - - - - - - - -

 9
                                         Newark, New Jersey
10                                       May 5, 2010

11    B E F O R E:   HONORABLE MARK FALK,
                       UNITED STATES MAGESTRATE JUDGE
12

13    A P P E A R A N C E S:

14        FINNEGAN HENDERSON FARABOW GARRETT & DUNNER
          BY:   LAURA MASUROVSKY, ESQ.
15        MICHAEL ANDREW HOLTMAN, ESQ.
          CHARLES LIPSEY, ESQ.
16        Attorneys for the Plaintiff

17        PEPPER HAMILTON, LLP
          BY:   JOHN F. BRENNER, ESQ.
18        Attorney for the Plaintiff

19

20    _____
      Pursuant to Section 753 Title 28 United States Code, the
21    following transcript is certified to be an accurate record as
      taken stenographically in the above entitled proceedings.

22

23                          S/Carmen Liloia
                            CARMEN LILOIA
24                          Certified Court Reporter
                            (973-477-9704)
25
```

```
 1
         APPEARANCES - continued
 2

 3       ELI LILLY & COMPANY
         BY:  MARK STEWART, ESQ.
 4       Attorney for Plaintiff

 5       LOCKE LORD BISSELL & LIDDELL, LLP
         BY:  ALAN CLEMENT, ESQ.
 6       ANDREA L. WAYDA, ESQ.
         JOSEPH FROEHLICH, ESQ.
 7       MYOKA KIM GOODIN, ESQ.
         Attorneys for the Defednant Apotex
 8

 9       ALSTON & BIRD, LLP
         BY:  THOMAS PARKER, ESQ.
10       Attorney for the Defendant Mylan Pharmaceuticals

11       SAIBER SCHLESINGER SATZ & GOLDSTEIN
         BY:  ARNOLD B. CALMANN, ESQ.
12       KATHERINE ANN ESCANLAR, ESQ.
         Attorneys for the Defendant Mylan Pharmaceuticals
13

14       HILL WALLACK, LLP
         BY:  ERIC I. ABRAHAM, ESQ.
15       Attorney for the Defendant Sandoz, Inc.

16
         WINSTON & STRAWN, LLP
17       BY:  JAMES S. RICHTER, ESQ.
         Attoney for the Defendant Sun Pharmaceuticals
18

19       CARELLA BYRNE, LLP
         BY:  MELISSA E. FLAX, ESQ.
20       Attorney for the Defendant Aurobindo

21
         RAKOCZY MOLINO, LLP
22       BY:  WILLIAM A. RAKOCZY, ESQ.
         Attorney for the Defendant Aurobindo
23

24

25
```

```
 1              THE COURT:  All right.  This is the case of Eli Lilly
 2      versus Actavis, et al.  It's docket 07-3770.
 3              Would counsel please place their appearances on the
 4      record.
 5              MS. MASUROVSKY:  Good morning, your Honor.  Laura
 6      Masurovsky for Eli Lilly & Company.  And together with me are
 7      my colleagues, Charlie Lipsey, from Finnegan; John Brenner,
 8      from Pepper Hamilton; and Mark Stewart, from Eli Lilly; and my
 9      colleague, Mr. Holtman, from Finnegan; and Mr. Barker, from
10      Finnegan.
11              THE COURT:  Good morning.
12              MR. BARKER:  Good morning, your Honor.
13              MR. CLEMENT:  Good morning, your Honor.  My name is
14      Alan Clement.  I'm from the law firm of Locke Lord Bissell &
15      Liddell on behalf of defendant Apotex.  And with me is my
16      partner Andrea Wayda from our New York office; Joe Froehlich
17      from our New York office; and Myoka Goodin, from our Chicago
18      office.
19              MS. FLAX:  Good morning.  Melissa Flax from Carella
20      Byrne on behalf of Aurobindo.
21              MR. RAKOCZY:  And William Rakoczy, your Honor, also on
22      behalf of Aurobindo.  Good morning, your Honor.
23              MR. PARKER:  Good morning, your Honor.  Tom Parker
24      from the law firm of Austin & Bird, representing Mylan
25      Pharmaceuticals; here with our local counsel, Arnie Calmann
```

```
 1     from the Saiber Law Firm.
 2             MR. CALMANN:  Good morning, your Honor.
 3             MR. ABRAHAM:  Good morning, your Honor, Eric Abraham
 4     from Hill Wallach, on behalf of defendant Sandoz.
 5             MR. RICHTER:  Good morning, your Honor.  James Richter
 6     on behalf of the Sun Pharmaceuticals.  There on the phone is
 7     Gail Standish on behalf of Sun.
 8             MR. CALMANN:  Good morning.  Let me not forget my
 9     colleague, Katherine Escanlar, also for Mylan.
10             THE COURT:  Good morning.
11             All right, welcome.  Before the Court is an In Limine
12     motion to exclude or to deal with the issue of Dr. Steven Paul.
13     This has been the subject of some prior discussion on the
14     record and off the record.  We know that the trial in this case
15     is going to proceed, I believe, on the 18th of May; and we had
16     the final pretrial a couple of weeks ago at the final pretrial.
17     The final pretrial I think was delivered to the Court the day
18     of the pretrial, and the In Limine motions were not very
19     specifically identified.  At the final pretrial I asked counsel
20     if there were any In Limine motions that addressed or dealt
21     with discovery issues, which normally I would handle for Judge
22     Cavanaugh.  And at that time Miss Masurovsky, I think, raised
23     immediately the issue of Dr. Paul replacing, or I guess the
24     plaintiff's position is Dr. Paul replacing Dr. Watanabe as a
25     witness at trial.  Of course the defendants take the position
```

 1    that that's not really the case.

 2            I directed that the plaintiffs provide a detailed

 3    proffer of what Dr. Paul was expected to testify to and we set

 4    a briefing schedule.  I've gotten extensive briefing, which we

 5    have read and poured over, as well as extensive declarations

 6    from both sides.

 7            There was also a telephone call when I was under

 8    the -- had the understanding that there were also a lot of

 9    documents in dispute.  And during that call we discussed the

10    issue on this motion.  I ordered that we appear here for oral

11    argument.  There were many questions that were raised.  There

12    were sharp disputes about many of the issues.  And I thought it

13    best, given the importance, and given how strongly everyone

14    felt about this, to come in and argue it on the record and get

15    it decided.

16            So I think I'd like to begin -- of course I'll hear

17    from you on the motions, but I think the first thing that I

18    would like to do, and I'm going to address it to plaintiffs, is

19    to try to get a clearer picture about what the plaintiffs wish

20    Dr. Paul to testify to because there was, I think, a three-page

21    or four-page proffer.  And the defendants have taken the

22    position that that is not -- or that what's in the proffer is

23    not really accurate, and that what plaintiff is trying to do is

24    something different than seems to be described, at least in the

25    words, the actual words of the proffer.

```
 1              So I think I'd like to hear from you on that, Miss
 2    Masurovsky.
 3              MS. MASUROVSKY:  Thank you, your Honor.
 4              To put the testimony in context, Lilly's
 5    identification of Dr. Paul as a replacement for Dr. Watanabe
 6    occurred as quickly as it could after the Court's denial of our
 7    motion for re-consideration on the issue of the invalidity
 8    and -- I'm sorry, the non-enablement issue that plaintiffs --
 9    defendants, excuse me, had raised.  And I think it would be
10    useful if the Court will permit me, if I may handle the
11    timeline, to put it all in context.
12              THE COURT:  That's fine.
13              MS. MASUROVSKY:  And I will give, of course,
14    defendants a copy to follow along.  I have made a few.
15              If I may approach?
16              THE COURT:  Sure.
17              MS. MASUROVSKY:  I made a few slides of the points
18    that I would like to make in my answering of your questions,
19    your Honor.
20              THE COURT:  Okay.
21              MS. MASUROVSKY:  And in our argument today.  And the
22    timeline, which is the first slide, I hope, that you have.
23              THE COURT:  Yes.
24              MS. MASUROVSKY:  Here, I'm sorry, let me get you all
25    another copy.
```

```
 1              There were really four distinct phases of this case,
 2      and the most important thing about where Steve Paul's testimony
 3      comes into play and in lieu of Dr. Watanabe's, is in the
 4      context of the issue that defendants have raised on
 5      non-enablement, on which they have the burden of proof.  Of
 6      course, as the Court knows, the only issue on which Lilly had
 7      the burden of proof was infringement, and Judge Cavanaugh
 8      decided that issue in our favor and infringement is no longer
 9      on the table.  The sole issues at trial, they have the burden
10      of proof on all of them, all of our validity and
11      unenforceability issues.  So we're in a responsive mode, even
12      though we're technically the plaintiff, they're attacking the
13      patent so we respond to them.
14              And what's important to understand about their
15      non-enablement argument, their attack on the patent for lack of
16      enablement, is that they did not actually disclose their
17      underlying allegations until after the close of discovery.  So
18      in this first phase on the left hand side of the timeline,
19      which is basically in yellow, all the way through their first
20      set of answers to our interrogatories asking for what their
21      contentions were and what their defenses were on this
22      non-enablement Section 112 issue, they referred us to their
23      notice letter.  And their notice letter had nothing about
24      Section 112.  So we knew nothing about any non-enablement
25      position that they had all the way through this timeline
```

1    section on the left.

2              Then -- that was in 2007.  And then in 2008, there

3    were more exchanges of discovery, depositions of 30(b)(6)s, and

4    individual depositions, including Dr. Watanabe's deposition,

5    Dr. Spencer, Dr. Heiligenstein, the third parties who conducted

6    the Mass General testing, the many Lilly 30(b)(6) witnesses on

7    Lilly's development of atomoxetine for ADHD, Lilly's business,

8    et cetera.  And it wasn't until after all of those depositions

9    were concluded, and after the close of fact discovery, and

10   after Lilly had supplemented its answers to interrogatories on

11   November 24th, 2008, did we, Lilly, receive the very first

12   explanation of their non-enablement under Section 112 position.

13             So wholly apart from the fact that it would not have

14   been good litigation technique to take Dr. Watanabe's full

15   trial testimony during my adversary's deposition of him, we

16   didn't even know what their non-enablement position was at the

17   time of his deposition, so it would have been impossible, even

18   if I had chosen to do it, to ask him those questions.

19             We get their response on November 24th, 2008.  That's

20   the bottom blue box.  And we take a look at their explanation

21   of what it is.  And we see that it contradicts 60 years of

22   Federal Circuit legal precedent.  And we say they have no

23   colorable claim, no legal basis for their contention that if

24   you don't have clinical trial results before you file the

25   patent application, you don't have an enabled patent, and that

```
 1       you couldn't use the very results that Mass General's testing
 2       gave us to prove enablement.  We said:  That's ridiculous.  I
 3       don't know where they're getting that.  Some district court may
 4       have held something like that, but that contradicts controlling
 5       Federal Circuit precedent.  They're wrong, and so we felt we
 6       proved that.
 7               And, in fact, when they moved for summary judgment,
 8       and that's in this third phase in, I guess tan, if that's the
 9       way to describe that color, beginning with the May 13th, 2009
10       summary judgment brief that they filed on enablement, we said
11       just that.  That was our opposition.  But there were these
12       clinical trial results that came through before the patent was
13       issued and we are relying on those.  And, in fact, in the
14       deposition testimony, that's what our witnesses talked about.
15       They said:  We got those clinical trial results and they were
16       very -- they showed efficacy, and we relied on that.
17               It really wasn't, your Honor, until after that, when
18       the Federal Circuit's decision on the In re: 318, Appellate
19       Court, Federal Circuit came down with its decision in December
20       of '09 that we had any inkling that this was going to be a
21       different kind of an issue.  And, in fact, when they tendered
22       that decision, they, defendants, tendered that to Judge
23       Cavanaugh, Judge Cavanaugh asked for a supplemental briefing on
24       this potential change in the law or different way of looking at
25       the law.  And we responded promptly with our contention that
```

```
 1        not only could we re -- not only could we prove that the patent
 2        was enabled by the test results that the Mass General study had
 3        generated, but there were other things that had been fully
 4        disclosed during discovery that we could rely on, such as the
 5        fact that Mass General went ahead in the first instance with
 6        this test and filed for FDA approval, or FDA permission to go
 7        forward with this Phase II test.  The fact that the FDA in fact
 8        did permit the Mass General folks to go forward in a Phase II
 9        clinical trial of the drug for ADHD.  The fact that Lilly
10        wanted to give them the drug and to promote it for that
11        purpose.  All of these were actually set out in our November,
12        2009 opposition brief where we said:  That's part of what shows
13        that if you're not going to take our clinical trial results,
14        for whatever reason, if that's how you took In re:  318, we
15        certainly have all this other evidence that's already in the
16        record.  Mass General going forward with it.  The fact that
17        they had IRB approval.  That's Dr. Spencer in his deposition on
18        behalf of Mass General said that they would not have gone
19        forward without the Institutional Review Board approval.  All
20        of that was in our opposition to the summary judgment briefing.
21        Promptly, on the day the Judge ordered it, we discussed all of
22        that and we were relying on what was already in the record.
23        These are deposition testimony quotes and documents that were
24        in the record.
25                We got the Judge's opinion in December, that's the
```

```
 1    bottom of the third -- what I call the third phase of the
 2    timeline.  December 31st, 2009, we got the Judge's ruling
 3    denying defendant's motion to -- for summary judgment on
 4    enablement.  And there were things in that amended opinion that
 5    caused us concern because there was this issue that we thought
 6    we could rely on, the Mass General clinical, and still believe
 7    we should be relying on the Mass General clinical trial
 8    results.  That just because the patent examiner didn't happen
 9    to ask us about that, because he, the patent examiner, didn't
10    question the enablement utility issue, we should still be able
11    to tell the Court that's good grounds to hold the patent is
12    valid like, you know, like an issue out of the patent office.
13    So we said:  We'd like you to reconsider on that point.
14             It wasn't until we lost that point before the Judge,
15    and he ruled on his -- on our motion for reconsideration on
16    February 23rd, that it really even became an issue for us as to
17    identify a witness who could address all of these.  Okay.  If
18    we can't talk about just relying on the clinical trial results,
19    let's -- who's our witness that can talk about Lilly's business
20    and the whole purpose of Phase II trials, and how they're
21    conducted, and what goes into them, and all of the things that
22    Dr. Watanabe had -- would have been our witness for?  I mean,
23    we searched for who that would be.  It would be Dr. Watanabe
24    who would fill that role.  He clearly testified at his
25    deposition about all of the ways in which Lilly goes about
```

1      engaging in the drug discovery process, including what's
2      involved in Phase I, Phase II, Phase III.  He talked about his
3      knowledge of the Mass General test.  The results.  All of that.
4      He would have been our witness, but he was -- he unexpectedly
5      had died.  So we cast about for who was an alternate witness,
6      and mid-March we got our first preliminary meeting with Dr.
7      Paul.  And he was in the process of retiring and shifting after
8      many years with Lilly, as President of Lilly Research
9      Laboratories.
10             We had a second meeting scheduled on April 5th, the
11     day the witness lists were due to be exchanged.  We were in
12     Indianapolis to meet with him.  He cancelled at the last
13     minute, he had a family emergency, his mother-in-law had a
14     heart attack and was in the hospital.  So we didn't actually
15     get to meet with him.  We identified with him right away then
16     any way as the person who could fill Dr. Watanabe's shoes and
17     testify to what is involved in the drug development process.
18             What is involved in these ethical guidelines that
19     govern both the business that we're in and that the defendants
20     are in?  The kinds of requirements that are -- that were fully
21     identified in not only our documents, your Honor, but their
22     documents as well, defendants' documents as well?  And to
23     suggest that we didn't actually disclose this in discovery is
24     just not wrong -- it's just wrong.  It's not true.
25             For example, on page 2 of the next slide, we have a --

1    we have the fact that we did provide a witness to testify on

2    these topics.  They complained we didn't have a 30(b)(6)

3    witness on Lilly's knowledge of the involvement of Lilly in the

4    Mass General study.  We did.  That was topic number one of

5    their 30(b)(6).

6           We gave a witness on the history of atomoxetine from

7    its first synthesis to the filing of the patent, and all about

8    the human clinical testing about atomoxetine.  That's what we

9    offered to provide, and that was done in full compliance with

10   our -- their request for a 30(b)(6).

11          We also, your Honor, gave them on the next page in

12   response to another 30(b)(6) request, a witness to testify on

13   Lilly's knowledge of its involvement with the MGH study.  And

14   we said we would give them -- that was a very broad request,

15   and we gave them someone who could talk about general research

16   and development of Strattera.  Again, they had another broad

17   request, which is the next question, your Honor.

18   Investigator-initiated trials.  We gave them a 30(b)(6) on

19   that.

20          And on the next slide, your Honor, they asked for all

21   agreements with and any and all fees paid to Drs. Biederman,

22   Spencer, Wilens, all the folks at Mass General.  And we gave

23   them a witness on that.  The only thing we didn't do that they

24   have raised in the context of a 30(b)(6) is we didn't have a

25   witness who could testify about Mass General's preparation and

```
 1      filing of its IND, which was a very narrow, narrow request.

