FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| | : | |
| ELI LILLY AND COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ACTAVIS ELIZABETH LLC, | : | **Hon. Dennis M. Cavanaugh** |
| GLENMARK PHARMACEUTICALS | : | Non-Jury Trial |
| INC., SUN PHARMACEUTICAL | : | |
| INDUSTRIES LTD., SANDOZ INC., | : | **OPINION** |
| MYLAN PHARMACEUTICALS INC., | : | |
| APOTEX INC., AUROBINDO PHARMA | : | Civ. No. 07-CV-3770 (DMC) (JAD) |
| LTD., TEVA PHARMACEUTICALS | : | |
| USA, INC., SYNTHON | : | |
| LABORATORIES, INC., ZYDUS | : | |
| PHARMACEUTICALS, USA, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court by Complaint of Eli Lilly & Co. ("Plaintiff" or "Lilly"),

against Defendants Actavis Elizabeth LLC, Apotex Inc., Aurobindo, Sun Pharmaceuticals, Teva

Pharmaceuticals, Sandoz Inc. and Mylan Pharmaceuticals Inc. ("Defendants"). This case concerns

the validity and alleged infringement of U.S. Patent No. 5,658,590 ("the '590 Patent").

This Court conducted a non-jury trial in this matter on May 18-19, and from May 24-27, 2010.

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. CIV.

P. 52(a). For the reasons stated herein, a finding in favor of Defendants will be entered.

## BACKGROUND

### I.    THE PARTIES

Plaintiff Eli Lilly and Company is an Indiana corporation having its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Pretrial Order Stipulation of Facts, Doc. No. 561 ("SF"), ¶1. Defendant Sun is a corporation organized under the laws of India, having its principal place of business at Acme Plaza, Andheri Kurla Road, Andheri (East) Mumbai, 400 059, India. Id. ¶2. Defendant Sandoz is a corporation organized under the laws of Colorado and has its principal place of business in Princeton, New Jersey. Id. ¶3. Defendant Mylan is a corporation organized under the laws of West Virginia having its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26504. Id. ¶4. Defendant Apotex is a corporation organized under the laws of Canada having its principal place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9. Id. ¶5. Defendant Aurobindo is a corporation organized under the laws of India having its principal place of business at Plot # 2, Maitri Vihar, Ameerpet, Hyderabad - 500 038, Andhra Pradesh, India. Id. ¶6. Defendant Actavis Elizabeth LLC is a corporation organized under the laws of Delaware having its principal place of business at 200 Elmora Avenue, Elizabeth, New Jersey 07207. Id. ¶7. Defendant Teva Pharmaceuticals USA, Inc. is a corporation organized under the laws of Delaware having its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Id. ¶8. Defendant Glenmark Generics Inc., USA (formerly Glenmark Pharmaceuticals, Inc., USA) is a corporation organized under the laws of Delaware having its principal place of business at 750 Corporate Drive, Mahwah, New Jersey 07430. Id. ¶9. Defendant Synthon Laboratories, Inc. is a corporation organized under the laws of Virginia

having its principal place of business at 7130 Heritage Village Plaza, Suite 201, Gainesville, Virginia 20155. Id. ¶10. Defendant Zydus Pharmaceuticals, USA, Inc. is a corporation organized under the laws of New Jersey having its principal place of business at 506 Carnegie Center, Princeton, New Jersey 08450. Id. ¶11

## II. THE '590 PATENT

United States Patent No. 5,658,590 ("the '590 patent") issued on August 19, 1997, and is entitled "Treatment of Attention-Deficit/Hyperactivity Disorder." SF ¶ 7.

Plaintiff is the owner by assignment of the '590 patent. SF ¶12. The '590 patent issued from U.S. Application No. 08/371,341, filed January 11, 1995, and will expire on November 26, 2016. Id. ¶13. The initial U.S. patent application was filed by Plaintiff's in-house patent attorney Joseph A. Jones. Id. ¶9. Plaintiff's pediatric exclusivity associated with the '590 patent expires on May 26, 2017. Id. Drs. John H. Heiligenstein and Gary D. Tollefson are the inventors named on the '590 patent. Id. ¶14.

The '590 patent contains one independent claim (claim 1) and 15 dependent claims (claims 2-16). Id. ¶15. Claim 1 reads as follows: A method of treating attention-deficit/hyperactivity disorder comprising administering to a patient in need of such treatment an effective amount of tomoxetine. Id. ¶16. Claims 2-16 depend either directly or indirectly on claim 1 and recite methods of treating the predominantly inattentive type of attention-deficit/hyperactivity disorder, the predominantly hyperactive-impulsive type of attention-deficit/hyperactive disorder, and the combined type of attention-deficit/hyperactivity disorder, in adults, adolescents and children. Id. ¶17.

Strattera® is the brand name for the commercial formulation of atomoxetine hydrochloride, developed, manufactured and sold by Plaintiff.  Id. ¶13.  Atomoxetine was formerly known as tomoxetine, and is referred to by that name in the '590 patent.  Id. ¶14.  The terms "atomoxetine" and "tomoxetine" are used interchangeably throughout this Opinion.[1]

## III.    FDA APPROVAL

The FDA approved New Drug Application No. 21-411 ("Plaintiff's NDA") for Strattera® capsules in strengths Eq. 10 mg, 18 mg, 25 mg, 40 mg and 60 mg for use in the treatment of Attention Deficit/Hyperactivity Disorder in children, adolescents and adults, on or about November 26, 2002.  SF ¶15.  Strattera® capsules in strengths of Eq. 80 mg and 100 mg were approved on or about February 14, 2005, for the same indications.  Id.  Pursuant to 21 U.S.C. § 355(b)(1) and related regulations, the '590 patent is listed in the FDA's "Approved Drug Products With Therapeutic Equivalence Evaluations" (the "Orange Book") for Plaintiff's atomoxetine hydrochloride products.

Each of the ten Defendants named in this action filed an Abbreviated New Drug Application ("ANDA") seeking FDA approval to market generic atomoxetine hydrochloride products in 10 mg, 18 mg, 25 mg, 40 mg, 60 mg, 80 mg and 100 mg dosage strengths for the treatment of ADHD.  SF ¶¶ 17-31.  Each Defendant's ANDA contains a paragraph IV certification with respect to the '590 patent.  The Defendants' paragraph IV certifications allege that the '590 patent is invalid, unenforceable, and/or will not be infringed by the manufacture, use, sale, or importation of the drug products described in the Defendants' ANDAs.  Id.

---

[1] The Court notes that the compound atomoxetine was disclosed and claimed in U.S. Patent No. 4,314,081, which issued on February 2, 1982.  Defendants' Proposed Findings of Fact, Doc. No. 643, ("Def.-PFF"), at 56, ¶65.

IV.     **ATTENTION DEFICIT HYPERACTIVITY DISORDER & TREATMENTS**

ADHD is a complex, chronic and inheritable neurobiological disorder that is characterized by a developmentally inappropriate level of inattention, hyperactivity and impulsiveness.  See Plaintiff's Proposed Findings of Fact, Doc. No. 639, ("Pl-PFF"), ¶34.  ADHD is the most common childhood neuropsychiatric disorder.  Id. ¶35.  The prevalence of ADHD is about three to five percent in school-age children.  Id.  Up to 60% of patients with childhood ADHD carry symptoms into adulthood.  Id. ¶36.  In children, ADHD affects many facets of a patient's life including social, familial and scholastic.  Id. ¶37.  Academic achievement is often impaired, leading to conflict with family and school authorities.  Id.  Familial relationships are often strained because parents believe that the afflicted child's troublesome behavior is willful.  Id.

ADHD is more than a school disorder. Individuals with ADHD may obtain less schooling than their peers and have poorer vocational achievement.  Id. ¶38.  Impulsive behavior may lead to accidents and to engagement in potentially dangerous activities without consideration of possible consequences.  Id.  Symptoms of hyperactivity in adults include holding multiple jobs, difficulty in participating in sedentary activities, and avoiding jobs and hobbies that provide limited opportunity for constant motion.  Id. ¶39.  Patients with ADHD frequently have coexisting disorders.  Id. ¶40.  In children with ADHD, the frequency of a tic disorder or Tourette's syndrome is particularly high.  Id..  ADHD's impact on society is enormous in terms of its financial cost, stress to families, adverse academic and vocational outcomes, and negative effects on self-esteem.  Id. ¶41.

Treatments of ADHD have existed for many years.  Id. ¶57.  The first medications used to treat ADHD were the stimulants.  Id. ¶58. Prior to 1995, the stimulants, including methylphenidate (e.g., Ritalin®), amphetamines (e.g., Dexedrine®), and pemoline (Cylert®), were the only

pharmaceuticals approved by the FDA for the treatment of ADHD.  Id. ¶59.  Stimulants were approved for treating ADHD only in children and adolescents, not adults.  Id. ¶60.  Despite their widely validated beneficial effects in treating ADHD, stimulants were well known to have certain side effects and disadvantages.  Id. ¶61.  At least 10% of ADHD patients do not adequately respond to stimulant therapy or are unable to tolerate the side effects of stimulants.  Id.  In treating patients with ADHD who also suffer tic disorders, stimulants may be particularly problematic as they may trigger or exacerbate motor or vocal tics.  Id. ¶62.  Indeed, the labeling of the stimulants advises against their use in patients with tic disorders.  Id.  In addition, stimulants are categorized as Schedule II controlled substances because they have considerable abuse potential.  Id. ¶63.  The Controlled Substance Act mandates that only a licensed practitioner can prescribe stimulants and that the patient must return for further assessment for each refill.  Id.  These restrictions result in increased time and effort for physicians and patients using these medications.  Id.  Physicians may prescribe only a limited quantity of stimulants to a patient at one time.  Id.  Patients must visit the pharmacy in person to refill prescriptions and cannot do so by mail.  Id.  Adults with ADHD also have high rates of alcohol and substance abuse, which may limit use of stimulant medications.  Id. ¶64.  Another common and serious concern with the stimulants is diversion, i.e., sale or use of the stimulants as recreational drugs.  Id. ¶65.  Due to their short half-life and limited period of action, stimulants yield incomplete coverage for late afternoon and evening symptoms.  Id. ¶66.  Some patients suffer from a "rebound" phenomenon where hyperactivity and impulsivity are exacerbated in the late afternoon and evening.  Id.  Thus, they require multiple doses per day.  Id.  Treatment of ADHD with stimulants may also lead to development of tolerance to the therapeutic effects,

inhibition of growth, worsening of coexisting disorders, loss of appetite and insomnia.  Id. ¶67.[2]

## V.    PROCEDURAL HISTORY

On August 9, 2007, Lilly sued Actavis in this District (Civ. No. 07-CV-3770) for alleged infringement of the '590 patent pursuant to 35 U.S.C. § 271(e)(2)(A).  SF ¶32.  On September 5, 2007, Lilly filed a First Amended Complaint naming as defendants Actavis, Glenmark, Sun, Sandoz, Mylan, Teva, Apotex, Aurobindo, Synthon and Zydus, and alleging that each defendant infringes the '590 patent pursuant to 35 U.S.C. § 271(e)(2)(A).  Id. ¶33.  Defendants filed Answers and Counterclaims to Lilly's First Amended Complaint, denying infringement and seeking declarations that the claims of the '590 patent are invalid, not infringed, and unenforceable due to inequitable conduct before the U.S. Patent and Trademark Office ("PTO").  Id. ¶¶34-38.

### A.    Stipulations as to Various Parties

This Court entered a Consent Judgment and Order on December 12, 2007, finally resolving this action between Lilly and Zydus.  Pl-PFF, at ¶25.  This Court entered a Consent Judgment and Order on July 2, 2008, finally resolving this action between Lilly and Glenmark.  Id.  This Court entered a Stipulation and Order of Dismissal on August 21, 2008, dismissing Lilly's claims against Synthon, and Synthon's defenses and counterclaims, without prejudice.  Id.  This Court entered a Stipulation on April 8, 2010, staying Lilly's claims against Teva and Teva's defenses.  Id.  This Court entered a Stipulation on April 19, 2010, staying Lilly's claims against Actavis and Actavis's defenses.  Id.

---

[2] Additional facts regarding the '590 patent prosecution and ADHD (as well as treatments for the disorder) are provided in the sections below, where appropriate.

**B.      Prior Summary Judgment Motions**

On May 21, 2009, the Court granted Defendants' motion for partial summary judgment of no direct infringement of the '590 patent.  SF ¶39.  On December 29, 2009, in <u>Eli Lilly & Co. v. Actavis Elizabeth LLC</u>, 676 F. Supp. 2d 352 (D.N.J. 2009), the Court granted Lilly's motion for summary judgment as to induced infringement of the '590 patent, and denied Defendants' corresponding cross-motions for summary judgment of no induced infringement of the '590 patent. <u>Id.</u> ¶40.  In its Opinion, the Court granted in part and denied in part Lilly's motion for summary judgment of no inequitable conduct, <u>id.</u> ¶41;  granted Lilly's motion for summary judgment of no invalidity based on anticipation, <u>id.</u> ¶42;  denied Defendants' motion for summary judgment of invalidity based upon lack of enablement/utility and based upon obviousness, holding that there were genuine issues for trial.  <u>Id.</u> ¶43.  On January 19, 2010, the Court granted Defendants' motion for summary judgment of no contributory infringement.  <u>Id.</u> ¶44.

On February 8, 2010, this Court denied Apotex's motion to reconsider the Court's December 31, 2009, grant of summary judgment of induced infringement.  <u>Id.</u> ¶45.  On February 23, 2010, in <u>Eli Lilly & Co. v. Actavis Elizabeth LLC</u>, 2010 U.S. Dist. LEXIS 16156 (D.N.J. Feb. 23, 2010), the Court denied Lilly's motion to reconsider the "portion of [the Court's] Opinion of December 31, 2009, wherein the Court denied Defendants' motion for summary judgment of non-enablement." <u>Id.</u> ¶46.

The remaining issues in this matter were tried before this Court without the benefit of a jury on May 18-19, and from May 24-27, 2010.

## VI.    TRIAL EXPERTS

At trial, this Court heard testimony from a number of expert witness, provided by Defendants and Plaintiff.

### A.    Defendants' Expert Witnesses

Primarily in support of their obviousness argument, Defendants introduced the testimony of Dr. Craig Berridge, their expert in neuroscience and neuropharmacology.  Def-PFF, at 7, ¶1.  Dr. Berridge received a Bachelor of Arts degree in psychology as well as biochemistry and cell biology from the University of California, San Diego, in 1982.  Id. at 8, ¶2.   He received a Ph.D in neuroscience from the University of Florida School of Medicine in 1988.  Id.  Dr. Berridge is a Professor of Psychology and Psychiatry at the University of Wisconsin in Madison, having held that position since 2002, and has been on the faculty of the Department of Psychology at the University of Wisconsin for nearly 15 years.  Id. at 8, ¶2.  Prior to joining the faculty at the University of Wisconsin, Dr. Berridge was employed in a number of capacities including as an Assistant Research Psychobiologist in the Department of Psychiatry at the University of California in San Diego, California, a Post-Graduate Researcher in the Department of Psychiatry at the University of California, San Diego, a Post-Doctoral Fellow at the Department of Pharmacology of the Yale Medical School and a Post-Graduate Researcher at the Department of Psychiatry at the University of California in San Diego.  Id.  For the past 25 years, Dr. Berridge has focused on the field of behavioral neuroscience, with an emphasis on the behavioral actions of monoamine neurotransmitters, particularly norepinephrine.  Id. at 7, ¶1.  Dr. Berridge holds a broad specialty in behavioral neuroscience and an expertise in neurotransmitter systems including the class of neurotransmitters known as catecholamines, which include norepinephrine and dopamine.  Id.