 2      And that's the only thing we didn't do.  But they did have,

 3      during discovery, your Honor, several witnesses who talked

 4      about the IND process and Lilly's knowledge of the Mass General

 5      study.

 6                And that is, for example, on the next page they asked

 7      Dr. Hynes:  Do you have an understanding that the Beiderman

 8      trial, the drug product came from Lilly?  And he answered:

 9      Yes, sir, it's my understanding that we provided clinical trial

10      material to Dr. Beiderman.

11                So in sum and substance, in this whole discovery

12      process, well before we even got their non-enablement

13      contention, we put forward witnesses who were very open about

14      what they knew about the Mass General study and what Lilly had

15      done.

16                Again, they asked, on the next page:  So you have

17      knowledge that Lilly provided material for the study, and you

18      have the knowledge that Lilly provided some funding for the

19      study?  Dr. Hynes answered:  That's correct.  And, again, they

20      asked our 30(b)(6) witness Dr. Hynes:  Do you know what an

21      investigational new drug application is?  Yes, sir, I do.  What

22      is that?  Answer:  It's basically going to the FDA to get

23      permission to begin clinical trials on an investigational new

24      drug.

25                THE COURT:  Could I interrupt for one second and just
```

```
 1    ask a question of you --

 2              MS. MASUROVSKY:  Yes, Judge.

 3              THE COURT:  -- Miss Masurovsky?  I must say that, you

 4    know, all of the things that you're saying are -- were not

 5    included in your briefing, so I'm hearing this stuff for the

 6    first time right now.  This is all new to me, which is fine.

 7    But I want you to understand that.  But if you, for example, I

 8    look at page 21 of what you've given me -- I don't know which

 9    slide it is, but Lilly designated witnesses to testify on

10    topics that include Lilly's knowledge of and involvement in the

11    MGH study number 3.  So who was that witness?

12              MS. MASUROVSKY:  Your Honor, just for clarity of the

13    record, these arguments are actually captured in our opposition

14    to their other motion In Limine on the -- on the documents and

15    the IND, the Mass General IND.  So I just -- these are my notes

16    for this particular set of points that I wanted to make, but it

17    is also in our briefing.  I can probably give you the docket

18    entry number in just a moment.  I don't have it.

19              THE COURT:  I think I'm familiar with it, although, I

20    mean -- I don't think it's a motion that, you know -- it's a

21    different motion.  And I don't think that I'm handling that one

22    for a variety of reasons.  So it's really not criticism, it's

23    just -- it's all new.  This is very new stuff for me here.

24    Obviously there were many In Limine motions and hundreds and

25    hundreds of pages, so I may have read part of that motion, but
```

```
 1       I didn't see this.
 2                 In any event, who was the witness that testified about
 3       this?
 4                 MS. MASUROVSKY:  The 30(b)(6) witness who testified
 5       about this particular topic was Dr. Hynes.  And I only used it
 6       to illustrate that there's nothing new in what Dr. Paul is
 7       going to testify about.  There are no surprises in what Dr.
 8       Paul's anticipated testimony is.  It was all fully vetted in
 9       many, many, many deposition questions; many, many, many
10       documents.  And so when I take the Court through what Dr. Paul
11       is anticipated to testify to that we would have asked Dr.
12       Watanabe, I just want to put it in this context of, there's
13       nothing new under the sun here.  These are topics that Dr.
14       Watanabe addressed in response to questions, our 30(b)(6)
15       witnesses addressed in response to questions.  I really just
16       wanted to put what Dr. Paul will say in the context --
17                 THE COURT:  And I'm going to let you finish.  But
18       what's the problem with having Dr. Hynes testify to this, as
19       opposed to -- why do we need a new witness, Dr. Paul?
20                 MS. MASUROVSKY:  Well, again, it's not in our view a
21       new witness, it would be the same as Dr. Watanabe's
22       perspective.
23                 THE COURT:  That doesn't really make sense on a
24       certain level because, I mean, you yourself said that -- I
25       mean, first of all, the description of Dr. Watanabe was quite
```

1    limited.  It was just some information about the development of
2    the drug, basically, of Strattera.  And that you, yourself,
3    have conceded that when Dr. Watanabe was identified and
4    probably deposed, this was prior to what you basically
5    described as a sea change in the law of Janssen.  And so we are
6    dealing with a new issue.  So I'll get to that later.  But I
7    just -- I want to go back to my question.  If indeed you did
8    respond to this 30(b)(6), which does seem to overlap somewhat
9    with the information in the proffer, why not Dr. Hynes?  Why do
10   we need a witness designated for the first time on April 5th,
11   Dr. Paul?

12            MS. MASUROVSKY:  Well, with all due respect to Dr.
13   Hynes, Dr. Watanabe's perspective as the President of Lilly
14   Research Laboratories, and Dr. Paul's perspective from that,
15   and his background, having been in charge of drug development
16   for many years, and his specific clinical expertise.  They both
17   were at the National Institute of Mental Health.  They both
18   brought to the position of drug development a certain
19   particular expertise and perspective from the top and from the
20   bottom up, and from both being MDs, clinical investigators,
21   themselves.  Dr. Paul will testify about what it takes to get
22   to a Phase II trial.  And having sat on an Institutional Review
23   Board, he brings to the perspective -- he'll bring to the Court
24   the perspective of what a drug development company must go
25   through to get through these various stages from that

```
 1      perspective.  He brings to bear particular experience.  And
 2      they both have markedly, Dr. Watanabe and Dr. Paul, we feel
 3      very fortunate, they had very similar training and experience
 4      and roles in Lilly's drug development process and in their
 5      prior experience.  Again, both are MDs, both were at the
 6      National Institute of Mental Health.  Dr. Paul knew many of the
 7      researchers in the ADHD field, as did Dr. Watanabe.  Dr.
 8      Watanabe had worked in catecholamines at NIMH, and that's also
 9      Dr. Paul's strong suit where he came from, NIMH.  So they both
10      brought to bear the experience outside of industry and in
11      practice, and the knowledge of the drug development process
12      unique to that aspect of it.
13              THE COURT:  Okay, go ahead.
14              MS. MASUROVSKY:  I'm sorry.  And that is the
15      perspective that we think is fair and important for this Court
16      to hear in deciding this ultimate legal conclusion of whether
17      or not the patent meets the criteria of Section 112.
18              THE COURT:  What --
19              MS. MASUROVSKY:  With all due respect to Dr. Hynes,
20      he's a very knowledgeable, good person.  But it's a different
21      perspective that Dr. Watanabe brings to bear, or Dr. Paul
22      brings to bear.  And, in fact, at Dr. Watanabe's deposition,
23      rereading it, it's clear the defendants knew where they were
24      going.  Now, looking back on it, we didn't have the benefit of
25      their contentions, but they asked a lot of questions that bear
```

```
 1        directly on this enablement question about what he thought
 2        before he got the clinical trial results, what he thought after
 3        he got the clinical trial results.  So there is actually a lot
 4        of testimony which now we understand in hindsight, since
 5        they've revealed what their position is, that they were asking
 6        about this particular issue.  And it is a perspective that we
 7        think is unique and vital to the Court's appreciation of how to
 8        resolve this issue.
 9               THE COURT:  Well, perhaps you can take me through
10        that.  I mean, it seems to me, and of course I have a lot of
11        issues about the Hynes versus Paul issue, what you just said.
12        Presumably you're saying Dr. Paul is going to give different
13        testimony than Dr. Hynes did on the development and research of
14        the invention.
15               MS. MASUROVSKY:  He's going to bring a particular
16        expertise and, I mean, a particular perspective as a fact
17        witness --
18               THE COURT:  Which no one has heard so far.  It's brand
19        new.
20               MS. MASUROVSKY:  It is what Dr. Watanabe would have
21        said.  Again, it's not brand new in the sense of -- it's not a
22        brand new issue.  It is not testimony that anyone has heard in
23        the sense of we did not take his trial testimony.  We did not
24        take Dr. Watanabe's trial testimony, direct testimony, at his
25        deposition.  We had no reason to believe he would not be here
```

```
 1     for the trial.

 2              As I mentioned on the phone, it was very unexpected.

 3     He committed suicide after his daughter died unexpectedly from

 4     a routine medical procedure.  There was no reason he would not

 5     be here today on the trial witness list.  And frankly, your

 6     Honor, defendants would be only able to object to questions as

 7     we posed them to Judge Cavanaugh if Dr. Watanabe were still

 8     alive.  Dr. Watanabe would be testifying.  He was deposed.  He

 9     was a fact witness.  He could be a fact witness.  They should

10     not be able to profit from his untimely death.  And that is

11     what they're asking the Court to do.

12              You know, in most cases when a witness dies, the Court

13     rules that a substitute maybe heard because that person may

14     have important information.  And we believe in this case, vital

15     to the resolution of a core issue in the case.  And the way to

16     deal with that, because prejudice from excluding that evidence

17     is so great, the way to deal with that is to take a deposition,

18     the same as you did with that other fact witness, so that

19     they're on equal footing.

20              THE COURT:  See, he tragically died 10 months ago.  So

21     you had a little time difference here.  We're on the eve of

22     trial, but I understand your point.

23              MS. MASUROVSKY:  But the reason we didn't know we

24     needed him 10 months ago is because the Federal Circuit

25     decision on 318 hadn't come down until September.  And more
```

```
 1        importantly, Judge Cavanaugh's ruling on our motion for
 2        reconsideration, which provoked the need for Dr. Watanabe, who
 3        unfortunately, obviously can not be here, wasn't until February
 4        23rd.  And honestly, your Honor, we acted as quickly as we
 5        could.  We set up a meeting for March to see if we could find a
 6        replacement witness in Dr. Paul.  I honestly could not have
 7        gotten to speak with him before that.  We tried.  We acted with
 8        all deliberate speed.  We would not have Dr. Watanabe as an
 9        issue at trial but for the Judge's decision on reconsideration.
10        We would not need him.
11             THE COURT:  I'm not -- well, I mean, on
12        reconsideration, of course you had the summary judgment
13        decision.
14             MS. MASUROVSKY:  Okay.
15             THE COURT:  You had the Janssen case that came down a
16        month or two before.  I mean, there were many earlier points in
17        which a witness could have been identified.  I'm not saying
18        that it's dispositive of the issue.  But even if Dr.
19        Watanabe -- I mean, had a very general description of
20        knowledge, and I'm not so sure that the defendants would not be
21        objecting were he available right now because, just by your
22        argument and by your concession, the subjects that he seems to
23        be, or that you seem to want Dr. Paul to testify to, are new
24        subjects.  But, you know, in other words, in the supplemental
25        disclosures, Lilly identified Dr. Watanabe as a person with
```

```
 1        knowledge regarding certain aspects of the development of
 2        Strattera.  And then in your disclosure, Dr. Paul, he's
 3        identified, one of seven witnesses, which raises another
 4        question, that may "address the invention in suit.  Its
 5        background and development.  A claim long felt but unmet need
 6        for this invention, and how the invention was made and used."
 7        That's the way he was described, Dr. Paul, on April 5th.  Which
 8        really brings me back to where I started, and I am going to let
 9        you continue with your presentation, but I would think it would
10        be helpful if you, and maybe it's part of your presentation,
11        would explain what Dr. Paul's testimony would go to.  In other
12        words, it seems clear, we now know, despite I guess
13        disagreements, but it seems clear that the fact of the Mass
14        General testing and the Institutional Review Board, et cetera,
15        is all out there, part of the record, well known to both sides.
16        It was considered in the summary judgment opinion.  And
17        arguably based on -- not arguably, but based on Janssen, Judge
18        Cavanaugh decided that the failure to provide the testing
19        results to the Patent Trademark Office raises a serious
20        question about the validity of the patent.
21              So what is it that Dr. Paul is going to say -- is it
22        the thought that -- I really need to hear.  Is it that you're
23        going to try to use this kind of rational analysis theory of
24        Dr. Paul to try to fit in the narrow window that would seem to
25        be discussed in Judge Cavanaugh's opinion, or is it that he
```

```
 1        simply is going to explain that there was this testing out

 2        there, and even though it wasn't supplied -- I'm not sure

 3        what -- I'm not sure really where he's going or where you're

 4        going with his testimony.  If you could clear that up, I think

 5        it might help us.

 6                  MS. MASUROVSKY:  Let me take a stab at that then.

 7                  THE COURT:  Okay.

 8                  MS. MASUROVSKY:  I think what we would anticipate Dr.

 9        Paul explaining to the Court is, if I may, by way of analogy.

10                  THE COURT:  Sure.

11                  MS. MASUROVSKY:  Would be like in a case, let's say an

12        SEC case where there was an allegation of a prospectus that was

13        misleading.  And it would make no sense to have the prospectus

14        in evidence, but not have a witness be able to explain the

15        business in which the prospectus was written so that the Court

16        could determine whether or not the statement was in fact

17        misleading or whether or not it was material.