-9-

Throughout his work, Dr. Berridge has worked with drugs extensively to manipulate neurotransmitter systems and different aspects of neurotransmitter function, including drugs that are commonly used to treat ADHD.  Id.  Dr. Berridge has extensive teaching experience as well as experience in the private sector.  Id. at 8, ¶¶3-4.

Regarding their argument that the '590 patent was not enabled to its full scope, Defendants introduced the expert testimony of Dr. James R. Johnson, who has a Doctorate of Philosophy in Pharmaceutics, a Masters of Science in Pharmaceuticals, and a Bachelor of Science degree in Pharmacy, from the University of Minnesota.  Id. at 69, ¶2.  He spent twenty years, from 1976 through 1996, working for Schering-Plough.  Id. at 69, ¶2.  Prior to working at Schering-Plough, Dr. Johnson worked at Ayerst Laboratories from 1968 through 1976.  Id.  His work was devoted to the development of dosage forms.  Id.  Dr. Johnson is currently an Associate Professor at the University of Tennessee in the Department of Pharmaceutical Sciences in the College of Pharmacy, where he has taught since 1986.  Id. at 70, ¶3.  Dr. Johnson has formulated a multitude of dosage forms including, for example, depot injections, suspensions, tablets, chewable tablets, coated gums, aerosols, sustained release formulations and transdermal formulations.  Id. at 70, ¶4.  Dr. Johnson, was qualified by the Court as an expert in the field of pharmaceutical dosage form development and drug delivery system development.  Id. at 70, ¶5.

In support of their position that the '590 patent was invalid as a result of inequitable conduct before the PTO, Defendants introduced the testimony of John T. Goolkasian, Esq.  Mr. Goolkasian has twenty-five years of experience working at the PTO, including as a Protest and Inter Partes Examiner specifically investigating allegations of inequitable conduct, and, for approximately ten years, as a Judge on the Board of Patent Appeals and Interferences ("the Board").  Id. at 138, ¶1.  Mr.

Goolkasian has a degree in chemical engineering, although he conceded that he does not qualify as a person of ordinary skill in the art.  Id. at 138, ¶2; Pl-PFF, ¶162.

In connection with their arguments regarding the secondary considerations of nonobviousness, Defendants introduced the testimony of Mr. Harry Boghigian and Dr. Jud Staller. Def-PFF, at 38, ¶8.

Mr. Boghigian has nearly forty years of experience in the pharmaceutical industry, including 30 years with Hoffmann-La Roche.  Id.  He has served as a sales representative; a division sales manager; a manager of market research, where he did the research that was involved in putting together strategic and tactical plans for commercializing drug products; a regional director; a product director responsible for specific therapeutic drug product areas; a group product director; and vice president of marketing.  Id.

Jud A. Staller M.D. testified as Defendants' expert in the area of psychiatry and the pharmacological treatment of disorders including ADHD.  Id. at 41, ¶18.   Dr. Staller is currently in private practice in child, adolescent and adult psychiatry with a Clinical Associate Professor appointment in the Division of Child and Adolescent Psychiatry at SUNY Upstate Medical University.  Id. at 41, ¶18 n.4.

**B.      Plaintiff's Expert Witness**

Plaintiff relied upon the testimony of Dr. Steven Pliszka.  Dr. Pliszka  received a bachelor's degree in psychology from the University of Texas at Austin in 1977.  Pl-PFF, ¶138.  He attended medical school at the University of Texas Health Science Center in San Antonio, graduating in 1981. Id.  He completed his residency in psychiatry at that same institution, completing his child and psychiatry training in 1986.  Id.  Dr. Pliszka was actively involved in the ADHD field prior to and

in 1995, reviewed the relevant pre-1995 publications prior to 1995, and had occasion to comment on them and incorporate them in his own work prior to 1995.  Id.  ¶137.  Dr. Pliszka has an active clinical practice, has conducted clinical trials for ADHD treatments, and has conducted research on the neurobiology of ADHD and treatment of ADHD and comorbid disorders.  Id.  ¶139.  Dr. Pliszka's clinical practice includes treating in excess of 500 children with ADHD, developmental disabilities, and other psychiatric disorders.  Id.  ¶140.  Dr. Pliszka also teaches psychopharmacology and neurobiology to medical students and psychiatry residents.  Id.  ¶141.  Dr. Pliszka is the principal author of the Practice Parameters of the American Academy of Child and Adolescent Psychiatry ("AACAP") for the diagnosis and treatment of ADHD.  Id.  ¶142.  AACAP is considered the leading national organization of child and adolescent psychiatrists in the United States.  Id.  Dr. Pliszka has participated in numerous clinical trials of ADHD agents, including tomoxetine, in the treatment of ADHD.  Id.  ¶143.  Dr. Pliszka has authored several publications and books related to ADHD and its treatment. Several of his relevant publications were published prior to 1995.  Id.  ¶144.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having received voluminous documentary and testimonial evidence from the parties' experts, as well as substantial briefing and oral argument on the various issues presented in this matter, the Court issues this Opinion which constitutes its findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a).  The Court's findings of fact and conclusions of law with respect to each of the various grounds for invalidity/unenforceability of the '590 patent are discussed below:  **(I)** obviousness, **(II)** inequitable conduct, **(III)** lack of enablement to the full scope of the patent's claims, and **(IV)** lack of enablement/utility.

-12-

I.   <u>OBVIOUSNESS</u>

Defendants assert that the '590 patent is invalid for obviousness.  Defendants argue that the '590 patent merely "substitut[ed] one potent selective norepinephrine reuptake inhibitor (atomoxetine) for another (desipramine) known to be effective in treating ADHD."  Defendants' Post-Trial Brief, Doc. No. 645, ("DPTB"), at 7.  Accordingly, Defendants assert, "it would have been obvious to a person of ordinary skill in the art . . . to make that simple exchange with a reasonable expectation of success."  <u>Id.</u>

Plaintiff responds that Defendants' argument must fail because:  (i) a truly selective norepinephrine reuptake inhibitor was not thought to be desirable, and (ii) desipramine's selectivity was associated with fatal side effects.

A.   **Applicable Law**

Under 35 U.S.C. § 103(a), a party may not receive patent protection for an invention that is "obvious"; as § 103(a) states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

Upon issuance, however, a patent is presumed valid and "included within the presumption of validity is . . . a presumption of nonobviousness."  <u>Structural Rubber Prods. Co. v. Park Rubber Co.</u>, 749 F.2d 707, 714 (Fed. Cir. 1984).  Accordingly, "[a] party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention,

-13-

and that the skilled artisan would have had a reasonable expectation of success in doing so." Procter & Gamble Co. v. Teva Pharms. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009) (internal quotation omitted).[3]

The Supreme Court has enumerated four factors to be considered by courts to assess whether an invention is obvious. Takeda v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)). The four factors are: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations, or "objective indicia of non-obviousness." Id.; see also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 405 (2007). The "objective indicia" of non-obviousness, the fourth Graham factor, instructs courts to consider the circumstances surrounding the invention process including, but not limited to: meeting a long-felt need, the inventors' success despite the failure of others, commercial success, copying, praise and recognition for the invention, unexpected results, and significant effort and serendipity. See Ruiz v. A.B. Chance Co., 234 F.3d 654, 660-62 (Fed. Cir. 2000); see also Proctor & Gamble, 566 F.3d at 994 (Fed. Cir. 2009); Ortho-McNeil, 520 F.3d. 1358, 1364 (Fed. Cir. 2002). A court must make findings of fact and conclusions of law as to each of the Graham factors.

### B.    The Scope and Content of the Prior Art

This Court will first define the scope and content of the prior art at the time of the patent's filing. The '590 patent relates to the fields of pharmaceutical chemistry and psychiatric medicine.

---

[3] An invention may be found obvious when it would have been "obvious to try"— "[i]n KSR, the Supreme Court noted that an invention may have been obvious '[w]hen there [was] . . . a design need or market pressure to solve a problem and there [were] . . . a finite number of identified, predictable solutions.'" Eisai Co. v. Dr. Reddy's Labs., Ltd., 533 F.3d 1353, 1359 (Fed. Cir. 2008) (quoting KSR, 550 U.S. at 421).

The relevant scope and content of the prior art is to be assessed as of the January 11, 1995 filing date of the '590 patent.

        1.   Drug Discovery – Generally

The parties agree that there are two ways that new drugs are discovered when individuals of skill in the art seek an effective treatment for a particular disorder.  Def-FFCL, at 18, ¶30.  A scientist could,  for example, focus on the structural formula of a drug, and draw inferences from differences or similarities as to how changes in a given molecule might affect the function of that molecule.[4]  Id.  Alternatively, a scientist could look at the properties of two structurally dissimilar compounds and draw inferences from their properties.  Id. at 18, ¶31.  For instance, a scientist might look at the properties of an existing drug and find others with similar therapeutic effects.  Id.

It is the latter method of drug discovery that is of primary concern here, as that was the approach used by Dr. Berridge in his assessment of the prior art concerning ADHD treatment.  Id. at 18-19, ¶¶31-32.  Dr. Pliszka confirmed that looking at the properties of existing drugs to find others with similar therapeutic effects was one recognized approach to drug discovery.  Id. at 19, ¶32.  Using that approach, Dr. Berridge explained that in studying the treatment of ADHD one might look to a drug like desipramine (known to be effective in the treatment of ADHD) as a basis for looking for other drugs having the same therapeutic properties.  Id.

        2.   Types of Drugs Used to Treat ADHD

Dr. Berridge began his analysis with the four main classes of drugs that had been used, prior

---

[4] An example of that technique, as Dr. Pliszka explained, might arise from a comparison of the similar structures of imipramine and desipramine where a skilled worker might infer that desipramine would be effective in the treatment of ADHD because of the close molecular structure desipramine shares with imipramine.  Def-PFF, at 18, ¶30.

to January of 1995, in the treatment of ADHD.  Id. at 19, ¶33.  The first of those classes is the stimulant drugs—the most effective (and most commonly prescribed) drugs for the treatment of ADHD.  Id.  These compounds in general act pharmacologically by blocking norepinephrine reuptake, thereby increasing the amount of norepinephrine present in the synapse (i.e., the functional connection where one neuron transmits signals to another neuron) and increasing norepinephrine transmission.  Id.  They also block dopamine, another neurotransmitter like norepinephrine, thus serving to increase dopamine in the synapse.  Id.

The second most significant group of drugs commonly used and studied for ADHD treatment is referred to as the tricyclic antidepressants or TCAs.  Id. at 19, ¶34.  They share, to some degree, the pharmacological action of the stimulants in that they also block the reuptake of monoamines, generally targeting both norepinephrine and serotonin reuptake.  Id.  These drugs therefore increase norepinephrine neurotransmission.  Id.

The third class of drugs commonly used and studied for ADHD treatment is referred to as the alpha-2 agonists.  Id. at 20, ¶35.  These drugs bind to and stimulate the alpha-2 receptor, producing the biochemical response that the receptor drives.  Id.  In that way, alpha-2 agonists mimic the action of norepinephrine.  Id.  It was known in January of 1995 that, by stimulating the alpha-2 receptors on the post-synaptic neuron, these drugs increase norepinephrine neurotransmission.  Id.

The fourth class of drugs used and studied for ADHD treatment, monoamine oxidase inhibitors ("MAOIs"),  increase the amount of serotonin and dopamine available for release into the synapse.  Id. at 20, ¶36.  MAOIs can be severely toxic at high dosages.  Id.  These drugs block the monoamine oxidase enzyme, thereby increasing the amount of norepinephrine, and have dangerous and potentially fatal interactions with other drugs and even certain common foods, such as dairy

-16-

products and beverages.  Pl-PFF, ¶70.  As a result, physicians did not feel comfortable prescribing

MAOIs for the treatment of ADHD outside of a research setting.

The focus of the parties' arguments regarding the content of the prior art surrounded the

teachings related to the stimulant drugs and the TCAs, as they were known to be the first and second

most effective lines of drugs for treating ADHD, respectively.  See Def-PFF, at 19, ¶33.

### 3.  Norepinephrine ("NE") Reuptake Inhibition

Norepinephrine is a neurotransmitter affected by drugs that treat ADHD.  Id. at 13, ¶15.  The

role of norepinephrine in ADHD treatment is critical to this Court's obviousness analysis, as

Defendants essentially argue that the '590 patent is obvious because the inventors simply

"substitut[ed] one potent selective norepinephrine reuptake inhibitor (atomoxetine) for another

(desipramine) known to be effective in treating ADHD."  DPTB, at 7.

In forming his opinion, Dr. Berridge reviewed a number of articles including 1984 and 1985

articles by Dr. David Gastfriend, et al. (GASTFRIEND 1984 and GASTFRIEND 1985).  The GASTFRIEND

1985 article proposed that:

> DMI may be more effective than imipramine in ADD, because of its greater
> specificity in blocking norepinephrine re-uptake in the central nervous system. DMI
> may also be better tolerated than imipramine, because of its reduced anti-cholinergic
> and anti-alpha adrenergic effects.

Def-PFF, at 22, ¶43.

Dr. Berridge also relied on a 1986 article by Dr. Maureen Donnelly, et al., from the National

Institutes of Health, National Institute of Mental Health ("DONNELLY").  Id. at 20, ¶39.  DONNELLY

describes a double-blind study in which desipramine was used to treat ADHD in children.  Id.  The

authors determined that their study results "support a noradrenergic mechanism in the mediation of

drug effects" on ADHD—i.e., a norepinephrine-related mechanism was involved in the study's success. Id. at 21, ¶41.  The DONNELLY PUBLICATION also observed that desipramine is "a less potent inhibitor of α1-adrenergic, muscarinic, and H1-receptors" when compared to other TCAs—that is, its activity was more selective as to norepinephrine reuptake inhibition. Id. at 21, ¶40.

Although DONNELLY stated that desipramine was more selective than other TCAs with respect to NE reuptake inhibition (e.g., imipramine), it also stated that desipramine "has been shown to affect other neurotransmitters centrally," Pl-PFF, ¶196, and that "[t]he interactions among different areas of the brain and the involvement of neurons, neurotransmitters, and receptors that affect attention, impulse control, and other higher cognitive functions (often referred to as 'executive functions') are highly complex." Id. ¶44.  The Donnelly Publication explained that the "literature describing the neurochemistry of learning and memory is voluminous, complex, and often contradictory." Id. ¶177.  In particular, it noted that "both noradrenergic and dopaminergic mechanisms are involved in the mediation of stimulant-induced behavioral improvement in [ADHD]." Id. ¶68.

Next Dr. Berridge relied on a 1993 article by Dr. Thomas Spencer *et al.* titled "Desipramine treatment of children with attention-deficit hyperactivity disorder and tic disorder or Tourette's syndrome" ("SPENCER").  Def-PFF, at 22-23, ¶44.  In the article, Dr. Spencer notes that desipramine was useful in treating ADHD, and observed that it was a relatively selective NE reuptake inhibitor compared to other TCAs, and caused fewer side effects. Id. at 22-23, ¶44.  Although Dr. Spencer describes desipramine's usefulness in ADHD and its selectivity, he does not explicitly find that the drug's selectivity was the cause of its effectiveness in treating ADHD. Id. at 22-23, ¶44.

Moreover, Dr. Spencer's assertion as to the drug's selectivity was made in comparison to other TCAs. Pl-PFF, ¶190. In fact, Dr. Spencer explained that because desipramine has actions on other neurotransmitter systems, when compared to drugs more broadly, it is "distinctly not selective"—an opinion shared by his colleague Dr. Biederman who opined that desipramine was a "dirtier drug" with effects on other neurotransmitters and was considered selective only when compared to other TCAs. Id.

Although the Gastfriend and Donnelly quotations discussed above certainly implicate NE inhibition in the treatment of ADHD (GASTFRIEND more directly than DONNELLY), two aspects of these references illustrate why such a conclusion was uncertain. First, even within the DONNELLY source there are various suggestions as to why the studied compounds were effective in treating ADHD. In fact, it appears to indicate that NE inhibition is one, among many, factors that contribute to the clinical efficacy of tomoxetine. The Court must bear these various possibilities in mind when determining the reference's teachings.