18                  So Dr. Watanabe would have filled the role.  And he

19        did in his deposition.  I'd just like to read a few excerpts,

20        explain what the business of being in the business of drug

21        development is in, which is the business the defendants are in

22        too.  I mean, their documents are filled with these -- the

23        references to the Helsinki Declaration, and all these other

24        requirement -- these underlying, underpinnings of the rules,

25        the regulatory framework in which human clinical testing is
```

```
 1    conducted.  So this is not new, but, for instance, Dr.
 2    Watanabe, in two different places in the deposition, I'm just
 3    going to read from one --
 4              THE COURT:  Okay.
 5              MS. MASUROVSKY:  -- as an example.  From his October,
 6    2008 deposition, page 154, line 16, says:  Well, there are --
 7    the development of the drug takes 12 to 15 years.  And as I
 8    reviewed earlier, there are multiple phases.  Phase I takes
 9    about a year.  Phase II takes two to three years.  Phase III
10    takes three to five years.  At each of those points going into
11    Phase I, going into Phase II, et cetera, it's a major milestone
12    and there's very in-depth review of all the data of safety,
13    efficacy and so forth.
14              And so in part what we want Dr. Paul to do is to talk
15    about the process by which Lilly undertakes to decide to go
16    forward in Phase II trial.  What is the process that an
17    Institutional Review Board, having sat on an Institutional
18    Review Board, he knows what's involved from personal experience
19    of the criteria for going forward with a clinical trial.  And
20    he would talk about his specific experience.
21              If I may turn to his anticipated testimony in the
22    offer of proof, your Honor.
23              THE COURT:  Sure.
24              MS. MASUROVSKY:  So in the background he would talk
25    about his having been in charge of the therapeutic area at
```

```
 1        Lilly that was responsible for discovery research, including
 2        Phase I and Phase II medical research that covered the, as he
 3        was identified by Dr. Watanabe in his deposition, in charge of
 4        the central nervous system drug development.
 5                 THE COURT:  Can I stop right there?
 6                 MS. MASUROVSKY:  Sure.
 7                 THE COURT:  Defendants, why is that a problem right
 8        there, if that's all he was going to say, the fact it's, this
 9        is the way it worked?
10                 MR. CLEMENT:  Well, I think that most of that is
11        actually covered in the Watanabe deposition designations.  I
12        mean, it's duplicative.  It's cumulative.  I don't think that
13        these facts in the background were -- you know, I have a whole
14        chart that I'd like to go through with your Honor breaking
15        these down, but I think, you know, if Dr. Paul --
16                 THE COURT:  I was just looking for a simple answer.
17        In other words, breaking it down, I can see where further
18        testimony would be objectionable, but that testimony, one,
19        seems to have been dealt with by Watanabe.
20                 MR. CLEMENT:  Exactly.
21                 THE COURT:  And two, I mean, so perhaps it's
22        duplicative, but it doesn't seem like a lot of prejudice to
23        have Dr. Paul testify to it.
24                 MR. CLEMENT:  If it was limited to that, we probably
25        wouldn't be here.
```

```
 1              THE COURT:  You see, I'm trying to figure out what
 2       they're going to be limited to.  Thank you.  Let me let Miss
 3       Masurovsky continue.
 4              Go ahead.
 5              MS. MASUROVSKY:  Thank you, your Honor.
 6              Again, it is our position and our request that we not
 7       of course be limited to only what Dr. Watanabe said in his
 8       deposition because we did not take his direct trial
 9       examination.  Again, if he were alive today, the things that we
10       would ask him at trial would not track what my adversary asked
11       him and the answers they got.
12              THE COURT:  Understood.
13              MS. MASUROVSKY:  It was honestly a completely
14       legitimate call, one that's made every day of the week, unless
15       someone is sick, not to have all your trial testimony come out
16       in the deposition.  And so we would not, if Dr. Watanabe were
17       alive today, we wouldn't be limited by anything other than what
18       Judge Cavanaugh ruled was an objectionable question at trial.
19       And to force us into the box then again it's punishing Lilly
20       and frankly the search for the truth by the Court that Dr.
21       Watanabe committed suicide.  And that's not the way the Federal
22       Rules of Civil Procedure are suppose to work.
23              THE COURT:  That's true.  The defendants take the
24       position that he was five years retired from Lilly, and his
25       availability is a question mark.  And that the plaintiffs took
```

```
 1    a gamble by not questioning him.  That's one thing, I think,

 2    that they're saying.

 3          And then I guess what I also might add, even though I,

 4    on the ultimate issue, I tend to agree with you, plaintiff, on

 5    that.  In other words, I find it hard to punish or blame under

 6    the circumstances the plaintiff for not taking the deposition

 7    of Watanabe at that point.  But I think that you took another

 8    gamble, the plaintiffs did here, in the context of the -- of

 9    what would happen with the law and with Janssen and the

10    reconsideration.  And I think there was another gamble there.

11          But, go on, I understand that.

12          MS. MASUROVSKY:  So our position is that based on his

13    background, which is set forth on page 1, where he served as

14    Scientific Director of the Intermural Research Program on

15    Institutional Review Boards for the National Institute of

16    Mental Health where, by the way, Dr. Watanabe also worked after

17    medical school, he could and would talk about his background

18    and experience.  And in particular, on page 2, as a member of

19    Lilly's Executive Management, the head of a multi-billion

20    dollar Research Development Organization, he will identify the

21    steps Lilly undertakes to bring to fruition a new treatment for

22    a disease, including those Lilly took to develop atomoxetine

23    for the treatment of ADHD for children and adults, and for its

24    maintenance indication.  And most importantly, he'll describe

25    the steps that Lilly takes when it believes a chemical compound
```

```
 1      is useful in treating a particular disease.  And we'll walk the
 2      Court through what the meaning of those steps are and what it
 3      means to file an IND.  And most importantly, that Phase I is a
 4      step in the process that involves perfectly healthy people and
 5      it's done to establish safety.
 6              But then the next phase is that if it's not toxic and
 7      it can be useful, considered useful in treating a disorder, it
 8      moves into Phase II, and that these are tests done if patients
 9      having a particular disorder and a rationale is applied when
10      that happens, when that transition is made.  And Lilly does
11      this kind of review every day of the week.  That's part of the
12      process.  And it was done here when Lilly allowed Dr.
13      Heiligenstein to offer clinical trial bottles, vials of pills,
14      capsules of atomoxetine to Mass General and then allowed Mass
15      General to file an IND that cross referenced Lilly's IND.  All
16      of those things happened in this case.  And the significance of
17      what that means, which is critical to the Court's determination
18      given where we are on this issue of whether people of skill in
19      the art at the time could believe and did believe that
20      Strattera could be useful in treating this disorder.
21              THE COURT:  Sounds a lot like expert testimony, at
22      least the last part of that.  You know, certainly what
23      happened, I think it's sort of a matter of record here.  I
24      think Judge Cavanaugh knows it, and I can't imagine that it be
25      given that there seemed to be some new 30(b)(6) notices that
```

```
 1        would seem to have been responded to about what happened, the
 2        steps, et cetera.  That's fine.  You start describing the
 3        significance and how it might impact upon enablement, utility,
 4        that's expert testimony, isn't it?
 5                MS. MASUROVSKY:  Your Honor, I was actually pointing
 6        to what we would argue, but not what Dr. Paul will say.  We
 7        will only talk about what he knows from his personal knowledge,
 8        as would Dr. Watanabe.  I'm saying we, the lawyers, should be
 9        free to argue whatever inferences, and they can argue if it's
10        immaterial or irrelevant through cross examinations.  They can
11        object.  They can expose, if they believe there are weaknesses
12        in that personal testimony, and argue what they want.  I was
13        making -- connecting the dots for why it's important.  I was
14        trying to put his factual personal testimony in context.  And
15        respectfully, your Honor, it's very different having a live
16        witness than having a cold deposition in the record.  And,
17        again, we did not ask Watanabe all the drawn out, clarifying
18        questions that we would ask him at trial.  And that is what we
19        are in a position to lose and be prejudiced by, should the
20        Court not allow us to go forward with his replacement who would
21        say in his stead what he would say about the significance to
22        Lilly and what the meaning to Lilly of these steps in the
23        process.
24                THE COURT:  And why is that relevant to the issue?
25                MS. MASUROVSKY:  Because the Judge will be taking into
```

1      consideration what people in the field did at the time.  And

2      looking at what people in the field, the state of the art of

3      people in the field actually doing the work thought at the

4      time.  And that is what's relevant to the inquiry, given the

5      way the case is shaping -- shaken out.

6             THE COURT:  And the plaintiff doesn't have an expert

7      on that issue?

8             MS. MASUROVSKY:  We don't -- it's not for expert

9      testimony, it's for what people actually did.  What we want Dr.

10     Watanabe -- rather, Dr. Paul, at this point to testify to, is

11     what Lilly actually did, what Lilly actually believed, what

12     Lilly's business was all about.

13            THE COURT:  What Lilly believed.  In other words,

14     their state of mind is somehow relevant to this issue?  I'm not

15     going to decide any of these evidentiary issues one way or

16     another, but I'm trying to understand it.

17            MS. MASUROVSKY:  Not their subjective state of mind,

18     but what their actions and what provoked their actions.  What

19     they were considered.  What considerations Lilly -- was

20     relevant to Lilly as a drug developer.  I think that is highly

21     probative and highly relevant of the issue of whether other

22     persons of skill in the art, including Lilly, reading the

23     disclosure in the patent, would have believed it to be a

24     credible statement, a credible position of utility.

25            THE COURT:  Pure expert testimony, seems to me, but go

1    ahead.

2            MS. MASUROVSKY:  Again, we're trying to show through

3    factual testimony what people on the ground really did.  And we

4    think that can be taken into consideration as much as any

5    expert opinions, and sometimes could be more probative than an

6    expert opinion because it's the true state of the art of what

7    people doing at the time thought, did, believed.  And

8    defendants actually questioned Dr. Watanabe at length about

9    what he thought, believed, et cetera, on this very topic.

10           THE COURT:  Which I can't -- well, I don't know about

11   what he thought or believed about what happened, the facts, I

12   can't imagine being a problem.  I think that, one, they're

13   already out there; two, presumably you provided that in answer

14   to the 30(b)(6), and presumably you responded to

15   interrogatories with that.  I don't know if that's true, we'll

16   hear from the defendants later.  I don't know whether those

17   contention interrogatory -- once again, this goes a little

18   beyond what I'm faced to decide.  But whether there was a

19   contention interrogatory in which this theory, this somewhat

20   new theory was responded to, I don't know.

21           MS. MASUROVSKY:  Again, your Honor, if I may refer you

22   back to the timeline.

23           THE COURT:  Okay, let's go back to the timeline.

24           MS. MASUROVSKY:  Page 1.  This theory was, of

25   non-enablement, was only disclosed to Lilly after the close of

```
 1     fact discovery, after Dr. Watanabe was deposed, after all the
 2     depositions, including Lilly's 30(b)(6) depositions were done.
 3     And our answer that we looked at, our answer after we got their
 4     supplemental interrogatory response, which was in November,
 5     2008, we looked at what we had answered and it remained true.
 6     It remained true that we didn't have anything different to
 7     offer at that time.  We believed that we could stand, as a
 8     matter of law, and I believe this was -- we continued to
 9     believe this is correct on the clinical trial results of Mass
10     General Hospital.  It was only after the Janssen case in the
11     fall of 2009, and the Court's interpretation of that in the end
12     of 2009, and early 2010, February, 2010 on motion for
13     reconsideration, that it became a different question for us in
14     terms of what we were going to focus on.  And our contentions
15     were not in our answers to interrogatories, but they were
16     spelled out in our -- and I have a few slides on this in our
17     opposition briefing, supplemental opposition that the Court
18     requested.
19               So if I may just continue --
20               THE COURT:  Continue.
21               MS. MASUROVSKY:  -- on what Dr. Paul would cover.
22     From his personal knowledge, he would say that it was well
23     known to him and to Dr. Watanabe, who he met with on a weekly
24     or at least monthly basis on these issues, that at the top of
25     page 4, that as managers of human clinical research, both he
```

```
 1      and Dr. Watanabe were aware in the mid-1990s, the relevant time
 2      period which the Court will be judging the patent in suit, that
 3      experimental drug should not be administered to a patient in a
 4      Phase II study unless there is an objective and reasonable
 5      belief the drug will be effective to treat the target disease,
 6      and those benefits to the patients outweigh the risks.
 7              THE COURT:  Sound like expert testimony to me, but go
 8      ahead, that's his opinion, presumably.  It's an inarguable
 9      fact.
10              MS. MASUROVSKY:  It is an inarguable fact from Lilly's
11      business perspective.  This is the business in which Lilly is
12      in.  This is how he and Dr. Watanabe, as managers of the
13      clinical research, conducted their business.  It's objectively
14      proven, your Honor, in the documents that defendants have
15      produced and the documents that Lilly produced in the clinical
16      trial agreements that Lilly signed with Mass General.  Each
17      clinical investigator must swear that he or she will abide by
18      these ethical principles.  They are spelled out in documents.
19      They are in their abbreviated new drug application documents.
20      They require their clinical investigators to sign on the same
21      dotted line that they will abide by the Helsinki, the
22      principles set forth in the Helsinki Declaration.  These are
23      the guiding principles.  It's a highly-regulated business, as
24      I'm sure your Honor knows, and these are the underpinnings of
25      that regulated business, so it is an objective fact.  It's not
```

```
 1    an expert opinion testimony.  These are objectively provable
 2    facts through the documents.
 3            And maybe it would help if I turn the Court's
 4    attention to one of those documents.  If you'll just indulge me
 5    a moment I'll find one.  It's -- unfortunately it's a little
 6    bit out of order, your Honor.  But if you could turn to what is
 7    maybe the fourth or fifth slide from the end, and it's slide
 8    number 6.  This was -- the heading is:  Compliance with ethical
 9    rules and guidelines.
10            THE COURT:  Yes, I see it.
11            MS. MASUROVSKY:  And this is a call out of a Lilly
12    document that the defendants examined on at deposition.  And it
13    says:  Regulatory considerations.  And it's the -- it's from
14    the agreement with Mass General, between Lilly and Mass General
15    Hospital.  And it says:  This study will be conducted in
16    accordance with the ethical principles stated in the most
17    recent version of the Declaration of Helsinki, or the
18    applicable guidelines on good clinical practice, which ever
19    represents the greater protection of the individual.
20            THE COURT:  And this was discussed or questioned at
21    the Watanabe deposition, or some other deposition?
22            MS. MASUROVSKY:  No, Lilly's -- a different Lilly
23    witness's 30(b)(6) deposition, and defendants asked about this
24    document.  I don't think they chose to ask questions about this
25    paragraph, but this was a document that was produced in
```

```
 1          discovery and they did ask the witness about the document.
 2                    And if you would turn to the next page, there's an
 3          example from their own production from defendants' clinical
 4          documents from their abbreviated new drug application which is
 5          what provoked this lawsuit.  Veranda.  They too acknowledge
 6          compliance with these ethical rules and regulations are the
 7          bedrock of conducting human clinical trials.  So these are
 8          objectionable, provable facts, their very own -- and this is
 9          from defendant Aurobindo's ANDA.  And when they're talking
10          about giving the version of atomoxetine that they would like to
11          sell to people, would be tested in people, they say they
12          require -- these studies must be conducted in accordance with
13          the provisions of the ethical principles enunciated in the
14          Declaration of Helsinki and the ICH-GCP norms.
15                    And it wasn't just one defendant.  If you turn the
16          page, your Honor, respectfully, Apotex also in its ANDA
17          acknowledges compliance with these ethical rules and
18          regulations because their ANDA document says:  This research
19          was conducted in compliance with a code of conduct for research
20          involving humans as issued by the Canadian Institutes of Health
21          Research, the U.S. 21 C.F.R. Part 312.20 regulations and the
22          principles of the Declaration of Helsinki.
23                    So with respect -- this is the business that they're
24          in, and we are in.  And, in fact, these are such fundamental
25          public documents that are the bedrock of what our business is,
```

     1     that neither side produced them.  And both we and defendants --

     2     and if you'll turn to the next page, they clearly also objected

     3     to producing publicly available documents because they were in

     4     the public domain.

     5          So we think it's perfectly appropriate to have Dr.

     6     Paul testify to what Dr. Watanabe would have testified to on

     7     these issues.  And it's also important and goes to the core

     8     issue of their alleged non-enablement defense for the Court to

     9     understand that nobody makes a decision to put a drug into

    10     humans who have a disease without believing, having a

    11     good-faith basis to believe, and a credible scientific

    12     rationale to believe that the drug could be effective.  And

    13     that's an important guide post for this Court to have in making

    14     and rendering its decision on the validity of this patent.

    15          Dr. Paul will also testify that he understood ADHD

    16     when he joined Lilly because of his experience.  Again, like

    17     Dr. Watanabe from NIMH, he was knowledge and had worked in this

    18     particular area of these kinds of diseases and disorders.  He

    19     was thus in a position to make informed decisions regarding

    20     Lilly's research and develop of atomoxetine for ADHD.

    21          Again, Dr. Watanabe went to great lengths to say why

    22     he had heard of Dr. Beiderman from Dr. Paul.  And while he, Dr.

    23     Watanabe, hadn't done the same kind of research as Dr.

    24     Beiderman, he was very well qualified to appreciate whether or

    25     not this drug could be effective because he had worked in his

1    field when he was in NIMH.  And so, again, Dr. Paul brings the

2    same perspective that his managers of Human Clinical Research

3    at Lilly, they made an informed decision to go forward with

4    giving Mass General the material to go forward with a Phase II

5    clinical trial.

6          Lastly, he -- we'll talk about the fact that he knew

7    Dr. Heiligenstein was a passionate child psychiatrist who cared

8    about children and that Dr. -- knew Dr. Heiligenstein to be an

9    insightful drug developer with excellent credibility in drug

10   development before the FDA in the field.  I think he was well

11   known to him.

12         THE COURT:  That's opinion testimony there, whatever,

13   apart from the relevance of it.

14         MS. MASUROVSKY:  That would be based on his personal

15   knowledge of those individuals.  And like Dr. Watanabe, who

16   knew them personally, again, if we make an objectionable

17   question, that's something Dr. -- Judge Cavanaugh can rule is,

18   you know, is objectionable, inadmissible, whatever.  Sustain or

19   object to the -- or overrule the question.

20         Lastly, Dr. Paul, on page 5, will testify that in

21   1994, Lilly conducted a Phase II clinical trial of atomoxetine

22   for ADHD at Mass General Hospital under the auspices of Dr.

23   Biederman and Spencer.  He will testify regarding the basis for

24   Lilly's approval of this trial as well as its subsequent

25   approval of the Phase III or registration clinical trial, FDA