Second, and related to the first point, the prior art **as a whole** did not suggest that NE inhibition was necessarily the paramount or exclusive contributor to efficacy in ADHD treatment. A comprehensive view of the prior art is essential in defining the prior art and comparing it with the invention in question (i.e., assessing the 1st and 3rd Graham Factors), as "the correct test of invention or nonobviousness focuses on the teachings of the prior art as a whole, not the disclosures of individual references taken singly." 2-5 CHISUM ON PATENTS § 5.04, n.14; see Takeda Chem. Indus. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1363 (Fed. Cir. 2007); Novartis Pharms. Corp. v. Teva Pharms. USA, Inc., 2007 U.S. Dist. LEXIS 65792, at *16-17 (D.N.J. Sept. 6, 2007) (finding that even if one reference points to a particular lead compound, this suggestion is negated when other

prior art references contain conflicting teachings); see also Custom Accessories, Inc. v. Jeffrey-Allan Indus., 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art"). The Court now turns to this second consideration: the teaching of the prior art as a whole.

As an initial matter, at the time the Gastfriend articles were written, the role of norepinephrine itself was unclear. For example, in 1984, a publication by Dr. Dennis H. Langer *et. al.* titled "Pilot Trial of Mianserin Hydrochloride for Childhood Hyperactivity" ("LANGER") indicated that mianserin, a compound believed to block pre-synaptic alpha-2 adrenergic receptors (resulting in an increase in norepinephrine levels), was actually found to be ineffective in ADHD treatment. Pl-PFF, ¶77. That is, the reference suggested that an increase in NE may not be desirable. Conversely, clonidine, which was thought to stimulate pre-synaptic alpha-2 adrenergic receptors resulting in a decrease in norepinephrine levels, was found to be moderately effective in children with ADHD in a 1985 article titled "Clonidine Benefits Children with Attention Deficit Disorder and Hyperactivity: Report of a Double-Blind Placebo-Crossover Therapeutic Trial" ("HUNT") by Dr. Robert D. Hunt *et al.* Id. It was not until later that NE reuptake inhibition was deemed critial to treating ADHD. See id. ¶179.

Although the stimulant and TCA classes of drugs are each norepinephrine reuptake inhibitors, in the period of time leading up to 1995, this Court finds that there was no consensus on the specific neurotransmitters or areas of the brain involved in the pathophysiology of ADHD. Id. ¶175. Critically, the scientific data did not imply prominent involvement of a single neurotransmitter. Id. ¶176.

This lack of consensus is reflected in a 1987 review by prominent researchers at the National

Institute of Mental Health ("NIMH"), Dr. Alan Zametkin and Dr. Judith L Rapoport, titled "Neurobiology of Attention Deficit Disorder With Hyperactivity: Where Have We Come In 50 Years?" ("ZAMETKIN AND RAPOPORT") Id. ¶179.  Drs. Zametkin and Rapoport reviewed the prior 50 years of ADHD treatments and the varied pharmacologic characteristics of prior art ADHD compounds, and concluded that "[i]t is clear by now that the array of effective agents has put to rest any single transmitter hypothesis."  Id.  An impact on norepinephrine alone was pronounced "necessary but not sufficient for clinical efficacy" in ADHD.  Id.  The authors suggested that the most promising areas for future research involved trials of a combination of dopaminergic and noradrenergic agents.  Id.

In 1989, Drs. Mefford and Potter, also from NIMH, published another hypothesis regarding etiology of ADHD in "A Neuroanatomical and Biochemical Basis for Attention Defect Disorder with Hyperactivity in Children: A Deficit in Tonic Adrenaline Mediated Inhibition of Locus Coeruleus Stimulation" ("MEFFORD AND POTTER")  Id. ¶180.  They suggested that increasing epinephrine (adrenaline), particularly in brainstem neurons, would treat the condition.  Id.  They argued that the "ideal therapeutic agent" for ADHD would itself be taken up into norepinephrine terminals and storage vesicles, and would, unlike tomoxetine, possess potent inhibitory properties toward MAO type A.  Id.  Alternatively, the authors suggested that "a site selective alpha-2 agonist acting only at the brainstem level [also unlike tomoxetine] might be effective."  Id.

Also in 1989, a publication by Dr. Joseph Biederman et al., "A Double-Blind Placebo Controlled Study of Desipramine in the Treatment of ADD: I. Efficacy" ("BIEDERMAN"), confirmed the uncertainty regarding the effect of NE inhibition.  See id. ¶196.  The study found that "[t]he pharmacological mechanism of action of DMI [desipramine] in ADDH remains unknown."  Id.

-21-

In 1991, Dr. James McCracken of the UCLA Neuropsychiatric Institute reviewed ADHD and its treatments in "A Two-Part Model of Stimulant Action on Attention-Deficit Hyperactivity Disorder in Children" ("MCCRACKEN"). Id. ¶181. Dr. McCracken found that "[i]t is reasonable to surmise that the amine reuptake blockade [norepinephrine reuptake inhibition] shared by desipramine, imipramine, and clomipramine is likely related to the moderate therapeutic effect of the tricyclics"—i.e., this action was instrumental in treating ADHD. Def-PFF, at 31, ¶63. He determined, however, that while NE inhibition may be related to ADHD treatment, its role was not clear, as he also asserted that "as yet there is no consensus on the precise mechanism of action of ADHD's most commonly prescribed treatment (the stimulants) or of the etiology of ADHD itself." Pl-PFF, ¶178. In fact, Dr. McCracken suggested that a beneficial drug might stimulate the pre-synaptic dopamine receptors (decreasing the level of dopamine) and stimulate alpha-2 adrenergic receptors (decreasing the level of norepinephrine). Id. Tomoxetine does not fulfil these prerequisites.

In a 1992 article by Dr. Andrew Shenker,"The Mechanism of Action of Drugs Used to Treat Attention-Deficit Hyperactivity Disorder: Focus on Catecholamine Receptor Pharmacology" ("SHENKER"), Dr. Shenker emphasized the uncertainty of NE inhibition as the single cause of the drug's effectiveness. Although Dr. Shenker stated that desipramine was effective to some degree in treating ADHD, and that the drug inhibited NE reuptake,[5] he also determined that the roles of

---

[5] Dr. Shenker emphasized that although he classified certain drugs as a NE inhibitors, he clarified:

> the effects of drugs on the brain receptors for DA, NE, and EPI have been discussed in separate sections—this is a gross oversimplification as far as their effects on the operation of the brain are concerned. As mentioned, a drug is classified according to the site for which it has highest affinity, but, depending on dose, it may be able to interact with receptors or uptake sites for several different neurotransmitters. Furthermore, even highly

dopamine and norepinephrine in ADHD treatment "remain unresolved." Id. He further explained that "[i]t may very well be that increased synaptic availability of both DA and NE is required for optimal pharmacotherapy of ADHD." Id. This proposition is supported on page 356 of his article, where Dr. Shenker considers that "[t]he clinical promise of nomifensine in ADHD could not be pursued because of its toxic effects, but several new drugs that are potent blockers of both DA and NE uptake systems have been described, including LU 19-005, diclofensine, mazindol and BTCP." In fact, Dr. Shenker went so far as to write that "[a]ny discussion of the efficacy of imipramine and desipramine in ADHD must include the fact that, unlike amphetamine, they are fairly potent antagonists at α1AR [adrenergic receptor] and certain other brain receptors." Id. ¶196. Dr. Shenker noted that "[w]hether these properties contribute to or detract from [desipramine's] clinical efficacy remains to be seen." Id. In this regard, desipramine's alpha-1 receptor activity was of particular interest, because this property was shared with the antipsychotic medications that had been found to be effective in ADHD. Id. In short, the article did not give an indication that NE reuptake inhibition selectivity was a sufficient property for a successful ADHD treatment.

Moreover, Dr. Shenker's research findings in general are qualified, as he (and other researchers) have found that there are

> treacherous waters [to] . . . be crossed between basic research and clinical applications in ADHD. Our growing knowledge of the basic pharmacology of DA and NE systems involved in rodent behavior is encouraging, but it must be applied judiciously in studying the effects of stimulants and other drugs in humans. Drug effects in rodent models are extremely dependant on drug dose, strain of rat tested, test conditions, behavioral measurement, and age of the animal.

---

selective agonist and antagonists can elicit effects on other neurotransmitter systems because of functional interconnections.

PTX-6, SHENKER, at 355.

Id. ¶177.  He explicitly states that "[r]odents may have inherently limited value as animal models of ADHD."  Id.

To summarize, while the prior art demonstrated that norepinephrine reuptake inhibition was relevant to ADHD treatment, the literature does not appear to indicate that it was alone sufficient. Id. ¶184.  The fact that desipramine (as a TCA) was a more selective NE inhibitor than other TCAs does not indicate that it (and all other selective NE inhibitors) were optimal ADHD treatments—that is particularly so because the TCAs, as a class, exhibited affinities for a large, diverse set of receptors, including alpha-1, alpha-2, cholinergic, dopaminergic, muscarinic, noradrenergic, serotonergic, and histaminergic receptors.  Id. ¶188.  As data introduced at trial indicates, desipramine is selective when compared to imipramine, but far less selective than tomoxetine with regard to selectivity.  Id. ¶193.

In arriving at this conclusion, the Court found both Defendants' and Plaintiff's expert to be credible and qualified.  This Court's independent consideration of the entirety of the prior art, however—after having the benefit of both experts' synopses—aligns more closely with the view of Dr. Pliszka.  In so concluding, the Court also finds it significant that Dr. Pliszka was directly involved in the relevant field of study during the key period (i.e., the time of patent filing in 1995, and the period leading up to filing).  His testimony was particularly helpful to the Court in that Dr. Pliszka described the various trends in ADHD treatment that would have been known to an individual of skill in the art.[6]

---

[6] As discussed further below, this Court agrees with Plaintiff's characterization of Defendants' obviousness argument—specifically, that the argument relied on sources selectively picked from the prior art.  See Section I.D, infra.

4. <u>Decrease in the Use of Desipramine</u>

Despite desipramine's apparent success in treating ADHD, by the early 1990s, its use decreased as a result of a severe side effect. <u>Id.</u> ¶200. In particular, there were reports of sudden deaths in apparently healthy children taking desipramine. <u>Id.</u> These deaths led to speculation that desipramine was more toxic than TCAs (including imipramine). <u>Id.</u> ¶200-01. The desipramine product label was modified to reflect these new toxicity-related dangers. <u>Id.</u>

In a 1993 article by Mark A. Riddle, M.D., he explained one possible explanation for the dangers associated with desipramine:

> **It is possible desipramine differs from other tricyclics in ways that make it potentially more lethal.** This possibility is supported by the findings of a recent study indicating that the chance of death after an overdose is greater for desipramine than for other tricyclic drugs (Kapur et al., 1992). **Desipramine's most distinctive feature among the class of tricyclic drugs is that it is the most specific inhibitor of uptake of norepinephrine.** All the tricyclic drugs available in the United States block the uptake of both norepinephrine and serotonin into neurons. Desipramine is most selective for the norepinephrine site whereas clomipramine is most selective for the serotonin site; other tricyclics are intermediate in their selectivity. **Thus, desipramine, by increasing noradrenergic neurotransmission, increases cardiac sympathetic tone. There is an evolving literature indicating that increased cardiac sympathetic tone predisposes vulnerable persons to ventricular tachyarrhythmias, syncope, and sudden death.**

<u>Id.</u> ¶205. Plaintiff argues that the evidence shows that there was widespread concern over the use of desipramine, and that many clinicians stopped using it, or began using it only as a last resort. The extent of the actual drop-off in desipramine use is not clear. As Plaintiff acknowledges, there was debate within the medical community about the safety of desipramine. <u>Id.</u> ¶204. Nonetheless, Dr. Pliszka, and a number of other doctors who Plaintiff has relied upon in its case, continued using desipramine—and even recommended it under certain conditions. <u>See</u> Def-PFF, at 37, ¶¶72-74; Pl-

-25-

PFF, ¶204.  The doctors concluded that the risk was appropriate in light of the therapeutic advantages of desipramine.  See Pl-PFF, ¶204.  Moreover, when use of desipramine was continued, it was done subject to appropriate cautions, such as cardiac monitoring.  Id. ¶76.

Although the precise impact that the reports of sudden death had on prescription of desipramine is not clear, the Court finds that it is reasonable to conclude that the dangers associated with desipramine (and the additional precautions required) must have had some impact.  Doctors would have been less likely to use the drug given an alternative.  As a result, the safety issues associated with desipramine would have—to some degree—discouraged a person of skill in the art from using the compound (or others like it) as long as there was another option available.

With respect to any conflict in the testimony of Doctors Berridge and Pliszka on this point, the Court largely credits that of Dr. Pliszka, as he was a practicing clinician in the field during the relevant time period.  See Pl-PFF, ¶¶146-50, 209.  Dr. Berridge lacks clinical experience, and conceded that he doesn't "really know the full manifestation of cardiac effects, or cardiovascular effects," and was not confronted with the desipramine situation in a clinical setting.  See id. Although the Court does not find that this lack of clinical experience detracts from Dr. Berridge's testimony as a whole (for example, with respect to certain testimony as to the prior art, and general explanations regarding neuroscience and pharmacology), with respect to the use of a particular drug in treating patients, Dr. Pliszka's testimony is more reliable, and is given more weight by this Court.

## C.    The Level of Skill in the Art

The parties' proposed definitions of the level of skill in the art are substantially similar. Essentially they agreed that a person of ordinary skill in pharmaceutical chemistry or psychiatric medicine as of January 1995 (i.e., the filing date) would have at least a M.D. or a Ph.D. in chemistry,

pharmacology, or the biological sciences, and at least 3-5 years of experience in the development of drug products and therapies for psychological disorders.  Pl-PFF, ¶168; Def-PFF, at 17, ¶¶28-29. The parties' dispute centers around whether this hypothetical person of skill in the art must also have had two or more years of post-doctoral experience in research relating to the behavioral pharmacology of ADHD.

The critical difference between the parties' definition is that Plaintiff asserts that the person of skill in the art must have "experience in the development **and clinical use** of drug products and therapies for psychological disorders."  Pl-PFF, ¶168 (emphasis added).  Plaintiff argued that "[e]xperience in clinical use of drugs for psychological disorders is necessary because it (i) provides perspective on how patients respond to medications and the drive to develop agents in the field, and (ii) allows one to evaluate the biology of the disorder in the human, not just in an animal model." Id.  The Court agrees with Plaintiff.

**D.    The Differences between the Prior Art and the Claimed Method**

For many of the reasons set forth above, this Court finds that the differences between the prior art and the invention covered by the '590 patent are significant.  See generally Section I.B, supra.

With respect to the patent itself, the '590 patent describes atomoxetine as a "well-known drug" having activity as a norepinephrine reuptake inhibitor:

> Tomoxetine is quite active in that function, and moreover is substantially free of other central nervous system activities at the concentrations or doses at which it effectively inhibits norepinephrine reuptake. Thus, it is quite free of side effects and is properly considered to be a selective drug.

see '590 Patent, at col. 1, ll. 60, et seq.   The specification of the '590 patent goes on to describe

atomoxetine as a "notably safe drug" and states that it represents "a superior treatment" for ADHD by reason of its improved safety.  Id. at col. 1, ll. 66, *et seq*.  The patent claims a method of treating attention-deficit/hyperactivity disorder comprising administering to a patient in need of such treatment an effective amount of tomoxetine

First, this Court finds that the prior art was not in accord as to the role of NE reuptake inhibition in ADHD treatment.  Indeed, several of the various references above specifically indicate that NE inhibition may not be necessary to a successful ADHD treatment.  For example, two of the references, from 1984 and 1985, suggest the NE reuptake inhibition was not necessary  (e.g., LANGER and HUNT).  Similarly, the 1989 MEFFORD AND POTTER article suggested that a drug that did not share the properties of tomoxetine would be successful in the treatment of ADHD.  A person of ordinary skill in the art would view these references as diverging drastically from the claimed subject matter of the '590 patent.