```
 1      approval for atomoxetine for ADHD in the United States as well
 2      as outside.
 3              And lastly, I think he will bring an important
 4      personal perspective, a personal factual perspective, like Dr.
 5      Watanabe could have, to the importance of this long felt and
 6      need for a non-stimulant alternative to the stimulants that
 7      were out there for the treatment until Strattera was approved,
 8      which is the first non-stimulant approved.
 9              And, again, if I may just, by way of -- return to a
10      few of these slides, show that we did not, again, keep -- hold
11      back anything that we knew, which is I gather one of their
12      complaints.  Again, we gave them everything we could possibly
13      know about what they got from us on their IND process.  So, for
14      example, if you turn back to what Dr. Spencer -- the document
15      they had from Dr. Spencer, which is our slide 31, Plaintiff's
16      Exhibit 240, shows that Dr. -- which they had before they took
17      Dr. Heiligenstein's deposition in August of '08, he writes to
18      Dr. Heiligenstein:  As we discussed, I'm faxing and then
19      mailing a copy of the preliminary atomoxetine paper, table,
20      figures in comparable figures from adult ADHD methyl phenyl and
21      disapproving studies.  In the discussion I outline the argument
22      for the interpretation of, et cetera.
23              So they, they had the opportunity to ask Dr.
24      Heiligenstein whatever he knew about the involvement with the
25      Mass General study, and they did.  And Dr. Heiligenstein told
```

```
 1      them at his deposition and provided dosing information and so

 2      on and so forth.

 3              THE COURT:  But they're not objecting to Dr.

 4      Heiligenstein's being a witness at the trial, just about Dr.

 5      Paul.  No?

 6              MS. MASUROVSKY:  I understand --

 7              THE COURT:  Okay.

 8              MS. MASUROVSKY:  The objection is to Dr. Paul.  It's

 9      just to show that his role there, we didn't hold anything back.

10      They have accused us of holding something back about what we

11      knew because we didn't offer a witness on Mass General's filing

12      of the IND or preparation of the IND.  We said we were not

13      responsible for that preparation, they were.  Dr. Spencer

14      answered their questions about how Mass General prepared and

15      filed the IND, and we had nothing to add to that.

16              THE COURT:  All right.

17              Miss Masurovsky and counsel, I'd like to take about a

18      three- or four-minute recess right now, and we'll come right

19      back.

20              THE COURT:  Thank you.

21              (Recess)

22              THE COURT:  All right, we're back on the record in Eli

23      Lilly.

24              Miss Masurovsky, you want to continue?

25              MS. MASUROVSKY:  Yes.  Thank you, your Honor.
```

```
 1              Let me turn to my final point here.  The critical
 2    issue here for this Court is what is the prejudice?  That's the
 3    ultimate question.  Excluding evidence is an extreme
 4    consequence.  Not letting Dr. Paul walk in the door to testify
 5    would be highly prejudicial to Lilly and prejudicial to the
 6    fact finder, as exclusion of evidence always is.  And we ask
 7    that the Court apply the rule in In re: Jacoby, where this
 8    jurisdiction found, like many others did, that eight of the
 9    witnesses of the nine who were identified for the first time on
10    the pretrial order, could testify because they had been in fact
11    identified in either documents or depositions along the way.
12    And the fact of the matter is, the time for identifying trial
13    witnesses was April 5th, when we identified Dr. Paul.
14              The purpose of having a pretrial order is in fact to
15    choose the trial witnesses that you are going to present at
16    trial, following summary judgment, so that you know what your
17    case for trial is going to be streamlined to be or needs to be.
18    And so there is -- there are these milestones in the
19    development of a case that can't all happen at once, or we
20    would obviously have trials by paper at the very beginning.
21    There is a phase and a process, and we responded to the rulings
22    on summary judgment by determining we needed a witness, we
23    would have called Dr. Watanabe.  We scurried to find, as
24    quickly as we could, who his replacement would be and we found,
25    we think, very fortunately, someone who has made himself
```

```
 1      available to be deposed, has laid out what his testimony would
 2      be so there are no surprises.  So that the question of, you
 3      know, weighing the prejudice here, the prejudice to us of
 4      exclusion of evidence is really extreme, and to the fact
 5      finder, but the prejudice to the defendants is to take his
 6      deposition.  They would be in no worse a position than Dr.
 7      Watanabe coming in to testify having taken his deposition.  All
 8      of the things they are complaining about and finding
 9      objectionable, those are within the province of Judge Cavanaugh
10      to decide, as we ask our questions.  Are those appropriate
11      questions?  Does that call for expert testimony?  Is there a
12      foundation for factual testimony on that issue?  Those are the
13      normal back and forth things that happen at trial.  But whether
14      or not Dr. Paul, like Dr. Watanabe, can walk into the courtroom
15      door and give his evidence to the Judge, we think that's really
16      extreme to Lilly.  Particularly where -- and I will now, with
17      the Court's indulgence, turn to my final series of slides,
18      where his role was fully disclosed to the defendants.  They
19      knew about as much as we did of him.
20              And if we could turn to my slide number 35, where Dr.
21      Watanabe identified Dr. Paul as his direct report responsible
22      for neurosciences, very early on in the deposition, it was at
23      page 26, Dr. Watanabe was asked:  You don't recall the
24      structure of the Lilly Research Laboratories?  And he answered:
25      I do recall that, sure.  "Question:  Okay.  How was it
```

1    structured?  Okay, Lilly Research Laboratories was structured
2    in different therapeutic areas.  Okay.  And he goes on to
3    answer:  And one of them was neurosciences.  And the person
4    responsible for neurosciences reported to me.  And defendants
5    asked:  And who was that?  And Dr. Watanabe answered:  That was
6    Steven Paul.
7           On the next slide 36, he -- Dr. Watanabe talked about
8    his weekly meetings with Dr. Paul.  He testified at page 58 of
9    his deposition in October of 2008, I used to meet with Dr. Paul
10   about once a week when we were both in town, since he was one
11   of my direct reports, we'd have maybe a one-hour one-on-one.
12   And he would update me on a number of things, progress in
13   certain projects, issues that were developing.  We would talk
14   about them.  And I didn't cul it out, but goes on to say:  We
15   would talk about science, et cetera, et cetera.  So there's no
16   question about what his role was.
17          In addition, it's spelled out on the next slide in the
18   annual reports produced, all of them, and it showed that when
19   Dr. Watanabe retired from the board, Dr. Paul succeeded him as
20   President of Lilly Research Laboratories, having been his
21   Executive Vice President in that discovery research and
22   clinical investigation role.  And that was again a document
23   produced, Plaintiff's Exhibit 774, produced in discovery.
24          Dr. Paul was mentioned 29 times in Dr. Watanabe's
25   deposition.  Not exactly a hidden name.  He also was mentioned,

1      even though I did cul it out in Dr. Spencer's deposition, and

2      Dr. Heiligenstein's deposition, and other people's depositions,

3      so Lilly witnesses and the President of Lilly Research

4      Laboratories made it very clear that Dr. Paul had a prominent,

5      high, important role in this development of this particular

6      drug for ADHD.

7              Your Honor, the final point here, again, is that the

8      defendants were very aware of Dr. Paul's role as much as we

9      were.  It is an extreme sanction to exclude critical evidence

10     and only to be reserved in the -- as set forth in the Meyers

11     vs. Pennypack case, and in the In re: Jacoby case for extreme,

12     extreme circumstances, which are not present here.  And if

13     defendants had taken his deposition when we identified him on

14     April 5th, which would have been more than a month before

15     trial, we wouldn't be here discussing this today.  That's what

16     we did when we wanted to substitute a witness, we took the

17     deposition.  That's again what in most people's practice you do

18     when there's been a death of a witness, fact or expert; often

19     on the eve of trial, sometimes even during trial.  Witness

20     becomes available, they have personal problems, whatever it is,

21     most jurisdictions accommodate that, not by excluding the

22     evidence.  That's too important and too extreme.  But by

23     allowing the other side to prepare, as they would have for the

24     witness during the discovery phase, by taking a deposition.

25              And, your Honor, with all due respect, we think that

```
 1      any, any prejudice right now is of their own making because
 2      they have chosen not to take Dr. Paul's deposition.  There was
 3      no reason they couldn't have taken his deposition.  And there's
 4      no reason they can't take it now.  And whatever concerns they
 5      have, they can ask whatever they want, get it all out on the
 6      table and be as prepared to cross examine and raise there
 7      objections to Judge Cavanaugh as they would have with Dr.
 8      Watanabe.  They'd be in no worse position.  And we respectfully
 9      ask your Honor not to let them profit from the circumstance we
10      find ourselves in and not to prevent the Judge, the trial Judge
11      from hearing this very important, highly probative evidence.
12      It is a bench trial.  Judge Cavanaugh can, of course, decide to
13      rule against us on any particular, and exclude any particular
14      piece of testimony he finds objectionable.  The core question
15      for this Court to weigh is what is the prejudice here of
16      excluding Dr. Paul entirely?  Should he be allowed to come into
17      court at all?  Once he's here to testify, Judge Cavanaugh can
18      rule.  If he doesn't like our questions or finds them
19      objectionable as defendants raise objections, that can be
20      addressed at trial.  And they will be as prepared for that
21      trial if they take his deposition as they would have with Dr.
22      Watanabe.
23              So with respect, your Honor, we ask that the Court
24      apply the ruling in In re:  Jacoby and allow Dr. Paul to
25      testify in lieu of Dr. Watanabe.  Thank you, your Honor.
```

```
 1              THE COURT:  Thank you, Miss Masurovsky.
 2              Before I hear from defendants, I'm just compelled to
 3     make two comments because I think you said that the time for
 4     identifying a witness is defined in pretrial.  That's really
 5     not the case.  As you know, if you read the Advisory Committee
 6     Notes, and the extensive case law regarding disclosure of
 7     witnesses and people with knowledge, the whole concept is early
 8     and often, and there's constant requirements to update and keep
 9     it current.  And frankly I think had the defendants come up
10     with a couple of witnesses that plaintiffs felt they knew
11     nothing about on April 5th, that you might be arguing a
12     different point.
13              I'd also want to just comment, I think it's important,
14     it's sort of part of a broader issue that's being presented to
15     me.  Of course you're right, the narrow issue to be decided is
16     the exclusion or non-exclusion of Dr. Paul, which I will
17     decide.  But this all comes in the context of what appears to
18     be a change in the theory or legal position.  Once again, no
19     one informed me whether this was covered in contention
20     interrogatories or whether it was updated, but I think to the
21     extent there's risk, I think the plaintiff, by withholding a
22     theory, which I think the plaintiff conceded they essentially
23     did when there's contrary law out there, even if it's just
24     district court law, I think that's a gamble that the plaintiff
25     takes in this case, rather than the defendants.  And I don't
```

```
 1    know if that's dispositive of the issue, but I think it's
 2    important that that be said.  So I think at this point, thank
 3    you, I'll hear from defendants.
 4              MS. MASUROVSKY:  Your Honor, I may have misspoken
 5    before.  If I may correct something I said before?
 6              THE COURT:  Sure.
 7              MS. MASUROVSKY:  It was our position that Dr. Paul was
 8    made known to the defendants in the course of depositions, and
 9    it was our reading of Rule 26 that -- 26E, and the Advisory
10    Committee Notes of the 1993 Amendments, that where the witness
11    was otherwise identified in the deposition, there was no need
12    to supplement.  That that forms the basis of letting the other
13    side know that we do not constantly need to be sending new 26A
14    disclosures when the witness has been otherwise identified in
15    the course of discovery.  And we, like I said, knew that he had
16    been prominently featured in Dr. Watanabe's deposition, and had
17    been identified in other witnesses' depositions.  And so that's
18    what we relied on in our interpretation and understanding of
19    the important Federal Rule of Civil Procedure 26.
20              THE COURT:  That's an accurate statement of what the
21    rule says.  I mean, in the context of a complex patent case
22    that's going on for years, where there's been numerous
23    discovery extensions and all kinds of discovery, there maybe a
24    lot of peoples' names who come up in depositions.  And so,
25    you're right, that the rule does say that.  But there's law out
```

```
 1        there that I may address in my decision that in this kind of a
 2        case that says that the disclosures have to be very specific
 3        and clear, unambiguous, as to the scope of knowledge of the
 4        expected testimony.
 5              Once again, I'm not saying that's dispositive of the
 6        issue, but there is law that says that.
 7              MS. MASUROVSKY:  And also just to clarify my last
 8        point.
 9              MR. CLEMENT:  I would just like to have an opportunity
10        at some point.
11              THE COURT:  You'll get a chance.
12              MR. CLEMENT:  Thank you.
13              MS. MASUROVSKY:  My final point is it's our position
14        that our legal position was spelled out very clearly, promptly,
15        when we saw their position in their summary judgment briefing
16        in the supplemental briefing in November, 2009, that we rest on
17        that, that that is in fact our position.  It was our position
18        then, it is our position now.  It was based on only information
19        that was adduced during the discovery process and not anything
20        more than what has been out there or is a well-known public
21        principle of conduct regarding human clinical trials.  We
22        didn't go beyond it.  We don't intend to go beyond it.  And we
23        have, in our view, made our position explicit in that briefing,
24        and there was no possible opportunity for us to do that before,
25        given the way we didn't get their disclosures, and then the law
```

```
 1      came out.  There was no other earlier place or opportunity for
 2      us to address that, given what our interpretation of the facts
 3      and the law was.
 4              THE COURT:  Today is the first time that I heard that
 5      you didn't get their disclosures, one.  Two, I understand your
 6      position.  But given what you just said, the question comes to
 7      mind, why did you not then identify Dr. Paul as a witness?  Dr.
 8      Watanabe had already passed away, had been gone for sometime.
 9      So if it was in the early briefing, or in the briefing of the
10      summary judgment motion, one could make an argument that that
11      was the appropriate time to identify Dr. Paul as a person with
12      knowledge.
13              MS. MASUROVSKY:  It was really the end of 2009 that we
14      did that briefing, and we identified him not too much longer
15      after that, in April of 2010.  It was not on our radar screen
16      that we needed to choose our witnesses for trial until we saw
17      how the Judge ruled on that issue.  Had the Judge ruled in our
18      favor, we would not have needed another witness on that point.
19              THE COURT:  I think, you know, this -- we only have --
20      we have some of the lawyers who do these patent cases here, and
21      I'm just going to make a gratuitous comment that, a word to the
22      wise, especially in these cases, certainly any case before me,
23      it would be wise to routinely review your discovery responses
24      and update them, especially with persons with knowledge.
25      Persons with knowledge, not necessary -- and especially not
```

```
 1        here, given that Dr. Paul was replacement for Dr. Watanabe,
 2        there's no reason that he should not have been identified as
 3        the person with knowledge, even at the outset.  It's not a
 4        question of choosing the witness.  When the initial disclosures
 5        require identification of the people with knowledge that you --
 6        well, in any event, I think there was also some interrogatories
 7        that I saw where you were specifically asked about who would be
 8        produced at trial.  So I think my question is still out there,
 9        once again, not necessarily dispositive of the issues, but
10        let's hear from the defendants.
11                  MS. MASUROVSKY:  Thank you, your Honor.
12                  MR. CLEMENT:  I --
13                  THE COURT:  Thank you.
14                  MR. CLEMENT:  Thank you, your Honor.  I appreciate it.
15                  Your Honor, I think you've hit the nail on the head.
16        What this is really all about is re-litigating the enablement
17        issue.  It's not really about Dr. Watanabe's unavailability.
18        They're really -- just like they're re-litigating the In Limine
19        motion.  I have to agree with you, everything that Miss
20        Masurovsky just said, was necessarily prepared for because it
21        wasn't in the briefs.  They're trying to relitigate the In
22        Limine motions.  They're trying to relitigate the enablement
23        issue.  Lilly certainly had plenty of opportunities to let
24        defendants know about Dr. Paul and his potential as a witness
25        on the enablement issue, but they chose specifically not to.
```

```
 1        And I think the timeline tells that.