Second, even the later references which indicate that NE reuptake inhibition was relevant to a successful ADHD treatment do not definitively define the role of NE reuptake inhibition.  For example, the BIEDERMAN, MCCRACKEN, and ZAMETKIN AND RAPOPORT articles suggest that the mechanism of action of ADHD was unknown.  Even more significant is the fact that many of these same articles indicate that perhaps activity at two or more receptor sites was necessary and/or ideal for an optimal ADHD treatment (e.g., DONNELLY, MCCRACKEN, SHENKER and ZAMETKIN AND RAPOPORT).

Third, during the period preceding the filing of the '590 patent—specifically, in the years closest to the time of filing—there were negative reports concerning desipramine.  This factor must weigh to some extent away from using atomoxetine as a potential ADHD treatment (even if not as

much as Plaintiff urges), as desipramine was functionally a similar compound to atomoxetine.

* * * * *

In view of this Court's findings with respect to the <u>Graham</u> Factors, this Court cannot does not find that the Defendants have established, by clear and convincing evidence, that the '590 patent was obvious.

As noted above in this Court's discussion of the various references discussed by the parties, the prior art must be considered as a whole.  <u>See</u> 2-5 CHISUM ON PATENTS § 5.04, n.14; <u>see</u> <u>Takeda Chem.</u>, 492 F.3d at 1363; <u>Novartis Pharms</u>, 2007 U.S. Dist. LEXIS 65792, at *16-17; <u>see</u> <u>also</u> <u>Custom Accessories</u>, 807 F.2d at 962.  Here, although excerpts from several of the references can be read to suggest that NE reuptake inhibition is a key component to an effective ADHD treatment, the majority of the prior art stresses that the mechanism of action of ADHD was unclear at the time the patent application was filed.

Even in references that support Defendants' position, there are frequently qualifications as to the optimal type of drug necessary for an ADHD treatment.  In some references there are even theories that would appear to be directly contrary to the theory espoused by the inventors and patent applicants here (i.e., that "truly" selective NE reuptake inhibitor would be effective in ADHD treatment).  These other teachings within the cited references are critical—just as the prior art must be considered in its entirety,  "[i]t is impermissible . . . to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."  <u>In re</u> <u>Wesslau</u>, 353 F.2d 238, 241 (C.C.P.A. 1965).

Additionally, negative developments with desipramine (i.e., a drug that was functionally

similar to tomoxetine) would further discourage tomoxetine's use as a model for further research.

Considering the prior art at the time of filing, this Court finds that the subject matter claimed in the '590 patent was not obvious.  Although segments of the prior art can be selected so as to create a path leading to the patent's method of ADHD treatment, this is insufficient to demonstrate obviousness.  Eli Lilly & Co. v. Zenith Goldline Pharms., Inc., 471 F.3d 1369, 1379 (Fed. Cir. 2006) ("[M]ere identification in the prior art of each component of a composition does not show that the combination as a whole lacks the necessary attributes for patentability, i.e. is obvious."); see also KSR, 550 U.S. at 421 (cautioning against "the distortion caused by hindsight bias" and "arguments reliant upon ex post reasoning" in determining obviousness); Processing Corp. v. Am. Maize-Products Co., 840 F.2d 902, 907 (Fed. Cir. 1988) (noting that in considering obviousness, "[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.") (internal citations omitted).  Having considered the prior art as a whole—and being mindful of the complexities of ADHD, the causes of which remain unknown to this day—the Court cannot find that a person of skill in the art would consider it obvious to use atomoxetine to treat ADHD.

For the reasons stated, the Court finds that the '590 patent is not invalid as obvious over the prior art.

### E.    Secondary Considerations of Nonobviousness

As Defendants have failed to demonstrate obviousness in accordance with the initial Graham factors, the Court need not consider the objective indicia of nonobviousness.  See Takeda, 492 F.3d

-30-

at 1363 ("In light of our conclusion that [the patent challenger] failed to prove that the claimed compounds would have been prima facie obvious, we need not consider any objective indicia of nonobviousness."); Unigene Labs., Inc. v. Apotex, Inc., 2009 U.S. Dist. LEXIS 78051, at *48-49 (S.D.N.Y. Aug. 31, 2009) (same).


## II.   INEQUITABLE CONDUCT

Defendants assert that the '590 patent is unenforceable because the applicants' patent prosecution counsel engaged in  inequitable conduct before the PTO.  Defendants' claim of inequitable conduct is premised upon the applicants' (i.e. Lilly) failure to disclose two documents during prosecution of the '590 patent.  Specifically, Defendants allege that Plaintiff improperly failed to disclose a prior art reference concerning the compound tandamine, Saletu *et al.*, "Tandamine—a New Norepinephrine Reuptake Inhibitor," Int. Pharmacopsychiat., 12:137-52 (1977) ("the Tandamine Reference"), and an Opinion from the Board of Patent Appeals and Interferences ("BPAI").[7]  Plaintiff responds that Defendants cannot establish the requisite materiality or intent with respect to each of the references to demonstrate inequitable conduct.

### A.   Facts

On January 11, 1995, the patent applicants filed the application for the '590 patent.  Pl-PFF, ¶122.  The application was submitted by Joseph A. Jones, an attorney at Lilly.  Id.

The application for the '590 patent set out the background of the invention by describing the

---

[7]  Defendants previously asserted that Plaintiff committed inequitable conduct by (i) failing to disclose a number of other prior art references, (ii) failing to disclose certain statements it made to the FDA, and (iii) its manner of drafting the patent specification.  Plaintiff was granted summary judgment of no inequitable conduct as to these other grounds.  See Eli Lilly, 676 F. Supp. 2d at 356-64.

-31-

prior use of the stimulant methylphenidate (Ritalin®) to treat ADHD, and setting forth its disadvantages, such as requiring several doses per day, producing a rebound effect as each dose fades away, and causing sleeplessness and lack of appetite in some patients. Id. ¶124. The application also described the prior use of tricyclic antidepressants such as imipramine, desipramine, nortriptyline, amitriptyline, and clomipramine, to treat ADHD and stated that the TCAs "have a number of physiological mechanisms and, as a class, tend to produce a number of side effects and require careful supervision and dose titration." Id. The application explained that the "need for a safe and convenient treatment for ADHD, applicable to both children and adults and without the disadvantages possessed by methylphenidate continues to be a concern of the psychiatric profession." Id.

### 1. Facts Related to the Tandamine Reference

On April 19, 1995, Mr. Jones submitted an Information Disclosure Statement ("IDS") enclosing 37 references, with an accompanying "List of References Cited by Applicant" related to its application to the PTO. Id. ¶126. These references contained information regarding imipramine, desipramine, nortriptyline, amitriptyline, clomipramine, bupropion, fluoxetine, chlorpromazine and clonidine. Id. The references also included published reports of Lilly's trials with tomoxetine for depression, as well as a large number of publications referring generally to tomoxetine. Id. On August 2, 1995, and August 3, 1995, Examiner James M. Spear signed the IDS and initialed next to each of the references listed in the IDS, attesting that he had considered all of the references submitted. Id. ¶126. The examiner also conducted searches of the PTO files and a computer database for prior art. Id.

In a first office action, the '590 patent examiner rejected all claims under 35 U.S.C. § 103,

-32-

relying on three references that Jones cited in the IDS—the Ryan reference, the Green reference, and the Wong reference.  Def-PFF, at 143, ¶30.  In rejecting the claims for obviousness, the examiner noted that atomoxetine was known in the prior art to inhibit norepinephrine (monoamine) uptake, citing the Wong reference.  Id. at 143, ¶31.  The examiner also stated that the Ryan reference suggests using selective inhibitors of monoamine uptake, such as tricyclic anti-depressants, to treat ADHD.  Id. at 143, ¶32.  The examiner also referenced a "motivating factor" for using the newly developed antidepressant, atomoxetine, in treating ADHD, which was "a desire to more selectively inhibit monoamine uptake with potent inhibitors having longer durations of action and potentially fewer side effects."  Id. at 143, ¶33.

In October 1996, Robert Titus, another Lilly patent attorney, filed a brief appealing the examiner's final rejection.  Pl-PFF, ¶131.  The brief explained that a rejection of the claims for obviousness was improper because:

> An artisan skilled in the relevant art is well aware that the tricyclic antidepressants as a class, in addition to their mixed serotonin and norepinephrine reuptake inhibition activity, bind directly to a wide variety of receptors.  Wong discloses (pages 63- 64, section entitled "Receptor affinity in vitro"), for example, that the tricyclic antidepressants desipramine and imipramine have high affinity at alpha-1, alpha-2, histamine-1, and muscarinic receptors.  Furthermore, Cusack reports (Cusack, et al., Psychopharmacology, 114, 559-565 (1994); PTO-1449 entry CAA, page 564, Table 2) that many of the tricyclic antidepressants have affinity at the human histamine-1, muscarinic, alpha-1, alpha-2, 5-HT1a, and 5- HT2 receptors.   The tricyclic antidepressants exhibit high affinity for a broad, diverse set of receptors.   The pharmacological benefit of this class could be mediated by any single neurotransmitter or by some combination of effects.  Tomoxetine and the tricyclic antidepressants share the ability to inhibit the reuptake of the neurotransmitter norepinephrine. Tomoxetine, however, is distinguished from the tricyclic antidepressants in that it is effectively devoid of many other receptor affinities characteristic of the tricyclic antidepressants.

Id.  The examiner agreed, finding that

-33-

> [t]he prior art of Ryan, Green and Wong et al. considered the closest prior art of record shows antidepressant drugs including tomoxetine. Ryan and Green show related antidepressants used in clinical studies and evaluate drug responses to (ADHD). Wong et al. shows some of the same antidepressants and additionally tomoxetine and addresses the issue of tomoxetine's potential as an antidepressant. The prior art does not show nor fairly suggest the method of treating the particular condition (ADHD) with an effective amount of the drug tomoxetine.

Id. ¶133.

In December 1996 the PTO issued a Notice of Allowability. The '590 patent issued on August 19, 1997. Id. ¶134.

While prosecuting the application for the '590 patent, Lilly also concurrently prosecuted corresponding or counterpart foreign applications, including European Application No. 96300157.3 ("the EP '157.3 application"). Def-PFF, at 149, ¶64. Lilly filed the EP '157.3 application in January 1996, and Titus was aware of the prosecution. Id. 149, ¶65-66. On or around January 17, 1997, while the '590 patent application was still pending in the United States, the EPO issued a report documenting its search of prior art for the EP '157.3 application. Id. 150, ¶67. The EPO search report listed four "Documents Considered to Be Relevant" to the EP '157.3 application. Id. 150, ¶68. Two of the documents so listed were denoted as so-called "Y" references, which is an indication by the patent office that the documents are considered "particularly relevant if combined with another document of the same category." Id. 150, ¶¶69-70. One such document was the Tandamine Reference. Id

### 2. Facts Related to the BPAI Opinion

Several years before applying for the '590 patent, Lilly filed U.S. application number 07/660,767 ("the '985 parent application"), to which U.S. Patent No. 5,441,985 ("the '985 patent") claims priority. Id. at 144, ¶40. The '985 patent claims subject matter significantly similar to that

claimed in the '590 patent:  both patents claim a method of treating a disorder (urinary incontinence for the '985 patent and ADHD for the '590 patent) using the selective norepinephrine reuptake inhibitor known as atomoxetine.  Id. at 144-45, ¶41.

During prosecution of the '985 parent application, the examiner rejected claims directed to the use of atomoxetine for the treatment of lower urinary tract disorders based on the prior art's teachings of the use of a TCA having norepinephrine reuptake inhibition properties.  Id. at 144, ¶43. The examiner rejected, in a final rejection, the claims of the '985 parent application under 35 U.S.C. § 103 "because it is well established in the art that norepinephrine uptake directly affects the lower urinary tract and detrussor muscle."  Id. at 144, ¶44.  Jones submitted a brief to the Board appealing the examiner's final rejection of the '985 parent application.  Id. at 144, ¶45.  The main claim pending in the '985 parent application at the time of appeal was a "method of treating incontinence, detrussor instability and interstitial cystitis in mammals comprising administering to a human suffering from incontinence, destrussor instability or interstitial cystitis an effective amount of tomoxetine or a pharmaceutically acceptable salt thereof."  Id. at 144, ¶46.  The Board issued an opinion affirming the examiner's rejection of the '985 parent application claims based on the reasons stated by the examiner.  Id. at 144, ¶47.

### B.    Applicable Law

The Manual of Patent Examining Procedure ("MPEP") contains guidelines regarding the duty of candor and conduct expected of attorneys and agents prosecuting patent applications before the PTO.  See Def-PFF, at 140, ¶13.  The duty of candor or disclosure, which is generally set forth at 37 C.F.R. § 1.56, is the duty to provide to the patent examiner information that would be important to the examiner in considering whether or not to grant a patent.  Id. at 140, ¶14.  It is well settled that

"[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent] Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." McKesson Info. Solutions, Inc. v. Bridge Medical, Inc., 487 F.3d 897, 913 (Fed. Cir. 2007). A breach of this duty constitutes inequitable conduct, which subjects any resulting patent to nullification.

To establish inequitable conduct, a party must show that the patent applicant, "with intent to mislead or deceive the examiner, fail[ed] to disclose material information or submit[ed] material false information to the PTO during prosecution." Id. Inequitable conduct, therefore, has two elements: materiality and intent.

Information is material "when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1297 (Fed. Cir. 2008). However, "[i]nformation concealed from the PTO may be material even though it would not invalidate the patent." Li Second Family Ltd. v. Toshiba Corp., 231 F.3d 1373, 1380 (Fed. Cir. 2000). An otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner. See Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1577 (Fed. Cir. 1996); FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1415 (Fed. Cir. 1987).

To determine whether there is intent to deceive the examiner, courts look at all the facts surrounding an applicant's overall conduct to infer culpability because "[i]ntent rarely can be, and need not be, proven by direct evidence." Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1364 (Fed. Cir. 2007). More than an omission of material information is necessary, "clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required." Northern

Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 939 (Fed. Cir. 1990).

Materiality and intent are separate elements of inequitable conduct, and must each be proven by clear and convincing evidence for a patent to be rendered unenforceable.  Id.  Nonetheless, the showing of intent can be proportionally less when balanced against high materiality.  N.V. Akzo v. E.I. DuPont de Nemours, 810 F.2d 1148, 1153 (Fed. Cir. 1987).  Similarly, the showing of intent must be proportionally greater when balanced against low materiality.  Id.

### C.    Analysis

The Court will discuss the materiality and intent elements of inequitable conduct with respect to each alleged reference that Defendants assert was improperly withheld from the patent examiner: (1) the Tandamine Reference, and (2) the BPAI Opinion.

#### 1.  The Tandamine Reference

Defendants argue that the Tandamine Reference was relevant because it received a "Y" designation in a foreign counterpart search, and the counterpart application was rejected in light of the reference.  DPTB, at 43.[8]  Essentially, Defendants assert that the "Y" designation should result in a presumption that the reference was material.  The Court cannot agree.

This Court recognizes that the Tandamine Reference was a "Y" reference, and that the "Y"

---

[8] Although there is a continuing duty of candor to the PTO, the Court notes that at the time of the prosecution of the '590 patent, the Tandamine Reference had not served as the basis for a rejection by the EPO of the European counterpart of the '590 patent.  Pl-PFF, ¶318.