 2              I think in our briefing, we've set forth a -- not a

 3        graphic as Miss Masurovsky just did, we have a timeline in our

 4        briefing that really proves the point.  I agree, in November of

 5        2008, at the time agreed, we weren't late in giving our

 6        contention interrogatory responses, we agreed to mutually

 7        exchange them like two weeks after, or whatever, three weeks

 8        after the close of fact discovery.  That was when we first put

 9        on the record our enablement issue, although we had been asking

10        questions all during discovery about it.

11              Now, if I were to get a contention interrogatory

12        response with a defense that I had never seen, what would I do?

13        I would certainly update mine to make sure I dealt with the

14        issue.  Lilly chose not to.  They're saying that this new case,

15        that In re: Janssen, In re:  318, however you want to refer to

16        it, was the reason for it.  There was law before that.  That's

17        not new law.  We cited in our briefs to Judge Cavanaugh, we

18        relied on those cases as well as In re: Janssen.  I think

19        there's a Hitzemen case, or In Re: Rasmussen.  And there was a

20        Hitzeman case.  There were other cases there, your Honor.  They

21        went through expert discovery.  They didn't put on any defense

22        to it there.  We never saw these six documents, the IRB.  We

23        never heard from any of these during expert discovery that they

24        were going to reline on that or Dr. Paul.  They put in their

25        summary judgment motions.  They put in their response to our
```

1    summary judgment motion, and they made their own request for

2    reconsideration.  Was there a declaration from Dr. Paul?  Were

3    these documents there?  No, none of that was there, your Honor.

4         Judge Cavanaugh, I agree, found the defense could

5    proceed and what did Lilly do?  They switched counsel.  And new

6    counsel comes in and what do they do?  That see there's a hole

7    in their case, they want to relitigate their issue, they decide

8    to sandbag us.  They took a calculated risk, which they lost.

9    And then they say, okay, we have three months to trial, what do

10   we do?  We have to come up with a witness.  What is this

11   witness?  I think you're right, your Honor, he's an expert

12   witness.  Most of what Miss Masurovsky says he's going to

13   testify to is all expert testimony.  That really prejudices the

14   defendants because we haven't had a chance to respond to that.

15        Under Rule 26(a)(2), they're suppose to provide us

16   with an expert report for an expert witness.  We're suppose to

17   have a chance to rebut that.  We're left with no recourse to

18   rebutting Dr. Paul except for maybe at trial if Judge Cavanaugh

19   allows us to rebut.  But it certainly wasn't in their expert

20   reports, not in their summary judgment briefing, not in their

21   requests for reconsideration.

22        You know, they say that, Miss Masurovsky says that Dr.

23   Watanabe was merely filling -- or Dr. Paul is merely filling

24   the shoes of Dr. Watanabe.  But there's no documents that show

25   him as important.  Miss Masurovsky showed us a few slides,

```
 1    deposition topic 1, 3 and 5.  That was all covered by Dr.
 2    Hynes, who was on their list.  So I think that can all be
 3    covered there, and they don't need Dr. Paul to do that.
 4         Now, what I'd like to do, your Honor, is I'd like to
 5    hand up -- we have gone through our discovery requests and put
 6    them in a binder where we think that these are where we should
 7    have heard about Dr. Paul or the documents.  I'd like to hand
 8    that up.
 9         THE COURT:  It's a new binder?
10         MR. CLEMENT:  It's a new binder.
11         THE COURT:  Hand it up.
12         MR. CLEMENT:  Sorry.  Do you need one as well?
13         THE CLERK:  No.
14         MR. CLEMENT:  And, your Honor, these are all the
15    discovery responses from Lilly to the various defendants'
16    interrogatories -- just excerpts from them, not the entire
17    excerpts.  And also, I've also prepared -- and I'd like to make
18    this binder of record on this at this hearing today.  These are
19    all Lilly responses, or there is some documents and some
20    deposition transcript.
21         Also, I'd like to hand up a chart that kind of keys
22    into the --
23         THE COURT:  Can you give Mr. Conlon a copy of the
24    binder, if you have one too?
25         MR. CLEMENT:  Certainly.
```

```
 1              THE COURT:  It's quite voluminous.

 2              MR. CLEMENT:  I apologize.

 3              THE COURT:  Okay.

 4              MR. CLEMENT:  Sorry.

 5              THE CLERK:  Thank you.

 6              MS. MASUROVSKY:  Counsel, can I have a copy of the

 7      chart too?

 8              MR. CLEMENT:  I'm sorry.

 9              Your Honor, what we've done in this chart and in this

10      binder is we've taken the proffer of Paul, and we've given it

11      little A, B -- if you look at the back, you'll see that that

12      shows where the A, B, C and D and everything came from.  The

13      proffers are attached to the back.  And what we've done is

14      showed where this information should have come in, in our

15      discovery requests, and did not.  So I'm going to use that as a

16      guide, your Honor.

17              But first I want to talk about the proffer, because I

18      think I'm at, a little at a loss, as you are, as to exactly

19      what Dr. Paul is going to testify to.  I think at the prior

20      hearing when it was discussed about Lilly making the proffer,

21      at page 26 of that transcript, your Honor stated:  The

22      plaintiff might consider a very detailed proffer, including the

23      questions and answers that you would expect to have from Dr.

24      Paul, and as part of your brief.  And then at page 27 I ask:

25      Okay.  Then maybe they can make the motion first with questions
```

1      and answers and we'll reply to that.  To which your Honor

2      answered:  I think that's a good idea.

3              The proffer doesn't have the questions and answers,

4      it's just generalized statements as to what he's going to

5      testify to.  They don't identify what exhibits he's going to

6      rely on.

7              Later in his proffer they say he's going to authentic

8      documents.  They don't tell us what documents there are, but

9      I'm going to get to that in a minute.

10             I want to start with -- I want to skip A through -- I

11     want to get to the more important issues first, so I want to go

12     straight through W.  Okay?

13             And W, Dr. Paul they say that he's going to say Dr.

14     Paul's experience operating under the framework of federal

15     regulations and other ethical obligations attendant to human

16     clinical research.

17             Your Honor, I think that's expert testimony.  He's

18     going to explain how the federal, you know, regulations work

19     and ethical obligations.  So I think, first, it should be

20     excluded because it's expert testimony.

21             Second, I think if Dr. Paul had this information, and

22     he's so important to their case, he should have been identified

23     in the 26(a)(1).  I think that's an overriding concern.  I

24     think we have that listed for every single one of these, that

25     he should have been disclosed in the 26(a)(1) statement.  I

```
 1          think, though, if we also turn to Mylan interrogatory 4.
 2                    THE COURT:  Where would that be?
 3                    MR. CLEMENT:  You'll see there's -- in the notebook.
 4                    THE COURT:  The notebook now?
 5                    MR. CLEMENT:  Yup, in the notebook.
 6                    THE COURT:  Okay, Mylan.
 7                    MR. CLEMENT:  If we go to the interrogatory section.
 8          There's a Mylan section under that.
 9                    THE COURT:  Okay.  Which number?
10                    MR. CLEMENT:  Four.  Four B, specifically.  Says that
11          Lilly was suppose to provide an answer as to Phase I, Phase II,
12          Phase III -- Phase III trials, and tell us how each study or
13          trial was conducted, if they were conducted under ethical or,
14          you know, they should have told us that.  The response doesn't
15          have any of that information.  They say:  Refer to the
16          documents.
17                    THE COURT:  Let me read this thing.
18                    MR. CLEMENT:  Sure.
19                    THE COURT:  It's kind of important.
20                    MR. CLEMENT:  Absolutely.
21                    THE COURT:  Miss Masurovsky, have you read this?
22                    MS. MASUROVSKY:  Yes, your Honor.
23                    THE COURT:  It seems fairly strong.  In other words,
24          they ask the question about these Phase Is, II, III and IV,
25          which presumably, from my reading of the proffer, is something
```

```
 1        that you would have Dr. Paul address, and yet when they were

 2        asked in interrogatory questions, you got a bunch of objections

 3        and never really give them the information.

 4             MS. MASUROVSKY:  Your Honor, respectfully, what we did

 5        was standard practice in the way both parties have dealt with

 6        each other and is common where you have hundreds of thousands

 7        of documents, you start by referring to the documents.  And

 8        that, respectfully, your Honor, is what we did.  There are

 9        hundreds, and hundreds and hundreds of thousands of documents

10        relating to this issue.  And we started by referencing the

11        documents.  And we were in fact producing documents, some of

12        which I showed your Honor, which do reference the ethical

13        obligations as set forth in, for example, the regulations and

14        the Helsinki code.  And they did use those very documents in

15        deposing witnesses.  So they knew about those documents too.

16        As far as I know, they did not make a motion complaining that

17        was not a sufficient way to answer the question.

18             MR. CLEMENT:  Your Honor --

19             THE COURT:  Just let her finish.

20             MR. CLEMENT:  Okay.

21             Your Honor, typically if you're going to rely on

22        documents, you identify the documents.  I mean that's typically

23        how it's done.  And Helsinki and all the six documents that are

24        in dispute were never -- they weren't in the production.

25             THE COURT:  I wasn't focusing on the documents.
```

```
 1                MR. CLEMENT:  Right.
 2                THE COURT:  I was focussed on the issue of --
 3                MR. CLEMENT:  Right.
 4                THE COURT:  There seems to be a clear question of
 5      about the Phase I, II, III and trial, and there doesn't seem to
 6      be a substantive answer.
 7                MR. CLEMENT:  And if Dr. Paul was so important, I
 8      would have expected to find it there.
 9                MS. MASUROVSKY:  I could be wrong, but I do not
10      believe at the time defendants complained about this being an
11      insufficient answer.  I think there were many back and forth,
12      but that was not a complaint we heard from them.
13                THE COURT:  Although, I mean, I'm not -- I agree it
14      would be good if someone has a complaint to bring it to the
15      Court's attention, or bring it to the other side's attention,
16      but I guess they could easily argue they didn't know that it
17      was going to be an issue in the case until now.  And then if it
18      was going to be an issue in the case, that the whole theory of
19      the rules is that it be identified.  But I understand your
20      point.
21                MR. CLEMENT:  Okay.
22                THE COURT:  I think -- let's let Mr. Clement continue.
23                MR. CLEMENT:  If we look at Aurobindo 9, which I
24      believe might be back a couple sections, which I think your
25      Honor alluded to earlier, it just says:  Identify all witnesses
```

```
 1        that Lilly intends to call at the trial.  And they never
 2        updated that either.  But that's a blanket one that kind of
 3        goes through.
 4              THE COURT:  You covered that one in your brief, and
 5        you don't need to point to that.  If you have more specific
 6        ones, I'd be happy to look at it.
 7              MR. CLEMENT:  There are more specific ones listed
 8        here.  I'm going to go through it.  I think the Mylan 4B was
 9        the best one for this proffer statement.  So that's what I'm
10        going to just discuss for W.
11              For X, although the other ones that we do have listed
12        there do also apply.  For X, the approval process a medical
13        institution must undertake to -- for -- prior to commencement
14        of a human clinical trial.  I think mostly our big objection to
15        that is it's expert testimony.  You know, I think that Dr. Paul
16        should have been identified if he was going to testify to
17        something like that.  We do believe -- some of their statements
18        in their proffer are much more general than what our
19        interrogatories were.  So this is a more general statement.
20        The interrogatory responses that we identify here are more
21        specific but they would go to the approval process for the
22        atomoxetine product instead of just in general.
23              If we go to Y, your Honor.
24              THE COURT:  Could I stick an X?
25              MR. CLEMENT:  Sure.
```

```
 1              THE COURT:  The way it's written there, the approval
 2     process a medical institution must undertake prior to
 3     commencement of the human clinical trial, I think that's a
 4     pretty good shot that's expert testimony.
 5              MR. CLEMENT:  Exactly.
 6              THE COURT:  But if the question was the approval
 7     process that Lilly follows prior to commencement of a human
 8     clinical trial, he's the head of the neuroscience unit, that's
 9     a fact evidence, isn't it?
10              MR. CLEMENT:  If that was a proffer, I would agree
11     with that.  Yes, I agree that would be more factual.
12              THE COURT:  I'm not sure what the proffer is, but go
13     ahead.
14              MR. CLEMENT:  I think that's the problem.  If they
15     gave us a question and answer, we might know.  For Y, it says:
16     Dr. Paul's testimony will be based on his personal experience
17     as a member of the management team that oversaw Lilly's
18     collaboration with medical institutions on human clinical
19     research trials, his experience as a member of the
20     Institutional Review Board approving such research, and his
21     experience as a physician.
22              Oh, I want to first, you know, reference this, I think
23     it was the 30(b)(6) topic.  It's pretty clear that this, you
24     know, goes to 30(b)(6) topic 18, because what they're really
25     talking about here is Lilly's collaboration with medical
```

```
 1      institutions.  The medical institution is just a buzz word for

 2      MGH, Mass General Hospital, because that's really what's at

 3      issue in this case, not any other dealings.  And they said

 4      that -- and Dr. Spencer testified about the IRB.  And they said

 5      in their interrogatory -- in their response to the deposition,

 6      which we have here, your Honor.

 7              THE COURT:  The deposition?

 8              MR. CLEMENT:  I'm sorry, the notice of deposition, I

 9      apologize, your Honor.  But we do have defendants' 30(b)(6)

10      notices and there's really just one in the topic 18, but I

11      think your Honor has seen that already.

12              THE COURT:  Right.  But why don't we look at it.  Why

13      don't we look at it.

14              MR. CLEMENT:  Okay, that's great.  It's in the binder,

15      just a few in.  If you can find the dark bolded one that says

16      defendants' 36(b)(6) notices.