After the issuance of the '590 patent, the EPO issued a rejection of the European counterpart application, citing the Tandamine Reference (as item "D4"), mischaracterizing it as a serotonin reuptake inhibitor, and erroneously stating that the reference disclosed that tandamine was effective "in the treatment of ADHD."  Id.  It appears, however, that the EPO was subsequently convinced by Lilly's explanation as to why the Tandamine Reference was not material to patentability.  Id. ¶¶ 323-24.

designation means that the reference is "particularly relevant if combined with another document of the same category." Def-PFF, at 150, ¶¶69-70. This fact notwithstanding, the Court cannot agree that the designation, alone, gives rise to a presumption of materiality for the purposes of inequitable conduct. The assignment of a "Y" designation confirms that the source may be relevant. Relevance, however, is only a part of the materiality determination when considering a claim of inequitable conduct: the standard for materiality when assessing inequitable conduct **also** comprises a requirement that the reference is non-cumulative. The Court finds that the Tandamine Reference does not meet these criteria, because other references before the examiner were more relevant to the patentability of the invention. An otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner. See Pro-Mold & Tool, 75 F.3d at 1577; FMC Corp., 835 F.2d at 1415.

The Tandamine Reference would not have contributed additional information to the examiner that would affect his decision regarding patentability, because the Tandamine Reference, discussing the use of tandamine for depression, would have been far less relevant to the '590 patent Examiner than information regarding the use of tomoxetine itself for depression or compounds that had actually been used to treat ADHD, such as desipramine. Pl-PFF, ¶318. Information regarding both topics was fully disclosed to the '590 patent Examiner in the '590 patent file history and cited references. Id. Moreover, as both parties' technical experts appear to agree, tandamine's use as an antidepressant would not help answer the question of whether it would have been obvious to use tomoxetine to treat ADHD. Id. ¶¶315-17, 326.

In light of these considerations, this Court does not find that the Tandamine Reference was material in light of the references before the patent examiner.

-38-

2. <u>The BPAI Opinion</u>

Defendants argue that a Board of Patent Appeals and Interferences opinion concerning another Lilly patent application was improperly withheld. Specifically, they argue that the opinion would have been relevant to an examiner because the rationale in the Board opinion was highly analogous to the examiner's rationale for initially rejecting the '590 patent claims. In particular, the '985 examiner had rejected claims over prior art that taught that: (1) atomoxetine was known to inhibit norepinephrine reuptake; (2) drugs that inhibit norepinephrine reuptake were known to treat the disorder in question (urinary incontinence in the '985 patent, ADHD in the '590 patent); and (3) a person of ordinary skill in the art would have been seeking a composition with an improved safety profile such as atomoxetine.

The Court does not agree with Defendants. First, the Court is not convinced by Mr. Goolkasian's testimony that because both rationales for rejection were predicated on the reasoning that where you have the same mechanism of action "it's obvious to substitute one chemical that works the same way for another chemical that works the same way." This reasoning, even if perhaps persuasive in many circumstances, does not apply here, where the mechanism of action for the treatment of ADHD was unknown. <u>See</u> FFCL Sec. I.B, <u>supra</u>. In the prosecution of the '985 patent, Lilly admitted that norepinephrine reuptake inhibitors were known to be useful for treatment of urinary incontinence, and given that tomoxetine was known to be a norepinephrine reuptake inhibitor, the use of tomoxetine to treat urinary incontinence would have been obvious. Pl-PFF, ¶352. In contrast, here, Lilly argues, and the Court is satisfied, that the mechanism of action for ADHD treatments was not known at the time the patent application was filed.

Second, the scientific context of the subject matter of the two patents was distinct. The

original application for the '985 patent, which was the subject of the BPAI Opinion, contained claims to treatments of various lower urinary tract disorders (including urinary incontinence, detrussor instability, and interstitial cystitis), which are quite distinct from the subject matter claimed in the '590 patent. Pl-PFF, ¶346. The Court is persuaded by the testimony of both Plaintiff's and Defendants' scientific experts on this point. Defendants' expert Dr. Berridge testified that prior art relating to the treatment of urinary incontinence was not scientifically pertinent to the issue of the obviousness of using tomoxetine to treat ADHD. Id. ¶350. Dr. Pliszka confirmed that the control of incontinence involves drugs that affect norepinephrine at the muscles of the bladder, which is an entirely different matter from drugs that affect the complex interaction of neurotransmitters and their receptors, including norepinephrine, in the brain. Id. ¶¶351, 358.

Third, the inventors named on the application for the '590 patent are different from the inventor named on the application for the '985 patent. The '590 and '985 applications are not related to one another. Id. ¶345. The '985 patent never mentions ADHD, and the claims of the '590 patent are distinct from those of the '985 patent. Id. Indeed, Defendants do not rely on the '985 patent or any prior art regarding urinary incontinence as a basis for their argument that the claims of the '590 patent would have been obvious. Id.

Fourth, to the extent the BPAI opinion was relevant in that it contained a discussion of tomoxetine's in vitro selective norepinephrine reuptake inhibition properties, such information was already before the examiner. Id. ¶361.

For these reasons, the Court cannot find that the BPAI Opinion was material. Accordingly, Defendants have not established, by clear and convincing evidence, that the '590 patent was obtained through inequitable conduct before the PTO.

### III.     ENABLEMENT TO THE FULL SCOPE OF THE CLAIMS[9]

Defendants argue that the '590 patent is invalid because the specification would not enable a person of ordinary skill in the art as of 1995 to practice (i.e., make and use) the full scope of the claims. Although Defendants admit that the patent teaches how to make and use the immediate release ("IR") tablet/capsule formulation, they contend that a skilled artisan would not have been able to utilize the other dose formulations claimed in the patent without undue experimentation. (Defendants emphasize that these other dose formulations include all dosage varieties, as claim 1 broadly claims: A method of treating attention-deficit/hyperactivity disorder comprising administering to a patient in need of such treatment an effective amount of tomoxetine.) Therefore, Defendants argue, the patent does not properly disclose how to make/use the claimed invention **in its entirety**, and is invalid for lack of enablement.

Plaintiff responds that the patent is fully enabled. Plaintiff contends that although there may be some experimentation required to achieve other embodiments of the invention (i.e., other dose formulations) beyond the IR tablets/capsules, the required experimentation would be merely routine for a person of skill in the art in 1995. Accordingly, Plaintiff asserts that there would only be a "reasonable" amount of experimentation required to practice the full scope of the claimed invention, and this level of experimentation would not be considered "undue."

---

[9] The Court notes that Defendants assert another argument in support of patent invalidity based upon lack of enablement, namely that the patent failed to properly disclose a credible utility. This, however, is a different enablement requirement, and this second argument is addressed separately below. See Section IV, supra.

A.      **Facts**

The nature of the alleged invention is a method of treating ADHD.  Claim 1 of the '590 patent is directed to "[a] method of treating attention deficit/hyperactivity disorder comprising administering to a patient in need of such treatment an effective amount of tomoxetine."  Id. at 71-72, ¶¶ 11, 16.  The remainder of the claims (claims 2-16) all depend from claim 1 and merely add limitations regarding the specific type of ADHD (predominantly inattentive, predominantly hyperactive or combined) and the patient to be treated (child, adolescent or adult).  Id. at 72, ¶17.  Patients include adults, children and adolescents, and patients with ADHD complicated with one or more additional disorders ("comorbidity").  Id.  The claims of the '590 patent are not limited to any particular dosage form.  Id. at 72, ¶12; 73, ¶¶19-21.

The '590 patent encompasses any form of atomoxetine to be used in practicing the invention, i.e., base, salt(s).  Id. at 74, ¶26.  Atomoxetine in its base form is an oily liquid and atomoxetine salts are generally solids.   Id. at 74, ¶27.   At the time of filing, there were at least sixty known pharmaceutically acceptable salt forms of atomoxetine, which were previously disclosed in U.S. Patent No. 4,314,081.

The '590 patent specifically states that "[s]ince tomoxetine is readily orally absorbed and requires only once/day administration, there is little or no reason to administer it in any other way than orally."  Pl-PFF, ¶279.  Consistent with this disclosure, the patent teaches that "[i]t will substantially always be preferred . . . to administer tomoxetine as a tablet or capsule and such pharmaceutical forms are recommended."  Id.  This preference is also consistent with the prior art, which disclosed that tomoxetine oral dosage forms were preferred and that in Lilly's published Phase

-42-

I and Phase II studies, tomoxetine was administered orally as tomoxetine hydrochloride capsules.

Id. Moreover, while the '590 patent mentions non-oral dosage forms, it states that they should be used only if there is a specific need or circumstance requiring their use: "It may be usefully administered, if there is any reason to do so in a particular circumstance, in other pharmaceutical forms, such as injectable solutions, depot injections, suppositories, and the like, which are well known to and understood by pharmaceutical scientists." Id. 280.

Defendants introduced the testimony of Dr. James R. Johnson to support their argument that the '590 patent was not fully enabled. Dr. Johnson, was qualified by this Court as an expert in the field of pharmaceutical dosage form development and drug delivery system development. Id. at 70, ¶5.

### B.    Applicable Law

The enablement requirement of patent law requires that "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" Genentech, 108 F.3d at 1365 (quoting In re Wright, 999 F.2d 1557, 1561 (Fed. Cir. 1993)). The enablement provision is contained in 35 U.S.C. § 112, which states:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

A finding of enablement is not precluded where a "reasonable" amount of routine experimentation is required to practice a claimed invention—such experimentation, however, must not be "undue." Enzo Biochem, 188 F.3d at 1371; Wands, 858 F.2d at 736-37. In Wands, the Federal Circuit set forth the following factors that a court may consider to determine if a disclosure requires undue

experimentation:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

858 F.2d at 737. As such, "[w]hether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." Id.

As patents are presumed valid, lack of enablement must be proven by clear and convincing evidence. See Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc., 501 F.3d 1274, 1281 (Fed. Cir. 2007); AK Steel Corp. v. Sollac & Ugine0, 344 F.3d 1234, 1238-39 (Fed. Cir. 2003). Enablement is determined as of the effective filing date of the patent's application. See Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1371-72 (Fed. Cir. 1999).

## C.   Discussion

Defendants assert that the claims of the '590 patent are not enabled to their full scope because the patent only enables immediate release tomoxetine hydrochloride tablets and capsules.

The '590 patent covers a method of treating ADHD by "administering" an "effective amount" of atomoxetine to a patient in need of such treatment. The scope of this claim is, admittedly, broad—it is not limited to using a particular dosage formulation for carrying out the treatment of ADHD patients.[10] The question for this Court is whether one of skill in the art, after reading the

---

[10] Defendants also assert that the claims are not enabled because the patent only describes how to practice the invention using the hydrochloride as the preferred salt of tomoxetine (and the claims cover the invention even when practiced using other salts). Id. ¶287. The Court does not agree, and finds that selection of a salt form of tomoxetine would have been routine. See, e.g., Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1367 (Fed. Cir. 2007) (finding that, upon making a new acid addition salt, it was routine in the art to verify the expected physicochemical characteristics of each salt, including solubility, pH, and stability, using standard techniques to do

specification, could practice the full scope of the invention without undue experimentation. This Court finds, guided by the applicable factors set forth by the Federal Circuit in Wands, that Defendants have not demonstrated by clear and convincing evidence that a person of ordinary skill in the art would be unable to practice the full scope of the invention.

Development of other conventional dosage forms was common in the art and taught in standard textbooks used by pharmacy students. With respect to the prior art on tomoxetine, there were a number of examples teaching how to prepare dosage formulations for the compound and structurally similar compounds (e.g., propylamines).

For example, Canadian Patent No. 1,181,430 ("the '430 patent") issued on January 22, 1985, and is directed specifically to tomoxetine. Pl-PFF, ¶290. The '430 patent describes four examples of specific capsule formulations of tomoxetine hydrochloride and three examples of different ways of making tablet formulations of tomoxetine hydrochloride. Id. The '430 patent also teaches liquid formulations containing tomoxetine, and accordingly, a compounding pharmacist could make a tomoxetine hydrochloride solution. Id. ¶290. The '430 patent teaches that it is usually preferred to use tomoxetine in its salt form, with the hydrochloride salt being most preferred. Id. It also states that tomoxetine is orally absorbed, and "oral administration is usually preferred." Id. Similarly, U.S. Patent No. 4,847,092 ("the '092 patent") issued on July 11, 1989, and contains two examples of sustained release capsules containing tomoxetine hydrochloride and excipients commonly used to

---

so). Additionally, in determining how much experimentation is required before it becomes "undue," the Court must read the patent's teachings in light of the prior art. Here, prior art consistently identified tomoxetine hydrochloride as the preferred salt of tomoxetine, as did prior art publications discussing clinical trials with tomoxetine hydrochloride. Pl-PFF, ¶295. Moreover, the evidence demonstrated that no salt other than the hydrochloride salt was needed to treat ADHD

make sustained release formulations.  Id. ¶292.  Here, then, even if it were necessary for some reason to develop an atypical dosage form for atomoxetine, there was substantial guidance in the prior art indicating how to do so.  (There is no question that the optimal dosage form was properly disclosure and enabled in the patent.).[11]

Relying on ALZA Corp. v. Andrx Pharms., LLC, 603 F.3d 935 (Fed. Cir. 2010), Defendants assert that the patent here is not enabled to the full scope of its claims.  In ALZA the patent at issue involved a method for a once-daily medication for treating ADHD.  Id. at 938.  The patent covered both osmotic and non-osmotic dosage forms with ascending release rates.  Id.  Although the patent included a description and figures devoted to explaining osmotic dosage forms, there was no such material describing the non-osmotic dosage forms.  Id.  Accordingly, the Federal Circuit concluded that the patent was invalid for lack of enablement under 35 U.S.C. § 112, ¶ 1, because it would take one of skill in the art, after reading the specification, undue experimentation to prepare a non-osmotic oral dosage form with an ascending release rate.  Id.

This Court does not believe that the same result is warranted here.  In ALZA, the Court stressed that "the field of ascending release dosage forms was not mature at the time the '373 patent was filed and was a 'breakaway' from the prior art, and thus, the preparation of such dosage forms was not routine." Id. at 941.  In satisfying the enablement requirement, "what one of the proper skill in the art knows cannot substitute for disclosure of **novel aspects of the invention**, i.e., the

_____

[11] Dr. Pliszka, a psychiatrist who has treated patients with ADHD for close to 25 years, testified that he has never confronted a circumstance in which he was unable to treat a patient with commercially available capsule forms of tomoxetine.  Pl-PFF, ¶282.  Dr. Pliszka never found it necessary to administer tomoxetine by injection, depot injection, or suppository, and explained that there was no need for a sustained release formulation to practice the invention.  Id.

non-osmotic dosage forms exhibiting ascending release rates." That is, in <u>ALZA</u> the allegedly non-enabled formulation itself was part of the invention's novelty. Here, in contrast, the various conceivable formulations are standard—and they were not part of the basis for the invention's patentability. As such, this Court finds that reliance on formulation-related disclosures in the prior art to be appropriate. <u>See id.</u>; <u>see also</u> <u>Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.</u>, 501 F.3d 1274, 1283 (Fed. Cir. 2007) ("Although the knowledge of one skilled in the art is indeed relevant, **the novel aspect** of an invention must be enabled in the patent.") (emphasis added); <u>Genentech, Inc.</u>, 108 F.3d at 1366 ("It is the specification, not the knowledge of one skilled in the art, that must supply **the novel aspects** of an invention in order to constitute adequate enablement.") (emphasis added). Indeed, the <u>ALZA</u> Court appeared to recognize that methods for developing certain conventional dosage forms—forms that were not part of the invention's novelty—were well known. <u>ALZA</u>, 603 F.3d at 937 ("At the time of the invention, it was well known how to develop sustained-release dosage forms, also known as 'controlled release' or 'extended release.'"). Accordingly, where a particular dosage formulation could be developed through routine testing, the patent specification need not explain the full development process. <u>Merck & Co. v. Biocraft Laboratories, Inc.</u>, 874 F.2d 804 (Fed. Cir. 1989) ("The evidence at trial showed that, though requiring time and care, the experimentation needed to arrive at the claimed dosages was nothing more than routine . . . [as] the dose response and compatability procedures followed by Merck were those that all pharmaceutical companies [follow] whenever they determine . . . the minimal dose and the appropriate dose."); <u>United States v. Telectronics, Inc.</u>, 857 F.2d 778, 785 (Fed.Cir. 1988) (finding a specification to be enabling in part because those skilled in the art would know how to conduct a dose response study to determine the appropriate amounts to be used).