17              THE COURT:  Oh, yeah, there it is.

18              MR. CLEMENT:  Okay?  And it was -- the topic was the

19      preparation and filing of IND for 46,806, which is the Mass

20      General one.  And what do they tell us, they said:  Subject to

21      objections, they're aware of the deposition testimony of Dr.

22      Spencer concerning preparation of filing IND 46,808.  Although

23      I think that's a typo, it should be 806.  And beyond that,

24      doesn't have any responsive information within its possession.

25              And I think one of the things to focus on here is they
```

1    use the word "collaboration" in their proffer.  Collaborate --

2    you know, this is all preparation.  They're trying to mince

3    words.  One of their defenses or their arguments is, okay,

4    preparation.  That didn't mean the IRB and things like that.

5    But when they say collaboration, that's exactly what they mean.

6    So I think that 30(b)(6) statement clearly means they should

7    have disclosed Dr. Paul, or this IRB, or what this proffer is.

8    Instead they chose to just rely on Dr. Spencer's testimony.

9              THE COURT:  But presumably -- I mean, to me, this

10   30(b)(6) topic, it just illustrates all kinds of problems with

11   the way discovery is being done, and that now on the eve of

12   trial the Court is faced with -- I'll start with the

13   preparation of filing of IND 46,806.

14             The first line is that Lilly objects to it as not

15   reasonably calculated to lead to the discovery of admissible

16   evidence.  Now, arguably Lilly is now trying to use this as

17   evidence at the trial.  I guess no one looks back and tries to

18   update these things.  I understand, I think it might be a good

19   practice, and I'm not here to lecture anybody, especially such

20   experienced lawyers, to look back and update things, but then

21   it goes onto say.  Look, after doing a search, the only

22   information we have about this, the preparation and filing, is

23   by Dr. Spencer.

24             Now, that's not necessarily a bad answer from my

25   perspective if Dr. Paul or no one else knows anything about the

```
 1        preparation and filing of IND 46,806.  All right, is he going
 2        to be offered for this purpose or not?
 3             MR. CLEMENT:  It certainly seems to me.
 4             THE COURT:  I got to tell you, I'm a little troubled
 5        by this too.  We had a telephone call the other day, and I read
 6        the proffer, and I think plaintiff's counsel said:  No, we're
 7        not going to talk about 48,606 -- 46,806.  And then you were
 8        saying, or one of your colleagues was saying:  No, Judge,
 9        that's what it's really all about.  And then I noticed in one
10        of the other briefs that was filed in an In Limine motion
11        yesterday before Judge Cavanaugh relating to the exclusion of
12        all IND evidence, in Lilly's brief is the statement:  "The
13        existence of MGH protocol, the IND, which is 46,806, the FDA
14        approval of the IND and existence of MGH IRB approval to do the
15        experiments were all disclosed in discovery.  The significance
16        of those events, the alleged non-enablement defense here close
17        directly from the regulatory limitations.  The significance of
18        those events, those -- the alleged non-enablement defense here
19        close directly from regulatory tests, regulatory limitations
20        imposed on the conduct of human drug testing.  Every
21        professional responsible for drug research is aware of these
22        limitations and requirements.  Dr. Watanabe at Lilly, had he
23        lived, could have so testified from personal experience, so can
24        Dr. Paul in his stead.
25             So now I go to my question, is Dr. Paul going to be
```

```
 1        talking about IND 46,806 or not?  It sure seems that way from
 2        the brief that was filed in the other motion, but I heard the
 3        other day that he will not.
 4                MR. CLEMENT:  I think he clearly is.
 5                THE COURT:  But I want to ask the plaintiff.
 6                MR. CLEMENT:  All right.  That's fine, your Honor.
 7                THE COURT:  Is he going to be testifying about that or
 8        not?
 9                MS. MASUROVSKY:  He certainly was not going to be
10        testifying, and we have no witness to testify about the
11        preparation of the filing of the IND 46,806.  There's no
12        question that no one at Lilly prepared or filed that
13        IND-46,806.  That was a very narrow 30(b)(6) topic.  I think
14        what Dr. Paul will testify to is not specifically that IND,
15        what Mass General did in its filing of the IND, but to the
16        extent he has knowledge of Lilly's collaboration or working
17        with Mass General in connection with that trial, yes, of course
18        he has factual knowledge about what happened.  He would testify
19        just like Dr. Watanabe did.  Dr. Watanabe said he first heard
20        of Dr. Beiderman from Dr. Paul.  It's not a secret.
21                MR. CLEMENT:  Your Honor, then why isn't he listed?
22        Why did they just say Dr. Spencer in response to -- you know,
23        and Dr. Spencer's deposition was taken.  Okay.  We spent a day
24        with Dr. Spencer.  Lilly then actually cross examined -- he's a
25        third party.  They knew he wasn't coming to trial.  They
```

```
 1    actually questioned him.  And they didn't ask any of these
 2    questions of Dr. Spencer, and yet they still wanted to just
 3    rely on Dr. Spencer.  I think they should be, you know, held to
 4    that.
 5              THE COURT:  Understood.  You can proceed.
 6              MR. CLEMENT:  Okay, thank you, your Honor.
 7              Also, on that I think the Mylan 4 that we just looked
 8    at before, which was, you know, Phase I, Phase II, Phase III,
 9    all the -- you know, this is a Phase II study.  It seems to be
10    that Dr. Paul's information and all this about the IRB that
11    should have all been disclosed as a result of Mylan 4.
12              Let me mover onto Z.  There we're talking about Dr.
13    Paul will testify that he had -- he and Dr. Watanabe, as
14    managers of human clinical research, were aware in the
15    mid-1990s, and Dr. Paul continues to be aware today, that an
16    experimental drug should not be administered to a patient in a
17    Phase II study unless there is an objective and reasonable
18    belief.
19              Okay.  This is going right to the enablement issue,
20    your Honor.  This objective and reasonable belief that the drug
21    will be effective.  That's the heart of this non-enablement
22    utility issue.  And, your Honor, this is expert testimony.  How
23    can a lay person, Dr. Paul, without giving us an expert report,
24    talk about what the objective and reasonable belief was?
25              Also, I think very highly relevant is contention
```

1    supplement 5, if we can turn there.  I think that's one of the
2    first ones.  It's one of the first couple tabs.  Oh, no, that's
3    the supplemental issue.  We need the supplemental
4    interrogatory, I'm sorry, your Honor.  It's more half way,
5    about half way down.  There's a section called supplemental
6    interrogatories.
7              THE COURT:  Okay, I got it.
8              MR. CLEMENT:  Okay.
9              Number 5, on page 4 there:  Lilly's Validity
10   Contentions.  Okay?  This is Lilly's validity contentions.
11   Then they go and they give a whole bunch, on page 4, they talk
12   about 102 and 103, about the obviousness which isn't really
13   relevant here.  But if you get to page 14, I think it is -- I'm
14   sorry, 16, 35 U.S.C. 112.  That's where enablement,
15   non-enablement utility comes from, U.S.C. 112.  And they did
16   give a little bit of information here on 35 U.S.C. 112
17   regarding enablement to the full scope.  How to make and use
18   the atomoxetine, which is different from the utility issue.
19   There's a couple different prongs to the Section 112 statute.
20   And non-enablement to full scope is another defense that's at
21   issue in this case as is non-enablement utility.
22              And what does Lilly say at the very end after they
23   talk about some of these patents and things where you know how
24   to make a capsule?  They say:  Lilly is unaware of any credible
25   evidence establishing a prima facie case that the claims are

1    not enabled or properly supported.  That was the gamble.  They

2    said we had nothing credible.  Okay.

3           We've been asking Dr. Heiligenstein:  Dr.

4    Heiligenstein, did you have a reasonable belief as to whether

5    this was actually going to work when you put it in a human?  He

6    said, 35, 30 times I think we counted, or some number, he said

7    no.  He had no reasonable belief.  They knew that was on the

8    table.  It was case law then, In re:  Rasmussen, the Hitzemen

9    case.  There's other cases out there.  They took the position

10   that there was no credible evidence and they weren't going to

11   have to worry about it.  At the same time they filed this, we

12   filed our supplemental contentions, and we laid out or

13   non-enablement utility.  Again, they never updated this, your

14   Honor.  They took a gamble, they lost.  They're trying to come

15   in and relitigate.  It's sandbagging.  It's like, is that the

16   new way to litigate?

17           THE COURT:  I understand that concept, and I know it's

18   part of the whole consideration, but can you tie that into Dr.

19   Pual for me?  I'm still not sure.  We read Z, which you said is

20   expert testimony.  Sounds like --

21           MR. CLEMENT:  Because what Dr. Paul is saying in Z is

22   that you wouldn't conduct a Phase II study unless there's an

23   objective and reasonable belief that the drug will be

24   effective.  If there is a subjective reasonable belief, then

25   there could be enablement utility.  And that goes -- that's why

```
 1        that ties directly in.  It's really that portion of this
 2        that -- of this testimony that is really objectionable here,
 3        and it goes directly to this contention.
 4                  THE COURT:  What's the context, where --
 5                  MR. CLEMENT:  The contention was, tell us what your
 6        validity contentions are.
 7                  THE COURT:  Oh, your validity contentions.
 8                  MR. CLEMENT:  Validity contentions.  And then included
 9        35 U.S.C. 112, which includes non-enablement utility in their
10        answer, and they bet the farm.  And they should be judicially
11        estopped from re-litigating that now at this late date.
12                  THE COURT:  I guess the argument were these
13        supplemental -- what's the date of these things?
14                  MR. CLEMENT:  This is November, 2008.
15                  THE COURT:  2008?
16                  MR. CLEMENT:  Yeah, before expert discovery, your
17        Honor.  There had been plenty of times for them to update this.
18                  THE COURT:  When did they get your contentions?
19                  MR. CLEMENT:  Same day, November, I think it was 24 --
20                  THE COURT:  2008?
21                  MR. CLEMENT:  Yes.
22                  THE COURT:  A year before the summary judgment
23        briefing?
24                  MR. CLEMENT:  Yes, your Honor.  Because then we went
25        into expert discovery, and then we briefed summary judgment.
```

```
 1              THE COURT:  So these were never updated?

 2              MR. CLEMENT:  No.

 3              THE COURT:  Okay.

 4              MR. CLEMENT:  All right.  We also have some others,

 5      but I think supplemental 5 is the biggest -- is the best, is

 6      the best discovery request we have on point.

 7              If we turn to AA.  Your Honor, this is where the six

 8      documents come in.  Okay?  What the proffer that Dr. Paul is

 9      going to make is he's going to try to introduce these six

10      documents.  And what's it all about?  Miss Masurovsky can say

11      it's not about the MGH IND, but right here it says Mass General

12      Hospital's IRB Phase II study.  What is that?  That's IND

13      46,606 whatever.

14              THE COURT:  Eight oh six.

15              MR. CLEMENT:  Eight.  Thank you, your Honor.

16              So I think that, you know, we have a lot of document

17      requests which we called for all documents.

18              If we go to Aurobindo document request 4B.  And that

19      should be right after that supplemental -- there should be a

20      section for request for production.  Four B is:  "All documents

21      relating to any research and/or experimentation conducted in

22      connection with the prosecution of the application of the '590

23      patent issued," and then it keeps going on.  It says:  "Or in

24      any way relate to any data, results, experimental or

25      equipment-related conditions, protocols, plans, procedures
```

```
 1    concerning the experiments, or studies or tests done by the
 2    inventors, Lilly or any other person."
 3          It just seems to me that one's right on point.
 4    Talking about the protocols and the tests that were conducted
 5    regarding the 590 patent.  And that's what Lilly is saying this
 6    is all about, this Phase II study, to show the objective
 7    reasonable belief that the 590 patent would work.
 8          If we look at document request 75 in Aurobindo.  One
 9    is:  All documents concerning Lilly's decision to file an NDA,
10    which really subsumed the IND, became part of the IND.  I maybe
11    wrong, but that's my belief.
12          If we look at Aurobindo 83, that's one of the
13    catch-all ones:  All documents on which Lilly intends to rely
14    upon or use as an exhibit at any hearing or trial.  I mean, we
15    ask for these documents over and over.  We have a whole list of
16    these.  I can go on.
17          THE COURT:  We're onto the documents now, you're not
18    talking about Dr. Paul any more.
19          MR. CLEMENT:  I think in AA, you'll see he's talking
20    about the guiding ethical medical principle is well known in
21    these six documents.  This is where these two things converge.
22    You see he has in there the Belmont report, the Ethical
23    Principles, the World -- Helsinki Declaration, the Nuremberg
24    Code.  Those are the six documents being referred.  They were
25    never produced.  We have multiple document requests.
```

```
 1              And also, your Honor, because what they want to use
 2      these documents for is to rebut our non-enablement utility
 3      defense, they should have identified these documents in
 4      response to our contention interrogatory 5, which said:  Give
 5      us your validity contentions.  Let us know what your case is.
 6      Don't hit us in the last minute right before trial with all
 7      this new evidence, you know, we're prejudiced in having to try
 8      to deal with.
 9              Also, I think that our 30(b)(6) Topic 18, you know,
10      the preparation of the Mass General Phase II study.  Okay.  An
11      IRB is something that's part of that preparation and filing
12      process.  It's something you have to do in order to file the
13      IND or actually start the experiments for the IND, you need to
14      get approval from the IRB, so it's all interrelated.  This is
15      all asked for over and over.  They took a risk, they decided
16      not to produce, and now they're trying to come in at the last
17      minute.
18              THE COURT:  Just so we're clear, the issue before me
19      is the exclusion of Dr. Paul as a witness.
20              MR. CLEMENT:  Right.  Okay.
21              THE COURT:  I mean, I know you have other In Limine
22      motions out there that may address these.
23              MR. CLEMENT:  We never filed an In Limine motion about
24      those six documents per se.
25              THE COURT:  We'll deal with the six documents, but
```

1     other than that, just the whole concept about -- I think that

2     you do have some other In Limine motions out there I saw.  I

3     didn't try to read them all.

4              MR. CLEMENT:  Right.  Those didn't deal with those six

5     documents, really.  Dr. Paul and the six documents seem to

6     converge.

7              THE COURT:  Okay.

8              MR. CLEMENT:  At this point, AA and his proffer.

9              AB.  Okay, Dr. Paul will testify that he had a

10    substantial appreciation for ADHD when he joined Lilly.  We

11    don't have that much -- you know, it seems what is substantial

12    appreciation.  He could be speaking as an expert clinician,

13    but, you know, I don't think that that's a huge deal, although

14    we do think that we asked for Dr. Paul's identification in many

15    interrogatories, and he should have been identified to us.

16             If we move onto AC.  Now, here's one.  When he joined

17    Lilly and assumed responsibility for the development of

18    atomoxetine for ADHD, Dr. Paul understood that it is a chronic

19    and complex disorder for which the existing FDA-approved

20    treatments carry significant liabilities, such as abuse

21    liability.

22             Okay, why do they want to enter that?  It doesn't have

23    to do with non-enablement utility.  This one goes to a

24    secondary COURSE, long-felt need?

25             We asked about long-felt need.  If we can go back to

```
 1      that contention response 5.

 2                  THE COURT:  Which one, contention response.

 3                  MR. CLEMENT:  Supplemental interrogatory number 5.

 4                  THE COURT:  All right.

 5                  MR. CLEMENT:  And if we go to page 12.  They have a

 6      section here on long-felt or unmet need or failure of others.