-47-

Having determined that certain dosage forms can be discovered by reasonable and routine experimentation (and are therefore enabled even absent a specific disclosure in the patent), the Court must determine whether the claimed dosage formulations here fall within this category. This Court finds that a dosage formulator as defined by the parties—a scientist with at least a bachelor's degree in pharmacy or some closely related field, at least three to five years of work experience in developing a particular pharmaceutical dosage form, and the ability to consult with others skilled in other particular disciplines (e.g., physicians, analytical chemists, and biopharmaceutical scientists)—would be able to do so without undue experimentation.

These dosage forms described in the '590 patent (which described the forms as "well known to and understood by pharmaceutical scientists"), are described in standard textbooks used by pharmacy students. Pl-PFF, ¶296. Such references provide standard, exemplary formulations, and discuss (1) how various physicochemical characteristics of a drug substance impact the choice or design of a formulation; (2) the different types of excipients available for each dosage form, their uses and selection; and (3) the factors to consider in preparing, evaluating, and administering each dosage form. Id. Although Defendants discuss at length the time-consuming nature of dose formulation and product testing from beginning to end, the Court nonetheless finds that although the process "requir[es] time and care, the experimentation needed to arrive at the claimed dosages was nothing more than routine." Merck & Co., 874 F.2d at 809; Telectronics, Inc., 857 F.2d at 785; see generally Thompson v. W. States Med. Center, 535 U.S. 357, 361 (1997) (noting that compounding "is a traditional component of the practice of pharmacy, . . . and is taught as part of the standard curriculum at most pharmacy schools").

Although the Court appreciates the complexities that may be confronted when developing a drug formulation, the extensive testimony elicited from Dr. Johnson was not entirely necessary to the enablement analysis.  For example, compounding pharmacists do not conduct many of the tests (including preformulation, *in vitro*, *in vivo*, and clinical) which were explained at length by Dr. Johnson.  Pl-PFF, ¶298.  (Those flow charts more accurately depict the amount of testing that would be required to develop a dosage form suitable for use in FDA-approved clinical studies.  Id.)

The Court, accordingly, agrees with Plaintiff's assertion that, "[t]he enablement inquiry is a **scientific** inquiry and focuses on whether one of ordinary skill in the art would have had the scientific ability to treat ADHD by administering an effective amount of tomoxetine without undue experimentation, given access to the materials described in the patent. It is not a **regulatory** inquiry into whether such use was then approved by the FDA.  Id. at n1. Indeed, most drugs are patented long before their commercial use is approved by the FDA.  Id.

Defendants have failed to show by clear and convincing evidence that one reasonably skilled in the art would be unable to make or use the invention from disclosures in the patent coupled with information known in the art without undue experimentation.  Telectronics, 857 F.2d at 785.  The '590 patent, therefore, is not invalid for lack of enablement to the full scope of its claims.

**IV.    LACK OF ENABLEMENT/UTILITY**

Defendants contend that the '590 patent failed to meet the enablement requirement of 35 U.S.C. § 112, and is thus invalid.  Defendants assert that Plaintiff (i.e., the patent applicant) did not properly establish that the claimed method of treating ADHD had utility at the time of filing the '590 patent application.  More specifically, Defendants asserts that because Plaintiff did not submit test results showing that atomoxetine could be used to treat ADHD, and because a person of ordinary skill in the art would not have recognized the claimed method's utility in light of the specification, the patent was not properly enabled.

Plaintiff responds that the '590 patent does satisfy the enablement/utility requirement of § 112.  First, Plaintiff asserts that a person of ordinary skill in the art would find that the disclosure of the '590 patent sufficiently established that tomoxetine could be useful to treat ADHD.[12]  Second (and most critically), Plaintiff asserts that this case is distinguishable from Janssen Pharmaceutica N.V. v. Teva Pharms. USA, Inc. (In re '318 Patent Litig.), 583 F.3d 1317, 1324 (Fed. Cir. 2009), a Federal Circuit case that Defendants contend controls the outcome of this case.  The parties have provided extensive briefing and oral argument as to the import of In re '318, as the Court has grappled with the enablement issue since summary judgment stage.  Third, Plaintiff argues that the '590 patent's utility may be established by post-filing date evidence.

---

[12] Plaintiff emphasizes that when assessing enablement/utility, it is proper to be aided by hindsight—unlike in the obviousness analysis when the inquiry must be void of any hindsight bias.  Compare Telectronics, 857 F.2d at 785, with Processing Corp., 840 F.2d at 907 (noting that in considering obviousness, "[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit."); see also Section I.B, supra.

A.     **Facts**

1.     The Patent Specification

As noted throughout this Opinion, the claims of the '590 patent recite methods of treating ADHD comprising administering an effective amount of tomoxetine.  The specification of the '590 patent correctly states that tomoxetine is a "well known drug," as demonstrated by publications reporting its properties as well as the results of a small Phase II clinical trial in which tomoxetine hydrochloride was evaluated as an antidepressant.  Pl-PFF, ¶251.   The specification further states that tomoxetine is a "notably safe drug."  Id. ¶252.  This statement is supported by the extensive Phase III clinical studies conducted by Lilly with the drug, where Lilly tested tomoxetine in more than 1,200 patients.  Id.  Although those studies were not public, they did demonstrate, in a very large sample of human patients, the very favorable safety profile of tomoxetine at various doses.  Id.  The '590 patent also discloses that tomoxetine is a "quite active" norepinephrine reuptake inhibitor, which is "substantially free of other central nervous system activities" (i.e., side effects).  Id. ¶253.

The '590 patent specification discloses how to diagnose the disease to be treated, id. ¶254, and how to use tomoxetine to treat ADHD. It specifically discloses the preferred route of administration, the preferred dosage form, and the dosage range for children and adults.  Id. ¶256.  The specification teaches that tomoxetine requires only once-a-day administration.  Id. ¶257.  It further teaches that the effective dose of tomoxetine for ADHD is in the range from about 5 mg/day to about 100 mg/day, that "[t]he preferred adult dose is in the range from about 10 to about 80 mg/day," that "a more highly preferred adult dose is from about 20 to about 60 mg/day," and that the children's dose is "in the range from about 5 to about 70 mg/day, more preferably from about 10 to

about 60 mg/day and still more preferably from about 10 to about 50 mg/day." Id.[13]

The specification contains a number of very general statements indicating that treatment of ADHD with tomoxetine is effective; for example, it states that: "Tomoxetine is a notably safe drug, and its use in ADHD, in both adults and children, is a superior treatment for that disorder because of its improved safety"; "Treatment with tomoxetine is effective in patients who are primarily suffering from either component [of ADHD] or from the combined disorder"; and "The method of the present invention is effective in the treatment of patients who are children, adolescents or adults . . . ." Id. ¶254.

Although the specification of the '590 patent indicates that the use of tomoxetine to treat ADHD is effective, it does not disclose any data or testing regarding the efficacy of atomoxetine to treat ADHD. Def-PFF, at 57, ¶1. In addition to being devoid of any supporting data, "there's no rationale provided [in the '590 patent]" explaining the compounds utility in treating ADHD. Id. ¶¶4-7. (This Court has previously recognized the minimal disclosure of utility in the '590 patent specification. See Doc. Entry Nos. 539, at 5; 621 at 10, n.7.)

    2. Clinical Trials

In conjunction with Massachusetts General Hospital ("MGH"), Lilly conducted clinical trials to study the effects of atomoxetine in treating ADHD. Pl-PFF, ¶104.

On December 1, 1994, Drs. Biederman and Spencer submitted an IND application to the FDA entitled "Effectiveness and Tolerability of Tomoxetine in Adults with Attention Deficit Hyperactivity Disorder." Id. ¶105. Among the material submitted to the FDA was literature

---

[13] The dosage forms of Strattera® approved by the FDA are capsules containing 10, 18, 25, 40, 60, 80, and 100 mg, all of which are within the range of doses identified in the specification of the '590 patent. Id.

concerning the safety of atomoxetine, which had previously been used in depression.  Id. ¶¶107-09.

In a January 3, 1995, telephone conversation, prior to the filing date of the '590 patent application,

the FDA informed Drs. Biederman and Spencer that they had approval to proceed with the clinical

investigation.  Id. ¶110.  Before commencing the clinical trial, Drs. Biederman and Spencer also

obtained approval from the MGH Institutional Review Board ("IRB")—a committee that is charged

with determining whether human clinical research may go forward.  Id. ¶¶111, 267.

The positive results were reported to Lilly by May 1995, and published in October 1995.  Id.

¶112.  It was found that the "overall response rate for ADHD symptoms was clinically and

statistically higher during [tomoxetine] treatment than during placebo (53% vs. 10.5%; p<0.05)."

Id.  Drs. Biederman and Spencer presented and published the positive results of the Phase II trial at

the meeting of the American Association of Child and Adolescent Psychiatry ("AACAP") in October

1995.  Id. ¶113.  In a subsequent publication reporting the results of the trial, Drs. Biederman and

Spencer reported that treatment with tomoxetine "clinically and statistically significantly improved

ADHD symptoms and was well tolerated."  Id.

After receiving the results from the MGH clinical trial, Dr. Heiligenstein made a presentation

to Lilly's Project Team Approval Committee on April 2, 1997.  Id. ¶114.  The Project Team

Approval Committee consisted of senior Lilly scientists who had decision-making responsibility for

selecting drug candidates for clinical development. As a group, this committee had vast experience

relating to development of drugs for human use, exceeding that of individual development teams,

and was expected to bring its collective experience to bear on important development decisions.

Id. ¶115.   The Project Team Approval Committee voted unanimously in favor of developing

tomoxetine for the treatment of ADHD.  Id. ¶116.  On July 8, 1997, Lilly approved the protocol for

the first of many studies of tomoxetine in pediatric patients with ADHD.  Id. ¶117.  Lilly subsequently filed a NDA for approval of tomoxetine to treat ADHD in children and adults.  Id. ¶118.  On November 26, 2002, the FDA approved tomoxetine as safe and effective for the treatment of ADHD.  Id. ¶119.

### B.    Applicable Law

To satisfy the enablement requirement for patentability, a patent applicant must describe the manner of making and using the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same."  35 U.S.C. § 112  The enablement requirement of § 112 "incorporates as a matter of law the requirement of 35 U.S.C. § 101 that the specification disclose as a matter of fact a practical utility for the invention."  See In re Cortright, 165 F.3d 1353, 1356 (Fed. Cir. 1999); In re Schoenwald, 964 F.2d 1122, 1124 (Fed. Cir. 1992).  The Federal Circuit has explained:

> The enablement requirement of 35 U.S.C. § 112, requires that the specification adequately discloses to one skilled in the relevant art how to make, or in the case of a process, how to carry out, the claimed invention without undue experimentation. The utility requirement of 35 U.S.C. § 101 mandates that any patentable invention be useful and, accordingly, the subject matter of the claim must be operable. If a patent claim fails to meet the utility requirement because it is not useful or operative, then it also fails to meet the how-to-use aspect of the enablement requirement.

Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1358 (Fed. Cir. 1999).  Therefore, if an applicant presents no evidence "to demonstrate that the claimed products [or methods] have . . . [the stated] effects, an applicant has failed to demonstrate utility and therefore cannot establish enablement."  Rasmusson v. SmithKline Beecham Corp., 413 F.3d 1318, 1322 (Fed. Cir 2005).

The utility requirement prevents parties from patenting a mere research proposal or an invention that is simply an object of research.  In re '318, 583 F.3d at 1324.  A process or product

"which either has no known use or is useful only in the sense that it may be an object of scientific research" is not patentable.  Brenner v. Manson, 383 U.S. 519, 535 (1966); In re Fisher, 421 F.3d 1365, 1373 (Fed. Cir. 2005).  As the Federal Circuit recently noted, "[p]atents are not awarded for academic theories, no matter how ground-breaking or necessary to the later patentable inventions of others."  Ariad Pharms., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1353 (Fed. Cir. 2010).

Enablement is determined as of the effective filing date of the patent application.  Janssen, 583 F.3d at 1323 (quoting Plant Genetic Sys., N.V. v. DeKalb Genetics Corp., 315 F.3d 1335, 1339 (Fed. Cir. 2003)); see also In re Brana, 51 F.3d 1560, 1566 (Fed. Cir. 1995); In re Glass, 492 F.2d 1228, 1232 (CCPA 1974) (noting that enablement, or utility, is determined as of the application filing date).

The utility requirement for patentability in the context of medical treatments has been developed in Federal Circuit case law.  "Typically, patent applications claiming new methods of treatment are supported by test results." In re '318, 583 F.3d at 1324.  However, "human trials are not required for a therapeutic invention to be patentable, [as] results from animal tests or in vitro experiments  may be sufficient to satisfy the utility requirement." Id.  For example "in vitro test results for a claimed pharmaceutical compound, combined with animal test results for a structurally similar compound, [may] show[] a reasonable correlation between the disclosed in vitro utility and an in vivo activity." Id.  Therefore, "a rigorous correlation is not necessary where the disclosure of pharmacological activity is reasonable based upon the probative evidence." Id.  Additionally, if a patent applicant does not rely on test results to demonstrate utility, a patent holder may be able to demonstrate utility by showing that a person of ordinary skill in the art at the time of the patent's filing would have recognized the utility of the invention in view of the specification. See, e.g., id.

at 1327 n.12 (considering "whether a person skilled in the art could infer [a medical treatment's] utility from the selected prior art described in the . . . patent's specification.").

### C. Janssen Pharmaceutica N.V. v. Teva Pharms. USA, Inc. (In re '318 Patent Litig.)

There is little guidance in the case law as to whether utility for a medical treatment can be established absent test data. The Federal Circuit decision in <u>Janssen Pharmaceutica N.V. v. Teva Pharms. USA, Inc. (In re '318 Patent Infringement Litig.)</u>, 583 F.3d 1317, 1324 (Fed. Cir. 2009), however, is instructive. There, the Court assessed whether a patent applicant can demonstrate utility for a method-of-use patent covering a medical treatment without providing in vitro or animal tests with its patent application. As the <u>In re '318</u> Court confronted a scenario legally and factually similar to the case here, this Court will discuss the decision at length.

<u>In re '318</u> concerned U.S. Patent No. 4,663,318 ("the '318 patent"), which was owned by Janssen Pharmaceutica. Teva Pharmaceuticals challenged the '318 patent's validity on several grounds, including obviousness and enablement. The patent claimed a method for treating Alzheimer's disease with galantamine.[14] The '318 patent application was filed on January 15, 1986. <u>Id.</u> at 1320. At the time of the application's filing, researchers had observed a correlation between Alzheimer's disease symptoms and a reduced level of the neurotransmitter acetylcholine in the brain. <u>Id.</u> It was also known that the compound galantamine inhibited acetylcholinesterase, an enzyme that breaks down acetylcholine. <u>Id.</u> at 1320. Therefore, acetylcholinesterase inhibitors like galantamine increase the amount of acetylcholine available for binding to muscarinic or nicotinic receptors. <u>Id.</u>

---

[14] Claim 1 is representative. The claim covers "[a] method of treating Alzheimer's disease and related dementias which comprises administering to a patient suffering from such a disease a therapeutically effective amount of galantamine or a pharmaceutically-acceptable acid addition salt thereof."

at 1320-21.  The patent applicants argued that reducing the level of acetylcholinesterase with galantamine, then, could potentially be useful in treating Alzheimer's disease by increasing levels of acetylcholine in the brain.