 7      I don't see anywhere in there about Dr. Paul.  I see a little

 8      bit in there about some case law.  They talk about

 9      Heiligenstein deposition; a Burton TS, I'm not sure what that

10      is; a couple prior art references.  We turn the page, you know,

11      they have a few other references, then they talk about a couple

12      of deposition transcripts.  They have Allen mentioned, two

13      pages from Watanabe.  They have Heiligenstein, they have Allen

14      again, nothing about Dr. Paul.  Never updated.  This is the

15      last word, and what they were going to use for long-felt need.

16      They put an expert report on that.  Dr. Paul's never mentioned,

17      you know.

18                  THE COURT:  So that there's expert reports on it, what

19      does it matter that Dr. Paul understood something about the

20      disorder?  I don't understand why that's even a concern.

21                  MR. CLEMENT:  I think it's been unfair.  Yes, they're

22      going to have an expert.  It's cumulative.  Why do they need

23      Dr. Paul?  They have their expert on it.  Why do they need Dr.

24      Paul?

25                  THE COURT:  I know, it sounds more like an evidentiary
```

```
 1      type of issue.

 2                MR. CLEMENT:  Okay.

 3                THE COURT:  I don't see that -- I mean, if they have

 4      an expert report on the subject, the fact that the company or

 5      the head of the science department felt the same thing, that's

 6      not --

 7                MR. CLEMENT:  Your Honor, we could live with him

 8      testifying on that.  We think it's improper, it's expert

 9      testimony, we should have had it.  Okay.  I mean, we could live

10      with that.

11                AD.  Dr. Paul was thus in a position to make informed

12      decisions.  And here I think, you know, it's just talking about

13      Dr. Paul talking about the composition of the management

14      committees.  Okay.  Again, we're getting surprised here on this

15      one.  We asked Lilly in Apotex interrogatory number 2, to

16      please identify every individual or entity, right, who

17      contributed to the conception.  If you go down to the last two

18      sentences:  Please identify all supervisors of the named

19      inventors of the patent-in-suit at the time of conception of

20      reduction of practice.

21                They're saying Dr. Paul was that.  But he's not

22      mentioned in their answer.  All they mention here is

23      Heiligenstein and Tollefson, two inventors, and they have this

24      blanket reference to:  Look at all our documents.

25                So, again, while this testimony isn't so critical, I
```

```
 1        don't think, to the case, again it's another example where they
 2        should have given us the information.  They didn't.  As counsel
 3        pointed to the extent they want to use that testimony for
 4        showing utility that maybe in his management committees, which
 5        we don't have the minutes of, Dr. Paul is going to say that
 6        they, you know, decided that there was utility for this to go
 7        ahead.  I guess we would object to that.  But just the fact as
 8        to what a management committee is, I think that's -- I think
 9        Dr. Watanabe actually testified to that at page 82 of his
10        deposition too.  I think we have that over there on the right.
11        Actually, I think what Dr. Watanabe testified to it on page 82.
12        And DTX 118, if you take a look at DTX 118, which is in the
13        very back, and this is an e-mail from Dr. Watanabe to Drs.
14        Heiligenstein, Potter, and Tollefson.  Dr. Paul is cc'd on it.
15        And he says:  John, Bill and Gary.  Heiligenstein, Potter and
16        Tollefson.  And he congratulates them on the success that they
17        had.  And when he was asked:  Why did you congratulate Potter?
18        On page 82 of his deposition, which we also have in here.  "And
19        so I just basically wanted to congratulate the three key
20        players who carried it to that point."  This is on page -- this
21        is what he's referring to, that document.  He wanted to -- he
22        sent that e-mail to congratulate the three key players.  The
23        three key players are Heiligenstein, Potter and Tollefson, not
24        Paul.  Again, why should -- just because Paul is cc'd on that
25        e-mail, it gives us no clue as to having to depose him or why
```

```
 1    he's here as a surprise witness.

 2              If we move onto AE.  Dr. Paul will testify that he

 3    knew Dr. Heiligenstein to be a passionate and devoted

 4    psychiatrist.  I don't know, that's lay -- that's opinion.  You

 5    know, I don't know -- I don't even know what to do with that,

 6    your Honor.

 7              On AF, though, your Honor, I have a bigger problem

 8    with.  You know, here they're saying Dr. Paul knew Dr.

 9    Tollefson to be an insightful drug developer and scientist with

10    excellent credibility before the FDA regarding the merits of

11    the drug.  This is code for enablement utility.  Credibility

12    before the FDA regarding the merits of the drug.  You wouldn't

13    put -- they're going to say you wouldn't put something in

14    unless you knew it was going to work.

15              Now, why is that objectionable?  If you look at the

16    stipulation, your Honor, Dr. Tollefson passed away, and we were

17    trying to depose him.  And instead of deposing him, we entered

18    into a stipulation.  It should be at the end, I'm being told:

19    DTX 43, at the end.  This is a stipulation, your Honor, signed

20    actually back in October of 2008.  And, you know, there

21    actually was a big dispute about this, and we settled.  We

22    settled the matter.  And number 2 says:  "Neither party shall

23    be advantaged nor disadvantaged by the absence of testimony

24    from Dr. Tollefson."  They're trying to get an advantage about

25    Dr. Tollefson through Dr. Paul.  I really think that should
```

1    come out.  They stipulated they wouldn't rely on those things.

2    We did not take the deposition, now they're trying to back

3    door.

4         Okay.  We move onto AG.  Dr. Paul will testify that in

5    1994, Lilly conducted a Phase II clinical trial.  You know, I

6    find this one a little hard to understand.  Dr. Paul will

7    testify that in 1994, Lilly conducted a Phase II clinical

8    trial.  I thought MGH conducted the study in 1994.  I'm not

9    even sure, you know.  And Dr. Watanabe, who they're saying Dr.

10   Paul is going to be put in, he actually contradicts that at

11   pages 32 to 34 of his deposition.  It was MGH, Lilly didn't

12   conduct it.

13        THE COURT:  It must a typo, no?  Is that a typo, AG?

14   In other words, they're talking from the proffer, because I

15   remember in reading it, it was MGH and those doctors doing the

16   clinical trials.  Lilly didn't do it, did they?  Or did they?

17   I don't know.

18        MS. MASUROVSKY:  Your Honor, may I respond?

19        THE COURT:  Yes.

20        MS. MASUROVSKY:  Mass General Hospital, through Drs.

21   Beiderman and Spencer, actually conducted the trial.  But it

22   was Lilly's clinical trial material that they had.  It was

23   provided by Lilly.  And it was Lilly's IND that they were able

24   to use to go get the FDA to allow them to put it into humans.

25   So Lilly provided all the pre-clinical work that the Mass

```
 1        General Hospital referenced in its IND.

 2                And we testified at great length about that on the

 3        various depositions that -- and Dr. Spencer from Mass General

 4        also testified that Lilly permitted him in his IND-46,806 to

 5        cross reference Lilly's IND.  Again, the way all this works

 6        would be something that Dr. Watanabe could have explained, but,

 7        again, we would like to offer Dr. Paul to explain how all this

 8        works.  But, again, Dr. Spencer's IND-46,806 referenced --

 9        cross referenced Lilly's IND, and it was Lilly's clinical trial

10        material that was used in the Phase II trial conducted by Drs.

11        Beiderman and Spencer at Mass General Hospital.

12                THE COURT:  Okay.  Thank you.

13                MS. MASUROVSKY:  And also Lilly contributed funds.

14        Lilly paid --

15                MR. CLEMENT:  Lilly did not conduct --

16                MS. MASUROVSKY:  -- a portion of the study.

17                MR. CLEMENT:  Your Honor, it's getting -- twenty to

18        one.  What -- would you like me to continue?

19                THE COURT:  Only on that one.  Did you cover that one?

20        Where did you ask for stuff that would have given --

21                MR. CLEMENT:  Mylan number 4, that was the one --

22        remember we went through that?  Give us all your information on

23        Phase I, Phase II, Phase III studies.

24                THE COURT:  Oh, yeah.

25                MR. CLEMENT:  And also deposition topic 18.  Thank
```

1    you, Tom.  So if it related to MGH study, deposition topic 18,

2    they said just Dr. Spencer.  Oh, I think that one was pretty

3    well covered.

4          AH, you know, they say he's going to identify

5    documents.  They never told us.  Would you like me to continue,

6    your Honor?  It's getting -- I have a one o'clock hearing.

7    It's getting late.  I could just move this into evidence, or

8    move this into the record, the chart, or I'll be happy to

9    continue, if you'd rather.

10          THE COURT:  No, no, you needn't continue.  It's up to

11    you.  But the one o'clock hearing, where is that?

12          MR. CLEMENT:  With Magestrate Shwartz.

13          THE COURT:  Okay.  How do you want to handle that,

14    folks?  I'm addressing the entire -- do you want to be heard in

15    response, Miss Masurovsky?  I mean, I'm going to need a minute,

16    I think, to be honest with you.  I had a decision of some sort

17    prepared, but you come forward with a lot of new information,

18    hundreds and hundreds of pages, and I'm doing everything on

19    sort of an overnight basis.  So do you want to take a break and

20    then have the lawyers who need to go?  It's not only you, is

21    it?

22          MR. CLEMENT:  It's Mr. Calmann as well.

23          THE COURT:  Others have to go to Magistrate Judge

24    Shwartz, and then continue, assuming that we still have the

25    services of --

```
 1              MS. MASUROVSKY:  Your Honor, for Lilly, I believe I
 2       could respond fairly quickly to the points, if we can continue
 3       for a few minutes.  We'll do whatever the Court prefers,
 4       obviously.
 5              THE COURT:  Okay.  I'm trying to say -- I want to
 6       give -- given the timeframe, I think I intend to issue a real
 7       opinion, or at least to supplement my opinion when I'm done
 8       with this.  But I want to give you my decision and get you,
 9       given the timeframe, so that you know it, and then I'll
10       supplement it as soon as I can with a formal written opinion.
11       But I'm not sure I can do that by one o'clock.  We'll see.  So
12       you needn't continue with the A through --
13              MR. CLEMENT:  Right.
14              THE COURT:  -- G. You might want to address one thing
15       for me, though, which is, it seems to me there's a full panoply
16       of objections to this testimony that's improper, evidentiary,
17       some of them substantive.  The real question is, what is the
18       prejudice by having him attempt, for example, some things that
19       you don't quarrel with, you can't really quarrel with, "I was
20       the head of the department, and we took these steps," period.
21       You yourself said that before.
22              MR. CLEMENT:  The prejudice?
23              THE COURT:  What's the prejudice if that's the scope
24       of the testimony and you're afforded an opportunity to take the
25       deposition?
```

```
 1              MR. CLEMENT:  Well, I think the prejudice is how do we
 2     rebut that?  We can take the deposition.  We can cross
 3     examination.  A lot of what he's saying is expert testimony.
 4              THE COURT:  Isn't that addressed a different way?  I
 5     mean --
 6              MR. CLEMENT:  If we can have a rebuttal, I guess if
 7     Judge Cavanaugh is going to let us have a rebuttal expert
 8     witness.
 9              THE COURT:  I don't think there's going to be expert
10     testimony from this witness.  I'd be very surprised about that.
11              MR. CLEMENT:  I guess if there was no expert testimony
12     from this witness, then --
13              THE COURT:  Okay.
14              MR. CLEMENT:  And the witness was limited I think to
15     certain areas where we're not -- I think the Tollefson area,
16     the areas where the Tollefson stipulation -- I don't think he
17     should be allowed to testify to that at all.  I think we
18     entered a stipulation.
19              THE COURT:  Yeah, that's an argument, once again, I'm
20     hearing for the first time today.  I read your brief.
21              MR. CLEMENT:  It's in our brief.
22              THE COURT:  It was in your brief, the Tollefson --
23              MR. PARKER:  No.
24              THE COURT:  I read that brief about four times.  I
25     hear you.  I think there's many objections to the testimony.
```

```
 1          But, okay, not that one, at least I didn't see it there.

 2                MR. CLEMENT:  But, in any event, we would like to

 3     preserve all our evidentiary objections, hearsay, before Judge

 4     Cavanaugh, and all of those types.

 5                THE COURT:  There could be no other way.

 6                MR. CLEMENT:  And I'd like to move into evidence, or

 7     into this hearing, the record of this hearing, the chart and

 8     the note book.  And their confidential information, I'm not

 9     sure if there's confidential, we'll file a motion to seal it,

10     if that's okay with your Honor.

11                THE COURT:  Yes, of course.  There's no problem with

12     that.  I mean, what about what has been said on the record?  I

13     wouldn't worry too much about it, it's all generic talk on the

14     record.  But keep in mind, this is open, we didn't seal the

15     proceedings.

16                MR. CLEMENT:  I understand, your Honor.

17                Okay.  If Miss Masurovsky can finish by one, I would

18     sit down.

19                THE COURT:  Okay.

20                MS. MASUROVSKY:  May I, your Honor?

21                THE COURT:  Sure.

22                MS. MASUROVSKY:  Thank you.

23                A couple of points.  As we indicated at the beginning,

24     we were responding to their coming forward with their

25     contentions on this non-enablement defense, so that is again in
```

```
 1      the context of the burden of proof being on the defendants to
 2      show us what their cards were.  We had no validity, quote
 3      unquote, evidence to come forward with in that interrogatory
 4      request until we saw what their case was.  And when they did
 5      articulate their case, contrary to what counsel said, there was
 6      no holding that Lilly could not submit post-filing evidence.
 7      That's not what the Rasmussen case stands for.  It simply held
 8      that in that particular case, there was no post-filing evidence
 9      offered.  Whereas here, your Honor, we had, and we continue to
10      believe, we certainly believed, until Judge Cavanaugh told us
11      otherwise, that our post-filing evidence would suffice to show
12      the end of the question.  And it was only after that became an
13      issue that we were in a position to have anything to
14      supplement, and we did that promptly.  We effectively
15      supplemented our interrogatory answer in our opposition
16      briefing on the reconsideration -- excuse me, on the
17      supplemental briefing in response to the Judge's -- to Judge
18      Cavanaugh's request that we address this case.
19              Your Honor, we had no other position to offer.  We
20      thought that was a complete defense -- a complete answer to
21      what they had come forward with.  They come forward with
22      certain evidence.  We responded.  When the Federal Circuit came
23      down with its 318 decision, Judge Cavanaugh recognized its
24      importance and asked for supplemental briefing.  At that point
25      we came forward with a supplemental response.  And we didn't
```

```
 1      put it in the form of a formal supplemental answer to
 2      interrogatory, but in general the commentary to the federal
 3      rules is if you make your answers known, you don't have to
 4      formally do it in the context of the same paperwork all the
 5      time.  In other words, just like when a witness is identified
 6      during a deposition in efficient ways, if you give an answer in
 7      a letter, parties are given supplemental information in a
 8      letter, it doesn't have to be in the form of an interrogatory,
 9      formal supplemental interrogatory answer.  At least that's what
10      the practice was in this litigation between these parties.
11      We've produced documents which answered their questions, and we
12      didn't specifically refer to them, and they didn't specifically
13      complain.  They complained about lots of other things.  So
14      respectfully, when we said they are in the documents, that's
15      sufficed in this case.