The '318 patent specification disclosed six papers that reported various effects of administering galantamine.  Id. at 1321.  Four of the papers discussed the compound's effect in animal studies relating to memory, and two suggested that galantamine was also able to have certain effects on the human brain.  Id.  Based on this prior art, Janssen reasoned that galantamine could be used to treat memory loss in humans with Alzheimer's disease.  Id. at 1326.  Although specific tests were not carried out to show galantamine's efficacy in treating Alzheimer's disease, the specification cited a seventh paper which set forth a model through which researchers could test acetylcholine's impact on memory and Alzheimer's-related cognitive functions.  The test would hypothetically track the effect increased levels of acetylcholine (through the administration of galantamine) could have on Alzheimer's symptoms.  Id. at 1321-22.  The specification, however, "did not refer to any **then-existing** animal test results involving the administration of galantamine  in connection with this animal model of Alzheimer's disease."  Id. at 1322 (emphasis added).

The '318 patent issued on May 5, 1987.  Id.  Although during prosecution there was an initial rejection based on indefiniteness and obviousness, the examiner never rejected the application for lack of enablement/utility.  Id.  In response to the initial rejection, though, the applicant stated that "experiments [are] underway using animal models which are expected to show that treatment with galantamine does result in an improvement in the condition of those suffering from Alzheimer's disease," and that it was "expected that data from this experimental work will be available in two to three months and will be submitted to the Examiner promptly thereafter."  Id.  The applicant,

-57-

however, did not receive "the results of the animal testing experiments—which suggested that galantamine could be a promising Alzheimer's disease treatment–until July 1987, after the '318 Patent had issued." Id.

In February 2005, Janssen sued several manufacturers for infringing the '318 Patent. Id. at 1323. A bench trial was held in May 2007 on the issues of anticipation, obviousness and enablement. Id. The District Court concluded that the '318 Patent was invalid for lack of enablement/utility for two reasons. Id. The Court found that the specification did not demonstrate utility because (1) relevant animal testing experiments were "not finished . . . by the time the '318 patent was allowed" and (2) the specification provided only "minimal disclosure" of utility. Id. The Federal Circuit affirmed. Id. at 1327.

Regarding the In re '318 Court's first basis for its holding (i.e., the lack of successful test results), the Federal Circuit observed that

> [t]ypically, patent applications claiming new methods of treatment are supported by test results. But it is clear that testing need not be conducted by the inventor. In addition, human trials are not required for a therapeutic invention to be patentable.
>
> . . .
>
> We have held that results from animal tests or in vitro experiments may be sufficient to satisfy the utility requirement.
>
> . . .
>
> In this case, however, neither in vitro test results nor animal test results involving the use of galantamine to treat Alzheimer's-like conditions were provided. The results from the '318 patent's proposed animal tests of galantamine for treating symptoms of Alzheimer's disease were not available at the time of the application, and the district court properly held that they could not be used to establish enablement.

Id. at 1324. The Court did not find Janssen's testing (which was completed after allowance of the patent) to be sufficient to satisfy the enablement/utility requirement. Id. at 1325. The Court was not

persuaded by the fact that the PTO was made aware of ongoing tests during prosecution of the patent.  Id. at 1325 & n.7.

As Janssen did not have timely test results to establish utility, Janssen also argued that through analytical reasoning based on the patent specification, utility could be established.  Id. at 1326.  Janssen's rationale was as follows:  (1) galantamine has positive memory-related effects on animals, (2) galantamine was shown to produce activity in the human brain, (3) galantamine would, therefore, produce memory-related effects in the human brain, and (4) galantamine would be efficacious in treating Alzheimer's.  See id.  The Court rejected this argument.  Id. at 1327.

The Federal Circuit observed that it was not aware of a single case where utility was established solely by analytical reasoning.  Nonetheless, the Court did not outright reject the possibility that under the appropriate circumstances analytical reasoning could suffice.  Id. at 1326.[15] The In re '318 Court assessed whether a person of skill in the art would have a reasonable expectation that galantamine would be effective in treating Alzheimer's Disease in light of the '318 Patent's specification.  Id. at 1322.

To determine whether utility could be inferred from the specification, the In re '318 Court considered the testimony of the parties' expert witnesses.  Plaintiff's own witnesses indicated that a person of skill in the art would not have a reasonable expectation that galantamine would be

_____

[15] The MPEP, states that establishing "a reasonable correlation between" a compound's activity and its asserted therapeutic use may involve "statistically relevant data documenting the activity of a compound or composition, arguments or reasoning, documentary evidence (e.g., articles in scientific journals), or any combination thereof."  Id. at 1326 n.10 (quoting MPEP § 2107.03).  The In re '318 Court noted that although "[t]he MPEP and [PTO Utility] Guidelines are not binding on this court, [it] may be given judicial notice to the extent they do not conflict with the statute."  Id. (citation omitted).

effective in treating Alzheimer Disease.  Id.  Specifically, the Court noted a statement of the patent's inventor, Dr. Bonnie Davis, in response to the obviousness rejection before the PTO.  Id.  With regard to the prior art studies cited in the specification showing galantamine's ability to reverse amnesia in normal rats, Dr. Davis opined that "[n]othing in this teaching leads to an expectation of utility against Alzheimer's disease."  Id.  Janssen's other expert, Dr. Raskind, testified that studying a compound's effects on amnesia "ignores the whole other [nicotinic] part that's damaged in Alzheimer's disease" and thus "doesn't mimic Alzheimer's disease."  Id.  Both witnesses, then, asserted that it was unforeseeable that galantamine could be used to treat Alzheimer's Disease.  The Court relied on this testimony to determine that utility could not be established by the patent's specification.  See id.  The Court found that the conclusion that galantamine would be beneficial in treating Alzheimer's was "nowhere described in the specification[; n]or was there evidence that someone skilled in the art would infer galantamine's utility from the specification."  Id. at 1326.

Accordingly, because there were no test results provided in the patent application, and no indication that a person of skill in the art would have a reasonable expectation that the claimed method would work, the Federal Circuit concluded that the patent applicants failed to meet the enablement/utility requirement of 35 U.S.C. § 112.

### D.    Rasmusson v. SmithKline Beecham Corp.

Prior to In re '318, in 2005, the Federal Circuit discussed the role of enablement/utility in Rasmusson.  There, the Court was faced with determining a priority date between two patent applications "relate[d] to a method of treating a type of prostate cancer by administering a chemical compound called finasteride."  Rasmusson, 413 F.3d at 1320.

Rasmusson filed his initial application on April 3, 1987.  The Board of Patent Appeals and

Interferences, however, declined to give Rasmusson a priority date earlier than the date at which he "provide[d] experimental proof that his invention could be effective in treating cancer." Id. at 1324. Such a showing could be made through providing test results. Alternatively, Rasmusson could demonstrate that a person of ordinary skill in the art, as of the filing date of the application, would have recognized the utility of the invention. Id. at 1323 (noting that where there is "no indication that one skilled in [the] art would accept without question statements [as to the effects of the claimed drug products] and no evidence has been presented to demonstrate that the claimed products do have those effects," an applicant has failed to demonstrate sufficient utility and therefore cannot establish enablement.) (citing Novak, 306 F.2d at 928).

In arriving at its determination, the BPAI (affirmed by the Federal Circuit) surveyed the prior art. It determined that with respect to the earlier filing dates (i.e., prior to the June 2, 1995 priority date which Rasmusson was granted) the "articles and testimony . . . show[ed] that a person of ordinary skill in the art as of the filing date of the eighth application would not know that [5#lsqbarsqb#-reductase] inhibition contributed to any anti-tumor effects, because it was not clear whether DHT or testosterone caused prostate cancer." Id. at 1324. Indeed, the Court noted, "[i]f testosterone, and not DHT, caused the disease, then the anti-tumor effects resulting from multi-active [5#lsqbarsqb#-reductase] inhibitors were not due to 5#lsqbarsqb#R inhibition, but rather to anti-testosterone mechanisms such as the inhibition of testosterone receptor binding." Id. In reviewing the prior art from the mid-1980s to the mid-1990s, "the Board referred to a 1991 article by Dr. Glenn Gormley stating that 'the concept that androgen-dependent prostate cancer is exclusively dependent on DHT and not testosterone has yet to be definitively established.' Likewise, the Board referred to a 1992 article by Dr. Joseph Presti stating that 'whether prostatic cancer cells

are dependent upon [DHT] rather than testosterone is not well defined.'" Id.  In short, it was still unclear whether the inhibition of 5#lsqbarsqb#-reductase would have beneficial effects in treating prostrate cancer.  Accordingly, Rasmusson's patent application was given a priority date of June 2, 1995 because it was only by that filing date that "a person of ordinary skill in the art would have believed that inhibition [of an enzyme known as 5#lsqbarsqb#-reductase] could play a role in treating prostate cancer in light of a presentation made by Dr. Ruben Gittes at the American Urological Association in August 1994, in which he reported successful results from treating prostate cancer with finasteride." Id.

The Court rejected Rasmusson's argument that "the enablement requirement of section 112 does not mandate a showing of utility or, if it does, it mandates only a showing that it is 'not implausible' that the invention will work for its intended purpose." Id. at 1325.  The Court noted:

> As we have explained, we have required a greater measure of proof, and for good reason. If mere plausibility were the test for enablement under section 112, applicants could obtain patent rights to 'inventions' consisting of little more than respectable guesses as to the likelihood of their success.  When one of the guesses later proved true, the 'inventor' would be rewarded the spoils instead of the party who demonstrated that the method actually worked. That scenario is not consistent with the statutory requirement that the inventor enable an invention rather than merely proposing an unproved hypothesis. Because we have upheld the Board's determination of priority due to lack of enablement, it is unnecessary for us to address the Board's ruling regarding lack of adequate written description.

Id.

Accordingly, while an invention need not be reduced to practice to satisfy the utility requirement, there must be some indication that the invention could perform successfully.  As subsequently stated in In re '318, the Rasmusson Court appeared to indicate that the utility showing could be made through providing test results or, by demonstrating that a person of ordinary skill in the art as of the filing date of the application would have recognized the utility of the invention.

-62-

### E.      This Court's Summary Judgment Opinion

In its Opinion denying Defendants' motion for summary judgment as to nonenablement, this Court observed that utility could potentially be established in two ways.   First, as in most circumstances, a patent applicant claiming a new method of treatment could disclose some form of test results to demonstrate that the method is useful.  Eli Lilly, 676 F. Supp. 2d at 373 (citing In re '318, 583 F.3d at 1324).   Second, a patent could meet the utility requirement if a person skilled in the art would infer the invention's utility in view of the disclosures in the specification.  Eli Lilly, 676 F. Supp. 2d at 373.   In this case, no test results as to the claimed method were referenced in the specification or otherwise presented to the PTO.  Accordingly, this Court determined that the only way that the '590 patent could be found enabled is if a person skilled in the art could infer atomoxetine's utility in view of the specification.  Eli Lilly, 676 F. Supp. 2d at 373.

Plaintiff urged the Court to consider the fact that the claimed invention did in fact have utility, and stressed that there were test results demonstrating the claimed method could successfully treat ADHD.  Moreover, Plaintiff asserted that even though test results did not become available until after the filing date of the patent, the fact that the clinical studies were permitted to go forward alone indicates that the invention must have been viewed as having some degree of efficacy.

Although this Court recognized the utility in fact of the invention, the Court determined that these results (or the initiation of the trials) could not serve to demonstrate utility because the materials were not disclosed to the patent office.  Id. at 371.  That is, the Court found that although non-disclosed materials could be relied upon to confirm a patent's disclosure of utility when challenged (e.g., to later demonstrate that the asserted utility was accurate), such non-disclosed materials could not make the initial demonstration of utility that is required in the first instance.

-63-

F.      Discussion

This Court must determine whether the facts of this case warrant a result different from In re '318—where the Federal Circuit found that, under 35 U.S.C. § 112, the patent in question was not enabled at the time of the filing date (January 11, 1995).  Specifically, this Court must determine (1) whether the submission of post-filing date test results can demonstrate enablement/utility, and (2) whether a person of skill in the art, as of January 11, 1995, would have recognized that the claimed method of treatment had utility.

1.      Whether the submission of post-filing date test results can demonstrate enablement/utility.

Defendants assert that Plaintiff's failure to provide test results at the time of patent application (or during the pendency of the prosecution) prevent it from relying on such test data to demonstrate that the patent satisfied the enablement/utility requirement for patentability.  Plaintiff argues that the test data from Lilly/MGH clinical trials, which demonstrate that the claimed method does in fact work, should be considered by this Court.  Plaintiff argues that, unlike in In re '318, the patent applicants here had test results during the pendency of the patent application, thus satisfying the enablement/utility requirement.[16]

This Court agrees with Defendants, and finds that the test results cannot be used to establish utility in satisfaction of 35 U.S.C. § 112.

As noted above, the utility requirement prevents a party from patenting a mere research

---

[16] Moreover, Plaintiff emphasizes, the Lilly/MGH human trials were permitted to proceed prior to the filing date of the '590 patent application.  Based on this fact (i.e., the mere permission to proceed with clinical studies), Plaintiff argues that a person of skill in the art must have been able to recognize the utility of the claimed method of treatment.  This contention is considered in Section IV.F.2, infra.

proposal or an invention that is simply an object of research.  In re '318, 583 F.3d at 1324; see Brenner v. Manson, 383 U.S. 519, 534-35 (1966) (stating that inventions must have "substantial utility" and "specific benefit exist[ing] in currently available form.").  To ensure that patents do not cover "intimations of general ideas that may or may not be workable" or just "hypothetical possibilities," the enablement/utility case law instructs that patent applicants must demonstrate utility (as well as other enablement-related requirements) at the time of filing the patent application.  In re Fisher, 421 F.3d 1365, 1373 (Fed. Cir. 2005) ("Tossing out the mere germ of an idea does not constitute enabling disclosure."); see  In re '318, 583 F.3d at 1323 (quoting Plant Genetic Sys., 315 F.3d at 1339; In re Glass, 492 F.2d at 1232.

Plaintiff emphasizes, understandably, that Lilly had successful test results prior to issuance of the patent.  This is a distinction from In re '318, where the applicant did not receive results until after the patent had issued.  This distinction, however, does not compel a different outcome here. Although it appears to be a harsh result (as Lilly received positive initial test data months after the filing date), the Court believes that binding precedent requires the enablement/utility requirement to be satisfied at the time the patent application is filed.  As Defendants note, and this Court agrees, there is a valid policy for requiring utility to be established at the time of filing:  permitting patents to be filed prior to the establishment (through some means) of enablement/utility cuts off future scientific research in a field "with no assurance that anything useful will be discovered in the end." 421 F.3d at 1373.  For example, a party could conceivably file patents claiming methods of treatments for various diseases through the administration of a certain drug prior to knowing that each method of treatment works.  Then, through later testing, the patent applicant could demonstrate that certain of the claimed treatments were in fact useful at the time of filing.  This Court does not

believe that such a shotgun approach would be permissible under § 112 of our patent laws.[17]  For this reason, this Court finds that satisfaction of the enablement requirement, through one of the two methods discussed above (see Section IV(B)-(D)), is measured at the time of the patent's filing.

The fact that, in this case, clinical test results became available shortly after the filing date does not change this Court's view of the law.  Under the approach urged by Plaintiff, any time successful test results became available prior to issuance of the patent (regardless of whether such results were disclosed to the PTO), an applicant would be able to successfully claim that utility had been established at the time of the initial filing date.  As such, a party would be permitted to obtain a priority date as of the initial filing of a patent application while conceivably providing test results years down the road, at any time during the pendency of what may be a potentially lengthy patent prosecution.