16              Finally, the issue of the documents and the IND that
17      they want to take back because it does show how people of skill
18      in the art at the time believed it was a promising treatment
19      for ADHD.  All of those are addressed fully in the briefing
20      that they filed, which is their document 582-1, and our
21      opposition response.  I won't belabor it, but I believe we've
22      adequately addressed their arguments with respect to the
23      30(b)(6) notice, and the very narrow topic on which they are
24      complaining about the preparation and filing of the Mass
25      General IND.  I believe that's fully addressed in our briefing.
```

```
 1              Finally, your Honor, again, while the words that Dr.
 2      Paul would use at his testimony are best addressed by asking
 3      him, himself, we did our best to lay out a road map for them so
 4      that -- in a deposition they can ask very pointed questions.
 5      They're obviously free to ask anything they want.  Obviously
 6      all the concerns they have that they articulated today, would
 7      be alleviated if they had already taken his deposition, or
 8      would take his deposition, because they can ask him, himself,
 9      and anything they think he's going to say, for example,
10      speculate in their paperwork that he would say Dr.
11      Heiligenstein was this or that.  They can ask him.
12              THE COURT:  I don't know how that would be admissible
13      any way, but that's fine.
14              MS. MASUROVSKY:  And I don't think we intend or have
15      any plans for him to, in any way, contradict the stipulations
16      that have been filed in this case at all.  He is not going
17      to -- there's nothing being offered about what Dr. Tollefson
18      said that would violate that stipulation in any way.
19              Again, the issue here is can he replace Dr. Watanabe,
20      given that we had an entirely unexpected situation and worked
21      as quickly as we could to replace him, to find a replacement
22      for him?  And will that prejudice be cured by putting him --
23      putting the defendants on equal footing as if Dr. Watanabe
24      could come to court?  We respectfully submit, under the In re:
25      Jacoby and similar cases, that that should be the result in
```

```
 1    this case as well, your Honor.  Thank you.

 2              THE COURT:  Thank you.

 3              I just want to respond quickly.  I feel I must, once

 4    again, you seem to be responding to their contention -- their

 5    contentions came out late 2008 regarding the unexpected death

 6    came out, what, in October, November, 2009?  So you have five

 7    or so unexplained months.  There's no question that as far as

 8    I'm concerned, the interrogatories, what I saw this morning in

 9    terms of the interrogatories and the document request, and the

10    30(b)(6) notices were not properly responded to and were not

11    updated in concept because in your briefing, your new theory

12    came across, I don't believe that's tantamount to what is

13    listed in Rule 26(a) and 26(e) about an initial disclosure

14    update.  I just want to make that clear.

15              So, I mean, to the extent there was a gamble here in

16    terms of not putting forward certain information until there

17    was a certain decision, I think on some level the Court would

18    have to decide who should bear that risk.  But, in any event, I

19    need a few moments and then I'm going to give you an

20    abbreviated decision on this.  And then I'm going to supplement

21    that hopefully in the next day or so, if I can, with a legal

22    written decision, but I need a minute to get that together.

23              Do you want to wait?  Shall we see?  Should I call

24    Judge Shwartz?

25              MR. CALMANN:  That would be most appreciative, Judge.
```

```
 1              MR. CLEMENT:  I would appreciate that, Judge.

 2              THE COURT:  I'll see if she can wait and get you out

 3     of here.  Give me a minute.

 4              (Recess)

 5              THE COURT:  I spoke to Judge Shwartz, and she's happy

 6     to wait for you folks for a few minutes.  I'm not going to be

 7     too long.

 8              MR. CLEMENT:  Thank you, your Honor.  Much

 9     appreciated.

10              MR. CALMANN:  Thank you, your Honor.

11              THE COURT:  All right.  Before the Court is the motion

12     to exclude Dr. Paul as a witness for failure to update initial

13     disclosures, and as we heard with far more detail today and

14     identified in response to numerous interrogatories and other

15     discovery requests.  I'm going to go through things in a very

16     general format, and give you my basic decision, which will then

17     be supplemented pursuant to local Rule 52.1, which permits the

18     Court to supplement an opinion.  So I'm going to speak in

19     rather general terms.

20              Rule 26(a) and 26(e) deal with initial disclosures and

21     provides that they must be made, which would certainly include

22     people with knowledge, and that they must be updated, timely

23     updated as required.  And there is some exception language in

24     the rule as well to the extent that the persons dealing with

25     initial disclosures are otherwise identified in discovery.  It
```

```
 1        may not need a formal supplementation.  This is very basic law.
 2               There is also a law from this District and Circuit
 3        that explain, especially in a patent case, that in order to
 4        qualify under the otherwise been made known disclosure
 5        language, the alleged disclosure must be clear and unambiguous.
 6        So disclosures during discovery that are not facially apparent
 7        and require the drawing of further inferences are insufficient
 8        to meet the requirements of Rule 26.  Ultimately this
 9        determination is made on a fact in a case specific basis.  Rule
10        26(a) and (e) work together with Rule 37, Federal Rule of Civil
11        Procedure 37, which provides that the party is not allowed to
12        use information or witness, or to supply evidence on a motion
13        and hearing where the trial, if there was a failure to disclose
14        and update, unless the failure was substantially justified and
15        was harmless.  So Rule 37 provides a strong inducement for
16        disclosure of Rule 26(a) material as well as updating discovery
17        responses.  Because failure to comply with Rule 26(a) may
18        preclude a party from using any information or witness that's
19        not disclosed.  When I supplement this, I'm going to give
20        further authority, far more detail.
21               Exclusion under Rule 37 is not automatic.  There is
22        discretion with the Court.  And in order to make the decision,
23        the Court, the Third Circuit has identified four factors to
24        consider whether failure to disclose or supplement warrants
25        exclusion of evidence:  The prejudice or surprise of the party
```

1       against whom the excluded evidence would have been admitted;

2       the ability of the party to cure the prejudice; the extent to

3       which allowing the evidence would disrupt the orderly and

4       efficient trial of the case and other cases in the court and

5       bad faith or willfulness in failing to comply with a court

6       order or discovery obligation.

7               It is true, as was mentioned here today, that

8       exclusion of evidence is an extreme sanction, not normally

9       imposed, absent a showing of willful deception or flagrant

10      disregard of a court order by the proponent of the evidence.

11      Alternative sanctions are available and should be considered as

12      well as the importance of the potentially excluded evidence,

13      prior to prohibiting the use of a witness or evidence at trial.

14      We have a rather fact specific and detailed and somewhat

15      unusual scenario before us, much of which was discussed on

16      prior occasions and today.  Indeed, today I received hundreds

17      of more pages of materials, having received hundreds and

18      hundreds of pages in just the past few days.  We're on the eve

19      of trial and we're doing this as quickly as possible.

20      Virtually on an expedited basis.  So without reviewing the

21      whole factual scenario, with that rather general description of

22      the applicable law, I'm going to make certain findings and

23      make -- and doing analysis under that law, an outline form, and

24      provide you with my decision on this motion.

25              First, I find that the initial disclosures and the new

```
 1      ones to the Court, to some extent, and numerous discovery
 2      requests, were not timely updated as required.  And despite
 3      plaintiff's explanation for same, which I take at face value,
 4      there's no legitimate excuse for not updating the initial
 5      disclosures and the discovery responses.
 6              To the extent that Dr. Paul is really a substitute for
 7      Dr. Watanabe, the tragic death of Dr. Watanabe occurred ten
 8      months ago.  To the extent that the plaintiff had to wait for
 9      the contentions of the defendants, that was in 2008.  And to
10      the extent, which I don't believe is a legitimate reason at
11      all, but to the extent the Court's decision, summary judgment
12      of reconsideration was a reason, even that was months ago and
13      there's no excuse for waiting until April 5th.  And I should
14      say that what I learned today, it appears while there was an
15      updating of the initial disclosures to include Dr. Paul as a
16      witness, it does not seem to be, to this day, to have been an
17      updating or supplementation of the numerous discovery requests
18      that I first saw today.  I could be wrong about that because I
19      don't know if the defendants -- if the plaintiff had a chance
20      to respond to it, or even saw it before today.
21              Having found that Dr. Paul was -- that the disclosures
22      were not updated as required, the Court does find that Dr. Paul
23      was identified in depositions in a general way as one or two or
24      three people who were involved in the neuroscience department
25      and had some knowledge of the development of atomoxetine, once
```

1    again, in a very general way that Dr. Watanabe was initially
2    identified.  I'm not sure when, the exact date, his description
3    of knowledge of certain aspects of the development of
4    Strattera.  I ordered a proffer be made, and there was much
5    argument about the proffer, and I still have questions about
6    the true meaning of the proffer and the true extent of it.  And
7    we had a discussion on the record about it today.  But at least
8    some of the proffer, very little, I should say, but some does
9    overlap with Dr. Watanabe's description.  Maybe one or two
10   sentences.  For example, in the proffer it does say that Dr.
11   Paul would testify about the development of Strattera.  Of
12   course there are many other things described in the proffer.
13   So I do find that Dr. Paul was identified as a person with some
14   knowledge related to the case in the depositions, but certainly
15   was not sufficiently disclosed or identified as to the topics
16   in his proffer.

17          And as we learned today, indeed in response to
18   discovery requests, the topics in this proffer do not seem to
19   have been responded to sufficiently with respect to some of
20   those discovery requests, keeping in mind that exclusions are
21   an extreme sanction.  And considering Rule 37, I consider the
22   Newman factors or the Meyers factors.  Newman is another Third
23   Circuit case 60 F. 3d 153.  They're the same four factors to be
24   considered when you find that a witness, or evidence has not
25   been disclosed, and you're considering the remedy versus the

1    prejudice to the defendants.  I find that the defendants have

2    been prejudiced to some extent by the late disclosure.  The

3    obvious prejudice is having to do this motion practice, being

4    distracted on the eve of trial.  It maybe that there's more

5    prejudice, but it's really impossible to tell.

6            The other prejudice that the defendants, the only

7    other prejudice that the defendants identify, which to some

8    extent could be legitimate, is based on evidentiary issues.  In

9    other words, if, for example, Dr. Paul was permitted to testify

10   as an expert, they would be prejudice in that they may not have

11   an expert to refute Dr. Paul.  So most of the other claims of

12   prejudice are based on evidentiary objections.

13           Can the prejudice be alleviated is the second factor?

14   And the Court believes that the prejudice that it is aware of

15   can be alleviated in terms that I will describe shortly.  Will

16   it disrupt or adjourn the trial or interfere with other cases?

17   And the answer is no, the trial will not be adjourned,

18   certainly for any reason that I can think of, absent --

19   certainly not for this reason.

20           Bad faith is the final factor.  I can't, based on what

21   I've heard, make a finding of bad faith.  I'm troubled by some

22   of the representations that have been made to the Court.  I

23   think parties, in an air of desperation, I think there is a

24   slight exaggeration on certain things.  And I understand the

25   stakes in this case, but I'm not prepared to find bad faith.

1    So Dr. Paul will not be automatically excluded for the late

2    disclosure.

3            Dr. Paul may indeed be excluded or certainly limited

4    on evidentiary or other substantive grounds.  And all of these

5    admissibility issues will be handled by District Judge

6    Cavanaugh, the trial judge in this case.  If plaintiff intends

7    to use Dr. Paul as a witness, it must immediately produce him

8    for deposition and pay all costs and fees of the deposition,

9    including the fees for one lawyer for each defendant to appear

10   at the deposition, not to prepare for the deposition, but to

11   appear at the deposition, at a rate, arbitrary rate of $400 per

12   hour.  I believe this is fully justified as an alternative to

13   Rule 37 sanction, and I think that it is fully justified by the

14   serial failure to update initial disclosures and discovery

15   responses by the -- by waiting until the last minute to make

16   Dr. Paul available, or to make his presence known.  Not his

17   presence, but the intention to use him known.  And depending

18   upon the deposition, defendants may be able to, certainly will

19   be able to supplement or have their witnesses address anything

20   new, anything that would be admissible.

21           Next, should the extent that any of Dr. Paul's

22   testimony is admissible or admitted, it must be strictly

23   limited to what is in the proffer.

24           Next, an essential part of my decision, not excluding

25   him, that Dr. Paul not be permitted to offer any expert

```
 1    testimony.  It's my view that this is not even a close call.
 2    There's been no compliance with Rule 26, no expert report, no
 3    expert disclosures.  And if he were permitted to give expert
 4    testimony, then defendants would have a right to have experts
 5    perhaps hire new experts and that would reshuffle the factors
 6    and not alleviate the prejudice.
 7             Further, it's my view that Dr. Paul should not be
 8    permitted to offer lay opinion testimony.  This issue is going
 9    to be up to Judge Cavanaugh.  But having spent so much time on
10    this, I'm including my strong view that this shouldn't be
11    permitted.  The Third Circuit, as well as other courts, have
12    noted global preclusion of any kind of lay opinion on a
13    specialized or technical subject, and I'll expand on that law
14    further.
15             Next, nothing here in any way meant to encroach on
16    Judge Cavanaugh's absolute and total control of the trial.
17             Finally, although it is entirely the province of Judge
18    Cavanaugh, having spent a tremendous amount of time reviewing
19    the papers in this case, and especially the defendant's
20    opposition papers, which to a great extent rely on evidentiary
21    and other problems with the proffer of Dr. Paul, I'm simply
22    going to state my opinion that there would appear to be very
23    serious substantive and evidentiary impediments to the
24    admission of much of the testimony outlined in the proffer,
25    which could include relevancy, hearsay, speculation, testimony
```

```
 1    which is lay opinion, either expert opinion, failure to comply

 2    with other discovery -- strike that.  And I included that in my

 3    own opinion, even though not controlling, certainly not fully

 4    briefed before me, so that the parties can at least take that

 5    into account in determining how to proceed with this.

 6              I'm going to enter an order, counsel, and then I'm

 7    going to supplement my opinion with detail, subject to Rule

 8    52.1.  If you proceed with this deposition and with this

 9    witness, I expect it to be done on a professional basis.  No

10    games of any kind.  I will make myself available to address any

11    problems.

12              MR. CLEMENT:  Your Honor, just one other -- the

13    location of the deposition, would you prefer it to be in

14    Newark, since we'll all be --

15              THE COURT:  I'm going to ask that you confer in good

16    faith and the moment you have a dispute, you call me.

17              MR. CLEMENT:  Thank you, your Honor.

18              THE COURT:  Is there anything I need to decide right

19    this minute?

20              MR. PARKER.:  Your Honor, this is Tom Parker, from

21    Mylan.  Your Honor indicated in his conclusions that there be

22    no expert opinion or lay opinion testimony.  We assume what

23    your Honor said is he could testify as to what's in his

24    proffer, we assume you mean excluding anything that goes to

25    expert opinion or lay opinion testimony.
```

```
 1              THE COURT:  What I'm saying to you is I'm going to do
 2     the best I can under the circumstances, I'm not the trial
 3     judge, in terms of making the determination of what expert
 4     testimony is or isn't.  To the extent that any of this is
 5     admissible, to the extent that it's allowed, it still must be
 6     within the proffer.  In other words, it can't go beyond that
 7     proffer.
 8              Certainly part of my ruling is that he should not be
 9     permitted to offer expert testimony, but there's no way you've
10     given me -- I can't simply sit here, I don't know what the
11     question and the answer are going to be.  You're going to have
12     to take that up with the, you know, trial judge.  I can't rule
13     on something specifically.  The proffer is vague.  And indeed
14     we don't have questions and answers, and it's too late, I don't
15     have the time.  I don't know what you're asking.  Me, I think
16     you got the right idea, that is my intention.  And I'm going
17     the best I can on short notice.
18              MR. PARKER:  Thank you, your Honor.  And I apologize
19     if I missed this.
20              With respect to the evidentiary objections that we
21     have, that were part of the submissions, do we do that by
22     separate submission to Judge Cavanaugh, or do they stay within
23     the papers?
24              THE COURT:  I can't answer that.  I will say that
25     they're all preserved.
```

```
 1              MR. PARKER:  Thank you.

 2              THE COURT:  And I think you should take a practical

 3    approach at this point.  You have put a lot of paper before

 4    Judge Cavanaugh.  It maybe best to address it at trial, I'm

 5    just not sure.  It doesn't seem very complicated to me, but

 6    that's up to you folks.

 7              Anything else?  Thank you.

 8              (All parties say thank you)

 9              (Matter concluded)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```