For the reasons stated, this Court finds that post-filing date test results are not sufficient, alone, to satisfy the enablement/utility requirement for patentability.[18]

_____

[17] Plaintiff also urges that it is in a "worse position" simply because the patent examiner did not request test results.  That is, if the examiner asked for test results, the applicants would have been able to furnish such results.  While this may be true, the fact that an examiner did not raise the utility issue does not prevent a Court from considering the issue where appropriate. See, e.g., In re '318, 583 F.3d at 1322-23.

[18] This Court notes that post-filing date test results or other data are properly relied upon to confirm a challenged assertion of utility.  See Brana, 51 F.3d at 1567 n.19 (determining that post-filing date evidence "does not render an insufficient disclosure enabling, but instead goes to prove that the disclosure was in fact enabling when filed (i.e., demonstrated utility).").  That fact notwithstanding, such evidence cannot establish utility where there was no credible disclosure of utility to begin with, see Doc. No. 539, at 6-7, as enablement is determined as of the filing date of the patent.

-66-

2.    <u>Whether a person of skill in the art, as of the January 11, 1995 filing date of the '590 patent, would have recognized the claimed method of treatment had utility.</u>

Having determined that Plaintiff cannot rely on its clinical trial results to establish utility here, the Court next must determine whether a person of skill in the art, as of the patent's filing date, would have recognized that the claimed method of treatment had utility.

Plaintiff asserts that a person of skill in the art would have recognized that the patent had utility in view of the specification. Plaintiff notes several distinction from the <u>In re '318</u> case. First, in 1985 (i.e., the time at which the '318 patent was filed), there were no successful drugs for the treatment of Alzheimer's Disease. ADHD, in contrast, had been successfully treated with a number of drugs. Second, Plaintiff asserts that the <u>'590</u> patent specification discloses that tomoxetine is a notably safe drug, which "would have allowed one of ordinary skill in the art to accept that tomoxetine could be used to credibly and safely to treat ADHD." Third, the specification here properly enabled the claim method. <u>See</u> Sections III(A)-(C), <u>supra</u>. Fourth—and most critically—Plaintiff asserts that the fact that the Lilly/MGH clinical tests were approved to proceed prior to the patent application's filing date indicates that a person of skill in the art would have viewed the claimed method of treatment as being useful.

(a) *Existence of Effective ADHD Drugs*

The fact that ADHD treatments existed in 1995 does not strongly weigh in favor of finding that a person of skill in the art would recognize the utility of atomoxetine in the treatment of the disorder. As discussed at length above, this Court finds that the state of the prior art was confused with respect to the cause(s) of ADHD. <u>See</u> Section I.(B)-(D), <u>supra</u>. As Dr. Pliszka (Plaintiff's own expert) testified, although discrete portions of the prior art may have suggested that NE reuptake

-67-

inhibition was relevant to an effective ADHD treatment, the majority of the prior art stressed that the mechanism of action of ADHD was unclear at the time the patent application was filed. The Court credited the testimony of Dr. Pliszka in this regard, as well as the deposition testimony of several others doctors, many of whom both parties agreed were foremost experts in the field of ADHD treatment. See Section I.B.3, supra; see, e.g., Pl-PFF, ¶196 (Dr. Biederman: "[t]he pharmacological mechanism of action of DMI in ADDH remains unknown."); Pl-PFF ¶179 (Drs. Zametkin and Rapoport: "[i]t is clear by now that the array of effective agents has put to rest any single transmitter hypothesis."); Pl-PFF ¶196 (Dr. Shenker: the roles of dopamine and norepinephrine in ADHD treatment "remain unresolved"); Pl-PFF ¶196 (Dr. McCracken: "there is no consensus on the precise mechanism of action of ADHD's most commonly prescribed treatment (the stimulants) or of the etiology of ADHD itself."). In light of this Court's findings with respect to the confused nature of the prior art, the Court finds that the mere existence of other ADHD drugs would not indicate to a person of skill in the art that the claimed method of treatment had utility.

(b) *Safety Profile of Atomoxetine*

Plaintiff next asserts that "the disclosure of the '590 patent provided important additional information about tomoxetine's safety that would have allowed one of ordinary skill in the art to accept that tomoxetine could be used credibly and safely to treat ADHD." See Doc. No. 636, at 24. The safety profile of atomoxetine, however, is not relevant to the question of whether the method of treatment has utility under the circumstances here. In re Hartop, 311 F.2d 249, 257-60 (1962) (holding that the utility of a pharmaceutical invention sufficient to premise patentability does not depend on absolute proof of safety); Pittway Corp. v. Fyrnetics, Inc., 1992 U.S. Dist. LEXIS 12172 (N.D. Ill. June 4, 1992) (In general . . . safety is not a criterion for patentability."); Ex parte Drulard,

-68-

223 U.S.P.Q. 364 (Bd. App. 1982).[19]

(c) *Enablement of the Claimed Method*

Plaintiff also asserts that unlike the patent specification in In re '318, which "did not teach one of ordinary skill in the art how to use the claimed method," the '590 patent specification gives the operative recipe for using tomoxetine to treat ADHD.  Although the Court agrees, see Section III.C, supra, this consideration does not bear upon the Court's enablement/utility assessment.

(d) *Initiation of Clinical Trials*

Plaintiff argues that a person of skill in the art, as of January 11, 1995, would have recognized that the claimed method of treatment had utility, as evidenced by the fact that clinical trials with atomoxetine were permitted to begin.  Plaintiff primarily relies on two facts in support of this argument:  first, prior to the filing of the '590 patent application, Drs. Biederman and Spencer agreed to conduct a clinical trial of tomoxetine for the treatment of ADHD; second, shortly thereafter, on January 3, 1995, the FDA orally advised Dr. Biederman that MGH could proceed with the clinical investigation of tomoxetine for ADHD.  Pl-PFF, ¶264.  Plaintiff asserts that the individuals involved in permitting clinical trials to proceed (i.e., the FDA and doctors at MGH) would not have permitted the testing to go forward if there was no expectation of success (i.e., a determination that the drug would be successful).  As such, Plaintiff argues that these facts indicate that a person of skill in the art would have recognized the invention's utility.  The Court cannot agree

_____

[19] The Court notes that in an extreme case safety concerns might conceivably negate utility. See, e.g., In re Watson, 517 F.2d 465, 476 (C.C.P.A. 1975) ("No one, we suppose, would seriously maintain that as a matter of policy, a composition unsafe for use by reason of extreme toxicity to the point of immediate death under all conditions of its sole contemplated use in treating disease of the human organism would nevertheless be useful within the meaning of the patent laws.").  Neither party, however, contends that a person of ordinary skill in the art harbored any such concerns with tomoxetine (or desipramine) in 1995.

for several reasons.[20]

First, the evidence demonstrates that the IRB's decision to approve atomoxetine for clinical trial was premised upon the drug's safety, not its efficacy.  Once it has been determined that a drug is safe enough to be involved in clinical trials, then, it is the clinical trial itself that tests the hypothesis that a drug (e.g., atomoxetine) would be effective in treating a condition (e.g., ADHD). See Def-PFF at 64, ¶44.  As Plaintiff's expert Dr. Pliszka explained, despite his disbelief about whether atomoxetine could be useful to treat ADHD, "it nevertheless would have been appropriate to go forward with pilot studies in humans in 1995" because "the drug by that time had been proven safe . . . all the way up to Phase III clinical trials."  Id. at 63, ¶43; 67, ¶¶69-70.  Dr. Biederman, one of the researchers at MGH who conducted the studies, said that he had no idea that the treatment would be effective.  Id. at 64, ¶¶43-47.  In the end, Plaintiff asserts that the IRB would not have approved a clinical test if there was not "a greater than zero percent chance that atomoxetine would work to treat ADHD."  Id. at 67, ¶71.  While the Court may accept this statement as true, it is insufficient to satisfy the utility requirement for patentabilty.  See In re Fisher, 421 F.3d at 1373 (inventions fail to meet the utility requirement if their "asserted uses represent merely hypothetical

---

[20] Defendants "move to strike all evidence of FDA permission to proceed or Institutional Review Board ("IRB") approval of the Massachusetts General Hospital ("MGH") pilot study, and any related testimony and argument."  Doc. No. 641-1, at 1.  Defendants, accurately, assert that this Court has already held that any test results (preliminary or otherwise) are irrelevant as to whether the '590 patent properly disclosed utility, as they were not provided to the PTO.

Plaintiff here, however, is arguing that **the mere decision to permit the clinical trials to go forward** (not the results themselves), is relevant to the question of whether a person of skill in the art would have recognized the claimed method's utility in view of the prior art and the patent specification.  That is, Plaintiff argues that the fact of FDA/MGH approval is relevant to Plaintiff's alternate ground for establishing utility.  See generally Section IV.F.2.  Although this Court finds that the approval to proceed with clinical trials is of minimal relevance here, the Court will not strike all such evidence to ensure a full record for appellate review.

possibilities, objectives which the claimed [inventions] . . . could possibly achieve, but none for which they have been used in the real world").[21]

Second, it is not clear that the IRB contained even one person of ordinary skill in the art when it reviewed the Lilly/MGH IND.  Def-PFF, at 66, ¶¶59-60.  Indeed, the chair of the IRB that reviewed the Lilly/MGH IND was an anesthesiologist, who would not be considered one of ordinary skill in the relevant art.  Id. at 66,  ¶61.  Even if there were persons of ordinary skill in the art on the panel, Plaintiff's expert confirmed that there was no documentation "report[ing] the reasoning of the IRB in terms of calculating the risks and benefits of moving forward with this pilot study."  Id. at 66,  ¶67.  The mere fact, then, that the clinical trials were permitted to proceed does not convince this Court that a person of ordinary skill in the art would have recognized the utility of the invention at the time of the patent's filing.

Third, other evidence, albeit anecdotal, illustrates that an IRB may very well approve a clinical trial of a treatment that is ultimately not shown to be efficacious.  For example, Lilly submitted an IND for the use of atomoxetine for the treatment of depression.  Id. at 68,  ¶74.  This IND for depression was approved by an IRB and Lilly subsequently conducted clinical trials to study such a treatment.  Id. at 68,  ¶75. These clinical trials were terminated because the results showed that atomoxetine was not effective for the treatment of depression.  Id. at 68,  ¶¶76-77.  Similarly, clinical trials of atomoxetine for the treatment of urinary incontinence were terminated because the

---

[21] In some circumstances, when weighing the pros and cons of permitting a clinical trial to proceed, an IRB may have to decide that the rewards of potential success outweigh some risk associated with undergoing the proposed treatment.  Here, though, as Plaintiff has stressed, tomoxetine was known as a safe drug.  See Section IV.F.2.b, supra.  This fact actually supports Defendants' assertion that the IRB's approval does not indicate that there was a credible utility—because there was no risk associated with taking atomoxetine, there would not have to be a significant showing of probable usefulness (efficacy) to justify the initiation of clinical trials.

results showed that atomoxetine was not, in fact, effective for the treatment of urinary incontinence. Id. at 68, ¶¶79-80.  Both sets of clinical testing were presumably approved by an IRB and in both cases atomoxetine did not prove effective.  Id. at 68, ¶81.

This Court believes that the fact that Lilly/MGH received IRB approval—which simply constitutes a decision that clinical testing may go forward—does not demonstrate that a person of ordinary skill would view the claimed method as having utility for the purposes of 35 U.S.C. § 112.

In arriving at its conclusion, the Court cannot agree with Plaintiff that the relevant regulations require that efficacy be shown prior to clinical trial approval (from either the FDA or an IRB).  Pl-PFF ¶265.    This Court does not share Plaintiff's reading of the procedures and regulations, and actually finds that the regulations confirm the Court's view.  For example, the relevant regulations provide that an IRB must make a determination that the "[r]isks to subjects are reasonable in relation to anticipated benefits, **if any**, to subjects, and the importance of the knowledge that may be expected to result."  Pl-FFCL ¶196 (emphasis added).    Similarly, as part of the informed consent procedure, the ADHD patients here were advised that "[y]ou **may** experience improvement in your symptoms if you are assigned to receive tomoxetine."  Pl-PFF ¶268.  Plaintiff also cites to the PTO's MPEP which explains that the "FDA pursues a two-prong test to provide approval for testing. Under that test, a sponsor must show that the investigation does not pose an unreasonable and significant risk of illness or injury and that there is an acceptable rationale for the study. As a review matter, there must be a rationale for believing that the compound **could** be effective."  Doc. No. 650, at 4.  The IRB/FDA approval to conduct clinical studies, then, only indicates that there is "a greater than zero percent chance that atomoxetine would work to treat ADHD."  Pl-PFF ¶71.

\* \* \* \* \*

The Court's inquiry into the enablement/utility question requires it to determine whether the '590 patent properly disclosed the patent's utility at the time of the filing date. In this case, the patent contained no test data. Furthermore, the Court cannot conclude that a person of skill in the art would have recognized the method of treatment's utility in view of the specification and prior art. The fact that testing had begun does not convince this Court otherwise, as "usefulness" in the context of a clinical study—which could include achieving the open-ended goal of gaining additional knowledge to assist in further research—is not the same as "utility" for the purposes of patentability. Compare, Def-PFF, at 66-67, ¶63 (noting the admission of Plaintiff's expert that "there doesn't have to be necessarily any benefits to the subjects" and any benefits may include "the importance of the knowledge to be gained" and other "benefits to society."), with Brenner, 383 U.S. at 535 (finding that a process or product "which either has no known use or is useful only in the sense that it may be an object of scientific research" is not patentable). This Court does not believe that speculation as to the reasoning of the IRB and/or the FDA in approving clinical trials here is sufficient to establish utility.[22]

For the reasons stated, this Court finds that the '590 patent is invalid for lack of enablement/utility under 35 U.S.C. § 112.

---

[22] See, e.g., Rasmusson, 413 F.3d at 1323 (a patent sufficiently discloses utility when "one skilled in the art would accept without question statements as to the effects of the claimed drug products."); see also In re '318, 583 F.3d at 1327 ("[T]he specification, even read in the light of the knowledge of those skilled in the art, does no more than state a hypothesis and propose testing to determine the accuracy of that hypothesis. That is not sufficient."); In re Jolles, 628 F.2d 1322, 1327 (CCPA 1980) ("[I]t is proper for the examiner to ask for substantiating evidence unless one with ordinary skill in the art would accept the allegations as obviously correct."); In re Novak, 306 F.2d 924 (CCPA 1962) (same).

**CONCLUSION**

For the reasons discussed above, this Court concludes that Defendants have failed to prove, by clear and convincing evidence, that the '590 patent is invalid as obvious or not enabled to the full scope of its claims.  Defendants have failed to prove, by clear and convincing evidence, that the patent should be held unenforceable as a result of inequitable conduct.[23]  This Court finds, however, that the '590 patent is invalid for lack of enablement/utility under 35 U.S.C. § 112.[24]

The parties are directed to submit a Judgment and Form of Order consistent with this Court's Opinion.


    S/ Dennis M. Cavanaugh

Dennis M. Cavanaugh, U.S.D.J.


Date:           August __12__, 2010
Original:      Clerk's Office
cc:             All Counsel of Record
                Hon. Joseph A. Dickson, U.S.M.J.
                File

---

[23] Defendants summarily assert that this case is "exceptional" and that they are entitled to attorney's fees based on Lilly's "inequitable conduct and its assertion of infringement of patent claims it knows are unenforceable."  See Doc. No. 644, at 44.  The Court disagrees, having determined that there was no inequitable conduct here.

[24] As noted above, Defendants' June 21, 2010 motion to strike [Doc. No. 641], is denied. See note 20, supra.