1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF NEW JERSEY

3

4   ELI LILLY AND COMPANY,              :    Civil No.
                                             07-cv-3770-DMC
5                    Plaintiff,         :
                                             TRANSCRIPT OF
6            v.                         : TRIAL PROCEEDINGS

7   ACTIVIS ELIZABETH LLC,             :         VOLUME 3
    GLENMARK PHARMACEUTICALS INC., USA,
8   SUN PHARMACEUTICAL INDUSTRIES LIMITED,  :
    SANDOZ INC., MYLAN PHARMACEUTICALS INC.,
9   APOTEX INC., AUROBINDO PHARMA LTD.,    :
    TEVA PHARMACEUTICALS USA, INC.,
10  SYNTHON LABORATORIES, INC.,            :
    ZYDUS PHARMACEUTICALS, USA, INC.,
11                                      :
                     Defendants.
12  ---------------------------------------x

13                                      Newark, New Jersey
                                        May 24, 2010
14

15

16

    BEFORE:
17
            THE HON. DENNIS M. CAVANAUGH, U.S.D.J.
18

19                                 Reported by
                                   CHARLES P. McGUIRE, C.S.R.
20                                 Official Court Reporter

21

22          Pursuant to Section 753, Title 28, United States
            Code, the following transcript is certified to be
23          an accurate record as taken stenographically in
            the above entitled proceedings.
24

25                                 s/CHARLES P. McGUIRE, C.S.R.


                    CHARLES P. McGUIRE, C.S.R.

```
 1      APPEARANCES:

 2

        PEPPER HAMILTON, LLP
 3      301 Carnegie Center
        Suite 400
 4      Princeton, New Jersey 08543-5276
        BY: JOHN F. BRENNER, ESQ.
 5      And
        FINNEGAN HENDERSON FARABOW GARRETT & DUNNER
 6      Two Freedom Square
        11955 Freedom Drive
 7      Reston, Virginia 20190-5675
        BY: CHARLES E. LIPSEY, ESQ.,
 8          L. SCOTT BURWELL, ESQ.,
            ROBERT D. BAJEFSKY, ESQ., and
 9          LAURA P. MASUROVSKY, ESQ.,
        And
10      MARK STEWART, ESQ., and
        TONYA L. COMBS, ESQ.,
11      Patent Counsel, Eli Lilly and Company,
        Attorneys for Plaintiff
12
        WINSTON & STRAWN LLP
13      35 West Wacker Drive
        Chicago, Illinois 60601
14      BY: JAMES S. RICHTER, ESQ.,
            JAMES F. HURST, ESQ., and
15          GAIL J. STANDISH, ESQ.,
        Attorneys for Defendant Sun Pharmaceutical Industries
16      Ltd.

17      HILL WALLACK, LLP
        202 Carnegie Center
18      Princeton, New Jersey 08540
        BY: ERIC I. ABRAHAM, ESQ.
19      And
        ROCKEY, DEPKE & LYONS, LLC
20      Sears Tower, Suite 5450
        33 South Wacker Drive
21      Chicago, Illinois 60606
        BY: KEITH V. ROCKEY, ESQ.,
22          KATHLEEN A. LYONS, ESQ., and
            JOSEPH A. FUCHS, ESQ.
23      And
        ALEXANDRA HANER, ESQ., and
24      PEARL SIEW, ESQ., in-house counsel,
        Attorneys for Defendant Sandoz Inc.
25
```

488

1      APPEARANCES:

2          SAIBER LLC
           One Gateway Center, 10th floor
3          Newark, New Jersey 07102-5311
           BY: ARNOLD B. CALMANN, ESQ.,
4          And
           ALSTON & BIRD, LLP
5          90 Park Avenue
           New York, New York 10016
6          BY: THOMAS J. PARKER, ESQ., and
               VICTORIA E. SPATARO, ESQ.,
7          Attorneys for Defendant Mylan Pharmaceuticals Inc.

8          LOCKE LORD BISSELL & LIDDELL, LLP
           3 World Financial Center
9          New York, New York 10281
           BY: ALAN B. CLEMENT, ESQ.,
10             JOSEPH N. FROEHLICH, ESQ.,
               ANDREA L. WAYDA, ESQ.,
11             MYOKA KIM GOODIN, ESQ., and
               DAVID B. ABRAMOWITZ, ESQ.,
12         Attorneys for Defendant Apotex Inc.

13         CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
           5 Becker Farm Road
14         Roseland, New Jersey 07068
           BY:  MELISSA E. FLAX, ESQ.
15         And
           RAKOCZY MOLINO MAZZOCHI SIWIK LLP
16         6 West Hubbard Street, Suite 500
           Chicago, Illinois 60654
17         BY:  WILLIAM A. RAKOCZY, ESQ., and
               CHRISTINE J. SIWIK, ESQ.,
18         Attorneys for Defendant Aurobindo Pharma Ltd.

19

20

21

22

23

24

25

1        THE COURT:  All right.  In the matter of Lilly.

2    J A M E S   R.  J O H N S O N, called as a witness on behalf

3    of the Defendants, and having been previously sworn, resumed

4    the stand and testified as follows:

5        MR. BURWELL:  Good morning, Your Honor.  Scott

6    Burwell on behalf of Plaintiff Eli Lilly and Company.

7        One minor housekeeping matter before we begin

8    today.

9        Upon review of the transcript from Wednesday's

10   session, we realized that a Trial Exhibit that had been

11   moved into evidence at the close of the cross-examination of

12   Mr. Goolkasian had not actually been discussed with the

13   witness, so we would like to withdraw that exhibit from

14   evidence.  It's Plaintiff's Trial Exhibit 912.

15       THE COURT:  Any objection?

16       MR. CLEMENT:  No objection, Your Honor.

17       MR. BURWELL:  Thank you, Your Honor.

18       MR. PARKER:  Good morning, Your Honor.

19       THE COURT:  Good morning.

20       As I recall, Dr. Johnson was in the middle of

21   testimony on Wednesday.  It seems like so long ago.

22       (Laughter)

23       MR. PARKER:  That's correct.

24       THE COURT:  So he is back on the stand, still

25   under oath.  Are you ready to proceed?

CHARLES P. McGUIRE, C.S.R.

1          MR. PARKER:  I am, Your Honor.

2          DIRECT EXAMINATION (CONTINUED)

3    BY MR. PARKER:

4    Q.    Good morning, Dr. Johnson.

5    A.    Good morning.

6    Q.    Dr. Johnson, when we left off, you identified dose

7    dumping as one of the challenges that one would encompass in

8    developing a depot injection.  Do you recall that?

9    A.    Yes.

10   Q.    Now, were there any other challenges that one could

11   face when developing a depot injection in connection with --

12   well, developing a depot injection that would enable one to

13   practice the claims of the '590 patent?

14   A.    I'm not sure exactly what I described were the

15   problems, but there are a number of problems.  One seems to

16   be initiation of release.  A second might be a burst release

17   on injection.  Irritation is a very significant problem.

18          There's a number of problems.

19   Q.    Can you just briefly explain what you mean by the

20   initial rate release?

21   A.    Quite often when you inject with these systems, you

22   get sort of a burst release.  With Leuprolide, for example,

23   is probably the most commonly used one, I think you release

24   somewhere between 20 and 40 percent of the drug within the

25   first two, three days.  It's something like that.  So that's

1     pretty high.  In the case of Leuprolide, it may not be a

2     significant problem because that jolt is useful, is my

3     understanding.

4     Q.   Now, why is it important to work out the initial

5     release rate?

6     A.   Because at any time you're dosing these systems, what

7     you're really trying to do is, the reason for doing most of

8     them is, you're trying to achieve some sort of constant

9     release rate so that you get a predictable release and you

10    get a predictable effect.

11    Q.   Okay.  And when you say constant release rate over a

12    period of time, how much -- what period of time are you

13    referring to?

14    A.   Whatever the -- whatever you've decided you were

15    trying to make.  If you're making a seven-day one, you want

16    to release continually over seven days; if it's a month, you

17    want a month.

18    Q.   And just generally, how is it that one of ordinary

19    skill in the art as of January 1995 would go about working

20    through or working out the initial release rate?

21    A.   Typically, we look at -- it's some sort of in vitro

22    drug release system.

23    Q.   Now, in working out that initial release rate, is that

24    an iterative process, to your knowledge?

25    A.   It's typically a difficult process because you can

1    work out -- you typically work out two or three different

2    release rates.  Then you test it in animals and you see, can

3    you make a correlation.  If you can make a correlation then

4    you may go to the next step.  If you can't make the

5    correlation, you go back and repeat it.

6    Q.    All right.  Now, Dr. Johnson, just referring to slide

7    22, last Wednesday, when you were describing the preliminary

8    formulation and excipient selection stage of making an

9    aqueous suspension, which is over here on slide 22, the

10   aqueous suspension depot injection, how long would it take

11   to conduct the same step, the preliminary formulation and

12   excipient selection step, for the base when making a -- when

13   making an oil hydrophobic solution?

14   A.    It really takes quite a long time.  If you're very

15   lucky, you might do it in six months.  Otherwise, it would

16   probably take up to a year.

17   Q.    Now, what about with respect to microparticles on

18   slide 22?

19   A.    They would be probably more difficult because you're

20   controlling the release.  You've added dissolution of the

21   particle, and the particle size is important, in addition to

22   releasing into the dosage form, which would subsequently

23   release into the body.

24   Q.    Now, Dr. Johnson, with respect to the opinions that

25   you provided the Court last Wednesday and the ones going

1    forward you're providing today, will you be giving these

2    opinions from the perspective of one of ordinary skill in

3    the art?

4    A.    When I did these charts, I tried to do this from the

5    perspective of people with like a pharmacy degree, three to

6    five years' experience, or a related technical degree with

7    similar experience.

8    Q.    Which is basically how you define one of skill in the

9    art?

10   A.    Correct.

11   Q.    Now, Dr. Johnson, generally, when preparing any dosage

12   form, does it require selecting the appropriate form of

13   atomoxetine?

14   A.    Could you repeat the question?

15   Q.    When preparing any dosage form, does it require

16   selecting the appropriate form of atomoxetine?

17   A.    Correct.

18   Q.    Now, can atomoxetine be in the form of a freebase?

19   A.    Yes.

20   Q.    Now, is the freebase in the form of an oil, to your

21   knowledge?

22   A.    From the earlier -- yes, from reading the patents, it

23   appears to be, but I don't have any of that --

24   Q.    I'm sorry?

25   A.    I don't have any atomoxetine base so I can identify it

1    as an oil, but from reading the patents, it appears that it

2    should be -- it's described as an oil.

3    Q.    Now, can atomoxetine be in the form of a salt?

4    A.    Yes.

5    Q.    And when it's in form of a salt, is it a solid,

6    liquid?  Is it an oil?

7    A.    It should be a solid.

8    Q.    Now, what are the various salt forms of atomoxetine

9    that a person of ordinary skill in the art as of 1995,

10   January 1995 would have had to consider in selecting an

11   appropriate salt form of atomoxetine?

12           MR. BAJEFSKY:  Objection, Your Honor.  This is the

13   same slide that we objected to last week, and it's just not

14   in his report.

15           THE COURT:  It's just not what?

16           MR. BAJEFSKY:  It's not in his expert report.

17           THE COURT:  Counsel?

18           MR. PARKER:  Your Honor, it is in his expert

19   report.  What we've done is, we took out the banner, which

20   had the breadth of the claim.

21           THE COURT:  Wait.  Did you say it is in his expert

22   report?

23           MR. PARKER:  Yes, it is.

24           THE COURT:  Where is it?

25           MR. PARKER:  Okay.

CHARLES P. McGUIRE, C.S.R.

1          THE COURT:  Point it out to counsel.

2          MR. PARKER:  Okay.  Sure.

3      (Off the record discussion)

4          MR. BAJEFSKY:  That's it?

5          MR. PARKER:  Well, then we also have in paragraphs

6      41 and much of the other paragraphs where he talks about

7      salt selection in developing the various dosage forms.

8          MR. BAJEFSKY:  Your Honor, the part that was

9      pointed to does not list those salts.  He never pointed to

10     those salts in the expert report, and if --

11         THE COURT:  This is a factual situation.  I mean,

12     it either is or is not in.  I don't know how we can have a

13     disparity.

14         MR. PARKER:  Right.  Your Honor, in your binder,

15     you have just DTX --

16         THE COURT:  In the?

17         MR. PARKER:  In the witness binder.

18         THE COURT:  Go ahead.

19         MR. PARKER:  We have DTX-3.

20         THE COURT:  DTX-3.  Yes.

21         MR. PARKER:  Which is the '081 patent, and again,

22     in his expert report, he refers to tomoxetine in its

23     freebase form as being an oil -- this is in his expert

24     report on paragraph 31 -- but when conjugated as a salt, it

25     forms a white crystalline solid.  And he refers to the '081

CHARLES P. McGUIRE, C.S.R.

496

1    patent that's now before you, Your Honor.

2              THE COURT:  Right.

3              MR. PARKER:  And refers to column two, lines 59 to

4    61.

5              THE COURT:  Yes?

6              MR. PARKER:  And there, it says:  "The compounds

7    of this invention in the form of their freebase are high

8    boiling oils, but white crystalline solids in the form of

9    their acid addition salts."

10             And right above that paragraph are the salts that

11   we have listed on the slide.  And throughout his expert

12   report he talks about salt selection.

13             THE COURT:  So you're saying they're listed in

14   there, just not in this form?

15             MR. PARKER:  They're listed in the patents exactly

16   how it appears on the slide.

17             THE COURT:  They're listed in --

18             MR. PARKER:  In other words, if you look at, okay,

19   on column two --

20             THE COURT:  Yes, I'm there.

21             MR. PARKER:  Okay.  So that when we -- it refers

22   to the acid addition salts, but the acid addition salts are

23   identified right above that paragraph.

24             THE COURT:  Okay.  They're not listed in this

25   form.  They don't look like that.

1          MR. PARKER:  Well --

2          THE COURT:  I'm not saying that's fatal.

3          MR. PARKER:  Right.

4          THE COURT:  I'm just saying they don't look like

5     that.

6          You're saying they're listed, just not in that

7     form.

8          MR. PARKER:  Exactly.

9          MR. BAJEFSKY:  Your Honor, he did not refer to

10    those salts at all in the expert report.  He just referred

11    to, as Mr. Parker pointed out, lines 59 to 61.  He never

12    suggested for a moment at any point in his expert report

13    that atomoxetine could be made using all of these salts.  I

14    never had an opportunity to examine him on it at his

15    deposition.  I might well have done that had he made an

16    allegation like that in his expert report.  It was not in

17    his report.

18          THE COURT:  So you're saying not only is it not in

19    his report, you've never heard him talk about this before?

20          MR. BAJEFSKY:  That's correct, Your Honor.

21          THE COURT:  What do you say to that?

22          THE WITNESS:  I believe I mentioned insoluble

23    salts, and many of these would be insoluble salts.  For some

24    of these dosage forms, it's best if I make an insoluble

25    salt.  So I go through this list because they're acceptable

1    pharmaceutical salts and take one of these and make that

2    salt.

3              THE COURT:  Why didn't you just put this listing

4    such as this attached as an exhibit in your report?

5              THE WITNESS:  I didn't think of it.

6              MR. PARKER:  If I may.  He adopted Dr. Shukla's

7    report, essentially, he didn't prepare the report.

8              THE COURT:  I wasn't saying that as blaming him.

9              MR. PARKER:  Oh, okay.

10              THE COURT:  I was just inquisitive as to why he

11    didn't.

12

13              MR. PARKER:  Your Honor, we did attach the '081

14    patent as an exhibit to Dr. Shukla's report.

15              THE COURT:  Yes, but you know, I realize this is

16    technical, but as a practical matter, it's not fair,

17    especially when dealing with pointed opinions of experts, to

18    just attach something and say, now anything and everything

19    in there has to be considered as part of that.  I mean, I

20    think there's a certain amount of obligation on behalf of

21    the expert to be somewhat specific as to what it is they're

22    referring to so that the other -- I mean, that's the whole

23    purpose of expert reports, so that the other side can make a

24    determination and review it and know what they're doing.

25              MR. PARKER:  And I agree, Your Honor, but in the

CHARLES P. McGUIRE, C.S.R.

1    report as well, the expert report, when it's laying out in

2    discussion the various dosage forms, there is a step where

3    it's a salt selection step, just like the atomoxetine salt,

4    and we refer back to the only patent in the prior art that

5    actually lists all these salts of atomoxetine.  And the

6    cite, we actually cite a portion --

7              THE COURT:  Well, why don't you just deal with his

8    testimony and talk about the salts without having all this

9    list of them?  We understand that this list is in the

10   universe.  Why do we have to have this whole list up there?

11             MR. PARKER:  Okay, Your Honor.  Thank you.

12             THE COURT:  So I'll sustain the objection.

13             Go ahead.

14   BY MR. PARKER:

15   Q.    Dr. Johnson, in your review of the prior art, were you

16   able to -- does the prior art -- let me back up.

17             Does the prior art in your review identify the

18   available salt forms of atomoxetine?

19   A.    Yes.

20   Q.    And do you have your witness book in front of you?

21   A.    Yes.

22   Q.    And I refer you to DTX-3.

23   A.    Correct.

24   Q.    Now, is that a reference you reviewed as part of your

25   analysis?

CHARLES P. McGUIRE, C.S.R.

1    A.    Yes.

2    Q.    And upon your review of that patent, which is DTX-3,

3    U.S. Patent 4,314,081, does it identify the list of the salt

4    forms that atomoxetine could be prepared?

5             MR. BAJEFSKY:  Objection, Your Honor.  He's just

6    showing the slide again without putting the slide up.

7             THE COURT:  Well, but did you say that the '081

8    patent was listed in his report?

9             MR. PARKER:  Absolutely, Your Honor.

10            THE COURT:  Well, if it was listed, I can't

11   preclude him from talking about it.  It's there.

12            MR. BAJEFSKY:  Well, but he cited it for a very

13   specific point, Your Honor, and it was the lines that

14   Mr. Parker pointed to.  He didn't cite it for the entire

15   disclosure in the patent.  There's a lot of stuff in the

16   patent that has nothing to do with his report, and these

17   salts have nothing to do with the report, Your Honor.

18            THE COURT:  No, I'm going to let him testify.

19            Go ahead.

20   BY MR. PARKER:

21   Q.    Dr. Johnson, can you tell us where in the '081 patent

22   you found a list of pharmaceutically acceptable salts, and

23   can you identify where you found it by column and line

24   number?

25   A.    Page -- column two, line -- I guess 31 to 54.

501

1    Q.    And if you look also, Dr. Johnson, just focusing on

2    pharmaceutically acceptable salts, which I believe is line

3    43, can you just identify where in the patent -- or column

4    2, line 43 where in the patent it lists pharmaceutically

5    acceptable salts?

6              THE COURT:  Wait.  I didn't catch that question.

7    Q.    Where in that patent it lists pharmaceutically

8    acceptable salts?

9              THE COURT:  Well, didn't you just say line 43?

10             MR. PARKER:  I said line 43.

11   A.    I said line 2 -- at 41, it says "pharmaceutically

12   acceptable salts of amine base."  Then in 40-something here,

13   it starts listing the actual salts themselves.

14   Q.    And where does that end, the list?

15   A.    Fifty-nine -- 58.

16   Q.    Again, just staying on salt selection, I believe,

17   Dr. Johnson, when you reviewed the '590 patent, were you

18   able to -- did it have any information about salts in the

19   '590 patent?

20   A.    Yes.

21   Q.    And can you tell us what information was in the

22   patent?

23   A.    It was a list of a variety of salts, over 60 salts

24   that I might be able to choose from as -- when I wanted to

25   make a different salt for atomoxetine.

502

1    Q.    Where in the patent does it talk about salts?  Can you

2    tell us that?

3    A.    Column 2.

4    Q.    I'm sorry, in the '590 patent.

5    A.    In the '590 patent.

6    Q.    That would be --

7    A.    Oh, that's on the first page.

8    Q.    DTX- -- '590 --

9    A.    Yeah.

10   Q.    I'm sorry.  DTX-1, which is the '590 patent?

11   A.    Correct.  It's on column 1, line 55:  "Tomoxetine is a

12   well known drug," it's a phenylpropylamine.  "It is

13   regularly used as a salt, and salts are included in the term

14   tomoxetine as used here."

15   Q.    Okay.  That was column 1, lines 54 to 57?

16   A.    Yes.

17   Q.    And that was DTX-1.

18         Now, Dr. Johnson, we've reviewed this portion of

19   the '590 patent.  Did you come to any conclusions?

20   A.    That I could use tomoxetine in any salt form or base.

21         MR. PARKER:  Slide 24.  I apologize.

22   Q.    Let's move on to a new dosage form, Dr. Johnson.

23         First of all, with respect to this slide, slide

24   24, and also slide 25 -- Dr. Johnson, with respect to slides

25   24 and 25, were these slides prepared pursuant to your

503

1      direction and supervision?

2      A.      Yes.

3      Q.      And do these slides accurately reflect based on your

4      knowledge and experience the steps one skilled in the art

5      would have undertaken to prepare a transdermal patch?

6      A.      Yes.

7      Q.      And you had this slide prepared for your testimony

8      today?  Did you have this slide prepared?

9      A.      Yes.  Yes.

10     Q.      Now, Dr. Johnson, did you find anything in the prior

11     art regarding formulating a transdermal patch comprising

12     atomoxetine or a similar compound?

13     A.      No.

14     Q.      Now, with respect to slides 24 and 25, are you

15     illustrating how one -- in these slides, are you

16     illustrating how one of ordinary skill in the art would

17     prepare a viable dosage form?

18     A.      Yes.

19     Q.      And in that context, what do you mean by viable dosage

20     form?

21     A.      One that's suitable for carrying out claim 1.

22     Q.      Claim 1 of what; the --

23     A.      To determine whether or not you could -- for use in

24     delivering an effective dose of atomoxetine to a patient.

25     Q.      And when you refer to claim 1, are you referring to

504

1       the '590 patent?

2       A.      Correct.

3       Q.      What is a transdermal patch?

4       A.      It's where you put medicament in a device or a --

5       that's placed on the skin.  And the drug actually leaches

6       out of that device in -- through the skin, into the

7       bloodstream.

8       Q.      And after the drug transports through the skin, where

9       does it go?

10      A.      It goes into the bloodstream.

11      Q.      Have you yourself ever made a transdermal patch?

12      A.      Yes.

13      Q.      And can you just describe the type of patches you

14      made?

15      A.      We did work with corn pads, which were adhesives

16      covered with salicylic acid and then it diffuses out into

17      the corn area.  And we did another one.  We were looking at

18      fungal nail, and we first looked at penetration through the

19      nail bed of the antifungal, and then we took some nonwoven

20      material and saturated it with the drug and a solvent which

21      would penetrate the nail bed and then put an adhesive

22      barrier over that.

23      Q.      Now, do you consider yourself as a person who is

24      highly knowledgeable with respect to what it takes to

25      develop a transdermal patch?

1    A.    Yes.

2    Q.    Now, let's just, if you can, Dr. Johnson, focus on

3    slide 22, I believe the first step that you've identified.

4             I'm sorry.  Slide 24.

5             The first step you've identified is selecting the

6    form of atomoxetine.  Do you see that?

7    A.    Yes.

8    Q.    Okay.  Now, does the patent, does the '590 patent

9    provide any guidance in making any selection of a particular

10   salt that could work in a transdermal patch?

11   A.    No.

12   Q.    So how does one skilled in the art go about selecting

13   an appropriate form of atomoxetine for a transdermal patch?

14   A.    Repeat the question, please.

15   Q.    Yes, sure.

16            How does one skilled in the art as of January

17   11th, 1995 go about selecting an appropriate form of

18   atomoxetine for a transdermal patch?  Referring to the

19   slide.

20   A.    The way we looked at it, we looked at it several

21   different ways.  One is, we tried to determine whether or

22   not you'd want to use a base or a salt, and so we thought

23   that the easiest way was to try to see if we could get the

24   soluble salt in the solvent and/or adhesive matrix which

25   would then -- you could put on the skin and it would diffuse

CHARLES P. McGUIRE, C.S.R.

506

1    out through the skin.

2    Q.    Now, whether you're selecting a base or a salt form of

3    atomoxetine, does irritation have any effect at all in that

4    decision?

5    A.    Yes.

6    Q.    Can you explain how that is?

7    A.    One of the problems with transdermal patches is wear,

8    in wear tests, one just keeping them on, but if you keep it

9    on for -- you know, some of these patches they keep on for

10   more than -- more than a day, the problem of irritation is

11   significant.  So you try to make it so that the drug won't

12   irritate it, the adhesive won't irritate, or any of the

13   adhesive layer binding the transdermal to your skin won't

14   irritate.

15   Q.    Now, would atomoxetine hydrochloride be an appropriate

16   salt for a transdermal patch?  If not, why?

17   A.    I don't believe it would be.

18   Q.    And why is that?

19   A.    It probably would -- it's a salt, and it's too soluble

20   and too hydrophilic, and it would not -- probably be

21   irritating.

22   Q.    So, then, looking at the selecting form of atomoxetine

23   step, where would you begin?

24   A.    I began with the base, because it would be

25   hydrophobic, and we could put that in adhesive and see

507

1    whether we could get a solvent or adhesive solvent system

2    which we'd penetrate.

3    Q.    Now, at what point would you know whether or not the

4    base is the appropriate form for a transdermal patch?

5    A.    Whether we could get it transferred to some kind of

6    skin or barrier into -- we did dissolution studies,

7    essentially, --

8    Q.    Okay.

9    A.    Through a barrier of some kind, which would simulate

10   the skin.

11   Q.    So now referring to the slide 24, can you just tell us

12   what tests are up there that one of ordinary skill would

13   conduct or would have conducted?  And you can use your

14   pointer as well.

15   A.    Well, we take the base, and we have to confirm that

16   it's pure because we don't want to repeat all this work with

17   an unpure material.  And we test the solubility of different

18   solvents.  We look at the purity, we look at the pH

19   solubility; in other words, if this matrix has any

20   hydrophilicity, we might adjust the pH slightly, too, to

21   keep most of the base in a more hydrophobic state.  And we

22   look at these solvent studies that might be compatible with

23   some adhesives.  Then we'd try to look at tests to look at

24   skin permeability through usually a Franz cell or some kind

25   of dissolution device where you'd have a cell in the bottom,

508

1    you have the drug, and you put it on a layer, and the layer

2    could be a semipermanent membrane or it could be some kind

3    of skin layer, and what you try to do with this is determine

4    how fast it will go through this layer into this receiver

5    compartment, and the receiver compartment is essentially the

6    bloodstream.

7    Q.    And, Dr. Johnson, just back up a little bit.  Why does

8    one skilled in the art need to conduct the stability

9    testing?

10   A.    Because you don't want to administer a drug which is

11   degraded.

12   Q.    And how does one skilled in the art, how would they

13   have conducted the stability testing?

14   A.    In this case, you'd conduct the stability test in the

15   matrix ingredients that you might eventually use to -- in

16   your layer that you put on the skin.

17   Q.    Now, I'm sorry, I meant to say solubility, stability

18   testing which is in the box there, so --

19   A.    Okay.  We'd look at the solvents we'd think we'd use.

20   We put these solvents at various conditions.  We might

21   subject them to oxygen, heat, light, and see whether or not

22   there's any degradation over a period of time.

23   Q.    Now, why does one skilled in the art need to conduct

24   the purity testing on slide 24?

25   A.    You have to have a drug -- the drug that you

CHARLES P. McGUIRE, C.S.R.

1    administer has to be intact, it can't be degraded.

2    Q.    And how does one skilled in the art go about

3    conducting purity testing?

4    A.    You develop analytical techniques for degradation

5    products in the active raw material.

6    Q.    Now, when you say you have to develop analytical

7    techniques, is there anything out there in the prior art

8    that is directed to analytical testing for something of a

9    compound like atomoxetine or something similar?

10   A.    I didn't.

11        MR. BAJEFSKY:  Objection, Your Honor.  It's not in

12   his expert report.  None of this is in his expert report,

13   Your Honor.

14        MR. PARKER:  Your Honor, it is.  I mean, the

15   entire expert report is focused on developing these various

16   dosage forms.  And we have paragraphs, and I'll go through

17   each one, if I have to, with respect to each step.

18        THE COURT:  If there's new theories that aren't in

19   the report, that's one thing; but certainly there are

20   inferences that can be drawn from statements in expert

21   reports, and he can certainly expand to some degree upon

22   that which is in the report.

23        MR. BAJEFSKY:  I understand that, Your Honor, but

24   there was nothing in his expert report about whether there

25   were things in the prior art that would enable him to

510

1    determine whether or not something was suitable.  It's not

2    in his expert report.

3             THE COURT:  But wouldn't that be part of the whole

4    basis of this argument?

5             MR. BAJEFSKY:  Okay.  I'll withdraw it, Your

6    Honor.

7             THE COURT:  Continue.

8             MR. PARKER:  Could you read a back the last

9    question.

10        (Record read)

11   A.    I -- I don't know.  I haven't looked.

12   Q.    Well, could you just explain a little more, what do

13   you mean by developing analytical techniques?  What do these

14   techniques do?  What's their function?

15   A.    Their function is to determine the purity of your

16   compound.

17   Q.    Now, why does one skilled in the art need to conduct

18   pH solubility testing?

19   A.    Because you want to make sure that if you do adjust

20   the pH that it's still stable.

21   Q.    So it's possible that changes in pH could affect

22   stability of the compound?

23   A.    Correct.

24   Q.    And how does one skilled in the art conduct the pH

25   solubility testing?

511

1      A.     You would put it in the media or solvent that you

2      think is -- and you can adjust pHs to different levels.

3      Probably you'd go up to eight, you wouldn't want to go

4      higher, seven, six, five, maybe, and just determine how the

5      stability and solubility change.

6      Q.     Now, you also have on slide 24 solvent studies in

7      connection with your analysis of the base.  Just, why would

8      one skilled in the art have to carry out solvent studies?

9      A.     You have to get it through the skin, so you need some

10     media to get it through the skin, and so you'd pick solvents

11     which would penetrate the skin or penetration enhancers

12     which would penetrate the skin and carry the drug through

13     the skin into the tissue, where it can then be absorbed into

14     the bloodstream.

15     Q.     Now, again, dealing with slide 24 as you were talking,

16     as you were testifying as to the analysis of the base, you

17     have arrows and you have other -- green arrows indicating

18     yes and orange arrows indicating no.  What was it you were

19     trying to convey in this aspect of the process?

20     A.     It's iterative.

21     Q.     Could one of ordinary skill in the art predict without

22     conducting any of these tests whether or not an atomoxetine

23     base would be suitable for a transdermal patch?

24     A.     Say that again, please?

25     Q.     Could one of ordinary skill in the art predict,

512

1    without conducting any of these tests that we just talked

2    about, could they predict the suitability of atomoxetine

3    base for a transdermal patch?

4    A.    No.

5    Q.    Now, based on your experience, Dr. Johnson, how long

6    would it take for a person of ordinary skill in the art as

7    of January 11th, 1995 to determine whether or not the base

8    form would be suitable for engaging in the next step of the

9    -- what you have down here as the skin

10    permeability/irritability step?  So how long would it take

11    to go through the process here that you described with

12    respect to the base dealing with the various testings,

13    solubility/stability, purity, pH solubility and solvent

14    studies, how long would it take you to complete this phase?

15    A.    It really depends on the base.  When we looked at

16    lidocaine base for a topical where we could spray on a

17    solvent system, it's actually transdermal because it has to

18    go through the skin, that was fairly easy, we could do that

19    in six months.  But the antifungal is a very difficult

20    material to both solubilize and transport, and I know we

21    spent more than a year.

22              THE COURT:  Wait.  Did you say more than a year?

23              THE WITNESS:  Yes.

24    Q.    And based on your experience and your knowledge of

25    atomoxetine, would you still estimate how long this would

1    take, that particular aspect of the testing?

2    A.   It's say probably not less than six months and

3    probably not more than a year.  I don't think it would be as

4    difficult as that antifungal.

5    Q.   Okay.  So now once you've evaluated the base form of

6    atomoxetine, what is the next step one skilled in the art

7    would have to conduct?

8    A.   You'd be looking at the skin permeability and

9    irritability, because if the parent compound is irritating,

10   then it's not a good choice.

11   Q.   Okay.  So what would skin permeability studies entail?

12   A.   As we discussed, when we were looking at these, we

13   tried to translate these results in these first four

14   diamonds into a system we could then run a dissolution study

15   and look at the permeability through a semipermeable

16   membrane or some kind of skin layer.

17   Q.   And what would skin irritability studies entail?

18   A.   We'd probably do a patch test on rats or guinea --

19   probably guinea pigs, where we'd take the drug, we'd mix it

20   in oil, we'd put it on the skin, and we'd cover it up with

21   material which is impermeable to evaporation.  In other

22   words, it's a closed patch test.  You really look at how

23   seriously this would be -- you overemphasize the

24   irritability if it exists so you can pick it up.

25   Q.   Well, just going back to transdermal formulation

CHARLES P. McGUIRE, C.S.R.

514

1      systems, as of January 11th, 1995, what transdermal systems

2      were available for drug delivery?

3      A.     There are a multitude of them.

4      Q.     Well, do you recall any of them?  Reservoir, would

5      that be one of them?

6      A.     There's Nitroderm, there's a nitroglycerin patch.

7      Q.     Were there multiple systems?

8      A.     Yes.

9      Q.     Over here, I believe, Dr. Johnson, we have multiple

10     systems.  Are those the multiple systems for transdermal

11     patches that were available as of January 11th, 1995?

12     A.     That's my understanding.

13     Q.     And you have reservoir, adhesive diffusion, and

14     micro-reservoir?

15     A.     Right.

16     Q.     Now, would one skilled in the art undertake any one of

17     these formulations first?

18     A.     Pardon me?

19     Q.     Would one of ordinary skill in the art undertake in

20     the development of the transdermal patch, would they take

21     any one of these systems first?

22     A.     You're trying to do the easiest one, and the adhesive

23     layer -- if you can put an adhesive layer and have that

24     controlled release good enough, that's probably the easiest

25     one.  I believe that's the nitroglycerin one.

CHARLES P. McGUIRE, C.S.R.

515

1    Q.    And just so we're clear, what are the components of an

2    adhesive diffusion system?

3    A.    You have a backing.  Then you have a layer of we'll

4    call it adhesive.  The adhesive would be kind of a --

5    probably a flowable material that would conform to the skin

6    and actually hold that layer onto the skin.  Then you have

7    another barrier on top of the adhesive which you peel before

8    you put it on.

9    Q.    And now, are there any excipients that would need to

10   be evaluated for an adhesive diffusion formulation?

11   A.    Well, we'd have to look at a solvent system that's

12   compatible with an adhesive and that would allow the drug to

13   penetrate through the skin.

14   Q.    Now, again, just referring to slide 25, I believe you

15   have a step, excipient compatibility step.  Do you see that?

16   A.    Yes.

17   Q.    Okay.  Now, you've laid that out in connection with

18   developing an adhesive diffusion system; is that correct?

19   A.    Right.

20   Q.    Okay.  Now, if you could, I see you have three tests

21   that are involved in the excipient compatibility analysis.

22   You have particle size, stability, you have in vitro

23   diffusion cell test.

24          Why does one skilled in the art need to conduct a

25   particle size analysis?

CHARLES P. McGUIRE, C.S.R.

1   A.      You probably wouldn't unless you're using an insoluble

2   drug which was a particulate.  With the base, we're trying

3   to get that dissolved in the adhesive layer, so we probably

4   wouldn't do the particle size, but let's say where we're

5   putting in the particles in the matrix which then slowly

6   dissolve, we control particle size because that's one of the

7   rate-limiting steps.

8   Q.      So if the base was not an appropriate form of

9   atomoxetine and you were using a salt form of atomoxetine,

10  then you would have to consider the particle size?

11  A.      Right.

12  Q.      And how does particle size -- what role does particle

13  size, if any, have in developing --

14  A.      This solution rate typically is controlled by the

15  particle size.

16  Q.      So determining --

17  A.      Small, like small particles will dissolve faster than

18  big particles.

19  Q.      And is there a situation with release rate in

20  connection with particle size that you need to adjust or

21  have to test?

22  A.      Right.  We would select particle sizes and look at the

23  release rate from different particle sizes.

24  Q.      And how does one go about carrying out the particle

25  size test?  In particular, how does one go about selecting

1       the appropriate particle size?

2       A.    We use different measuring equipment.  Just the size

3       -- particle size is usually fairly difficult.  We may use a

4       dissolution technique.  We may use a laser counterpart

5       technique.  We have a new one that we've been looking at

6       called the particle insight where it takes pictures of all

7       the shapes and sizes, and it's kind of unique in that it

8       allows you to evaluate unexpected results better.

9       Q.    Now, was that technique available in January of 1995?

10      A.    No.  No.  No.

11      Q.    Okay.  So what would one of ordinarily skill in the

12      art, what would they have done as of January 11th, 1995?

13      A.    He could have used a laser particle counter.  He could

14      use dissolution, or he could use a Coulter counter.  There's

15      a variety of instruments that were available.

16      Q.    Okay.  Now, just continuing on the excipient

17      compatibility step on slide 25, with respect to the

18      stability testing, can you just tell us why would one of

19      ordinary skill in the art carry out those tests and how

20      would they go about doing it?

21      A.    They would take the matrix system that we had and

22      would put it in different conditions and look at the -- the

23      -- if the drug remained stable.

24      Q.    Now, again, why?  Why would they have to conduct that?

25      Why is stability important?

518

1    A.    Because you really can't administer an unstable

2    compound.   It has to be intact.

3    Q.    Now, again, looking on the same, again, dealing with

4    the excipient compatibility portion of your slide on slide

5    25, can you tell us, why would one of ordinary skill conduct

6    in vitro diffusion cell test and how would they go about

7    doing that?

8    A.    Well, they would make the system as -- at probably

9    different variance concentrations, and you'd probably put it

10   -- you'd put it on one of these membranes, and the membrane

11   is sitting on top of a liquid; you stir the liquid and

12   measure how much transports from that system into the

13   liquid.

14   Q.    Now, when you say "membrane," are we talking about

15   pieces of skin or --

16   A.    Sometimes you use pieces of skin.   We had some mouse

17   skin models.   But you can use semipermeable membranes as

18   well, which are plastics, let's say.

19   Q.    And these were the type of tests that were available

20   prior to 1995?

21   A.    They were commonly used.

22   Q.    Now, Dr. Johnson, as you go through the process of

23   assessing the excipient compatibility in developing an

24   adhesive diffusion, is that -- well, you have arrows, and

25   you have the yes and noes.   Again, I just want to ask you,

CHARLES P. McGUIRE, C.S.R.

519

1    what were you trying to convey there?

2    A.    What you do is, you do these studies, and then you

3    changes things, you do them again, you change things, you do

4    them again.  They're mostly iterative steps.

5    Q.    Okay.  So now before we get to the next step, so just

6    going through, again, focusing on adhesive diffusion system,

7    and you've gone through -- now you're going through the

8    excipient compatibility phase of the development here, how

9    long would this particular process take one of ordinary

10   skill in the art in January 1995?

11   A.    Probably three to six months.

12   Q.    Now, again, could one of ordinary skill in the art

13   predict whether or not one excipient or another is

14   compatible with the active ingredient without conducting any

15   tests?

16   A.    Not generally, no.

17   Q.    I'm sorry, can you repeat that?

18   A.    Not generally, you can't.  You can predict certain

19   things.  By this time we will have enough information to

20   make some predictions because we're doing all that study in

21   the front, you know, the first half, so we have -- at this

22   point, we have enough information to make some predictions.

23   Q.    But with that, would one of ordinary skill in the art

24   still have to conduct some -- carry out at least some aspect

25   of the testing?

CHARLES P. McGUIRE, C.S.R.

1    A.    Right, because we don't know how it's going to affect

2    the release.

3    Q.    You don't know how it's going to affect the release?

4    A.    Correct.

5    Q.    And how it affects the release would impact whether or

6    not a certain quantity of the testing would be carried out?

7    A.    Well, it would affect whether or not we are close

8    enough to start looking at animal studies or animal models.

9    Q.    Now, does the prior art provide any correlation

10   between atomoxetine penetration through the skin?

11   A.    Repeat the question, please?

12   Q.    Does the prior art provide any information with

13   respect to the correlation of atomoxetine penetration

14   through the skin?

15   A.    No.

16   Q.    And none of that information is found -- is any of

17   that information found in the '590 patent?

18   A.    No.

19   Q.    Now, we didn't get into -- well, let's just focus just

20   on the micro-reservoir and the reservoir system that's on

21   top of slide 25.

22   A.    Right.

23   Q.    Now, is the quant of experimentation and the

24   unpredictability that you described in connection with the

25   adhesive diffusion formulation when you're assessing

521

1      excipient compatibility, is it the same with respect to the

2      reservoir system?  Would it be the same?

3      A.      Reservoir is probably more difficult.

4      Q.      And why is that?

5      A.      Because you have more components.

6      Q.      I'm sorry?

7      A.      You have more components.  It's a more complex system.

8      Q.      What other additional components do you have?

9      A.      You'd have a reservoir which is distinct from the

10     adhesive layer.  So now we've got another diffusional

11     component where it's got to diffuse out of the reservoir

12     through the adhesive to the skin.

13     Q.      And with respect to a micro-reservoir --

14     A.      That would be probably comparable.

15     Q.      Comparable to what?

16     A.      The reservoir.

17     Q.      Now, just for the -- could you just -- can you

18     describe the differences -- I mean, we have three systems,

19     reservoir, adhesive diffusion, and micro-reservoir.  I mean,

20     can you just generally describe the differences between the

21     three systems just to get an understanding as to why they're

22     separated out as being different?

23     A.      I separate them mainly because the reservoir in the

24     middle system, adhesive system is the adhesive.  The

25     reservoir on these other systems -- and they may be multiple

CHARLES P. McGUIRE, C.S.R.

522

1    reservoirs, may be one, may be two, maybe be three, where

2    the drug is actually in different layers, and these might be

3    like sandwiches that are put together, in other words, which

4    layer might have more drug, so it would -- so you can

5    actually program the release.

6    Q.    Have you ever heard the reservoir system being

7    analogized to a ravioli?

8    A.    No.

9    Q.    I have.

10         THE COURT:  What about that?

11         (Laughter)

12         MR. PARKER:  I had a case a long time ago dealing

13   with reservoir systems, and it looked like a ravioli.  The

14   inside, the cream cheese was the active ingredient that went

15   through, and that was the analogy made.

16   Q.    Okay.  So in developing a transdermal patch, now, once

17   you've prepared a suitable preliminary formulation, so to

18   speak, what's the next step one of ordinary skill in the art

19   would have had to conduct --

20         THE COURT:  Wait a minute.  Who puts cream cheese

21   in a ravioli?

22         (Laughter)

23         MR. PARKER:  I'm sorry, you're right.  My mother

24   would kill me if she heard me say that.  Ricotta, or

25   ricotta.

CHARLES P. McGUIRE, C.S.R.

1               THE COURT:  Go ahead.

2    Q.    All right.  So in developing a transdermal patch, once

3    you've prepared a suitable preliminary formulation, what is

4    the next step one of ordinary skill in the art would have to

5    conduct?

6    A.    You really now -- you've really got to go to an animal

7    at this point and make sure that your in vitro system is

8    actually rational.  So you usually like to go to some kind

9    of -- it could be a rat model, or maybe you need a little

10    bigger, more scale, you can use a guinea pig, and you make a

11    primitive dosage form of the adhesive backing layer that

12    simulates your dosage form, and you look at the penetration

13    rate in a live animal, and then you do a PK on this.  You

14    take blood levels from the animal and look at the

15    relationship between transport and blood level.  So you can

16    estimate dose release per given area, because these things

17    all go out of a patch.  They all -- you know, maybe one inch

18    square or two inches square, but it's all coming out of this

19    patch.  You've got to relate the size of that to how much

20    transports into the body.

21    Q.    Now, you mentioned PK again.  What does that refer to?

22    A.    It refers to a measurement of drug in the blood, and

23    we relate that to the dose in the transport.

24    Q.    Now, you also have mentioned the irritation.  So why

25    would one skilled in the art assess irritation, and how

524

1      would they go about doing that?

2      A.    That really is going to define whether or not this is

3      a viable way to try to do this.

4      Q.    Now, in carrying out these animal PK studies and the

5      irritation study, approximately how long would that take one

6      skilled in the art in January of 1995?

7      A.    Around three months.  That's assuming by this time --

8      what you do in parallel, you would also develop a blood

9      level method.

10     Q.    Excuse me?

11     A.    You'd need a blood level method so you can measure the

12     drug in the blood.  So you'd be doing that during one of

13     these earlier stages so that you'd have it ready when you

14     have to actually do the PK study.

15     Q.    And what do you mean by blood --

16     A.    You have to be able to analyze the drug in the blood

17     to determine how it's released.

18     Q.    Now, just going down to your next step -- and by the

19     way, you have the circular arrow next to the animal PK study

20     and irritation in your slide 25.  What was that intended to

21     convey?

22     A.    That these kind of go back and forth.  If you get a

23     no, you've got to repeat it.  If you get a yes, you can

24     proceed.

25     Q.    Now, let's just discuss -- well, let me back up.

CHARLES P. McGUIRE, C.S.R.

1          Now, once we've refined the formulation -- I'm

2     sorry.  Once we finish the animal studies, the next step --

3     can you tell us what the next step is?

4     A.    What we want to do is -- now we know how much is

5     released per unit area.  Now we have to put it on a human,

6     and so we have to refine the formula to different sizes with

7     the correct amount of drug in that patch so that on release,

8     we'll have a good idea how much is going to be released per

9     hour per unit area, like one milligram per square inch per

10    hour, or some designation or some -- we'd have to grade it

11    some way.  So we then have to actually fabricate the patches

12    so we can do the human study.

13    Q.    I'm sorry, you had to fabricate what?

14    A.    The patches so that we could actually do the human

15    study.

16    Q.    Did you also have to conduct an adhesion test or --

17    A.    Yes, we do that as part of it, but --

18    Q.    Is it also --

19    A.    If it won't adhere to the skin, it won't work.  So we

20    do an adhesion study as swell.

21    Q.    Pouch integrity; is that a factor?

22    A.    Yes.

23    Q.    And why is that a factor?

24    A.    Because it has to -- the package has to retain

25    integrity, but we really don't study that this much because

CHARLES P. McGUIRE, C.S.R.

526

1    these are mostly handmade.  They're to see whether or not

2    you can get the right transport.

3    Q.    Now, and how do you go about conducting in vitro

4    tests?

5    A.    We put -- we continue to use that as a quality

6    standard.  In other words, we get a test -- if we make 10

7    patches, or 20 patches, or whatever we make, we've got to

8    make sure that once we refine the formula, we're still

9    getting the same relative release rate.

10   Q.    And what do you use as the medium, or what would one

11   of ordinary skill in the art use as the medium?

12   A.    We often used a phosphate buffer, but I think you can

13   use other media as well.

14   Q.    With respect to not so much the buffer, the medium, I

15   meant the barrier under which you're looking to see if the

16   drug is going through into the -- you know, is it going

17   through the skin or not?

18   A.    Probably use a semipermeable membrane or something

19   like that.

20   Q.    Now, again, going to refine formulation step, is that

21   also an iterative process in your view?

22   A.    Yes.

23   Q.    And any idea how long that would take one of ordinary

24   skill in the art in January of 1995?

25   A.    The human PK, I would guess let's say six months.

527

1    Q.    No, the refine formulation step.

2    A.    That would probably take one to three months.

3    Probably three months, because we've got to do some

4    stability on it as well to make sure it's not changing.

5    Q.    And with stability, I know you talked about that

6    before in connection with the depot injections, but just to

7    move things along, did that also involve looking at the

8    effect that heat, light could have on the formulation?

9    A.    Yes.

10   Q.    Oxidation?

11   A.    At this point, we would -- we would know -- at this

12   point, we would already know if oxidation's an issue.

13   Q.    Just turning to the reservoir system, the

14   micro-reservoir system, is the amount, is the quantity of

15   experimentation, and -- let me back up.

16          With respect to refine formulation, can one of

17   ordinary skill in the art predict how to refine the

18   formulation without conducting any tests?

19   A.    No.

20   Q.    Now, with the amount of -- with the quantity of

21   experimentation and the level of unpredictability, if you

22   look at the -- in connection with the reservoir, would that

23   amount of quantity of experimentation and level of

24   unpredictability be the same as it would be for adhesive

25   diffusion when you're looking at the refine formulation step

1          in slide 25?

2          A.    It might be more difficult to refine it.

3          Q.    And why is that?

4          A.    Because it has more components.

5          Q.    Excuse me?

6          A.    There are more components to affect the release.

7          Q.    And what about micro-reservoir; would that be more, or

8          less?

9          A.    That would be similar to the reservoir system.

10         Q.    All right.  So now that you've refined the

11         formulation, can you tell us what the next step is, would

12         be?

13         A.    We would do the human PK studies and finalize what the

14         release rate would be and what the transport rate relative

15         to the blood level is.

16         Q.    Okay.  So down here, we're still looking at -- well,

17         you said human PK, studies and you also have irritation.

18         What do you mean by irritation?

19         A.    We would look and see whether it's irritating the skin

20         of the subject.

21         Q.    Now, you have dose range study for patch size.  Can

22         you just elaborate on that?  What do you mean by that?

23         A.    Again, we need to know how much drug is transported

24         through the skin per hour per square inch so that we can

25         arrive at units that we will try to confirm when we do a

529

1    blood level study.  At this point, we don't know what the

2    dose is because we have no information on the dosing related

3    to blood level.

4    Q.    And how long would these human PK studies and

5    irritation studies take?

6    A.    I think it would be in the range of six months.

7    Q.    Also, you have a circular arrow next to that.  Can you

8    just tell the Court what you intend to convey?

9    A.    If it doesn't work, you've got to do it again.

10   Q.    And so after you've carried out these human PK studies

11   and the irritation study on slide 25, after that's been

12   completed, what then would one of ordinary skill in the art

13   go about -- what's the next step?

14   A.    We would take the patches and put them on people to

15   see if we could get efficacy.

16   Q.    And why do you have to determine whether or not

17   there's efficacy?

18   A.    That's to fulfill the claim 1 in the practice of the

19   invention.

20   Q.    And what is it about claim 1 that requires that in

21   your view?

22   A.    It's a method of treatment for ADHD, and probably

23   you'll be doing four- to six-week studies to try to

24   determine if there's efficacy.

25   Q.    When you say four- to six-week studies --

1    A.    Because it's a chronic -- it's a chronic condition

2    which requires multiple treatment or treatment for sustained

3    periods of time to determine efficacy.

4    Q.    Now, does the claim also recite the phrase "effective

5    amount"?

6    A.    Correct.

7    Q.    And does that have -- did that have any influence on

8    your analysis?

9    A.    Right.  We don't know what the effective amount is

10   from a transdermal system.

11   Q.    Now, in your experiences, Dr. Johnson, based on your

12   knowledge, when developing a transdermal patch, what are

13   some of the challenges that one of ordinary skill in the art

14   would encounter?

15   A.    Trying to determine whether or not you can actually

16   make a patch to get enough drug through fast enough so that

17   this could be a viable way to dose the compound.

18   Q.    What about --

19   A     And whether or not it would be safe enough to do.

20   Q.    What about an issue of release rate?

21   A.    That's very important.

22   Q.    Can you explain why that's important?

23   A.    Because that determines -- if it isn't transported --

24   if it's eliminated from the body faster than it's

25   transported into the skin, then you don't ever achieve any

531

1    effective blood level.

2    Q.    Now, you also mentioned size of the patch could be an

3    issue.  Is that correct?

4    A.    Correct.

5    Q.    Can you explain how that --

6    A.    Well, you know, if the patch is too big, people won't

7    wear it.  It's not a back plaster.  If it's a back plaster,

8    then they can wear it.  But let's say it would be two by

9    four inches or two by six inches.  If you can place it in an

10   area where the absorption is sufficient -- in other words,

11   some of these patches you can place right behind the ear

12   because that's a very absorptive area for like scopolamine.

13   That will go through the skin very quick.  But you can't put

14   a four by six inch plaster under your ear, so you've got to

15   find places where you can put it which transports fast

16   enough so it could be used.

17   Q.    Now, Dr. Johnson, based on your consideration of the

18   Wands factors as you pointed out, as you set them out last

19   Wednesday, have you formed an opinion as to whether as of

20   January 11th, 1995, undue experimentation would have been

21   required by a person of ordinary skill in the art to prepare

22   a transdermal patch comprising an effective amount of

23   atomoxetine in some form to treat ADHD?

24   A.    Yes.

25   Q.    And what is that opinion?

CHARLES P. McGUIRE, C.S.R.

532

1    A.      It would take undue experimentation.

2    Q.      Before I move on to the next one, Dr. Johnson, I just

3    want to go back to slide 24.

4            Now, we talked about developing the transdermal

5    patch in connection with a base.

6    A.      Right.

7    Q.      Now, would the undue experimentation and

8    unpredictability that you described for conducting the

9    solubility testing, stability testing, crystal purity

10   testing, pH solubility testing and solvent testing in

11   connection with the salt, would that be more or less or the

12   same as you described in connection with the atomoxetine

13   base?

14   A.      It would probably be more difficult, because you first

15   have to decide what salt that might work, so you would make

16   multiple salts.  So instead of maybe one box, you'd have two

17   or three more because you'd probably go through some of that

18   first process with maybe two or three different salts.

19   Q.      And could a person of ordinary skill in the art

20   predict as of January 11th, 1995 without conducting any

21   tests whether a particular salt would be suitable for a

22   transdermal patch?

23   A.      No.

24   Q.      And why not?

25   A.      Because there's no evidence or literature or anything

CHARLES P. McGUIRE, C.S.R.

1    that I'm aware of that would provide help or assistance to

2    the use of atomoxetine hydrochloride salts, hydrochloride

3    salts or other salts for a transdermal patch.

4    Q.    Now, Dr. Johnson, in total -- well, your estimate, how

5    long would it take -- how long would it take to make a

6    transdermal patch from start to finish, whether using a base

7    or -- let's assume you're using a base.

8    A.    Probably more than two years.

9    Q.    And if you were using a salt?

10    A.    Two-plus years, maybe three.

11    Q.    All right.  Dr. Johnson, let's move on to another

12    dosage form, suppositories.

13            Can you go to 26, please?

14            Dr. Johnson, does the '590 patent call out

15    suppositories as a potential dosage form for administering

16    atomoxetine?

17    A.    Yes.

18    Q.    And where in the patent does it say that?

19    A.    It's in the '590 patent, column 2, lines 28 to 30.

20    Q.    And that's DTX-1?

21    A.    DTX-1, I believe.

22    Q.    Well, for the record, it's DTX-1.

23            Back to the slide, please.

24            Dr. Johnson, what is a suppository?

25    A.    It's a dosage form where the drug is inserted into a

534

1    hydrophilic or hydrophobic matrix which is placed in some

2    sort of body cavity to release the drug.

3    Q.    Before we go any further, though, back to, just on the

4    transdermal patch, are you aware of -- does there exist

5    today a transdermal patch that's used for treating ADHD?

6    A.    Yes.

7    Q.    Do you know what drug that is?

8    A.    I think it's methylphenidate.

9    Q.    Back to the suppository.  You testified it was

10   inserted typically rectally; right?

11   A.    I don't recall.  It typically would be, but I don't

12   recall what I said.

13   Q.    Well, how would you characterize the absorption of a

14   drug through the rectum?

15   A.    It's typically erratic.

16   Q.    I'm sorry:  Rectal mucosa.

17   A.    It's highly erratic.

18   Q.    I'm sorry, can you repeat that?

19   A.    Absorption from the rectum from a suppository is

20   typically erratic.

21   Q.    Does it avoid first-pass effect?

22   A.    Yes.

23   Q.    I meant does the drug avoid first-pass effect.

24   A.    Correct.

25   Q.    Now, does the prior art describe a suppository

535

1       formulation comprising atomoxetine?

2       A.      No.

3       Q.      Does it describe a suppository formulation comprising

4       a propylamine?

5       A.      Yes.

6       Q.      Is atomoxetine a propylamine?

7       A.      Yes.

8       Q.      Now, let's take a look up on slide 26, Dr. Johnson.

9       You have there a Formulation 5.  Do you see that?

10      A.      Yes.

11      Q.      And you also have I believe what's DTX-166, U. S.

12      Patent number 5,281,624.

13              Did you evaluate that patent --

14      A.      Yes.

15      Q.      -- as part of your analysis?

16      A.      Yes.

17      Q.      In your evaluation of that patent, what did you find?

18      A.      I found a suppository formulation which included a --

19      it appears to be a propylamine, which I would assume would

20      be a base.  However, they pass it through a screen, which

21      doesn't make any sense.  So I don't know how applicable this

22      truly is.

23      Q.      Well, let's just back up.

24              You're referring to Formulation 5 --

25      A.      Yes.

CHARLES P. McGUIRE, C.S.R.

1    Q.    -- on slide 26?

2          But what is this formulation directed to?

3    A.    A suppository.

4    Q.    Now, do you have an opinion as to whether or not

5    Formulation 5 would have made it possible for one of skill

6    in the art as of January 11th, 1995 to make a suppository

7    containing an effective amount of atomoxetine for treatment

8    of ADHD and, if so, can you tell us what that opinion is?

9    A.    It wouldn't help.

10   Q.    And can you please explain to the Court why that is

11   so?

12   A.    Because we don't know the dose of atomoxetine that

13   would be necessary.

14   Q.    Well, what's wrong with the dose that's on formulation

15   5?

16   A.    We have no knowledge of what the dose for atomoxetine

17   in a suppository should be because we don't know the

18   absorption rate, we don't know the dose.

19   Q.    Now, the '624 patent, is it directed toward treating

20   any particular disorder?

21   A.    Not that I'm aware of.  It may have been depression,

22   but I don't remember.

23   Q.    Is it directed to treating ADHD?

24   A.    No.

25   Q.    And in that formulation, atomoxetine is not described;

537

1    correct?  Formulation 5?

2    A.    It's not in the patent.

3    Q.    In the '624 patent.

4    A.    Correct.

5    Q.    You mentioned that it's not clear whether or not it's

6    a solid or base form.  Why is that?

7    A.    Because they list it as a base, and so I assume the

8    base is what was used.

9    Q.    But why would that make it confusing, if at all?

10   A.    Because they're pushing the base through a screen,

11   like a regular screen, and I don't -- you don't do that.

12   Q.    Now, where do you see that in Formulation 5?

13   A.    In the instructions.

14   Q.    Could you just recite where that is?

15   A.    It's right below the formula.

16   Q.    Just read it.

17   A.    "The active ingredient is passed through a No. 60 mesh

18   U.S. sieve and suspended in the saturated fatty acid

19   glycerides previously melted..."

20   Q.    Now, in your view, do you typically pass a base

21   through a sieve?

22   A.    No.

23   Q.    What is it that you normally would -- what would you

24   pass through that?

25   A.    You pass -- pass a powder.

1           THE COURT:  Counsel, can we take a short break?

2           MR. PARKER:  Yes, Your Honor.

3           THE COURT:  Okay.  Why don't we take about 15

4      minutes?

5           (Recess taken)

6           THE COURT:  Be seated.

7           (The witness resumed the stand.)

8           MR. PARKER:  Thank you, Your Honor.

9      BY MR. PARKER:

10     Q.    Okay.  Dr. Johnson, just staying on slide 26, okay?

11     Are you with me?

12     A.    Yes.

13     Q.    Okay.  Dr. Johnson, given the information that's

14     contained in the '590 patent together with the information

15     that's in Formulation 5 of the '624 patent, what

16     experiments, if any, would one skilled in the art need to

17     conduct in order to prepare a viable suppository formulation

18     comprising an effective amount of atomoxetine for the

19     treatment of ADHD?

20     A.    He would have to go through similar steps trying to

21     determine what ingredients, the active ingredient, what can

22     I use, the stability, solubility, and screen these

23     ingredients to arrive at some kind of preliminary formula.

24     He'd then want to put this in -- refine it so it can be put

25     in animals.  I don't know if you want me to go through all

1      of the --

2      Q.     No, no, we'll do that individually.  But just to look

3      at slide 27, slide 28, now, in these slides, are you

4      illustrating how one of ordinary skill in the art would

5      prepare a viable dosage form?

6      A.     Yes.

7      Q.     Okay, and in what context -- well, what do you mean by

8      a viable dosage form in this context?

9      A.     Suitable that you could do a human efficacy study to

10     determine whether or not it would be efficacious.

11     Q.     And in your review of claims 1 through 16 of the '590

12     patent, do you believe that's necessary?

13     A.     Yes.

14     Q.     Now, does the '590 patent provide any guidance with

15     respect to selecting the appropriate atomoxetine form for

16     making a suppository?

17     A.     No.

18     Q.     Does the '624 patent provide any guidance as to what

19     form of atomoxetine should be used for preparing a

20     suppository?

21     A.     I don't believe so, no.

22     Q.     Excuse me?

23     A.     No.

24     Q.     Now, let's first turn to I believe -- well, where

25     would the person of the ordinary skill in the art start

1      first with the atomoxetine selection, where would he begin?

2      A.    He would probably begin with the raw material and

3      decide is he going to do a base or a salt of some type.

4      Q.    Okay.  Now, do we know whether or not the base is

5      stable?

6      A.    We don't know.

7      Q.    Is there anything in the 624 -- well, strike that.

8            Now, just staying on slide 27 and just following

9      along, I believe, with the -- you said the base.  So is this

10     over here in the portion of slide 27 where you have the

11     base, analytical method, --

12     A.    Yes.

13     Q.    -- and going down?  Okay.  Now, could you just tell us

14     in this particular selection process, you have three tests,

15     stability, solubility, and -- I'm sorry, I can't read that.

16     That is?

17     A.    Partition coefficient.

18     Q.    Partition coefficient.

19           So let's just stick with stability.  Why would one

20     of ordinary skill in the art conduct these tests, and how

21     would they conduct them?

22     A.    Disability tests -- the first thing you've got to make

23     sure, in every one of these, you have to look at the raw

24     material, choose a pure raw material and then look at the

25     stability, whether in the mix of ingredients or excipients

541

1   that you think you might use in the formula.

2   Q.    And how would they go about testing that?

3   A.    They would mix the drug with the excipient and put it

4   in different temperatures.  You'd look at -- light, in this

5   case, is not quite as important because the form is not

6   usually in a situation where it's going to be affected by

7   light, but we typically would look at light, oxidation, we'd

8   do some things under nitrogen just to make sure that that

9   doesn't make a difference.

10  Q.    And suppositories, when administered, they melt?

11  A.    Yes.

12  Q.    And does that have an effect on as to why you would

13  look at the stability of the active ingredient?

14  A.    One of the -- one of the things we'd look at.

15  Q.    All right.  Now, with respect to solubility, on slide

16  27, coming off of the -- where it says base analytical

17  method, why would one of ordinary skill want to consider

18  solubility, and how would they go about assessing

19  solubility?

20  A.    I'd want to know what ingredients it's soluble in,

21  whether or not I would use a solvent in the system to help

22  carry it out of the suppository, a penetration enhancer to

23  determine whether or not I would need that to get improved

24  absorption.

25  Q.    And again, we're just looking at the -- determining

1    whether or not the atomoxetine base would be suitable at

2    this point; correct?

3    A.     Correct.

4    Q.     And how would they go about looking at solubility?

5    A.     In this case, you usually -- you'd actually just put

6    the base in different solvents and determine how much of the

7    drug went in solution.

8    Q.     Now, looking at the partition coefficient testing, why

9    would someone of ordinary skill in the art have to look at

10   that, and how would they go about doing it?

11   A.     You'd want to get an idea of what it is.  That tells

12   you sort of how hydrophobic the drug is, the base drug is,

13   and if you have a very hydrophobic vehicle, I don't think

14   you'd use that because it would stay -- it would migrate out

15   of the vehicle.  So you'd want to know some relationship

16   between the hydrophobicity of the vehicles you might use and

17   the drug, and if you want to determine the hydrophobicity of

18   the drug, you can put it in an organic solvent, like

19   octanol, and then you can shake it up with octanol and water

20   and then it will separate and then we can measure how much

21   resides in each phase.  So it gives you a measure, rough

22   measure of how hydrophobic it is.

23   Q.     Okay.  Now, you mentioned the word "hydrophobicity."

24   Just, what does that mean?

25   A.     That means it's oil-loving instead of water-loving.

1    Q.    Now, turning to the other side of your slide here,

2    slide 27, Dr. Johnson, you also have a portion where you

3    have a selection of a -- a process for selecting an

4    appropriate salt.  Do you see that?

5    A.    Yes.

6    Q.    Now, are there any tests that are in the -- when

7    dealing with the salt, are there any tests that are being

8    carried out here in selecting a form of atomoxetine stage,

9    are there any tests in this portion of your schematic that

10   are not in the base, dealing with the base?

11   A.    Yeah.  We would have a crystal here, so we'd want to

12   know what the crystal purity is, and we wouldn't know -- at

13   this point, we don't know what salt we might try.  It's my

14   understanding that the hydrochloric may be irritating, so

15   you might not want to use that, so you might look at some

16   other salts.

17   Q.    Now, with respect to the selecting the form of

18   atomoxetine both from the perspective of the selecting the

19   -- analyzing the base and selecting the salt form, you have

20   -- shown on this slide, you have arrows, and you have yes

21   and noes.  What were you trying to convey in this aspect of

22   the development process?

23   A.    As you go through these diamond steps, you find

24   properties that you didn't anticipate, and if you don't

25   think that's acceptable, then you maybe have to regroup and

544

1    go back and do it over.

2    Q.    Now, when analyzing the base, in carrying out these

3    series of tests that you indicate on slide 27, stability,

4    solubility, and partition coefficient, approximately how

5    long would it take one of ordinary skill in the art to

6    complete those tests?

7    A.    For the base, probably three to six months.  The raw

8    material probably would take longer because you don't know

9    -- at this point, you have no idea which salts you would

10   want to try to use.

11   Q.    Okay.  So my next question was, then, how long -- with

12   respect to the -- in selecting a salt in connection with

13   selecting the form of atomoxetine, would that be longer than

14   it would be for the base?

15   A.    Yes.

16   Q.    And how much longer?

17   A.    I think probably at least three months.

18   Q.    Now, based on what you've seen in the prior art,

19   including the '624 patent, as well as the '590 patent, could

20   a person of ordinary skill in the art predict what salt form

21   would be appropriate for a use in a suppository without

22   conducting any testing?

23   A.    No.

24   Q.    And could the person of ordinary skill in the art as

25   of January 11th, 1995, would they be able to ascertain

CHARLES P. McGUIRE, C.S.R.

545

1   whether or not atomoxetine freebase would be suitable for a

2   suppository without conducting any testing?

3   A.    No.

4   Q.    Now, once you've evaluated the base and the salt for

5   atomoxetine, what is the next step one skilled in the art

6   would have to conduct?

7   A.    We would put these ingredients together in some sort

8   of formulation and compatibility test with the other

9   ingredients we would select.

10  Q.    So is this what you're referring to, your preliminary

11  formulation --

12  A.    Right.

13  Q.    -- and excipient selection, --

14  A.    Correct.

15  Q.    -- which is on your slide 27?

16  A.    Correct.

17  Q.    Now, what, if any -- given the prior art as you had

18  read and evaluated it, what if any preliminary assessments

19  would one of ordinary skill in the art have to conduct in

20  dealing with the step here, preliminary formulation and

21  excipient selection?

22  A.    We'd put the materials together in a suppository form

23  and then we would look at the impact of melting point, we'd

24  look at in vivo dissolution to make sure that the drug was

25  coming out of the dosage form, and we'd do stability

1        studies.

2        Q.     And for both the base and salt, you have MP

3        differences, in vivo dissolution, and you have stability; is

4        that correct?

5        A.     Right.

6        Q.     Now, can you just -- well, why is looking at the melt,

7        MP -- MP stands for melting point?

8        A.     Yes.

9        Q.     Why is it important to assess the melting point

10       differences?  Why make that assessment?

11       A.     Because the dosage form really has to melt to release

12       the drug.

13       Q.     Now, would the excipients in the suppository have an

14       impact at all on melting point of the suppository?

15       A.     Yes.

16       Q.     It could increase it or decrease it, the melting

17       point?

18       A.     Right.  Yes.

19       Q.     Why does one skilled the art with respect to both the

20       base and salt need to conduct in vitro dissolution testings?

21       A.     Because what you're doing is trying to get a method of

22       assessing whether or not the drug is released in the dosage

23       form.

24       Q.     Now, with respect to a suppository, why is release

25       important?

1    A.    It has to be released so that it can pass through the

2    rectal mucosa into the tissues and into the bloodstream.

3    Q.    Now, with respect to -- now, with a suppository, the

4    drug is released as it's melting?  Is that how it works?

5    A.    Once it's melted, it kind of coats the mucosa and then

6    it releases from there.

7    Q.    And why is stability important when formulating -- why

8    would one skilled in the art need to assess stability when

9    you're looking at the preliminary formulation and excipient

10   selection stage?

11   A.    Because it must be compatible with the ingredients

12   you're selecting so that it will remain stable.

13   Q.    And how do you look at stability?  How does one of

14   ordinary skill make that assessment?

15   A.    In this case, you would analyze for intact drug.

16   Q.    Now, again, as we go through the process both from --

17   well, with respect to the preliminary formulation and

18   excipient selection process as you've laid it out in slide

19   27, you've made some notations there with the arrows.  Are

20   you trying to convey that it's an iterative process?

21   A.    Yes.

22   Q.    Can you explain why it would be an iterative process?

23   A.    Because before you do the work, you can't predict

24   what's going to happen.

25   Q.    Now, could one -- could a person of ordinary skill in

548

1    the art predict as of January 11, 1995, without conducting

2    any test what excipients would yield a suitable preliminary

3    suppository formulation allowing you to proceed to the next

4    step?

5    A.     No.

6    Q.     Now, based on your experience, Dr. Johnson, with

7    respect to the base, how long would this particular aspect

8    of the process take?  I'm referring to the preliminary

9    formulation and excipient selection stage.

10   A.     That would probably take another three months.  To get

11   to refined formulation, we're talking six to nine months.

12   Q.     I'm sorry.  What was that?

13   A.     We're talking six to nine months, roughly.

14   Q.     And with respect to the salt, would that be longer,

15   shorter?

16   A.     I think it would be maybe S three months longer.

17   Q.     And why would that be longer for the salt?

18   A.     We really have to pick the salt.  It takes time to

19   make the salt, characterize the salt, analyze the salt.  So

20   you lose maybe three months in the front end making these

21   salts and characterizing them.

22   Q.     Okay.  Now, let's just go to the refined formulation

23   step that you've laid out in slide 27.

24         Now, for both the base and the salt, I believe the

25   tests would be similar?

CHARLES P. McGUIRE, C.S.R.

549

1    A.    Yes.

2    Q.    They would include -- tell us what they would include.

3    A.    We would certainly look at stability and -- of various

4    types, and we would look at in vitro dissolution.

5    Q.    Okay.  So for the base, why would one skilled in the

6    art look to stability, look at stability?  How would they go

7    about assessing it?

8    A.    You would really look, make sure that the drug stayed

9    intact in the time you had to evaluate it.  In this case,

10   you don't have a lot of time because you're trying to move

11   it along, get to the next step, but you could also rely on

12   the prior stability with these excipients.  At this point,

13   you're refining it to the point where you can actually

14   administer, make a suppository and administer it to a dog.

15   The first one would be ranges of -- ranges of drug in these

16   various systems, but not necessarily shaped in the

17   suppository.  When we go down here, we're starting to

18   actually make suppositories with the drug that we can give

19   to a dog in this case.

20   Q.    Now, with in vitro dissolution, why would one of

21   ordinary skill in the art want to assess that, and how would

22   they go about doing it?

23   A.    We would want to continue to evaluate the rate at

24   which it releases the drug.

25   Q.    And just quickly, with respect to the salt selection,

1    as far as the how and the why with respect to what one of

2    ordinary skill would do, would your testimony be the same

3    with respect to the base as it would be for the salt form?

4    A.    Yes.

5    Q.    Okay.  Now, let's just move down to the -- what is the

6    next step?  Once you've refined the formulation, what would

7    one of ordinary skill in the art do if they were going to

8    pursue the base as the potential active ingredient?

9    A.    We'd like to determine whether or not it's released

10   appropriately in at least some kind of in vitro -- in vivo

11   model, like a dog.

12   Q.    And can you explain the type of studies that would be

13   undertaken?

14   A.    You'd do a blood level study on the dog and look at

15   the rate of release and extent of release of the drug from

16   the suppository.

17   Q.    Now, on your slide, you also mention bioavailability.

18   What does that mean?

19   A.    It means we're looking at the rate of release, extent

20   of release, and the blood levels.

21   Q.    Now, you also have the same testing also for the salt

22   form as well?

23   A.    Right.

24   Q.    So your description with respect to the carrying out

25   those tests for the base, would that be also the same for

551

1  the salt form?

2  A.  Yes.

3  Q.  And you have a circular arrow next to that step, the

4  animal PK study step.  What is that intended to convey?

5  A.  That's to determine whether or not we would have to go

6  back and rerun the tests and go back and refine the formula

7  again.

8  Q.  Now, Dr. Johnson, now, are these, any of these steps

9  -- let's just talk here, with the base, going to the

10  selecting, is selecting the form of atomoxetine to determine

11  whether or not it's suitable, is that a routine step?

12  A.  No.

13  Q.  Why would you not consider that to be routine?

14  A.  Because it requires a high level of training, skill,

15  and evaluation ability.

16  Q.  And what about selecting the preliminary formulation

17  and excipient selection phase:  Are the underlying tests for

18  that, would you consider those to be routine?

19  A.  No.

20  Q.  And why not?

21  A.  Because they -- they just are not.  There are certain

22  steps that may be routine, for example, weighing, pouring,

23  mixing, a lot of those steps are not necessarily -- you can

24  say they're routine, but you have to do them in the context

25  of what your goal is, and that's where it takes a certain

552

1    intellectual content or ability or -- to perform and get the

2    right answers.

3    Q.    And to your knowledge, with respect to animal PK

4    studies, were those -- do you consider those to be routine?

5    A.    No.

6    Q.    And just explain why.

7    A.    You have to relate this blood level to the release of

8    the drug, make a decision whether or not that's adequate,

9    inadequate; is it irritating.  So it's not simple.

10   Q.    After refining the formulation, what is the next step

11   one skilled in the art would carry out?

12   A.    We do the dog study, and we try to pick whether or not

13   either one of these might be satisfactory.

14   Q.    When you do the dog study, are you talking about the

15   animal PK study?

16   A.    Yes.

17   Q.    All right.  After that is all done, what is the next

18   study, the next step?

19   A.    We take that evidence or information we got, try to

20   pick whether or not we thought the base is more promising or

21   the -- or it makes -- which does it make sense to do, do you

22   want to do the base or do you want to do the salt, for

23   example, is one more stable than the other, does one release

24   more completely than the other, does one have more or less

25   irritation than another?  It's a matter of judgment which

553

1    one you take, because you really at this point don't want to

2    carry too many things through to the next step.

3    Q.    Okay.  Now we're going -- what would be the next step

4    once you've done that?

5    A.    We refine the dosage forms used, the dosage forms and

6    the raw material or active constituent that we used in the

7    dog study, and we'd put that in formulation suitable for

8    dosing people.

9    Q.    And you have a whole series of tests.  Can you just

10   identify what those are?

11   A.    You'd start running some additional tests, which could

12   have an effect on physical form, like you'd freeze it, thaw

13   it three or four or five times.  You'd look at the stability

14   of the drug, you'd look at appearance; in other words, does

15   it get misshapen so that it doesn't hold its shape.  You'd

16   run dissolution.  You'd look at penetration studies to

17   determine whether or not is it getting softer with time as

18   we -- as we -- in other words, as it ages, does the dose --

19   does the wax matrix retain its strength.  It's pretty

20   important that it's homogenous, because if you pour these

21   and if it separates too fast when you're making the

22   suppository, you're not going to get a suppository which is

23   homogeneous.

24   Q.    Let me back up there.  What happens with -- just

25   sticking with the homogeneity of the suppository, the active

1      ingredient mix in the suppository, when administering a

2      suppository, why is it important that the drug be

3      homogeneously mixed throughout?

4      A.    So that it releases consistently.

5      Q.    What is the next that we have over there?

6      A.    We have hydrophobicity.  We want to get more

7      information on whether or not it's moisture-sensitive.  It's

8      just really a -- it's really another stability test that we

9      do.  But I'm just saying, the difference is, we were

10     expanding some of the testing we're doing because it's now

11     going into people.  We want to make it safe, consistent.

12     Q.    Now, you have -- again, without -- if you would just

13     expand a little bit, we haven't seen freeze/thaw.  How would

14     one go about conducting a freeze/thaw test?

15     A.    You actually take the suppository, you put it in --

16     you can put it in a bottle, you can put it in anything, and

17     you put it in the freezer, and then you bring it out of the

18     freezer -- put it in the freezer for 24 hours, take it out

19     for 24, back and forth.  You usually do four cycles.

20     Q.    Again, what is the purpose of doing that?  Why one of

21     ordinary skill in the art want to assess that?

22     A.    You want to make sure that the physical form of the

23     waxes, the things that you have in that system don't change,

24     because, if they change, they probably will change the

25     release rate.

CHARLES P. McGUIRE, C.S.R.

1    Q.    Okay.  Now, would you consider this -- as you have

2    laid it out in slide 28, the various testing involved with

3    refining the formula for the suppository, would you consider

4    that aspect of the process routine?

5    A.    No.

6    Q.    And why would you not consider it routine?

7    A.    Because it involves a lot of decisions along the way.

8    I laid it out in a way I thought that I would expect a

9    formulator to follow this path.

10   Q.    Now, again, you have the arrows, and you have the

11   yeses and the noes.  Are you trying to convey there that

12   it's -- well, why don't you tell us, what are you trying to

13   convey here with respect to refining the formula for the

14   human studies?

15   A.    I want to make sure that I've refined it sufficiently

16   and it's going to be consistent so that when I can give it

17   to humans, I'm going to get consistent results, consistent

18   data, I can understand the relationship of the release of

19   the suppository to the blood level and excretion and have a

20   system which is suitable to determine the efficacy.

21   Q.    Okay.  But now, again, just -- is this an iterative

22   process in your view?

23   A.    You hope it isn't at this point, but it would be, yes,

24   depending on whether or not the results are satisfactory.

25   Q.    All right.  Now, let's just go to the next step.  Once

556

1    you've refined the formula for human studies, what do you do

2    next?  What would one of ordinary skill -- where would you

3    go in that direction?  What would you do next?

4    A.    We prepare supplies and do a human efficacy study.

5    Q.    Well, hold on.  You have human PK studies that are

6    listed there as well.

7    A.    Yes, I thought we did those, but --

8    Q.    I don't -- would you just -- I don't believe we did,

9    but could you just describe what would be involved or -- why

10   would you need to conduct the PK studies, human PK studies?

11   A.    Because we really need to look at the release of the

12   drug from the suppository and how it relates to blood levels

13   because we don't know the dose of atomoxetine when it's

14   given by a suppository.

15   Q.    Now, you have an arrow that's indicated there, a

16   circular arrow.  What is that intended to convey?

17   A.    It could be iterative.

18   Q.    Now, what's the next step after that, human PK

19   studies?

20   A.    After that, we'll make a decision on whether it's

21   active enough or effective by conducting human efficacy

22   studies.

23   Q.    And does the patent require that the suppository be

24   effective in treating ADHD?

25   A.    Correct.

557

1    Q.    And is that one reason among others that you would

2    conduct the efficacy studies?

3    A.    Yes, we need that as well to determine the dose.  We

4    don't know the dose.

5    Q.    Now, how long would it take -- roughly, about how long

6    would it take to carry out, to complete the step here about

7    refining the formula before you get to the human studies?

8    A.    Probably about two to three months.

9           One of the problems here is the stability studies

10   are -- you've got -- you can't -- it's very difficult to

11   accelerate a suppository because it melts.  So you can

12   accelerate stability, but these physical forms, like

13   freeze/thaw or durometer, some of these physical tests, you

14   can't really accelerate those.  You can accelerate chemical

15   degradation, but it's hard to accelerate other physical

16   testing here.  So it would be more than a month.  It would

17   probably be two to three months.

18   Q.    Now, any -- do you have any idea with respect to the

19   human PK studies how long those tests would take to carry

20   out?

21   A.    Three to six months.

22   Q.    And any idea about the human efficacy studies?

23   A.    I think they would be six months-plus, six months or

24   more.

25           THE COURT:  You've been giving testimony where

558

1    you've talking about a time period, and, of course, you've

2    used the phrase the undue amount of --

3            THE WITNESS:  Right.

4            THE COURT:  -- testing.

5        When does it become undue?

6            THE WITNESS:  In my mind, it -- what I try to do

7    is look at all these Wands factors and describe those versus

8    the amount of work necessary to do any of these tests, and

9    the lack of data and information in the patent as well as

10   the prior art is what I'm trying to base whether or not it's

11   undue or not.

12           THE COURT:  Well, the point is, there would be a

13   certain amount of time necessary under any circumstance;

14   correct?

15           THE WITNESS:  Correct.  Correct.

16           THE COURT:  Well, when does it become -- what tips

17   it into the undue category?

18           THE WITNESS:  In my mind, if you can do it -- if

19   -- if a person skilled in the art, when I look at these,

20   like a year or less.  If I can do it all in a year or less,

21   that's probably not undue.  If the information is also in

22   the literature, which helps, for example, making a tablet,

23   capsule, tablet.  These other, there's almost no

24   information, and we're well over one to two years on almost

25   every one.

CHARLES P. McGUIRE, C.S.R.

1          THE COURT:  So what causes it to be undue is the

2     amount of time?

3          THE WITNESS:  No, it's actually the amount of

4     work.  It's uncertainty, predictability, unpredictability,

5     amount of work, time.

6          THE COURT:  So the time is merely one factor?

7          THE WITNESS:  It's one factor.

8          THE COURT:  In any event, it's subjective.

9          THE WITNESS:  It is subjective.

10          THE COURT:  And why did you just say one year?

11     What --

12          THE WITNESS:  Well, that -- that was kind of a --

13     I laid out the development of all these things and tried to

14     group them, I could -- I could group the oral, solid,

15     tablet, capsule, fast-disintegrating tablet for oral use, I

16     could kind of group those all together in a matter of time.

17     The rest of them all grouped, longer.  And it ends up --

18     there's more uncertainty and unpredictability in those other

19     forms.  The capsules, that's a dry system.  There's no

20     liquid.  It's unlikely to have a stability problem.  That's

21     a big issue.  The need of not having to make a new salt is a

22     big deal.  That's expensive.  I've been involved in several

23     situations where they didn't make the right salt, it wasn't

24     the right purity, and you delay things for three -- three

25     months to a year, and you repeat all that work.

1              What else?

2              It's issues like that.  That's how I kind of think

3      they're different.

4              THE COURT:  Okay.

5      BY MR. PARKER:

6      Q.    Now, Dr. Johnson, just in your opinion, in your

7      experiences, when developing a suppository, what are some of

8      the challenges that one of ordinary skill would encounter as

9      they develop this product -- I'm sorry, this viable dosage

10     form?

11     A.    Probably the biggest one is, we don't know the dose,

12     and we don't know the rate of absorption or the extent of

13     absorption from the rectum, and the variability, irritation,

14     unpredictability is a big issue.  You don't know how many

15     patients you're going to need to do because you can't

16     predict the release rate.

17     Q.    Now, during your deposition, you were asked whether or

18     not a pharmacist can simply just take a tablet, grind it up,

19     let's assume the tablet has 50 milligrams of the effective

20     amount, which to effectively treat ADHD that a pharmacist

21     could just simply grind that tablet up and throw it in a

22     suppository.  Do you have any idea or any view as to whether

23     that would be a viable dosage form in your view?

24     A.    I don't believe it's viable.

25     Q.    It would not be viable?

561

1    A.    No.

2    Q.    Would the physician or the pharmacist have any basis

3    to believe that it would actually work to treat ADHD in your

4    view?

5    A.    He shouldn't have.  He doesn't know the dose.

6          THE COURT:  He doesn't what?

7          THE WITNESS:  Know the dose.  That route of

8    administration, we don't know what the dose is.

9    Q.    I mean, is that a correlation between what a dose is

10   in a tablet and what you can actually put into a

11   suppository?

12   A.    In this case it's pretty uncertain because you have

13   two types of metabolizers, and the rectal route, the drug

14   should not be metabolized that way.  So it's not

15   predictable.

16   Q.    Right.  You referred to the absorption through the

17   rectal mucosa as erratic?

18   A.    Yes.

19   Q.    Dr. Johnson, with respect to the slides 27 and 28 that

20   we looked at for the suppository, were those slides prepared

21   based on your instruction and direction?

22   A.    Yes.

23   Q.    And they were prepared today for your testimony?

24   A.    Yes.

25   Q.    And in your opinion, do they reflect how one of

562

1    ordinary skill in the art would go about developing a

2    dosage, a suppository?

3    A.    Yes.

4    Q.    Dr. Johnson, just moving along, based on your

5    consideration of the Wands factors that you referenced last

6    week and you referenced this morning, have you formed an

7    opinion as to whether or not as of January 11th, 1995, undue

8    experimentation would have been required by a person of

9    ordinary skill in the art to prepare a suppository

10   comprising an effective amount of atomoxetine in some form

11   to treat ADHD?

12   A.    I think it would take undue experimentation.

13   Q.    Okay.  So let's take -- let's move on to a different

14   dosage form.

15         Suspensions.  What is a suspension?

16   A.    That's where you have a suspended solid in a liquid.

17   Q.    Now, are suspensions called out in the '590 patent?

18   A.    I believe so.

19         MR. PARKER:  Slide six.

20   A.    Yes.

21   Q.    And where in the patent is it identified?

22   A.    It's "usual oral pharmaceutical forms, such as

23   tablets, capsules, suspensions and the like."

24   Q.    Does the '590 patent provide a working example of a

25   suspension?

563

1    A.    No.

2              MR. PARKER:   Slide 29.

3    Q.    Now, in your review of the prior art, Dr. Johnson, did

4    you come across any references that disclosed a suspension

5    that contained a propylamine?

6    A.    Yes.

7    Q.    Now, atomoxetine is a propylamine, is it not?

8    A.    Correct.

9    Q.    But did that reference specifically deal with

10   atomoxetine?

11   A.    No.

12   Q.    And any idea as to what indication the drug that's

13   described in the '624 patent, which is DTX-166, what the

14   condition was that was being treated?

15   A.    I don't know.  I think these were all depression.

16   Q.    You believe it's depression?  Was it directed to ADHD?

17   A.    No.

18   Q.    Now, was there -- on your slide, at 29 you have

19   Formulation 6.  Do you see that?

20   A.    Correct.

21   Q.    Now, did you consider that formulation?

22   A.    Yes.

23   Q.    And why did you consider that particular formulation

24   as a part of your analysis?

25   A.    Because it was a propylamine.  It was a suspension,

564

1    purported suspension, but when you read the formula and the

2    ingredients and the method of manufacture, I don't believe

3    you could use it as an example.  It's not really relevant.

4    Q.    All right.  Do you believe it's helpful or unhelpful,

5    the formulation?

6    A.    It's not helpful because it looks like they're using

7    an amine.  An amine would be an oil.  They're passing it

8    through a sieve, which reduces credibility because you

9    wouldn't pass the oil through a sieve.

10    Q.    Well, then, Dr. Johnson, after your evaluation of the

11    '624 patent, which is DTX-166, given that, and given the

12    information in the '590 patent, did you -- well, what

13    experiments, if any, would a person of skill in the art need

14    to conduct in order to prepare a viable suspension

15    formulation?

16    A.    This is another chart with --

17    Q.    This is a chart that was prepared pursuant to your

18    direction and supervision?

19    A.    Right.  Right.

20    Q.    For your testimony today?

21    A.    Yes.

22    Q.    Okay.  So you've looked at at least -- you've

23    identified the '624 patent which had a formulation in there

24    that you evaluated, and you also looked at the '590 patent.

25    So now does this -- what does this slide illustrate now with

1    respect to your -- given your evaluation of those materials?

2    A.    To make a suspension, you're going to need an

3    insoluble salt.  I don't believe it's practical to use the

4    base.  So if we want to make a suspension, we'd want to

5    choose an insoluble salt.

6    Q.    And why would it not be practical to use the base?

7    A.    It's an oil.

8    Q.    And does the '624, the '590 patent identify any

9    particular salt form that would be suitable for a

10   suspension?

11   A.    No.

12   Q.    At least with respect to atomoxetine.

13   A.    Correct.

14   Q.    Okay.  So, now, does the '590 patent provide any

15   guidance at all in terms of what salt one would want -- one

16   could use for a suspension?

17   A.    No.

18   Q.    All right.  And what is a -- we've talked about viable

19   dosage forms.  Just, what do you mean by viable suspension?

20   A.    It's a suspension that would be safe, effective, and

21   we could dose it to people.

22   Q.    So now how does one skilled in the art as of January

23   11th, 1995, how does he or she go about selecting an

24   appropriate form of atomoxetine for a viable suspension?

25   A.    We really need to pick a raw material, which is in a

CHARLES P. McGUIRE, C.S.R.

566

1    soluble salt, and then we need to test one or more of these

2    with regard to stability, particle size, crystal purity,

3    dissolution, and solubility to determine whether or not it

4    might be appropriate.

5    Q.    All right.  Now, just, I know you have four -- five

6    different tests, stability, particle size, crystal purity,

7    dissolution, and solubility pH on slide 30.  Again, so what

8    are we looking -- in carrying out the stability test, what

9    is one skilled in the art looking at?  What are they looking

10   for?

11   A.    Say that again?

12   Q.    With respect to the stability test that you have on

13   slide 30, what is one in the ordinary skill in the art

14   looking at?  Why are they conducting this test?

15   A.    We're conducting it because, at the end of the day,

16   you have to have a stable, effective suspension of product

17   to dose people.

18   Q.    And you mentioned stability testing before.

19   Generally, what does it entail?

20   A.    In this case, it would entail putting -- putting the

21   insoluble salt in water, suspending it and looking -- we

22   would probably do multiple pHs, and we would look at

23   dissolution from these different pHs and also the drug

24   itself, does it retain its potency.

25   Q.    Now, is particle size an important aspect of a

1     suspension?

2     A.     Yes.  Ultimately, if it's too big, it will settle; if

3     it's too small, it might dissolve too fast when you're

4     feeding, putting it in your mouth.  So you're going to have

5     to adjust particle size so it will stay in suspension but

6     you could still use it as an oral dosage form to get

7     adequate absorption.

8     Q.     Okay.  So how does one skilled in the art go about

9     adjusting the particle size?

10    A.     Well, you produce it in different particle size.  You

11    might even mill it.  If you make a big one, you might mill

12    it, although you would really try to crystallize it in a

13    controlled fashion.

14    Q.     Now, you also mentioned crystal purity.  Why is that

15    important in connection with developing a suspension?

16    A.     Because at the end of the day, you have to administer

17    pure drugs.  You can't -- you can't have decomposition in

18    the drug.

19    Q.     All right.  Now, with respect to dissolution, why is

20    that an important assessment to make?

21    A.     Because initially, it's got to pass -- it's got to be

22    -- dissolve slow enough to get through the mouth and fast

23    enough so it can be absorbed.

24    Q.     Absorbed where?

25    A.     In -- through the -- goes into the stomach, into the

568

1    intestine, and then it is absorbed.

2    Q.    And with respect to solubility, pH, how does -- why is

3    that an important -- why is that an assessment that needs to

4    be made?

5    A.    In this case, we were going to probably adjust pH to

6    control solubility to some extent.

7    Q.    Now, when you're going about selecting the form of

8    atomoxetine, do you have a view as to whether or not it's an

9    iterative process?

10   A.    It typically is.

11   Q.    And could you just explain, why is that?  Why would

12   that be?

13   A.    Because you're going to have to use multiple-size

14   particles.  You're going to have to -- you have a lot of

15   parameters, things going on at the same time.  Just the

16   physical attributes of just particle settling, it's got to

17   settle slow enough so that you can actually just shake it,

18   pour out five mls or whatever the quantity is and dose that

19   and not have it settle so fast you can't get the same amount

20   every time you pour it out.

21   Q.    And just based on your experience -- well, first of

22   all, could one of ordinary skill in the art predict without

23   conducting any tests what salt form of atomoxetine would be

24   appropriate for a suspension?

25   A.    No.

CHARLES P. McGUIRE, C.S.R.

569

1    Q.    You'd have to conduct the tests?

2    A.    Well, he'd go to the literature, he'd get leads, he'd

3    make the compounds, and then he'd do the tests.

4    Q.    And I know we've been talking about in terms of how

5    much time it takes to carry out certain aspects of these

6    development phases.  Well, first of all, is selecting the

7    form of atomoxetine, is that a routine process?  Would that

8    be a routine process for one of ordinary skill in the art as

9    of January 11th, 1995?

10   A.    No.

11   Q.    And why is that?

12   A.    It requires a pretty -- pretty good level of skill,

13   assessment of the literature, chemistry, and trying to

14   determine which might be the most appropriate salts.

15   Q.    And approximately how long would it take for one of

16   ordinary skill to carry out these tests that you've laid out

17   on slide 30 in connection with selecting the form of

18   atomoxetine?

19   A.    It would probably take at least three months to get

20   the raw material and another three months to get to the

21   point where you're evaluating preliminary formulations.

22   Q.    Well, let's just focus on just, you've got the raw

23   material and you're carrying out the tests.  How long would

24   that take, approximately?

25   A.    Two, three months.

CHARLES P. McGUIRE, C.S.R.

1    Q.    Okay.  Now, once you've actually selected -- you found

2    the lead and you selected the form of atomoxetine you want

3    to go with, what's the next step?

4    A.    We'd make the preliminary formulation excipient

5    selection, and then we'd do -- we'd make this in a

6    suspension, we'd do the stability tests with the excipients

7    that we thought were the most appropriate.

8    Q.    And then you listed a series of tests there.  Can you

9    just read -- could you just tell us what those test are on

10   slide 31?

11   A.    Yes.  We'd do stability testing.  We'd look at the

12   suspendability, caking, degradation.  We'd look at

13   resuspendability, uniformity, dissolution, viscosity, taste,

14   microbial growth.

15   Q.    Now, when you talk about stability -- and let's talk a

16   little bit about viscosity.  Why is viscosity important?

17   A.    That helps to determine how long the particle size and

18   the particle mass, how long it will stay suspended.

19   Q.    And what type of testing is done to make that

20   assessment?

21   A.    You can do various things.  We use a viscometer for

22   viscosity.

23   Q.    Now, you have taste.  Is taste a factor in developing

24   a suspension?

25   A.    Yes.  That's the reason we're making a suspension,

CHARLES P. McGUIRE, C.S.R.

571

1    because taste is -- of a liquid, it's my understanding,

2    would probably be very bitter.

3    Q.    What would be very bitter?

4    A.    The taste of atomoxetine.

5    Q.    But why is the bitterness a factor in developing a

6    suspension?

7    A.    People won't take the dosage form if you don't -- if

8    it's not palatable.

9    Q.    You can force them to take it; right?

10   A.    I don't think you'd want to do that to your kid.

11   Q.    Well, let me ask you, you understand the ADHD is

12   treated over a long period of time; is that your

13   understanding about ADHD?

14   A.    Correct.  You have to take this four to six weeks to

15   see its efficacy, and it's a product that you anticipate

16   that you'd be taking for years, and so it's just not

17   reasonable to make something that's not palatable.

18   Q.    Would you consider a viable suspension one that's

19   palatable to patients?

20   A.    Yes.

21   Q.    Now, so how does one go about -- now, when you're

22   dealing with bitter taste, is taste masking a phrase that

23   comes to mind?

24   A.    Yes.

25   Q.    What is involved with taste masking?

1    A.    You'll do a variety of things.  You'll change the

2    sweetness of the product, you can add sweeteners, you can

3    add flavors.  You can do different -- different things like

4    that.

5    Q.    Is there anything out there in the literature that

6    would tell you which particular ingredients would

7    sufficiently or successfully mask the bitter taste of

8    atomoxetine?

9    A.    Well, there's a lot of literature to help you choose

10   which ingredients will flavor bitter things better than

11   others.  So you would use literature, you'd pick things like

12   and then you'd try it, see if it works.

13   Q.    And as of now, sitting here today, do you know of any

14   particular compound that might be able to mask the bitter

15   taste of atomoxetine?  Or you'd have to carry out the tests?

16   A.    In any case, you have to carry out the tests because

17   you've got to confirm you were right.

18   Q.    Now, you mentioned microbial growth.  What does that

19   mean?  Why is that a factor?

20   A.    Because you've got -- it's a liquid system.  You

21   likely will have microbial growth.  It's easy to get

22   contaminated.

23   Q.    Now, just looking at resuspendability and uniformity,

24   what do you mean by that?

25   A.    That's so when it's dosed, you get the same amount of

1    drug per dose, and if it's not resuspendable, you won't.

2    Q.    And why is that important in developing a suspension?

3    A.    Because any time you dose somebody, you're trying to

4    get a certain amount of medicament to fulfill that dose

5    request.

6    Q.    Now, the resuspendability and uniformity of any

7    suspension, would that have an effect -- is that affected by

8    the excipients in the suspension itself?

9    A.    Yes.

10   Q.    And stability, you mentioned degradation, caking, and

11   sedimentation.  What do you mean by caking?

12   A.    That's when you hold the bottle up and the bottom --

13   the drug's all caked and the other excipients are caked on

14   the bottom, and they won't resuspend.

15   Q.    And sedimentation; what do you mean by that?

16   A.    Well, most of the things we have in there are

17   insoluble, and that's where they settle.

18   Q.    And you also mentioned degradation, and how is that

19   assessed?  How would that be assessed by one of ordinary

20   skill in January of 1995?

21   A.    We would assay it for the intact compound and the

22   degradation product.

23   Q.    All right.  So in carrying out all these various tests

24   to obtain a preliminary formulation and excipient selection,

25   do you have a sense of how long this process might take?

574

1    A.    Probably at least three months plus.

2    Q.    Again, from the perspective of one skilled in the art,

3    would you consider this process here of identifying and

4    selecting a preliminary formulation and excipient selection,

5    would that be an -- would you consider that to be routine?

6    A.    No.

7    Q.    And just why is that?

8    A.    Because there's a lot of factors here to consider and

9    blend together to arrive at a decision which is an effective

10   decision and both select a dosage form which is likely to be

11   worthwhile to be carried forward.

12   Q.    Now, what's next after you've carried out the

13   preliminary formulation and excipient selection step?

14   You've finished that.  What's the next step?

15   A.    We are on suspensions because you really at this point

16   are not completely sure of the solution rate.  We always did

17   a rat toxicity maximum tolerated dose test.  It was not a

18   long-term test.  It's a test, maybe about a month.

19   Q.    Now, -- well, let me back up quickly.

20         Now, just on the selecting the form of the

21   atomoxetine, would you consider that to be an iterative

22   process as well?

23   A.    Yes.

24   Q.    And again, with respect to this aspect of the

25   development process, the preliminary formulation and

1    excipient selection, you have arrows, you have other

2    indications there.  What was it you were intending to convey

3    with that process?

4    A.    That if any one of these fails, you have to go back

5    and start, make some modifications.

6    Q.    All right.  So now once you've done the -- you've

7    finished the preliminary formulation and excipient selection

8    step, what's next?  What would one of ordinary skill in the

9    art, where would they go next?

10   A.    We'd go to the animal tox test and then go to the

11   animal PK test.

12   Q.    And what would be the objective of conducting those

13   tests?  Why conduct them?

14   A.    To try to assess the approximate rate that the drug

15   might be -- drug from this solid, insoluble drug material is

16   going to be released.

17   Q.    And any sense of how long that would take?

18   A.    Oh, about three months.

19   Q.    Okay.  Now, once you've conducted your animal PK

20   studies, you've collected your data, what's the next step

21   that one of ordinary skill in the art would do?

22   A.    We'd refine the dosing suitable for and concentrations

23   suitable for doing a human PK study.

24   Q.    All right.  Now, you've listed a series of tests under

25   "Refine Formulation":  Stability, resuspendability and

1    uniformity, dissolution -- and I'm speaking of slide 32 --

2    viscosity, taste, and microbial growth.  With respect to

3    what one of ordinary skill in the art would do in connection

4    with those tests, is that the same as you described it in

5    the previous slide, in 31?

6    A.    Correct.  Correct.

7    Q.    And is this aspect of your refining formulation, is

8    that also an iterative process?

9    A.    Yes.

10   Q.    And why do you call it an iterative process?

11   A.    Because unless you're extremely lucky, you won't

12   always hit every mark.

13   Q.    Now, you used the words "extremely lucky."  Does that

14   happen often?

15   A.    Yeah.

16   Q.    It does?

17   A.    No, not being extremely lucky.

18         (Laughter)

19   A.    It's not -- you're usually not lucky enough to always

20   be correct.

21   Q.    Okay.  Now, what happens now?  You refine the

22   formulation.  Where does it go next?

23   A.    We do the human PK study to try to assess the rate of

24   drug release and the rate of absorption and the blood levels

25   because now we have an insoluble salt, and it's really

1     important that you make sure the drug is fully released.

2     Q.    And what are some of the things -- just to be clear,

3     what are some of the things -- when you carry out the human

4     PK studies, what are some of the -- what is it that you're

5     looking for?  What type of data are you generating?

6     A.    We're looking at the in vivo or in-the-body release

7     rate of the drug.  We'd be looking at the blood levels that

8     it gave and the --

9     Q.    Now, would that be an iterative process as well?

10    A.    It could very well likely be if we're not getting --

11    if an extent of absorption is not suitable, you'd probably

12    have to repeat it.

13    Q.    All right.  Now, you've done your human PK studies.

14    What's next?

15    A.    We'd have to look at the human efficacy studies to

16    confirm that it complies with the patent.

17    Q.    And is that because this claim 1 -- does claim 1

18    require that it be effective?

19    A.    Correct.

20    Q.    Now, again, could one of ordinary skill in the art not

21    get from the -- can they refine the formulation without

22    conducting any testing?

23          Let me back up.

24          Is there any way that one of ordinary skill in the

25    art could predict how to refine the formulation without

578

1    doing any experiments?

2    A.    I don't believe you could predict it.   In most of --

3    in some of these cases, you can skip some tests if you have

4    prior data or prior art; but in this case, we don't have

5    any.

6    Q.    And do you have a sense of how long it would take to

7    carry out the human PK studies?

8    A.    Three to six months.

9    Q.    And the human efficacy studies?

10   A.    Five or six months plus.

11   Q.    And what about the refining formulation?

12   A.    About three months.

13   Q.    Now, in developing a suspension, in your experiences,

14   Dr. Johnson, what are some of the challenges one of ordinary

15   skill in the art would encounter?

16   A.    Picking the right salt.

17   Q.    That would be a challenge?

18   A.    Yes.

19   Q.    And is there anything else?  Controlling release, is

20   that a challenge?

21   A.    It's a problem to estimate the release that's

22   appropriate, in other words, it's not too fast, not too

23   slow, so that you get roughly equivalent release of the drug

24   as you would with let's say a capsule of soluble material.

25   Q.    What about getting the release in the gut; is there a

1     challenge there when you're dealing with a suspension versus

2     a tablet?

3     A.     Correct.

4     Q.     What is that?

5     A.     Because we've made an insoluble salt, so it's not

6     soluble, so it's going to have to dissolve.

7     Q.     And again, just the challenge with respect to the

8     absorption in the gut and the suspension, what is it -- I

9     mean, there's a dynamic there in terms of you want it to

10    happen in the gut, so what is the challenge that --

11    A.     It's got to be in solution.

12    Q.     Now, based on your consideration of the Wands factors,

13    have you formed an opinion as to whether as of January 11th,

14    1995, undue experimentation would have been required by a

15    person of ordinary skill in the art to prepare a suspension

16    having an effective amount of atomoxetine in any form to

17    treat ADHD?

18    A.     Yes.

19    Q.     And what is that opinion?

20    A.     I think it would take undue experimentation.

21    Q.     Now, Dr. Johnson, let me just make a point here.

22           With respect to slides 31 and 32, in making this

23    presentation in this discussion, are you suggesting that the

24    '590 patent have included all the data that's generated in

25    connection with slide 31 and slide 32?  Is that your view,

1    that the patent should contain all that information?

2    A.    It should contain some information.  For example, if

3    they select a salt, it would be a great help.  And possible

4    concentrations.  Some information like that.

5    Q.    The fact it doesn't have a working example of the

6    specification; does that have a -- does that play a -- is

7    that a factor in terms of carrying out the study --

8    A.    Yeah.

9    Q.    -- as you've laid out in slides 31 and 32?

10   A.    Yes.

11   Q.    And what impact does that have?

12   A.    There's no working examples.

13   Q.    Right.  The fact that there are no working examples;

14   what does that -- as far as one of ordinary skill is

15   concerned, what does that mean?  What do they have to do?

16   A.    That favors undue experimentation.

17   Q.    And with respect to the experiments you've laid out in

18   31 and 32, there's no working examples, so why do those

19   experiments still have to be carried out?

20   A.    Yes.  You said why do they have to be carried out?

21   Q.    Yes.

22   A.    Because there are no working examples and you have no

23   information.

24            MR. PARKER:  Your Honor, I'm going to go on to

25   another dosage form.  I don't know whether this would be a

CHARLES P. McGUIRE, C.S.R.

1       good time for lunch.  I'm more than prepared to go forward.

2                 THE COURT:  Would everyone like to break for lunch

3       at this time?

4                 Speak up, cowards.  You can talk.

5            (Laughter)

6                 THE COURT:  All right.  We'll break for lunch.

7       We'll take an hour.  Come back about 1:30.

8                 All right.  You may step down, sir.

9                 THE WITNESS:  Thank you.

10           (Luncheon recess taken)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

582

1                    **A F T E R N O O N    S E S S I O N**

2              THE COURT:  Be seated.

3          (The witness resumed the stand.)

4              THE COURT:  Okay.

5              MR. PARKER:  Thank you, Your Honor.

6              THE COURT:  Proceed.

7              MR. PARKER:  Thank you, Your Honor.

8    BY MR. PARKER:

9    Q.    Dr. Johnson, are you ready?  Are you ready?

10   A.    Pardon me?  Am I ready?  Yes.

11   Q.    Dr. Johnson, just on the, if you look to the slide, I

12   just want to just go back before we went to injectable

13   solutions.

14          We were talking about the '624 patent, and it

15   shows you Formulation 6.  And within that Formulation 6, it

16   says -- it identifies flavors.  Do you see that?

17   A.    Right.

18   Q.    Now, with that disclosure, is that sufficient for --

19   is that sufficient information for one of ordinary skill in

20   the art to know how to go about taste-masking the bitter

21   taste of atomoxetine?

22   A.    No.

23   Q.    And why is that?

24   A.    It doesn't describe the flavor.

25   Q.    Excuse me?

583

1    A.    It doesn't describe what flavors you use, nor does

2    this compound atomoxetine.

3    Q.    Dr. Johnson, let's move on to what's referred to as

4    injectable solutions.

5          MR. PARKER:  Can we have slide 6, please?

6    Q.    Now, injectable solutions, are they called out in the

7    '590 patent?

8    A.    Yes.

9    Q.    Can you just tell us where in the patent that's

10   located?

11   A.    It's line 20 -- 28 or 9 of column 2.

12   Q.    I'm sorry, did you say column 2, lines 20 --

13   A.    -- 8 to 30.

14   Q.    Twenty-eight to 30.  Thank you.

15         Does the '590 patent disclose any working examples

16   of an injectable solution?

17   A.    No.

18   Q.    What is an injectable solution?

19   A.    A solution which the drug is in solution and you

20   inject it either IM, subcutaneous, you might drip it in, or

21   it might be a bolus injection.

22   Q.    Now, does -- at that -- using that form of

23   administration, does the active ingredient undergo any

24   first-pass metabolism?

25   A.    No.

CHARLES P. McGUIRE, C.S.R.

584

1    Q.    Now, in your evaluation of the state of the art, did

2    you come across any patents or published literature

3    describing or dealing with atomoxetine in connection with an

4    injectable solution?

5    A.    Yes.

6    Q.    And which patent did -- well, where did that come

7    from?  What information are you referring to?

8    A.    Well, one of these mentions injectable solution in the

9    patent, DTX-3, '081.

10   Q.    Okay.  So that's DTX-3, U. S. Patent Number 4,314,081?

11   Is that what you're referring to?

12   A.    Right.

13   Q.    Now, is the 08 patent also -- well, strike that.

14         Does the '081 patent cover atomoxetine, to your

15   knowledge?

16   A.    Yes.

17   Q.    Now, what does this disclosure, what does the '081

18   patent say about using atomoxetine in any particular dosage

19   form?

20   A.    It states in a couple of different places.  One --

21   let's say between 50 and 65 lines, it discusses, can be

22   mixed with starch binders formulating tablets, they may be

23   stored, it can be used in telescoping gelatin capsules, and

24   it can be administered intramuscularly, intravenously, or

25   subcutaneously.

CHARLES P. McGUIRE, C.S.R.

1    Q.    Do you know if this particular patent was directed

2    toward using atomoxetine toward treatment of ADHD?

3    A.    It was in particular as an antidepressant or

4    psychotropic agent.

5    Q.    Now, looking at this disclosure, is this disclosure

6    sufficient to make it possible for a person of ordinary

7    skill in the art to formulate atomoxetine into a suitable

8    dosage form for parenteral administration?

9    A.    No.

10   Q.    What is parenteral administration?

11   A.    That's where you inject something into the body.

12   Q.    And why -- please explain your answer.  Why is this

13   disclosure not sufficient?

14   A.    Well, all it describes is that you can do it.  It

15   doesn't provide any example of how to do it.

16   Q.    Is there any information about stability?

17   A.    No.

18   Q.    Any information about any salt, particular salt form

19   that you would use?

20   A.    I don't believe so.

21   Q.    Does it mention anything about buffers?

22   A.    No.

23   Q.    pH?

24   A.    No.

25   Q.    Antioxidants?

1    A.    No.

2    Q.    Preservatives?

3    A.    No.

4    Q.    Now, with respect to -- were there any other

5    references that you came across that discussed using a

6    propylamine for an injection or injectable solution?

7    A.    Yes.

8    Q.    And where is that information found?

9    A.    In Exhibit 166, the '624 patent, column 9, lines 36 to

10   55.

11   Q.    All right.  Are you referring to Formulation 7?

12   A.    Correct.

13   Q.    And what is Formulation 7 directed to?

14   A.    It's directed to an intravenous formulation.

15   Q.    And do you know to whether or not -- is it used for

16   treating any particular disorder?

17   A.    I believe '624 is written for norepinephrine

18   inhibitors or -- some -- some -- a number of these molecules

19   can treat any kind of neurological imbalance is the term

20   they use.

21   Q.    Do you know if it's specifically directed to

22   depression?

23   A.    I -- it probably is, yes.

24   Q.    Do you know if it's directed to ADHD?

25   A.    No.

587

1   Q.    Is it directed to ADHD, this particular patent?

2   A.    Is it?  I don't know.  I don't think so.

3   Q.    Now, in your review of Formulation 7, did you reach an

4   opinion as to whether or not this formulation by itself

5   would have made it possible for one of ordinary skill in the

6   art to make an intravenous solution containing an effective

7   amount of atomoxetine?

8   A.    Repeat the question.

9   Q.    Did you reach an opinion as to whether or not the

10  disclosure in Formulation 7 was sufficient for one of

11  ordinary skill in the art to practice the invention of the

12  '590 patent?

13  A.    Yes.

14  Q.    What is that opinion?

15  A.    It's not.  It's not.  Not.

16  Q.    It is not.

17  A.    Not.

18  Q.    Okay.  Why is that -- why is that so?

19  A.    There's really -- there's no stability information, no

20  salt buffers.  The concentration is -- is kind of low for an

21  IV drip.  There's no antioxidants, preservatives.  We don't

22  know what the blood levels would be.  We don't know what the

23  dosage amount for ADHD would be.

24  Q.    Now, in dealing with injectable solution, why is

25  knowing the blood level of active ingredient important?

1    A.    You'd have to relate the dose to the blood level, and

2    we don't have that data.

3    Q.    Now, given the information that you've -- given the

4    information that's contained in the '590 patent as well as

5    the information that you see in Formulation 7 and the '081

6    patent we just talked about, what other -- what, if any,

7    experiments would one need to carry out in order to practice

8    an invention of the '590 patent?

9    A.    On the next slide there, it's a pathway for someone to

10   use to develop a dosage form or dosage forms for

11   atomoxetine.

12   Q.    All right.  Well, we're referring to slide 35.

13         Just like the other schematics that we looked at,

14   is what you're illustrating here how one would go about, how

15   one of ordinary skill would go about preparing a viable

16   dosage form?

17   A.    Yes.

18   Q.    In this particular context, what do you mean by a

19   viable dosage form?

20   A.    We'd like to develop a system which we could

21   administer to a patient to treat ADHD.

22   Q.    All right.  Now, let's just start with the selecting

23   of atomoxetine -- the selection of the form of atomoxetine.

24   And does the '590 patent provide any guidance in making that

25   selection?

CHARLES P. McGUIRE, C.S.R.

1    A.    No.

2    Q.    So how does one skilled in the art go about selecting

3    an appropriate form of atomoxetine for injectable solution?

4    A.    We went back to the literature and we tried to see

5    what literature was present.  We combined that with my

6    experience, knowledge, and tried to develop a chart or a

7    flow path for development.

8    Q.    Now, would you select hydrochloride as your salt?

9    A.    Yes.

10    Q.    And why would you do that?

11    A.    It's a simple salt that had been used before, and it's

12    going to be soluble.

13    Q.    It's fairly soluble?

14    A.    Yes.

15    Q.    Soluble in -- can you explain -- what do you mean

16    by --

17    A.    It's water-soluble, about 25 milligram per ml, so we

18    could -- it would be -- has adequate solubility.

19    Q.    All right.  So you would choose the hydrochloride salt

20    as your starting point.

21    A.    Yes.

22    Q.    Now, why does one skilled in the art -- now, you

23    identified two types of tests, solubility and sterility.

24    Why does one skilled in the art need to carry out the

25    stability test?

590

1    A.    To make sure that it's stable while in use.

2    Q.    I'm sorry, I meant to go back.  Let me start over

3    again, Dr. Johnson.  I apologize, because I was one slide

4    ahead.  So let's just take a look.

5          You would begin with the hydrochloride form of

6    atomoxetine in this case?

7    A.    Yes.

8    Q.    And over there, you have three types of tests where

9    you select your atomoxetine salt, solubility, stability, and

10   purity.

11   A.    Right.

12   Q.    So if you have atomoxetine hydrochloride as your

13   starting point, would you still need to carry out these

14   tests?

15   A.    Yes.

16   Q.    Why is that?

17   A.    You're going to test -- you're not going to -- you're

18   going to have to get a new lot of raw material, you're going

19   to confirm that your lot of raw material or lots of raw

20   material are pure, you're going to confirm that the

21   solubility is as specified in probably some literature, and

22   you want to make sure that it's sufficiently stable.

23   Q.    And just, can you just generally just describe how one

24   of ordinary skill in the art would conduct these three

25   tests?

CHARLES P. McGUIRE, C.S.R.

1    A.    In solubility, we look at solubility versus pH so we

2    can arrive at what's the best pH.  We look at it with

3    probably some antioxidants and some buffers because we

4    probably put it in some kind of isotonic system.  We look at

5    light stability to see whether we have to package it or put

6    it in a -- protect it from light in some way.  And we'd see

7    how easy it's oxidized.

8    Q.    And with respect to purity, what would you do in that?

9    A.    It has to be pure.  It has to be a hundred percent,

10   close, or close to it.

11   Q.    Why does it have to be so pure?

12   A.    Because you can't administer degraded drugs.

13   Q.    Now, with respect to the selection of the form of

14   atomoxetine or in this case analyzing atomoxetine

15   hydrochloride salt, in this particular case, you have it

16   described in slide 35 as an iterative process.

17   A.    Right.

18   Q.    Why is that?

19   A.    Because you're going to look at a variety of buffers,

20   probably, and other raw materials.

21   Q.    When you say "other raw materials," what do you mean?

22   A.    Well, you would probably look at several buffer

23   systems.  You look at buffer capacity, we'd look at not just

24   -- so at this point, we don't know what buffer capacity we

25   would have to have.  We don't know the amount of antioxidant

1      we would need.  We don't know any of these things.

2      Q.    All right.  So now with respect to -- now, after you

3      actually conduct the solubility, the pH test, the stability

4      test, the purity test, what would be the next step?

5      A.    We start building the preliminary formulation with all

6      those additives together.

7      Q.    Okay.  So now with respect -- now we're at the

8      preliminary formulation of the excipient selection step.

9            Now, if you notice at the box there, Dr. Johnson,

10     you've identified four sub-boxes:  IV Bolus, IV Drip, SC,

11     and IM.  Can you tell the Court exactly what they mean, what

12     they stand for?

13     A.    These are just different dosage forms that might be

14     used to administer atomoxetine.  If we had IV bolus, we

15     would actually have a higher concentration in the liquid.

16     Q.    Well, let me back up.  What is an IV bolus?

17     A.    It's where you inject the medication, IV,

18     intravenously.

19     Q.    Just by way of example, someone who is treating

20     themselves with insulin, would that -- where would that fall

21     in this --

22     A.    That's subcutaneous -- no, put it in the muscle.  IM,

23     intramuscular.

24     Q.    Maybe I'm getting ahead of myself.  I apologize.

25            IV drip; what does that mean?

CHARLES P. McGUIRE, C.S.R.

593

1          THE COURT:   I'm still not sure what IV bolus is.

2          MR. PARKER:   Okay.

3     Q.     So could you go back and define for the Court, what is

4     an IV bolus?

5     A.     It's where you take the drug, put it in solution to be

6     buffered, but you inject it intravenously in one dose over a

7     short time.

8     Q.     And can you describe, what is an IV drip?

9     A.     That's where you drip it in slowly, typically in

10    conjunction with another IV that's already hooked up.  He'll

11    have a bag dripping in, somebody that's already hooked up to

12    IV, and then you'll hook up the rest of the medicament,

13    which drips in.

14    Q.     And you have the letters "SC" in one of the boxes.

15    What does that stand for?

16    A.     Subcutaneous.

17    Q.     And what is that?

18    A.     That's where you just put it under the -- under the

19    tissue, but it's usually probably in the arm.  Like most

20    allergy shots are given subcutaneously.  It's not into the

21    muscle, it's in the fat layer, under the dermis.

22    Q.     And then you have the letters "IM."  What do they

23    stand for?

24    A.     Intramuscular.  That's when you put it in the muscle.

25    Q.     All right.  Now, you chose in your slide, Dr. Johnson,

CHARLES P. McGUIRE, C.S.R.

594

1   IV drip.  Why did you choose that one?

2   A.     Because that was pretty simple.

3   Q.     And would that be the one one of ordinary skill in the

4   art would first look to?

5   A.     He would look at probably the dosage form he found was

6   most -- made most sense.

7   Q.     So when you say it would be pretty simple, are you

8   just saying -- what do you mean by that?  It makes more

9   sense?  Just, can you clarify it?

10   A.     I had to pick one.  I didn't want to go through four

11   different ones.

12   Q.     Okay.  But in your view, this would be the one one of

13   ordinary skill in the art would try out first?

14   A.     Yeah, because it doesn't have any particular

15   attributes of, it's going directly into the muscle, do I

16   need to worry about irritation or burning?  It's going to be

17   diluted before it goes in, so it's somewhat simpler.

18   Q.     Now, what you have done, you laid out a series of

19   tests in terms of developing and working out your

20   preliminary formulation and excipient selection.  Could you

21   just state for the record what those tests are?  You don't

22   have to describe them right now.  Just tell us what are the

23   names of these tests.

24   A.     Isotonicity, stability, solubility, freeze/thaw,

25   light, oxidation, buffer, preservative.

CHARLES P. McGUIRE, C.S.R.

595

1   Q.    Now, I know you've discussed some of these tests and

2   they're probably a little bit similar, but let me just see

3   if we can go through these relatively quickly.

4         What is isotonicity?  Why would one of ordinary

5   skill in the art evaluate that, and how would they go about

6   doing it?

7   A.    You try to combine ingredients so that it's isotonic,

8   in other words, the same osmotic pressure as blood, so that

9   it won't sting when you put it in or cause untoward

10  reaction.

11  Q.    And how would they go about assessing that?

12  A.    You can compare the osmotic pressure.  There's various

13  devices to do that.

14  Q.    That were available in January of 1995?

15  A.    Yes.

16  Q.    Now, what about stability?  Just quickly, why would

17  one skilled in the art assess that, and how would they

18  assess it?

19  A.    They would put it in various vials, put it in

20  conditions of different temperature and flood it with

21  oxygen, you flood it with light.  You do different things

22  like that to see was it susceptible to degradation.

23  Q.    So you're looking for degradation under certain

24  conditions.

25  A.    Right.  Right.

1   Q.   Now, solubility, again, I know you've talked about

2   that before.  Just generally in this context, why would you

3   look at that and how would you go about assessing it?

4   A.   You'd reconfirm the solubility that you might have

5   seen in a publication, make sure that it's still around 25,

6   27 milligrams per ml and then you'd see the effect of change

7   in pH, and you'd also look at the stability and the changes

8   with pH.

9   Q.   Okay.  Now, with freeze/thaw?

10   A.   Any liquid like this that's going to be injected, you

11   always do a freeze/thaw.  In other words, you freeze it, you

12   put it back in room temperature, make sure it comes back in

13   solution, it doesn't develop some kind of untoward

14   precipitate that doesn't redissolve.

15   Q.   Light?

16   A.   A lot of these are in vials, which are clear, so you

17   want to make sure that you don't need a cloudy -- that you

18   don't need to protect it from light.

19   Q.   Now, you have oxidation.

20   A.   Yes.  It would be subject to oxidation to make sure

21   that that medicament stays pure as -- through the course of

22   use.

23   Q.   Then you have buffer and preservative.  Can you just

24   quickly -- can you just generally describe why those would

25   -- why one of ordinary skill would make those assessments

597

1       and what they would do to carry them out?

2       A.    You always want to buffer these systems because, if

3       anything is likely to change, you can protect that with a

4       buffer.  The other problem is, if you put too much buffer

5       in, it might sting when you inject it or -- that's why you

6       make an isotonic, if the buffer capacity is too high.  So

7       you always try to blend these things in a way that are easy

8       for the patient to utilize or be utilized for a patient.

9       Q.    Now, once one -- well, you have the arrows again with

10      the arrows, yes and no.  Are you conveying that this is an

11      iterative process?

12      A.    It typically would be, yes.

13      Q.    So now once this -- well, now, let's just take a look

14      at this for a second.

15            Even using atomoxetine hydrochloride, and you're

16      doing your stability, solubility and purity tests, which are

17      above slide 35, do you have any idea how long it would take

18      one of ordinary skill in the art to carry out those tests?

19      A.    From where to where?  From preliminary -- probably

20      three months plus.

21      Q.    And now with respect to developing a preliminary

22      formulation with all your various excipients, the selection

23      of excipients, how long would that process take one of

24      ordinary skill in the art as of January 11th, 1995?

25      A.    Say about three months.

598

1    Q.    So now once you've completed that aspect of the

2    process, development process, what is the next step?  What

3    happens next?

4    A.    We'd refine the formula so we can test it in vivo.

5    Q.    Okay.  So you refine the formulation, and you have on

6    the slide -- can you tell us what you have underneath the --

7    A.    We refine it so that we would have a dose or a

8    concentration per unit ml that we would feel comfortable

9    dosing in an animal study.

10   Q.    Now, underneath "Refine Formulation," you have

11   stability, sterility tests.  Could you tell us why one of

12   ordinary skill would make these assessments and how they

13   would make those assessments?

14   A.    It's got to be sterile, so we would subject it to some

15   kind of sterility test.  Typically, it's a prepackaged test

16   that you can do to tell whether they're sterile.

17         Stability, we would do the same stability tests

18   that we did before.  We subject it to heat, light.

19   Q.    Now, would you consider these tests in terms of

20   putting together or preparing a preliminary formulation and

21   excipient selection, as you've laid out these tests, would

22   you consider that to be routine for one of ordinary skill in

23   the art?

24   A.    No.

25   Q.    And why would you not consider that to be routine?

CHARLES P. McGUIRE, C.S.R.

599

1    A.    Because you have to -- you have to -- because you're

2    always making a decision on whether or not these things are

3    satisfactory.  I mean, some of the steps, you're going to

4    go, like putting the samples at station, taking them off

5    station, do some of the physical testing is fairly routine,

6    but sooner or later you have to make a decision, is this

7    satisfactory, is it unsatisfactory, and it takes a fair

8    level of skill to do that.

9    Q.    Now, also with respect to above on slide 35 where you

10   have those three tests, pH solubility, stability, and purity

11   in connection with selecting the form of atomoxetine

12   solvent, would you consider that to be routine for someone

13   of ordinary skill as of January 11th, 1995?

14   A.    No.

15   Q.    And can you please explain?

16   A.    The purity test is fairly sophisticated.  You have to

17   make sure you have a very solid analytical method.  You have

18   to have -- make sure it's a hundred percent.  You probably

19   are going to have to create some reference standards.  So

20   there's a number of aspects that are going to go into that.

21   Q.    Okay.  So once you've -- you've now refined your

22   formulation -- and by the way, is that -- you have that

23   also, is that indicated -- on your slide 36, are you

24   indicating that process, the refine formulation as being an

25   iterative process?

CHARLES P. McGUIRE, C.S.R.

600

1    A.    Yes.

2    Q.    All right.  Once you refine the formulation, what

3    would one of ordinary skill in the art do next, or what

4    would be the next step?

5    A.    You refine the formulation, make sure it maintains its

6    stability and sterility, and then you'd try to do an animal

7    PK study.

8    Q.    And what's the reason for doing an animal PK study?

9    A.    You try and develop a relationship between the dose

10   and the blood level and --

11   Q.    And you have a circular arrow next to that.  What is

12   that intended to convey?

13   A.    It possibly could be iterative.

14   Q.    All right.  Now you've gone on, you've carried out the

15   animal PK studies, and what's next?

16   A.    You can do a human PK study.

17   Q.    And why would you want -- why would one of ordinary

18   skill in the art -- well, why would those studies be carried

19   out?

20   A.    You don't know the dose, and we want to get a

21   relationship between an injected dose and the blood level.

22   Q.    Okay.  Once you've conducted those PK studies, what

23   would be next?

24   A.    We would do a human efficacy study.

25   Q.    And what would be the objective?  What are you trying

601

1    to determine in connection with those studies?

2    A.    Determine whether or not we can satisfy claim 1 of the

3    patent, '590 patent.

4    Q.    Now, you're not laying on process to prepare a dosage

5    form that's going to be approved by the FDA for commercial

6    marketing, are you?

7    A.    No, but it would probably be one that we could also

8    utilize in many of our other human PK studies, so...

9    Q.    Now, how long would it take to carry out this aspect

10   of the process?  This is the preliminary formulation and

11   excipient selection.

12   A.    I think I said about three months.

13   Q.    Okay.  And how long would the animal PK studies take?

14   A.    You could probably do those in two to three months.

15   Q.    And the human PK studies?

16   A.    Probably three to six months.

17   Q.    And the human efficacy studies?

18   A.    Probably six months.

19   Q.    Now, with respect to the part of the process where we

20   refine the formulation, approximately how long would that

21   take one of ordinary skill in the art as of January 11th,

22   1995?

23   A.    One to three months.  If it's a liquid, we can

24   accelerate some of the stability tests.  It's not as

25   time-consuming as with a suppository.

1    Q.    Just back to predictability, is there any way for one

2    of ordinary skill in the art to predict compatibility of

3    atomoxetine hydrochloride, for example, how it would

4    interact with any particular excipients without actually

5    conducting a test to see what it would do?

6    A.    After the first three months there in that top -- once

7    you get a -- once you know what the solubility, pH

8    solubility in water is and the stability along with that

9    various pHs, you can probably make a fair guess as to some

10   of the ingredients you're going to use in the preliminary

11   formulation excipient section, but then you have to do that

12   and confirm what your prediction might be.  So you really

13   have to carry that work out.

14   Q.    But would you be able to predict the compatibility of

15   the preservative with the active ingredient without actually

16   conducting the test?

17   A.    No, we carry it out.  But at that point, you probably

18   predict what pH you want to work with.

19   Q.    And again, with respect to the PK studies, human PK

20   studies and human efficacy studies, is there any way to

21   predict the outcome of these studies without actually

22   conducting them?

23   A.    No.

24   Q.    Do you know if there's any way to predict what amount

25   of atomoxetine hydrochloride in an injectable solution would

CHARLES P. McGUIRE, C.S.R.

1   be effective to treat ADHD without conducting any of these

2   tests?

3   A.    No.

4   Q.    Now, Dr. Johnson, on slide 35, as you are describing

5   other forms of injectable solutions, you mentioned IV bolus,

6   subcutaneous, and intramuscular.

7            Now, with respect to the quantity of

8   experimentation and the predictability in working with these

9   types of dosage -- let me back up.

10           With respect to quantity of experimentation and

11  the unpredictability that you pointed out as it concerns

12  developing the IV drip, would that amount of experimentation

13  and that level of unpredictability, would that be the same,

14  or less, or more for the IV bolus?

15  A.    It would probably be more for the IV bolus and the

16  other two systems because in those systems we're going to

17  have more concentrated drug, we're going to worry more about

18  irritation, and we'll be concerned, like an IV bolus, how

19  fast can we actually inject the material.  So I'd certainly

20  want to do an animal study on those systems.

21  Q.    Now, what about subcutaneous; would it be the same,

22  more, or less?

23  A.    We'd want to inject it subcutaneous and then evaluate

24  the site.  We'd biopsy it and look for any problem.

25  Q.    Let me back up.  So the amount of -- with respect to

604

1    quantity of experimentation and the level of

2    unpredictability that you described with the IV drip, would

3    that be more, the same, or less in connection with

4    developing a subcutaneous formulation?

5    A.    It would be less.

6    Q.    Less.

7          And what about intramuscular; would it be more,

8    the same, less?

9    A.    It would be similar to subcutaneous.

10   Q.    Now, you said it would be less.  How much less would

11   it be relative to the IV drip?

12   A.    It would be more.  These would be -- these three

13   others would be somewhat more than IV drip, and it would be,

14   let's say -- the animal studies can be more extensive.

15   Q.    More what?

16   A.    Extensive.  It would probably take another month or

17   so.

18   Q.    Now, just, in your experience, when developing an

19   injectable solution, what are some of the challenges that

20   one would encounter or could encounter?

21   A.    Oxidation is often a problem.  Once -- and stability

22   is often a problem, because once you're in a liquid, it's

23   much more difficult than a powder that's -- where there's no

24   moisture.  So stability is often one of your biggest

25   problems.

605

1   Q.    Is compatibility a potential problem?

2   A.    It can be.  That's why we'll study it.  But we mostly

3   will pick things we don't think it will be incompatible

4   with.

5   Q.    Now, Dr. Johnson, again, based on your consideration

6   of the Wands factors, your review of the '590 patent, your

7   review of the '081 patent, and also your review of the '624

8   patent, have you come to an opinion one way or the other as

9   to whether or not undue experimentation would be required to

10  practice the invention using injectable solution?

11  A.    Yes.

12  Q.    And what would your opinion be?  What is your opinion?

13  A.    That would require undue experimentation.

14  Q.    Now, with respect to the slide dealing with injectable

15  solutions, was that slide prepared under your supervision

16  and direction?

17  A.    Yes.

18  Q.    As well as, it was prepared for your testimony today,

19  you had it prepared for your testimony today; right?

20  A.    Correct.

21  Q.    Dr. Johnson, let's move on, and we're getting through

22  this, so this is very good.

23        Let's talk a little bit about sustained release

24  formulations.

25        Now, what is a sustained release solid dosage

CHARLES P. McGUIRE, C.S.R.

606

1      form?

2      A.    It's a dosage form where the drug is typically

3      embedded in some matrix which slows the release down.

4      Q.    Now, does the prior art describe a sustained release

5      dosage form comprising atomoxetine?

6      A.    Yes.

7      Q.    Have you evaluated that --

8      A.    Yes.

9      Q.    -- that piece of prior art?

10     A.    Yes.

11     Q.    And can you identify for the record what that piece of

12     prior art is?

13     A.    It's Exhibit 165, so --

14     Q.    That's U. S. Patent 4,847,092?

15     A.    Correct.

16     Q.    Now, you mentioned that it discloses a sustained

17     release formulation.  Is that a capsule formulation --

18     A.    Yes.

19     Q.    -- do you know?

20     A.    Yes.

21     Q.    Where in the patent is that found?

22     A.    It's -- Example 4 and 5 give examples of where he

23     heated up this waxy material and embedded the drug.

24     Q.    So this is Example 4 and 5 in the -- what we're

25     referring to as the '092 patent?

1      A.    Right, and it's column 4, lines 30 to 47, and then the

2      Table II is in column 6, lines 3 to 18.

3      Q.    Now, in your evaluation of this formulation, did you

4      reach any conclusions as to whether or not this disclosure

5      was sufficient to allow one of ordinary skill in the art to

6      prepare a sustained release formulation comprising a

7      sufficient amount of atomoxetine to treat ADHD?

8      A.    No.

9      Q.    And why is that?

10     A.    It doesn't -- it uses three dogs.  There's no

11     statistical evaluation.  There's no stability data.  It's

12     really a sample they prepared of a few capsules, it appears,

13     and gave these to some dogs, and we would expect if you

14     embed the drug in wax, it will retard the release.  The

15     problem is, we don't know, we have no idea how this is going

16     to relate to human dose or human response.  A dog isn't

17     particularly a good model for sustained release.

18     Q.    Do you know, is there an animal model for ADHD?

19     A.    Not that I'm aware of.

20     Q.    Now, you said that there was -- you mentioned

21     something about this statistical analysis.  Can you just

22     explain what you meant by that?  In other words, you were

23     saying -- it wasn't sufficient statistical analysis?

24     A.    I don't believe there's any.  I think there's an

25     average.

CHARLES P. McGUIRE, C.S.R.

1    Q.    There was an average.  So what is your -- do you take

2    -- what is your issue with that with respect to having --

3    concluding that one of ordinary skill in the art would not

4    be able to make a sustained release formulation based upon

5    this disclosure?

6    A.    We don't know what the variability is, and if the

7    variability is high, it's probably not going to be

8    appropriate.

9    Q.    When you say you don't know what the variability is,

10   can you just be a little bit more specific?  What do you

11   mean?

12   A.    Well, if the dosage forms are all the same, if it

13   releases and it's absorbed, and nearly, you know, plus or

14   minus five percent in most of these -- these data points,

15   that's pretty good; but with only three dogs, that's really

16   not enough.

17   Q.    Now, can you refer your answer -- I mean, can you --

18   with respect to the answer you just gave, can you correlate

19   that to Table II up on your slide 37?

20   A.    Yes, in Table II, what they have are the blood levels

21   after these times, which appears to be an average microgram

22   per ml of the drug.  But there's -- but there's no standard

23   deviation, so we don't know if it's .05 plus or minus 10, or

24   we don't know any of these numbers, .8 plus or minus 10, or

25   20.  We have no idea.  So we don't know what the variation

1    is.

2    Q.    So is this just simply, is it a formulation where they

3    just included I believe atomoxetine in a wax and they add

4    anything else to the formulation, do you know?

5    A.    They I think added -- they added a cellulose to one of

6    these.

7    Q.    Do you know what the purpose of adding cellulose was?

8    A.    It probably would create some porosity in the matrix.

9    Q.    Some what?

10   A.    Porosity, when -- and -- because 591 is what they

11   used.  That's somewhat hydrophilic, so it would probably

12   create porosity so water can get in this wax and the drug

13   can diffuse out.

14   Q.    What is the name of the wax?  What is the name that

15   they use?

16   A.    Gelucire, and the grade is 46/7.

17   Q.    Now, Dr. Johnson, given the information that's

18   contained in the '590 patent taken together with the

19   information that was found in the '092 patent, which is

20   DTX-165, and I'm referring to Examples 4 and 5, given that

21   example in hand, what experiments, if any, would one of

22   skill in the art need to conduct in order to prepare a

23   viable sustained release atomoxetine formulation?

24   A.    If you look at the next slide --

25   Q.    Okay.  Could you just -- is this a slide that was

CHARLES P. McGUIRE, C.S.R.

610

1        prepared under your supervision and direction?

2        A.    Yes.

3        Q.    Now, let's just start with the selection of

4        atomoxetine form.

5              Does the '590 patent provide any guidance in

6        making that selection?

7        A.    No.

8        Q.    Now, with respect to the '092 patent, I believe, what

9        form of atomoxetine did they use?

10       A.    They used the hydrochloride.

11       Q.    And that was used in dogs.

12       A.    Correct.

13       Q.    Now, so you have there as your first step selecting a

14       form of atomoxetine salt.

15             So with that, where would one of ordinary skill in

16       the art, where would they begin?

17       A.    I think you'd probably start with the hydrochloride.

18       Q.    Why is that?

19       A.    Well, you typically can sustain the release of a salt

20       that soluble for at least 12 hours.

21       Q.    And so if you start with a hydrochloride salt, and

22       below this, you have a series of tests, and I think we've

23       seen these before, crystal purity, solubility, stability,

24       dissolution, and you also have particle shape and size --

25       did I read that correctly?

611

1    A.    Yes.

2    Q.    Again, would developing a sustained release solid dose

3    form, could you just explain -- let's just go through them

4    quickly each one.

5           Crystal purity:  Why is that an assessment that

6    needs to be made with this particular dosage form, and how

7    would one with ordinary skill go about doing it?

8    A.    You have to administer a pure drug.  The word the FDA

9    uses is "unadulterated."

10    Q.    Now, what about solubility; what do you have to assess

11    there?

12    A.    It has to be -- you have to have an idea of the

13    solubility of the drug, and that helps guide you whether

14    you're going to -- if it's more soluble, you are more likely

15    to put insoluble ingredients in your dosage form.

16    Q.    And stability; what's going on there?  Why do you have

17    to look at stability?

18    A.    We like to -- we want to know the solubility as a

19    function of pH, and we want to know the stability as a

20    function of pH, and we want to know the stability with our

21    excipients and as a raw material.

22    Q.    Dissolution; why do you have to assess dissolution?

23    A.    We want to look if it has any unique or particularly

24    unusual properties, like some of these -- some of these

25    compounds will, even if they're fairly soluble, will

CHARLES P. McGUIRE, C.S.R.

612

1      aggregate, and they won't dissolve quite as you think they

2      might.

3      Q.      And in particle size and shape?

4      A.      That will affect the dissolution rate.

5      Q.      That will affect the what?

6      A.      The dissolution rate.

7      Q.      Is that an important factor?

8      A.      Yes.

9      Q.      Now, does the '092 tell you anything about particle

10     size and shape?

11     A.      No.

12     Q.      Is that something that one of ordinary skill in the

13     art would need to know in developing a sustained release

14     soluble dosage form?

15     A.      Yes.

16     Q.      Now, as with your other schematics, in selecting the

17     form of atomoxetine salt or at least assessing it for

18     purposes of using it for a solid -- for a sustained release

19     solid dosage form, on slide 38, again, you have arrows, and

20     you have yes and noes going in various directions.   Just

21     what do you intend to convey there?

22     A.      If we find any untoward events, we would then probably

23     have to go back and do something.   In other words, if the

24     crystal wasn't pure, we'd have to purify it before we did

25     the rest of the work.

613

1    Q.    And are there other things that could go in a certain

2    direction that would require repeating certain tests?

3    A.    Yes, if it's a relatively unstable compound, as you go

4    to solutions or liquids, we'd have to judge whether or not

5    we would have to -- what other ingredients we might mix

6    with.

7    Q.    And just by way of example, particle size and shape,

8    how would that affect it?

9    A.    Well, they affect flow, so if it's in a powder that is

10   a very big particle and we put it in with our other powders,

11   it will probably segregate or separate and we won't be able

12   to use it properly.  So it has to be small enough so we can

13   mix it and big enough so it will flow.

14   Q.    And none of that information is found in the prior

15   art; right?

16   A.    No.

17   Q.    Now, so, then, dealing with the portion of your slide,

18   the process, that would be an iterative process?

19   A.    Yes.

20   Q.    All right.  So now that you've conducted all those

21   tests and you've gone through and made your -- you're ready

22   to go to the next step, and what would that be?  Once you've

23   carried out this crystal purity, going through the particle

24   size and shape on slide 38, what would be the next step?

25   A.    We'd want to make out some preliminary formulations

CHARLES P. McGUIRE, C.S.R.

1    and look at, characterize their dissolution.  So we'd try to

2    pick, select a dosage form system which we're familiar with

3    and run through.  Just -- you wouldn't do five different

4    types.  You may do one or two.

5    Q.    Now, below that preliminary formulation and excipient

6    selection stage, you have five boxes underneath that.  You

7    have coating, beads, hydrogel, osmotic, and ion exchange.

8    Could you briefly just describe to the Court what types of

9    systems are these?  So starting with coating, what is that?

10   A.    That's where you use a coating to really control the

11   release.  You control the release from a bead or you can

12   control the release from a tablet, but you primarily do it

13   through the composition of the coating.  In other words,

14   your core would be pretty soluble, but you control the rate

15   of release with the coating.

16   Q.    Now, you mentioned beads, but you also have beads up

17   there on the slide so --

18   A.    Right.  That's where -- you can do it two ways.  You

19   can coat, make a bead that's very soluble, and then you can

20   coat the bead and have the drug release modified by the way

21   you control the -- coat the bead.  You can also make beads

22   that the cells are formulated so they dissolve rather slow.

23   Q.    Now, hydrogel; what is that?

24   A.    It's usually like a cellulose or methylcellulose or

25   something related which when it hits the water it forms a

1    gel, and then this gel mass is hydrated and the drug will

2    slowly diffuse out of this gel.

3    Q.    Now, the system you saw in the '092 patent; is that a

4    hydrogel system?

5    A.    No, that's -- I guess we don't have that up there.

6    That's a wax matrix system.  That's really a wax, and then

7    you modify the wax porosity with different materials, either

8    hydrophilic or phobic, depending on your drug, and you

9    control the release that way.

10   Q.    Now, you have osmotic systems.  Just describe that.

11   A.    Those are systems where -- they can be -- you can have

12   an osmotic coating or like the Alza system where they have a

13   matrix which is coated and then they put a hole in, and the

14   osmotic pressure forces the drug up.

15   Q.    And ion exchange?

16   A.    That's like one of these resins where you usually

17   absorb the drug onto this resin, and you can control the

18   release off the resin, or you can coat the resin and control

19   the release that way.

20   Q.    All right.  Now, you're going in the direction of a

21   hydrogel.  Why did you select hydrogel?

22   A.    It's a -- I thought it was one of the more simple

23   ones.  It's commonly used.

24   Q.    Now, okay, so we're going with the hydro developing

25   hydrogel.  Now, what would be the next step that you have

1   laid out in slide 39?

2   A.    We have like a basic formulation and then we'd vary it

3   with different parameters, concentrations of drug,

4   concentrations of other excipients.  We'd make it more

5   hydrophilic, more hydrophobic, and then do dissolution

6   studies on this group of formulations to see where we were.

7   Q.    And you have two tests underneath the "Multiple

8   Formulation With Different Release Rates" step.

9   A.    Yes.  While we were evaluating our dissolution rate on

10  these different systems, we'd also study the stability to

11  see how it changed.

12  Q.    Okay.  To see how what changed?

13  A.    How these dosage forms might change.  Their release

14  might change on day one, or if we put it at 40 degrees for a

15  month or two months, how it would change, because those

16  forms have to be stable throughout these periods, at even

17  elevated temperatures, to be one that we would want to use.

18          So in this case, we're concerned about stability

19  of the drug as well as stability of the release rate.

20  Q.    Okay.  Now, just walk us -- let's go, continue going

21  through the process.

22          You have -- well, I take it, then, the multiple

23  formulations with different release rates, you have the

24  stability and dissolution rates.  Is that an iterative

25  process, too?

1    A.    Yes, that's a cycle you most likely would go through

2    several times.

3    Q.    Now, the next step you have down is "Human Pilot

4    Studies."  You have "2 Dose vs. IR."  Can you explain what

5    you mean by that?

6    A.    You would probably want to try at least -- at this

7    point, we would use in vitro dissolution testing to try to

8    predict rates which we felt were suitable.  So we pick one

9    that's slower and one that's faster, and we do a pilot study

10   to see approximately where we are as related to amount of

11   drug released, as amount of drug absorbed, and try to get an

12   idea, is this near the model or the line where we want it to

13   be released.  Is it releasing the way we need to have it

14   released.

15   Q.    Now, you have this "2 Dose vs. IR."  What does IR

16   stand for?

17   A.    Immediate release.

18   Q.    And why are you making that comparison?

19   A.    That's typically what you do as you -- you'll run a

20   study versus immediate release and look at that absorption.

21   We probably do it with multiple release of two dosage forms,

22   probably at zero and four, zero and six hours, and then we'd

23   run our sustained release, see do we get the same blood

24   levels.  We're trying to -- what we're trying to do with the

25   sustained release is reproduce the current dose.

CHARLES P. McGUIRE, C.S.R.

618

1    Q.    And then when you refer to sustained release, just

2    generally, what does that mean, sustained release?

3    A.    It's where you're taking the drug and it's not

4    immediately releasing, you're changing the rate that it's

5    released.

6    Q.    Now, you have that also down as iterative process, the

7    human pilot studies.  Why is that?

8    A.    Because at that point, you're really not sure how you

9    want to release, but from that, you should be able to judge

10   how to make it the next time so that it would be released

11   properly.

12   Q.    Now, --

13   A.    We usually bracket the release rates you want, and you

14   do multiple studies and you pick the one nearest the level

15   you want.

16   Q.    Now, going down to the next step, can you just

17   describe what that entails?

18   A.    We would do a PK study and look at extent of

19   absorption, rate of release of the dosage form, and

20   determine whether or not we thought it was delivering the

21   drug as we purport it to be.

22   Q.    Now, to make all these assessments, at least with

23   respect to PK or human pilot studies, you need analytical

24   assays; correct?

25   A.    Right.

CHARLES P. McGUIRE, C.S.R.

1    Q.    What type of assays would you need or what types of

2    assays would need to be available to one of ordinary skill

3    in the art to carry out these types of tests?

4    A.    We'd need to be able to analyze the drug in the blood.

5    Q.    Now, with respect to the human PK comparative studies,

6    you also have that circular arrow there.  What is that

7    intended to convey?

8    A.    Once we do that, we may have to go back and modify the

9    amount of drug and size of the dosage form and the release

10   rate.

11   Q.    So it's an iterative process there as well?

12   A.    It can be an iterative process.  If we could replicate

13   the release of the drug and the blood levels from the oral

14   versus the multidose, then we have a good chance to get this

15   approved on bioavailability studies.  If we don't, we're

16   going to have to do efficacy studies.

17   Q.    Now -- well, then you have down there, you have

18   efficacy studies.  Just explain what the objective is there

19   for those tests.

20   A.    For example, if our dose -- let's say a release from

21   the drug or the area under the curve was maybe 20 percent or

22   -- let's say 20 percent less than if they did multiple

23   doses.  I think you'd probably have to do a human efficacy

24   test.

25   Q.    But what is the ultimate goal of carrying out these

620

1       efficacy tests, and what are you trying to determine?

2       A.      To evaluate the drug release.

3       Q.      For purposes of what?

4       A.      We have to evaluate whether or not this drug can treat

5       ADHD.

6       Q.      And determine whether or not you actually have an

7       effective amount for the dose?

8       A.      Correct.  Correct.

9       Q.      Just to go back.

10              Okay.  So just, how long would this -- for one of

11      ordinary skill in the art, how long would this process take?

12      I'm trying to point to it here, where it says "Selecting

13      Form of Atomoxetine Salt," this particular aspect of the

14      process, how long would that take?

15      A.      Probably about three months.

16      Q.      And now when you're developing and dealing -- well,

17      focusing on your multiple formulations with different

18      release rates, that test, how long would that take for one

19      of ordinary skill in the art?

20      A.      Three to six months.  We want to get a pretty good

21      idea of the drug release from their dose if it wasn't

22      changing over time, so you're going to have to do your

23      stability studies for several months.

24      Q.      And just a sense of how long it would take to carry

25      out the human pilot studies.

CHARLES P. McGUIRE, C.S.R.

1    A.    Well, the pilot study, maybe three months.

2    Q.    The human PK comparative studies?

3    A.    Probably three to six months.

4    Q.    And the human efficacy studies?

5    A.    Six months more.

6    Q.    Okay.  Now, when we talk about coating, you have other

7    different systems for sustained release forms.  You have

8    coating, beads, osmotic, and ion exchange.  We didn't talk

9    about them in great detail, but we'd probably be here

10   forever if we did.

11         Would the quantity of experimentation and the

12   level of unpredictability -- well, let me back up.  I didn't

13   talk about that.  Then let's just focus on unpredictability.

14         You described a fair amount of testing that would

15   be involved in preparing sustained release dosage forms;

16   correct?

17   A.    Yes.

18   Q.    Now, given the prior art that you evaluated, okay,

19   could anyone -- could one of ordinary skill in the art be

20   able to come up with a sustained release dosage formulation

21   without conducting any of the tests that you've just

22   described?

23   A.    No.

24   Q.    Is there any way to predict what atomoxetine

25   hydrochloride would do in a particular dosage form if it's

622

1    injected into a patient -- I'm sorry, if it's administered

2    to a patient?

3    A.    Say that again.

4    Q.    Would one of ordinary skill in the art be able to

5    predict how a sustained release dosage form would behave

6    once it's administered inside the patient?

7    A.    Well, your prediction is going to be that it will meet

8    that need, but it's not likely that you're going to make it

9    the first time.

10   Q.    And as far as selecting excipients and as far as

11   looking at stability, I mean, these tests would have to be

12   carried out; you can't predict those, I mean, you can't

13   predict the outcome of those tests.

14   A.    You keep doing these studies because you're always

15   changing things, and it's typically not predictive.

16   Q.    Now, so now going to these other systems, the

17   coatings, the beads, the osmotic, and the ion exchange,

18   then, with respect to the quantity of experimentation and

19   the unpredictability you described for the hydrogel, okay,

20   is that more or less the same for the coating?

21   A.    They're comparable.  I don't like to -- I don't know

22   that I can say that they're -- in this case, a lot of them I

23   can tell pretty much their -- it depends on what the skill

24   of the formulator is:  Has he made these a lot of times or

25   not.  In other words, we can probably do beads, coated beads

623

1    as fast as we could do hydrogels, but that's probably not

2    the case for most people.

3    Q.    What about an osmotic system or an ion exchange

4    system?

5    A.    There are a lot of patents in those areas, so they're

6    generally reported.

7    Q.    Okay, but assuming there were no patents in the area

8    and you were free to go ahead and do it, in terms of the

9    amount of experimentation and unpredictability, would it be

10   about the same as the hydrogel, or less?

11   A.    The coated tablets where you have an osmotic tablet

12   wouldn't be as -- too difficult.  The problem there is

13   actually making them with the right kind of hole in them

14   consistently and have the coating being -- integrity of the

15   coating sufficient so that it doesn't crack, break, or allow

16   unwanted moisture into the system.

17   Q.    Now, early on, from a formulating standpoint, earlier,

18   you testified that there were two populations of individuals

19   in terms of how they metabolize atomoxetine.  Do you

20   remember that testimony?

21   A.    Correct.

22   Q.    Does that fact have any -- what effect, if any, would

23   that have on one of ordinary skill in the art who's trying

24   to develop a sustained release solid dose form?

25   A.    I think you'd have to design a sustained-release

624

1    system probably based on one of the groups.

2    Q.    So one sustained release dosage form in your view for

3    an extensive metabolizer would be suitable for a poor

4    metabolizer?

5    A.    No.

6    Q.    Are you aware of any other challenges that one of

7    ordinary skill would encounter in formulating a sustained

8    solid dose form?

9    A.    I think that the difficulty is going to get similar

10   absorption from the sustained release system that you get

11   from the multidose tablets, fast release.

12   Q.    Now, -- well, you mentioned dissolution.  I just want

13   to make sure we covered it.

14        Okay.  You mentioned dissolution in both the

15   selecting the form of atomoxetine salt level or the step in

16   slide 38, and also, you mentioned dissolution rates in

17   connection with multiple formulations with different release

18   rates.  I'm not sure if I covered it, but I just wanted to

19   ask you, Dr. Johnson, why would someone of ordinary skill in

20   the art carry out those tests?

21   A.    The first is on the raw material and the second is on

22   the dosage form, and the dosage form, we measure that so we

23   can assess the performance of the dosage form.

24   Q.    Now, Dr. Johnson, based on your consideration of the

25   Wands factors and also your evaluation of the state of the

625

1    prior art, which included the '590 patent, I believe the

2    '624, and there may have been other patents, but based on

3    your evaluation of the state of the prior art, did you reach

4    an opinion as to whether as of January 11th, 1995, undue

5    experimentation would have been required by a person of

6    ordinary skill in the art --

7    A.    Yes.

8    Q.    -- to prepare a sustained release solid dosage form

9    having sufficient atomoxetine to treat ADHD?

10   A.    Yes.

11   Q.    And what is that opinion?

12   A.    It would take undue experimentation.

13         MR. PARKER:  Slide 21, please.

14   Q.    Now, Dr. Johnson, earlier, you testified, it may have

15   been Wednesday, that in your view, based on your review of

16   the prior art and your reading of the '590 patent that you

17   concluded that immediate release capsules and tablets

18   containing atomoxetine hydrochloride would not require undue

19   experimentation.  Do you recall that?

20   A.    Yes.

21   Q.    And can you explain to us how you come to that

22   conclusion?

23         Why don't we start off with, was there information

24   in the prior art that led you to that conclusion?

25   A.    There was information in the prior art and my own

626

1       experience that allowed me to come to that conclusion.

2       Q.     Okay.  Now, with respect to the prior art, do you have

3       in front of you DTX-86, which is a Canadian patent?

4       A.     Yes.

5       Q.     Now, does the Canadian patent disclose any

6       formulations containing atomoxetine hydrochloride?

7       A.     Yes.

8       Q.     What formulations does it disclose?

9       A.     It has capsules, tablets, --

10      Q.     All right.  Well, let's just focus on capsules and

11      tablets.

12             Now, you evaluated these formulations; right?  Can

13      you find them?

14      A.     They're on page -- 1,181,430, page 22 of the patent.

15      Q.     Page 22 of DTX-86, page 22?

16      A.     Correct.

17      Q.     And you evaluated these formulations?

18      A.     Yes.

19      Q.     And what is it about these formulations, among other

20      information that you had, including your experience, that

21      led you to conclude that one of ordinary skill in the art

22      would have been able to develop these dosage forms without

23      undue experimentation?

24      A.     These are very simple systems, they're dry systems,

25      and it's unlikely to be unstable in this kind of a system.

627

1     Q.     And why is that?

2     A.     Because they're dry.  There's not enough moisture

3     present for anything to react -- for something to react, you

4     typically have to have mobility.  So you have mobility which

5     can dissolve the drug so it can react and degrade.  But if

6     you have no water that's really free, it's unlikely to have

7     degradation.

8     Q.     Now, with respect to the effective amount, the

9     appropriate dose for the tablet, now, the patent provides

10    dose information, does it not, the '590 patent?

11    A.     The '590 patent provides dosing information but it

12    doesn't specifically say whether that dosing information is

13    -- what it's related to.  But we're assuming that where they

14    got their dosing information was from the work probably done

15    earlier for depression because they're using the same dosage

16    range, and some of these other publications also use that

17    dosing range, so I'm making that leap of faith.

18    Q.     Well, let me put it this way.  So based on your review

19    of the prior art and your review of the '590, is it your

20    view that the dose range described in that patent is

21    directed to capsules and tablets?

22    A.     Yes.  Yes, because the capsules in these publications

23    -- the dose forms in those cases were capsules, and in one

24    case, I know it was a hydrochloride salt.

25    Q.     And did you assume for purposes of your analysis, did

CHARLES P. McGUIRE, C.S.R.

628

1    you make any assumptions as to whether or not those dose

2    amounts in the patent were directed to effective amounts for

3    a tablet?

4    A.    I don't know.  They were just the same dose, because

5    one was for depression, and the patent's for atomoxetine.

6    So I'm making that leap of faith that that's comparable.

7    Q.    All right, but is there anything else in the patent

8    that correlates these dose amounts to any particular dosage

9    form?

10    A.    Well, they don't really -- in this patent, they don't

11    specifically talk about what amount they're dosing, and they

12    don't relate it to a dosage form, whether it's capsules or

13    other dosage forms.

14    Q.    But based on your assessment of the prior art, you

15    came to a conclusion that it was directed to capsules and

16    tablets?  Is that fair?

17    A.    I'm making that assumption, yes.

18            MR. PARKER:  Slide 47.

19    Q.    Now, as part of your analysis, did you assess whether

20    or not there was any information relating to whether or not

21    atomoxetine presented any special problems in formulating

22    dosage forms comprising atomoxetine hydrochloride?

23    A.    Yes.  The Exhibit 162 has a number of pages which

24    identify various problems or potential problems that you

25    might have in formulation of atomoxetine hydrochloride.

1    Q.    And you're referring to DTX-162?

2    A.    Right.

3    Q.    Do you have an understanding as to where the document

4    came from?  Was it produced in litigation?

5    A.    Pardon me?

6    Q.    Do you have an understanding as to where Defendants

7    got a copy of this document?

8    A.    I assume it was produced for litigation.

9    Q.    Do you know who it was produced by?

10   A.    I'm not sure.

11   Q.    What is the title of the document?

12   A.    "Atomoxetine Drug Delivery Line Extension

13   Opportunities."

14   Q.    Is it your understanding that this is a document that

15   came from Lilly's files?

16   A.    That's my understanding.

17   Q.    Now, you have there --

18   A.    I'm assuming it's Allen.  His name is on the document.

19   Q.    Are you talking about Albert Allen?

20   A.    I don't have a first name.

21   Q.    Now, you have there on your list, you have high

22   solubility, and you have suspension.

23   A.    Right.

24   Q.    Could you tell us -- well, where is that found in

25   DTX-162?  I'm referring to slide 47.

630

1    A.    We found most of these in -- there's four or five

2    pages of items which --

3    Q.    Wherever it is, just identify in the corner that you

4    see a confidential ST patent number, could you identify what

5    you're looking at?

6    A.    What pages there are?

7    Q.    Yes.

8    A.    I'm looking at 00769571.

9    Q.    769571 from DTX-162.

10   A.    Yes.

11   Q.    Okay.  Where does it talk about high solubility as a

12   potential problem?  Can you explain -- you have on the slide

13   "High Solubility-Suspension."  Can you explain what you mean

14   by that?

15   A.    The high solubility is a problem because you can't

16   make a suspension.  The drug will be in solution.

17   Q.    So your review of this document, it was identified

18   that that was a potential problem for atomoxetine

19   hydrochloride?

20   A.    Correct.

21   Q.    Now, you also have listed "Requires High Dose."  Where

22   was that found in DTX-162?

23   A.    571.

24   Q.    Okay.  And can you show us -- can you kind of give us

25   a sense of where in the document?  You're reading it as a

CHARLES P. McGUIRE, C.S.R.

1    chart.

2    A.    There's a chart under "Comments."  They have a number

3    of comments where they address issues like high dose, bitter

4    taste.

5    Q.    Well, with respect to "Requires High Dose," how would

6    that have an effect, if any, on developing a transdermal

7    system?

8    A.    It would increase the difficulty of preparing or

9    developing systems of transdermal delivery, thin film,

10   pulmonary, buccal, or sub-lingual sprays.

11   Q.    And why would that pose a problem -- well, why would

12   that be considered a special problem, if at all, in dealing

13   with or developing a pulmonary type system?

14   A.    Difficulty can arise if you find or actually have one

15   of those doses containing sufficient atomoxetine to treat.

16   In other words, you can't, you know, if you -- if the dosage

17   form's got to weigh a gram, you can't put a pound of powder

18   in it.  So in this case, our dosage -- for some of these, we

19   don't have any idea what the dosage is, but I'm assuming

20   they thought it was high.

21   Q.    And the same, is that true for the buccal, sublingual

22   spray?

23   A.    Yes.

24   Q.    Now, you have listed bitter taste.  Where is that

25   found in the document, DTX-162?

CHARLES P. McGUIRE, C.S.R.

1    A.    That's also under the "Technical Challenge" column

2    under "Comments" on 571.

3    Q.    Okay.  This is where it says "Technical Challenges"?

4    A.    Correct.

5    Q.    Okay.  Well, the word bitter is not there.  So -- it

6    says "taste."  How did you come to the conclusion that it

7    was bitter taste that was being referred to in this

8    document?

9    A.    I believe I've seen that written different places, and

10   I know it would be bitter.

11   Q.    Now, how is it that a bitter taste can be a problem at

12   all in developing any of the dosage forms you'd have on

13   slide 41, which is effervescent tablet, or disintegrating

14   tablet, chewable and chew, a buccal or sublingual spray and

15   nasal?  How would that be?

16   A.    They'd have to be palatable.

17   Q.    And in your experience, if they're not palatable, is

18   that a viable dosage form in your view?

19   A.    Usually not.

20   Q.    And why is that?

21   A.    People won't take it.

22   Q.    And is that an important consideration when treating

23   ADHD?

24   A.    Especially ADHD, because you have to take it for four

25   to six weeks to see effect, you've got to take it for years,

CHARLES P. McGUIRE, C.S.R.

633

1    and if it's not palatable, people just won't keep taking it.

2    Q.    All right.  Now, you've also listed metabolism of

3    atomoxetine varies among population, and you have extensive

4    metabolizers, EM, and poor metabolizers.  Where is that

5    identified or presented as a potential problem or a possible

6    problem with forming a dosage form of atomoxetine?  Where is

7    this on DTX-162?

8    A.    I think on page 574, they talk about poor metabolizer,

9    atomoxetine, and number one, and extensive metabolizers.

10   Q.    Okay.  Let me back up.  You're referring to STPAT

11   769574 --

12   A.    Correct.

13   Q.    -- point six?

14   A.    Correct.  And also document number six:  "If

15   formulation and dose regimens are to be modified, then

16   genotypic differences will likely need to be considered -

17   for example, delay in Tmax to improve daily coverage, will

18   likely create very different looking profiles in EMs versus

19   PMs.  Will need to consider what impact, if any, that could

20   have clinically."

21   Q.    Now, Dr. Johnson, in your experience, if you have a

22   population -- by the way, can you just tell us again, there

23   was a difference in the level of metabolism.  How different

24   was it between EMs and PMs, based upon your reading?

25   A.    It was substantially different.  Half-life of the fast

CHARLES P. McGUIRE, C.S.R.

634

1    metabolizers may be four to five hours, and the other, slow

2    metabolizers was 17 to 20 hours.

3    Q.    So when you're developing a modified release -- and by

4    the way, when I say modified release form, what does that

5    mean to you?

6              THE COURT:  When you say it, what does it mean?

7              MR. PARKER:  I'm sorry.  What I say doesn't make a

8    difference.

9    Q.    Modified release; does that have a meaning in your

10   field?

11   A.    It means you've changed the rate that it's released

12   from let's say -- it's been modified in some way.  It could

13   be slower, it could be faster, it could be different.

14   Q.    So if you're developing let's say for example

15   sustained release, and you know you have this population of

16   different metabolizers, does that present a challenge when

17   you're trying to develop that type of formulation?

18   A.    Yes.

19   Q.    And can you explain what that challenge would be?

20   A.    I think -- if you just give one dosage form for slow

21   and fast metabolizers, you're going to have such variability

22   in your blood levels that you won't be able to make a

23   prediction as to whether this is an appropriate sustained

24   release system.  I think you'd have to choose a fast

25   metabolizer group or a slow metabolizer group and design a

635

1     dosage form for one of those groups.

2     Q.    All right.  Now, let's just go on to slide 42.

3           You have down pH solubility, and --

4           THE COURT:  Is this slide 48?

5           MR. PARKER:  I'm sorry.  Slide 48.  Thank you,

6     Your Honor.

7           THE COURT:  How much longer are you going to be

8     with the witness?

9           MR. PARKER:  Probably 10, 15 minutes.  Just about

10    done.  Getting close.

11          THE COURT:  Go ahead.

12          MR. PARKER:  Do you want to break now?

13          THE COURT:  No, you go ahead.

14          MR. PARKER:  Thank you, Your Honor.

15    BY MR. PARKER:

16    Q.    All right.  So, Dr. Johnson, you have on your slide 48

17    "pH Solubility."  Can you show us where it is in DTX-162

18    where that is found?

19    A.    Page 572 in the same document:  "PH solubility can

20    complicate delayed-release formulation; not so for sustained

21    release matrix formulations that are polymer-driven -

22    evaluate impact of pH solubility and delivery technology

23    select ed."

24    Q.    Now, you have response time, four- to six-week

25    evaluation period to determine the patient response to

1    atomoxetine.  Where is that on DTX-162?

2    A.    On page 570, about the middle of the column, the

3    biggest -- the biggest paragraph, where it starts,

4    "Prescription level data for adult patients show that 40

5    percent of patients discontinued Strattera within the first

6    30 days of the treatment."

7            Then down to the right side of the third line:  "A

8    four to six week evaluation period is required to determine

9    if a patient is a Strattera responder.  During the treatment

10   initiation phase, tolerability issues predominate and can be

11   exacerbated with a rapid dose escalation."

12   Q.    So if it takes -- four to six weeks are required to

13   evaluate whether a person is responding to tomoxetine, how

14   does that from a formulating standpoint pose any challenges?

15   A.    Well, it takes a long time to get feedback on whether

16   your dosage form is delivering the right amount of drug in

17   the appropriate period of time.

18   Q.    So it would affect the length of time it would take?

19   A.    Well, they're -- usually if you can do just a

20   bioavailability study, you can get your data back relatively

21   quick.  If you've got to wait four to six weeks for each

22   patient, and it takes them three to six months to enroll all

23   the patients, it takes a long time to get your feedback back

24   to know whether or not the dosage form you developed is

25   going to be suitable.

CHARLES P. McGUIRE, C.S.R.

637

1    Q.    Is it fair to say tomoxetine is not a fast-acting

2    drug?

3    A.    Apparently.

4    Q.    So does that also now have an impact on the stability

5    of your formulation?

6    A.    No.

7    Q.    Well, as far as treatment goes, it's a long treatment

8    period, and storage is important --

9    A.    Right.  Right.  Storage will always be important.

10   Q.    And why is that important?

11   A.    Because you have to deliver an effective amount of the

12   drugs, and it can't be degraded.

13   Q.    And so does that have impact -- so that would fall

14   under the category of stability?

15   A.    Correct.  You would do that.

16   Q.    Now, you've also listed Cmax, "Small change in drug

17   release can affect Cmax."  Where is that found in DTX-162?

18   A.    On page 570, the second paragraph, the last 10 words:

19   "Small changes in drug release can affect Cmax and Tmax."

20   Q.    Do you have an understanding of what that was

21   referring to based on your understanding of this document?

22   A.    Well, if you're trying, especially if you're trying to

23   make a sustained release system, very small changes in the

24   way you've released the drug can affect the maximum

25   concentration that you have and the time you reach maximum

CHARLES P. McGUIRE, C.S.R.

638

1    concentration of drug.  So it affects your evaluation of

2    sustained release, and I would think it makes it more

3    difficult.

4    Q.    Now, you also have listed -- you also have on your

5    list "dosing children, challenging capsule size."  And just

6    tell us where is that on DTX 162.

7    A.    It's the fifth -- fifth paragraph down on page 570:

8    "Challenging capsule size; better effect in adolescents

9    rather than in six to 12 year age group patients," which

10   means to me the kids are having trouble swallowing the

11   capsules.

12   Q.    So children, at what point, at what age group do the

13   children have to swallow capsules?

14   A.    Their brackets were six to 12 having an issue.

15   Q.    Now, Dr. Johnson, Plaintiff Lilly in this case has

16   taken the position that there are no special problems, you

17   have not identified any special problems in formulating

18   dosage forms comprising atomoxetine or atomoxetine

19   hydrochloride.  Do you consider that to be a true statement?

20   A.    No.

21   Q.    Is that based upon, among other things, your

22   evaluation of DTX-162?

23   A.    In addition to 162.

24   Q.    Now, I don't recall if I asked you, but I have to go

25   back.  With respect to the sustained release --

639

1          MR. PARKER:  Your Honor, I'm just about done.  I

2     just want to confer.  One second.

3          (Off the record discussion)

4          MR. PARKER:  541.

5     Q.    All right.  With respect to some of the prior art,

6     additional prior art that you evaluated, Dr. Johnson, I

7     believe you also reviewed a reference that we referred to as

8     Chouinard.

9     A.    Yes.

10    Q.    And that is in your book as DTX-55.

11         Can you just -- did that have any -- did you

12    consider that in your analysis --

13    A.    Yes.

14    Q.    -- on new experimentation?

15    A.    Yes.

16    Q.    What information did that reference provide, if

17    anything?

18    A.    It was one of those that provided information relative

19    to treating depression in this dosage range that we've

20    viewed before --

21    Q.    Okay.

22    A.    -- with the caps.

23    Q.    Now, with respect to -- did you also consider DTX-95,

24    which is the Farid article?

25    A.    Yes.

CHARLES P. McGUIRE, C.S.R.

1    Q.    Now, what information did this reference have in the

2    prior art and how -- did it have any impact -- did it have

3    an impact at all on your analysis?

4    A.    Yes.  They used the tomoxetine hydrochloride, in one

5    section they discuss it, and in another section they say it

6    was a capsule.  So I'm assuming that this capsule was -- was

7    atomoxetine hydrochloride that they dosed these people.

8    Q.    What was it that Farid showed in that paper?

9    A.    Mainly that there are two populations of metabolizers.

10   I believe they provided some limited pharmacokinetic

11   parameters, but they really didn't do a lot of people.  They

12   only did -- they did multiple dose in 20-milligram and they

13   did multiple dose 40-milligram.  So you get an impression of

14   dose, two doses in a day as well as some --

15   Q.    Now, did it show any correlation between plasma blood

16   levels and the amount of atomoxetine hydrochloride given to

17   a particular patient?

18   A.    It showed different levels because in the extensive

19   metabolizers, the blood level is quite a bit lower.

20   Q.    Now, on DTX-34, you recall reviewing an article

21   authored by a gentleman named Zerbe?

22   A.    Correct.  This is actually -- I'm pretty sure this is

23   the same population, same group of people.  The difference

24   was, this reported on pharmacodynamic parameters for blood

25   pressure, they talked about decreased appetite, some of the

1      --a number of adverse experiences.

2      Q.     So that was something you considered in your

3      evaluation of undue experimentation?

4      A.     Yes.

5      Q.     Now, just see if we can -- there are other

6      formulations, dosage formulations that you believe were also

7      covered by the claim, the claim of the '590 patent; correct?

8      A.     Correct.

9      Q.     And what are those other dosage forms?

10     A.     We could -- we could have considered fine granules,

11     oral disintegrating tablets, chewable -- chewable tablets or

12     a chewable mass that children could take, delayed release

13     tablets or caplets, or entero coated matrix tablets, thin

14     films, sub-lingual tablets, lozenges, ointments, creams,

15     elixirs, emulsions, gels.

16     Q.     And we did not choose -- well, why did you not choose

17     to go through all those different formulations?

18     A.     Well, I thought the six or eight we did was tough

19     enough.

20     Q.     Okay.  Well --

21     A.     But these in many senses are related in degree of

22     difficulty.  For example, a delayed release tablet/capsule

23     or entero coated is going to be comparable to the sustained

24     release oral dose.  A chewable/chew or orally disintegrating

25     tablet, sub-lingual tablets or fine granules are going to be

1    comparable to suspensions, dosage forms like that.  You're

2    going to probably have to have a insoluble salt or you're

3    going to have to have something different.  And other

4    topical systems would be relatively similar to transdermal

5    patches.

6    Q.    So when you say comparable, are you saying comparable

7    in the --

8    A.    Degree of difficulty.

9    Q.    And also in unpredictability?

10   A.    In what?

11   Q.    In unpredictability?

12   A.    Yes.

13   Q.    All right.  Dr. Johnson, we're just about finished.

14   Let me just wrap this up really quickly.

15          Now, you've showed a fair amount of schematics

16   over the past, Wednesday and throughout the day today, and

17   there's a lot of information, a lot of experiments carried

18   out and a lot of data being generated, but I just want to

19   make clear:  Are you suggesting that the '590 patent

20   contained all that information in the specification?

21   A.    No.

22   Q.    But what is it about the patent in your view that

23   would require those experiments be carried out and develop

24   those dosage forms?

25   A.    It just doesn't contain the information necessary to

643

1    carry out the necessary work to develop these systems for

2    treating ADHD in the practice that was claimed.

3    Q.    And is that also because there's no working examples

4    in the '590 patent?

5    A.    There's no working examples.  There's just a paucity

6    of information.

7    Q.    So in everything that you would need to carry out --

8    well, let me back up.  So everything one skilled in the art

9    would need to develop a dosage form of any kind, you'd have

10   to go to -- you would have to resort to the prior art; is

11   that --

12   A.    Correct.

13   Q.    Now, just the last two questions now.  You recall the

14   factor, the Wands factor dealing with breadth of the claims?

15   A.    Yes.

16   Q.    Now, with respect to the dosage form, did that impact

17   your analysis in connection with undue experimentation?

18   A.    Yes.

19   Q.    How did it?

20   A.    You really have these two groups of things.  You've

21   got oral products, which -- fast-dissolving products which

22   are much more simple, and we're making a leap of faith to

23   actually guess what the dosage would be for them.  However,

24   for the other dosage forms, we have no idea what the dose is

25   going to be because we don't know from the transdermal

644

1    system if it's going to by 20 percent, 10 percent, 80

2    percent.   The same with -- and sustained release is going to

3    be also a problem.   But we basically don't know any of these

4    other doses from what the dose would be.

5    Q.    So that factor would favor undue experimentation as

6    you just described it?

7    A.    Yes.

8    Q.    Now, on Wednesday, you make a comment, you were

9    discussing it in the PT studies, you referred to an LCMS

10   device.   Just, what does that stand for, the LCMS?

11   A.    LCMS?

12   Q.    Right.

13   A.    Okay.   That's a --

14   Q.    Liquid chromatography?

15   A.    -- liquid chromatography mass spec device.   That's

16   what we used for all our blood studies.

17   Q.    Now, Dr. Johnson, with respect to the Wands factors,

18   your evaluation of the prior art, you know, the breadth of

19   the claim, everything else that's under the Wands factors,

20   and going through all these iterations with respect to

21   dosage development, now, did you reach any opinions overall

22   as to whether or not undue experimentation is required to

23   practice the full scope of the claims of the '590 patent?

24   A.    Yes.

25   Q.    And what is your opinion in that regard?

CHARLES P. McGUIRE, C.S.R.

1    A.    My final conclusion is that as of January 11, 1995,

2    the filing date of the '590 patent, undue experimentation

3    would have been required by one of ordinary skill in the art

4    to practice the invention as broadly as it's claimed in the

5    '590 patent, excluding conventional immediate release

6    capsules and tablets of atomoxetine hydrochloride.  Our

7    opinion was reached by assessing the many factual

8    considerations, including but not limited to those factors

9    known as the Wands factors.

10             MR. PARKER:  All right.  Dr. Johnson, thank you.

11             I have no further questions.

12             Yes, we have a couple things to move into

13    evidence, if there are no objections by counsel.

14             Okay.  DTX-1 is already in.

15             DTX-3.  The Defendants move into evidence DTX-3.

16             MR. BAJEFSKY:  Why don't you read off the whole

17    list?

18             MR. PARKER:  Okay.

19             THE COURT:  Well, read off the whole list, but I'm

20    going to have to know if there are any objections in

21    specific.

22             Are there any objections, do you know, to the

23    documents he's putting in?

24             MR. LIPSEY:  Could I suggest at the break we can

25    go over this and not take up court time?

CHARLES P. McGUIRE, C.S.R.

1              THE COURT:  Fine.

2              All right.  We'll take a 15-minute break.

3              MR. BAJEFSKY:  Thank you, Your Honor.

4         (Recess taken)

5              THE COURT:  Be seated.

6         (The witness resumed the stand.)

7              MR. PARKER:  Your Honor, with respect to some of

8    the documents defense would like to move into evidence, at

9    least we've agreed upon, that would be DTX-3, DTX-34,

10   DTX-55, DTX-42, DTX-86, DTX-95, DTX-165, and DTX-166, we'd

11   move into evidence, Your Honor.

12             THE COURT:  Any objection?

13             MR. BAJEFSKY:  Not to those, Your Honor.

14             THE COURT:  Okay.  In evidence.

15        (Defendants' Trial Exhibits 3, 34, 42, 55, 86, 95, 165

16   and 166 marked in evidence)

17             MR. PARKER:  Now, with respect, Your Honor, this

18   is where we have an issue.  Defendants would like to move

19   into evidence Defendant's Exhibit DTX-162, which I believe

20   Plaintiffs have an objection.

21             MR. BAJEFSKY:  Well, Your Honor, we objected

22   during the testimony and you ruled because it was related to

23   the technology in 2007, not to the time 1995, when --

24             THE COURT:  162?

25             MR. PARKER:  Yes, DTX-162.  It's in the witness

647

1      binder, Your Honor.

2                  THE COURT:  And what was the objection?

3                  MR. BAJEFSKY:  The objection, the issue, Your

4      Honor, in this case is whether in 1995 --

5                  THE COURT:  Right.

6                  MR. BAJEFSKY:  -- one of ordinary skill in the art

7      would have been able to make these dosage forms.  That

8      document reflects 2007.  It is not related to the technology

9      in 1995.

10                 MR. PARKER:  Well, Your Honor, just by way of

11     example, the issues with atomoxetine as they're identified

12     in 2006 really reflected what they would have been in 1995

13     as well.  I mean, it was a bitter-tasting compound; that was

14     the same in 2006 as it was in '95.  To the extent that it

15     was high -- you required high dose to form a transdermal

16     patch, that was probably -- I mean, that was the situation

17     in '95.

18                 Another example, too, Your Honor, it mentions

19     extensive metabolizers, poor metabolizers.  That was well

20     known in the prior art.  That was the Farid article in terms

21     of the various populations that metabolized atomoxetine.

22                 So really what it's reflecting is, they're

23     identifying formulation challenges that atomoxetine would

24     present, and these challenges are really a reflection of the

25     compound.

CHARLES P. McGUIRE, C.S.R.

648

1              THE COURT:  Well, these are Eli Lilly's documents.

2              MR. PARKER:  Yes, they are.

3              THE COURT:  Okay.  What were these prepared for?

4    Where did these documents come from?

5              MR. PARKER:  They came from -- well, they were

6    produced from Lilly's files.

7              THE COURT:  No, I know that; but why were they

8    produced in 2006 or whatever?  What's the origin of these

9    documents?

10             MR. PARKER:  This is what's called a line

11   extension document, Your Honor.  During deposition

12   testimony, these were various dosage forms that Lilly was

13   going to consider.  Now, what I mean by line extension,

14   companies have a drug, and they want to formulate it into a

15   different form, a patch or a sustained release, controlled

16   release, whatever, and this document was really a reflection

17   of Lilly's consideration of the various dosage forms where

18   they could take atomoxetine beyond the immediate release

19   tablet.  And this was an assessment of that, and we have

20   deposition testimony to that effect, and they would rule out

21   certain ones and they would consider other ones as a

22   possibility.  So that's all directed to the formulation.

23             MR. BAJEFSKY:  Your Honor, that is not an accurate

24   characterization of what the document reflects.

25             The individual who testified about it -- there was

CHARLES P. McGUIRE, C.S.R.

1    no one who really had knowledge of the document's creation,

2    but the individual who testified about it said this was a

3    standard list of dosage forms which would apply to almost

4    any, potentially to any drug, and it was not necessarily

5    ones that they were considering for atomoxetine.

6              THE COURT:  And it was prepared when?

7              MR. BAJEFSKY:  In 2007, Your Honor.

8              THE COURT:  Well, was it prepared in 2007 to

9    discuss that which occurred in '95?

10             MR. BAJEFSKY:  No, Your Honor, it was -- it

11   related to potential line extensions of the product after

12   2007.

13             THE COURT:  All right.  I'll sustain the

14   objection.

15             Next?

16             MR. PARKER:  Your Honor, with respect to the

17   slides that were shown, we had slides that were the

18   schematics that we went through.  We would like to move

19   those into evidence as well.

20             THE COURT:  What's the objection to those?

21             MR. BAJEFSKY:  Your Honor, we had agreed

22   previously on the demonstratives to defer on those, and the

23   parties will try to reach an agreement as to all

24   demonstratives.

25             THE COURT:  All right.  Then we'll hold those in

650

1      abeyance.

2              What else?

3              MR. PARKER:  I guess that applies to all the

4      slides that were shown in connection with Dr. Johnson's

5      testimony?

6              MR. BAJEFSKY:  Yes.

7              MR. PARKER:  Okay.  We'll hold it in abeyance --

8      Your Honor will hold it in abeyance.

9              THE COURT:  Okay.  Ready to proceed?

10             MR. BAJEFSKY:  I am, Your Honor.

11             THE COURT:  Let's go.  We'll go to around four.

12             MR. BAJEFSKY:  Excuse me?

13             THE COURT:  We'll go to around four.

14         (The witness resumed the stand.)

15                         CROSS-EXAMINATION

16      BY MR. BAJEFSKY:

17      Q.    Good afternoon, Dr. Johnson.

18             THE COURT:  Do you think you can finish by then?

19             MR. BAJEFSKY:  I don't think so, Your Honor.

20         (Laughter)

21             MR. BAJEFSKY:  I promise to be shorter than the

22      direct, but --

23      Q.    Dr. Johnson, I'd like you to start by looking at

24      PTX-1, which is tab one in your book.  It's the '590 patent.

25             And first of all, you have been -- I'll let you

651

1    get it.

2                THE COURT:  Are you going to be putting most of

3    these documents up on the screen?

4                MR. BAJEFSKY:  Yes, Your Honor.

5                THE COURT:  You know, Doctor, I would suggest,

6    unless you just have some abiding desire to look at the

7    books, since you have so little room over there to

8    manipulate, you may be just as well off, unless you need

9    something to refer to, just looking at the screen.  It might

10   be easier for you.  But certainly if you want to look at the

11   documents, you can.

12               Go ahead.

13   BY MR. BAJEFSKY:

14   Q.    Okay.  If we could turn to claim 1, and as you have

15   stated on numerous occasions, that claim defines "a method

16   of treating ADHD by administering an effective amount of

17   atomoxetine to a patient"; correct?

18   A.    Correct.

19   Q.    Okay.  Now, during the direct, you identified portions

20   of the specification which you stated described dosage forms

21   in the patent, but you didn't look at the whole paragraph

22   there, did you, Doctor?  If you look at column 2, in the

23   second full paragraph -- can we bring that up? -- that

24   paragraph says about dosage forms a little bit more than

25   just simply identifying several dosage forms; is that

CHARLES P. McGUIRE, C.S.R.

1     correct?

2     A.     Correct.

3     Q.     And it indicates in the first sentence that "Since

4     tomoxetine is readily orally absorbed and requires only once

5     daily administration, there is little or no reason to

6     administer it in any other way than orally."  Is that

7     correct?

8     A.     Yes.

9     Q.     And did you consider that in rendering your opinion?

10    A.     Yes.

11    Q.     And the last sentence indicates that it is

12    substantially always preferred, however, to administer

13    tomoxetine as a tablet or capsule, and such pharmaceutical

14    forms are recommended?

15    A.     Yes.

16    Q.     You see that?

17           Now, you agree that immediate release atomoxetine

18    hydrochloride capsules and tablets are enabled.

19    A.     Yes.

20    Q.     And, in fact, you agree that immediate release tablets

21    and capsules containing atomoxetine, not just atomoxetine

22    hydrochloride, are enabled?

23    A.     No, I don't think I do.

24    Q.     You don't.  Okay.

25    A.     Because I think specifically we said atomoxetine

653

1    hydrochloride were enabled because that's where the data --

2    there was prior art data referring to the hydrochloride.

3    Q.    Okay.  Let's look at your expert report, Doctor.

4    We'll turn to DTX-168, paragraph 18, which is on page four.

5          In the last sentence, you say:  "In my opinion,

6    the '590 patent specification failed to enable one of

7    ordinary skill in the art to make the dosage forms

8    commensurate in scope with the claims of the '590 patent

9    without undue experimentation, excluding conventional

10   immediate-release tablets and capsules."

11   A.    Right.

12   Q.    And that was in your report?

13   A.    Yes.

14   Q.    And let's look at your -- and there was no limitation

15   as to hydrochloride, was there, Doctor?

16   A.    No.

17   Q.    And you agree, Doctor, -- well, one other question,

18   Doctor.

19         You have the patent back up there?  Can we go back

20   to PTX-1?

21         You mentioned the injectable -- if we go to column

22   2 and the same paragraph we were looking at, you mentioned

23   the injectable solutions, depot injections, and

24   suppositories --

25   A.    Right.

CHARLES P. McGUIRE, C.S.R.

654

Q.    -- in your testimony?

A.    Correct.

Q.    And they appear in a sentence which states:  "It may usefully be administered, if there is any reason to do so in a particular circumstance..."  is that correct?

A.    Correct.

Q.    And, Doctor, you agree that the dosage forms that the patent states as substantially always referred are enabled; is that correct?

A.    Yes.

Q.    And are you aware of any patient, Doctor, who could not be treated for ADHD by administering orally administering atomoxetine hydrochloride immediate release capsule or tablet?

A.    There are probably a substantial number of number that really reject it.

Q.    Are you aware of any in particular?

A.    I would have no way of knowing.

Q.    I'm sorry.  What?

A.    My experience is -- I've had a lot of experience in making children's dosage forms.

Q.    Have you ever been -- you're not a doctor, are you, sir?

A.    No.

          THE COURT:  Not a medical doctor.

CHARLES P. McGUIRE, C.S.R.

1              THE WITNESS:   No.

2    Q.    And you've never treated anyone with ADHD.

3    A.    No.

4    Q.    And so you're not aware of any patient who, in fact,

5    could not be treated, any patient with ADHD who, in fact,

6    could not be treated using atomoxetine hydrochloride

7    immediate release capsules or tablets; is that correct?

8    A.    Correct.

9    Q.    Correct?

10   A.    Correct.

11   Q.    And isn't it a fact, Doctor, that in 1995, all

12   pharmaceuticals that were approved for use in the treatment

13   of ADHD were capsules or tablets?

14   A.    I think it was.  I'm not sure.  There may have been a

15   sustained release tablet in '95.  I simply don't know.

16   Q.    But they were all capsules or tablets.

17   A.    I believe so.

18   Q.    Now, do you know of any patient with ADHD that

19   required a depot injection for treatment?

20   A.    No.

21   Q.    In fact, you do not believe that there is any reason

22   why someone would use a depot injection in children when an

23   oral dosage form is available; is that correct, Doctor?

24   A.    Probably -- probably correct.

25   Q.    And do you know of any patient with ADHD that requires

CHARLES P. McGUIRE, C.S.R.

656

1      suppository for treatment?

2      A.      No.   I'm not a clinician.   I'm not treating these

3      patients, so there's no way I'd know of these things.

4      Q.      And you don't know of any patient with ADHD that

5      required a suspension for treatment, do you, Doctor?

6      A.      No.

7      Q.      And you don't know any patient with ADHD that required

8      an injectable solution for treatment, do you, Doctor?

9      A.      No.

10     Q.      And, in fact, you agree that an injection is not the

11     type of dosage form that would be used for a drug that is

12     administered daily.

13     A.      Yes.

14     Q.      And you also agree that an IV injection is not an

15     appropriate dosage form for administering a drug for

16     treating ADHD.

17     A.      Yes.

18     Q.      And, Doctor, you do not know of any patient with ADHD

19     that requires sustained release atomoxetine solid dosage

20     form treatment.

21     A.      I don't know any patients.

22     Q.      And, in fact, according to the patent, the '590

23     patent, as we looked at before, atomoxetine only requires

24     once-a-day administration.

25     A.      That's what it states.

657

1   Q.    So there would be no reason for sustained release;

2   isn't that true, Doctor?

3   A.    From the data I've seen, I think sustained release is

4   appropriate.

5   Q.    And what data is that, Doctor?

6   A.    Well, looking at the Farid data and just the general

7   indication that there's nausea problems, the release --

8   looks like it was -- some of the early, the Zerbe paper, in

9   fact, the drug is released, there's a lot of nausea things

10   like that.  So what you would probably try to do is modify

11   the release to some extent so it would be less irritating

12   and cause less problems.

13   Q.    And you don't know of any patient with ADHD that

14   required an atomoxetine transdermal patch treatment.

15   A.    No, I don't know patients.

16   Q.    And you don't know of any patient with ADHD that

17   required a form of atomoxetine other than the hydrochloride

18   salt in treatment, do you, Doctor?

19   A.    I don't know any patients.

20   Q.    And, Doctor, you're aware that all of the Defendants

21   in this lawsuit are proposing to make immediate release

22   capsule formulations of atomoxetine.

23   A.    Yes.

24   Q.    And none are proposing to make any other form of

25   atomoxetine for treatment of ADHD.

CHARLES P. McGUIRE, C.S.R.

1    A.    At this -- I have no knowledge of any other plan.

2    Q.    Now, when you talked about depot injections this

3    morning, you mentioned that, you talked about time periods

4    of seven days or one month for the depot injections.  Are

5    you aware of any ADHD treatment that's on the market even

6    today that has an administration time of seven days or one

7    month?

8    A.    No.  I don't know the Ritalin -- I don't know how the

9    methylphenidate patch, if that's a daily patch, I don't know

10   how long it lasts.

11   Q.    Doctor, I asked you a series of questions where I said

12   you don't know about any patient taking certain dosage

13   forms, and your answer was no.  The answer was, I take it,

14   no, I don't know such patients?

15   A.    I don't know such patients.

16   Q.    Okay.  Let's talk about -- let's bring up PTX-1 again

17   and the claims, claim 1, if we can.

18         Now, as we've said over and over again or has been

19   said today, claim 1 defines a method of treating a specific

20   disease; is that correct?

21   A.    Yes.

22   Q.    And that's ADHD ; right?

23   A.    Correct.

24   Q.    And it's with a specific compound, atomoxetine; is

25   that right?

1    A.    The effect of atomoxetine, I don't know what salt they

2    were using, if they're using a salt or what.

3    Q.    Now, claim 1 does not require any particular dosage

4    form; is that correct?

5    A.    That's correct.

6    Q.    And there's no dosage form recited in the claim, is

7    there, Doctor?

8    A.    No.

9    Q.    And there's no dosage form recited in any of the

10   claims of the '590 patent, is there, Doctor?

11   A.    No.

12   Q.    None of the claims mention a dosage form, do they?

13   A.    No.

14   Q.    Let's look at the specification of the patent and turn

15   to the summary of the invention, first of all.

16         And the summary of the invention as the claims do

17   simply defines the invention as a method of treating ADHD by

18   administering atomoxetine; is that correct?

19   A.    Pardon me?

20   Q.    The summary of the specification in essence --

21   A.    Yes.  Yes.

22   Q.    -- says it's a method -- the invention is a method of

23   treating ADHD by administering an effective amount of

24   atomoxetine.

25   A.    Yes.

660

1    Q.    And there's nothing in the specification that states

2    the invention involves a new dosage form, is there, Doctor?

3    A.    Could you repeat that question?

4    Q.    Sure.

5          There's nothing in the specification of the '590

6    patent that indicates that the invention involved in that

7    patent is a new dosage form; is that correct, Doctor?

8    A.    It doesn't define the dosage form in the claims.

9    However, in the specifications, it lists a variety of dosage

10   forms, all of which may be used to treat ADHD.

11   Q.    Doctor, does the specification of the '590 patent

12   indicate that any of the dosage -- that any dosage form is

13   -- strike that.

14         Does the specification of the '590 patent state in

15   any place that the invention itself is a new dosage form?

16   A.    No, but to utilize it, you have to use a dosage form.

17   Q.    I understand that.  But it doesn't indicate that the

18   invention is a new dosage form.

19   A.    No.

20   Q.    Now, Doctor, I'd like to for a minute just talk a

21   little bit about what you did in preparing for your role as

22   an expert.

23         Am I correct that you did no work to determine if

24   atomoxetine had any properties that would create formulation

25   problems?

CHARLES P. McGUIRE, C.S.R.

661

1    A.    I don't have any compound.  I did no laboratory work.

2    Q.    And the only research that you did on the properties

3    of atomoxetine and whether it would have any formulation

4    problems was an Internet search?

5    A.    I did brief Internet searches.  I did not search in

6    detail.

7    Q.    And, in fact, the only properties that you found at

8    the time you wrote your -- or adopted Dr. Shukla's expert

9    report and at your deposition was that atomoxetine was

10   probably going to be bitter and that the base would probably

11   oxidize; is that correct?

12   A.    Repeat the front end of that again.

13   Q.    Sure.

14         The only property that you had identified at the

15   time you adopted Dr. Shukla's expert report was that

16   atomoxetine might have a bitter taste and that the base may

17   oxidize?

18   A.    That's the only one I identified.  However, I worked

19   with a variety of compounds that had similar structures.

20   There's propylamines, there's pseudoephedrines, there's

21   phenylproplyamines, there's propanol.  There's all types of

22   these tablets that I worked for for 40 years.  So I had a

23   pretty good idea that there would be some problems, and I

24   think I can identify what those problems were.

25   Q.    But you didn't identify any of those problems in your

1    expert report, did you, Doctor?

2    A.    I think the expert report identifies a number of

3    problems that have to be solved to actually prepare these

4    dosage forms.

5    Q.    The expert report dealt with general problems.  I'm

6    talking about the problems with -- specific problems as to

7    atomoxetine.  At the time you wrote your expert report, you

8    had not identified any problems other than potential bitter

9    taste and potential oxidation of the base.  Isn't that

10   correct?

11   A.    No, there were -- metabolizers were different.  You

12   had poor metabolizers, you had slow and fast metabolizers.

13   That's certainly a dosage form development problem.

14   Q.    Doctor, do you have your deposition transcript in

15   front of you?

16            We'll put it up on the screen.

17            MR. BAJEFSKY:  Could you put up page 53, lines 7

18   to 17?

19   Q.    Do you recall, Doctor, at your deposition, I asked

20   you:

21            "And did you find anything that would indicate

22   that it had -- that it would -- that some -- any particular

23   property or any constellation of properties would create

24   formulation problems?

25            "ANSWER:  Yeah.  It was -- it was probably going

CHARLES P. McGUIRE, C.S.R.

1    to be bitter.

2              "QUESTION:  Okay.  Aside from that?

3              "ANSWER:  The base would probably oxidize.

4              "QUESTION:  Okay.  Anything else?

5              "ANSWER:  Not that I recall right now."

6         Did I ask those questions and did you give those

7    answers?

8    A.   Yes.

9    Q.   And as far as the bitter taste goes, Doctor, you never

10   made any effort to determine if that bitter taste could be

11   masked, did you?

12   A.   No.

13   Q.   And you don't know whether or not it could, in fact,

14   be masked with regular syrups, conventional syrups?

15   A.   I'm pretty sure it can't because I've worked with

16   pseudoephedrine, we've made children's products with

17   pseudoephedrine.  We had to do different things to make it

18   palatable.

19   Q.   I'm sorry, you're --

20   A.   I worked with similar compounds, and I had to coat

21   those to make them palatable.

22   Q.   Okay.  You have your deposition in front of you?

23             MR. BAJEFSKY:  Could we go to page 154?  I mean,

24   I'm sorry, line 19 to 23.

25   Q.   And I asked you the question:

CHARLES P. McGUIRE, C.S.R.

1           "Okay.  So you don't know, sitting here today,

2    whether or not it could, in fact, be masked with regular

3    syrups -- conventional syrups?

4           And you answered, "I don't know."

5           Do you recall I asked that question, you gave that

6    answer?

7    A.    Yes.  Yes.

8    Q.    Doctor, I'd like to talk a little bit about your

9    background.

10          And if we could bring up PTX-1412, which is your

11   CV.

12          Go to the next page.

13          And I want to focus initially on your employment

14   in industry when you were with Schering-Plough and Ayerst.

15          Now, throughout that entire time period, you were

16   involved in formulating pharmaceutical products; is that

17   correct?

18   A.    Correct.

19   Q.    And am I correct, Doctor, that in those 28 years in

20   industry involved in formulation work, this complex

21   formulation work, that you received one patent?

22   A.    Yes.

23   Q.    And that patent --

24          MR. BAJEFSKY:  Can you put up PTX-1411?

25   Q.    Is this the patent you received, Doctor?

1    A.    Yes.

2    Q.    And it's a patent on a method of protecting against

3    jellyfish stings?

4    A.    Correct.

5    Q.    And you got that patent at the end of your career at

6    Schering?

7    A.    Right.

8    Q.    Now, you testified on direct while you were at

9    Schering-Plough you managed over-the-counter products,

10   suncare products, and Dr. Scholl's products?

11   A.    Yes.

12   Q.    Now, you're a consultant for Atlantic Pharmaceuticals?

13   A.    I have been, yes.

14   Q.    You have been?  You still are?

15   A.    I'm not retained.  He doesn't pay me.  He calls me.

16   He doesn't pay me.

17         (Laughter)

18   A.    Well, I've worked with him -- we've worked together on

19   a number of projects, so he still feels obligated to call

20   me.

21   Q.    Can we bring up PTX-413, which is tab one in your

22   book?

23         You recognize this as a web page for --

24   A.    Yes, that's it.

25         MR. BAJEFSKY:  Okay.  And if we can bring up

CHARLES P. McGUIRE, C.S.R.

1    Dr. Johnson's bio, which bridges the bottom of the first

2    page and also the second, top of the second page.

3    Q.    And about four lines from the bottom on the first

4    page, it says:  "While at Schering-Plough he was responsible

5    for the development of several skin care products, including

6    Coppertone Sport, Coppertone Water Babies, Coppertone Kids,

7    and other unique and international sun and skin care

8    products."

9    A.    Right.

10    Q.    Does that accurately describe what your

11    responsibilities were at Schering-Plough during that period?

12    A.    Well, we had hundreds of projects.  That's -- that's

13    some of those.

14    Q.    But those are the ones that you felt were most

15    significant.

16    A.    I have no -- I've never seen this before.

17            MR. PARKER:  Your Honor, just, if I may,

18    objection.  He's already been qualified as an expert.  I

19    don't know the relevance of going into his background.

20            THE COURT:  No, no, merely because he's qualified

21    as an expert, that doesn't mean that someone still can't

22    discuss his qualifications.  He's not challenging them, but

23    I assume he's pointing something out; and sometimes, things

24    can be pointed out that won't necessarily negate someone

25    being an expert but still could have other points of

1      interest.

2                MR. PARKER:  Thank you, Your Honor.

3                THE COURT:  But no, he just said he had nothing to

4      do with this.

5                Correct?

6                THE WITNESS:  I've never seen it.  I think some of

7      this is abstracted from -- oh, some of this looks like it's

8      abstracted from NIH grants we made, like the last part here,

9      the --

10               THE COURT:  But my point is, you didn't edit,

11     author it.

12               THE WITNESS:  I didn't see the edit.

13               THE COURT:  Go ahead.

14     BY MR. BAJEFKSY:

15     Q.     Now, Doctor, in your testimony on Wednesday, you

16     indicated that you were highly knowledgeable about

17     suppositories.

18     A.     Correct.

19     Q.     And today, you testified that you were highly

20     knowledgeable about transdermal delivery systems.

21     A.     Right.

22     Q.     But isn't it true, Doctor, that you don't consider

23     yourself an expert in either one of those dosage forms?

24     A.     I consider myself highly knowledgeable.  I'm not

25     somebody that you could put at the bench and formulate the

                    CHARLES P. McGUIRE, C.S.R.

1    suppositories.  You pick somebody that's been doing that for

2    three or four years.  So for the laboratory skills, no, but

3    for the product development skills, yes.  I know the steps.

4    I've done it hundreds of times.

5    Q.    Doctor, isn't it true that in your expert report, you

6    did not include transdermal systems or suppositories in your

7    description of your expertise?

8    A.    I don't believe I did.  I don't believe I did or not.

9    I don't recall.

10    Q.    Do you have the deposition in front of you?

11          Page 41, lines six to 17.  And I say, and I ask

12    the question:

13          "Okay.  If you would look at Paragraph 8 of your

14    expert report.  Now, as I've read it, you -- you list the

15    expertise that you have in this paragraph, right?

16          "ANSWER:  Yes.

17    A.    Correct.

18          MR. CLEMENT:  Objection.

19          THE COURT:  What's the objection?

20          MR. CLEMENT:  Your Honor, it's improper

21    impeachment.  That's not an inconsistent statement.  He just

22    said he was not -- it's not an inconsistent statement.

23          THE COURT:  First of all, we're going to hear from

24    you (indicating Mr. Parker), not anybody else during

25    objections.  The person that does the questioning does the

669

1        objection.

2                Next, I'm not positive what he said vis-à-vis his

3        expertise.

4                What did you say to that first question?

5                THE WITNESS:  The question --

6                THE COURT:  No, forget that for a second.

7                THE WITNESS:  Oh, okay.

8                THE COURT:  Let me hear his other question read

9        back.

10               THE WITNESS:  Let me hear what I thought.

11           (Record read)

12               MR. BAJEFSKY:  I'm refreshing his recollection

13       now.

14               THE COURT:  But wait a second.  He didn't say that

15       -- I assume you're trying to get him to say that he did not.

16               MR. BAJEFSKY:  Correct.

17               THE COURT:  Well, he said he did not, or, I don't

18       recall.

19               MR. BAJEFSKY:  Let's pull up his expert report.

20       He says he doesn't recall.

21               THE COURT:  Do you recall?

22               THE WITNESS:  No, what I was trying to -- trying

23       to say is that I think when I was asked the question here,

24       today, it had -- am I highly knowledgeable?  Yeah, I'm

25       highly knowledgeable in developing most any dosage form or

670

1    system.  Have I spent years on the bench so I would know

2    every aspect of formulating a -- one of these -- one of

3    these dosage forms?  No.  But I -- on most of them, I have,

4    but at least two, I did not.

5         So I think when you asked me this, I didn't

6    consider myself an expert.  But I am highly knowledgeable.

7    BY MR. BAJEFSKY:

8    Q.    Doctor, you've never been -- you have never had any

9    involvement in formulating a drug design to treat ADHD, have

10   you?

11   A.    No.

12   Q.    And as far as your -- on a slightly different topic,

13   your position at the University of Tennessee, it is not a

14   tenured position, is it?

15   A.    No.

16        MR. BAJEFSKY:  Your Honor, can I turn the tab to

17   the reference, PTX 555?  Fifty-five, I'm sorry.  55, DTX.

18   Q.    I just want to touch on the Chouinard reference

19   briefly, Doctor.  You talked about it in your direct.

20        Now, this publication reports the use of

21   atomoxetine hydrochloride in clinical trials; is that right?

22   A.    Correct.

23   Q.    And the atomoxetine was administered orally in the

24   form of capsules?

25   A.    Correct.

1      Q.      And if you look at -- let's go to DTX-95, tab three.

2              Let's go to the first page of that.

3              Now, you also talked about the Farid article, and

4      this article also discusses clinical trials with atomoxetine

5      hydrochloride?

6      A.      Yes.

7      Q.      In capsule form?

8      A.      Correct.

9      Q.      And it describes, if you turn to the second page --

10     third page, I'm sorry, third page, in Figure 2, that's a PK

11     analysis?  Is that correct?

12     A.      Well, that's the mean plasma concentrations of the

13     metabolite as well as tomoxetine.

14     Q.      Excuse me?

15     A.      It's the mean plaza concentrations of the tomoxetine

16     and nortomoxetine, the metabolite.

17     Q.      And it's the result of an assay reported in this

18     publication?

19     A.      Correct.

20     Q.      And that assay tells one skilled in the art how to

21     measure the blood levels of atomoxetine?

22     A.      Correct.

23     Q.      And it tells you how to measure the blood levels of

24     atomoxetine metabolites?

25     A.      Yes.

1    Q.    And that assay could be used to assay the blood levels

2    of atomoxetine with different dosage forms; correct?

3    A.    If it's reproducible, yes.

4    Q.    I'm sorry, I didn't hear your answer.

5    A.    If it's reproducible, yes, it would.

6    Q.    And you have no reason to doubt it's reproducible.

7    A.    I really can't evaluate it.

8    Q.    You can't what?

9    A.    Evaluate the assay method.  I would have an analytical

10   chemist review it.

11   Q.    Because you don't consider yourself an expert in

12   analytical chemistry.

13   A.    I'm not an analytical chemist, no.

14   Q.    By the way, Doctor, you talked about the '081

15   patent --

16   A.    Correct.

17   Q.    -- in your testimony, and that's DTX-3.  And you

18   talked about the number of potential salts that were

19   described in that patent; is that correct?

20   A.    Correct.

21   Q.    And that patent issued in February of 1982?

22   A.    Yes.

23   Q.    And if we go back to the Chouinard publication,

24   DTX-55, --

25   A.    Okay.

673

1    Q.    -- that was published in 1984?

2    A.    Right.

3    Q.    And it describes a specific salt for atomoxetine?

4    A.    I don't think the specific salt was described, is it?

5          Yeah, it is.  It's hydrochloride.

6    Q.    Let's look at the first sentence.

7    A.    Yes.  I see it.

8    Q.    And if we look at Farid, which is DTX-95, that was

9    published in 1985?

10   A.    Correct.

11   Q.    And that also focuses on a specific salt of

12   atomoxetine.

13   A.    Yes.

14   Q.    The hydrochloride salt.

15   A.    Correct.

16   Q.    So in the subsequent publications, they focus on a

17   specific salt of atomoxetine.

18   A.    Well, the Farid and Zerbe are the same study, I think.

19   I'm not sure what other publications you're referring to.

20   Q.    I'm talking about Chouinard -- however you pronounce

21   it, DTX-55 --

22   A.    No, I've already agreed to that.  You said what

23   subsequent publications.  I don't know what subsequent --

24   Q.    I'm talking about subsequent to the -- I'm sorry --

25   A.    To the patent?  Yes.

CHARLES P. McGUIRE, C.S.R.

674

1    Q.    To the '081 patent.

2    A.    Correct.

3    Q.    To the '081 patent.  So the '081 patent was a general

4    disclosure, and the subsequent publications report clinical

5    investigations -- so the subsequent publications, Chouinard

6    and Farid, report clinical testing of atomoxetine

7    hydrochloride.

8    A.    Correct.

9    Q.    Which is much more advanced in the general disclosure

10    in the '081 patent.

11    A.    Correct.

12          Excuse me.  Clarify what is much more -- what was

13    the word --

14          THE COURT:  "Advanced."

15    A.    -- advanced.  What do you mean by much more advanced?

16          MR. BAJEFSKY:  Your Honor did you say we were

17    going to four, or 4:30?

18          THE COURT:  Four.

19          MR. BAJEFSKY:  I'm starting a new --

20          THE COURT:  Well, can you answer that question he

21    just had?

22          MR. BAJEFSKY:  I'm sorry.

23          THE COURT:  I don't think he understood what you

24    meant by much more advanced.

25          MR. BAJEFSKY:  Oh, okay.

1    Q.    In the '081 patent, --

2    A.    Right.

3    Q.    -- that was a generic disclosure of a whole bunch of

4    compounds, right?

5    A.    Yes.

6    Q.    And it had a long list of salts in the

7    specifications --

8    A.    Correct.

9    Q.    -- not necessarily associated with atomoxetine.

10   A.    Correct.

11   Q.    And in the subsequent publication, where they're

12   reporting on clinical work, they're reporting a specific

13   salt of atomoxetine has been selected --

14   A.    Correct.

15   Q.    -- to move the compound into clinical studies.

16   A.    Yes.

17   Q.    And in order to get it into clinical studies, the

18   compound had been studied in the ways that you pointed out

19   in the various flow charts you had there; right?

20   A.    Right.

21             THE COURT:  Okay?  Does that answer your question?

22             THE WITNESS:  Yes.

23             THE COURT:  All right.

24             How long do you think you're going to be with this

25   witness tomorrow?  Approximately.

CHARLES P. McGUIRE, C.S.R.

676

1          MR. BAJEFSKY:  I will try to shorten it.  I

2     suspect no more than an hour.

3          THE COURT:  Oh, okay.

4          What's next after this witness?

5          First of all, I assume there might be a little bit

6     of redirect, not much, I assume.

7          MR. CLEMENT:  Right, after redirect, we don't have

8     further witnesses.  We have the deposition designations

9     we're moving in or offering some exhibits that will go with

10    the --

11         THE COURT:  So that will be your case?

12         MR. CLEMENT:  Well, we have the secondary

13    considerations which we're going to hold in abeyance for

14    rebuttal, but that would be -- yes.

15         THE COURT:  Okay.

16         So then that being said?

17         MR. LIPSEY:  First of all, we think they have an

18    obligation to put their case-in-chief in, whatever it is.

19         THE COURT:  But I've made a ruling with respect to

20    the commercial situation.

21         MR. LIPSEY:  True, and except to the extent that

22    it's appropriate rebuttal, I assume that is what they will

23    put in.

24         THE COURT:  But that's what he just said.

25         MR. RAKOCZY:  Your Honor, Bill Rakoczy.

CHARLES P. McGUIRE, C.S.R.

677

1           It is Lilly's burden to put on any secondary

2    consideration that they believe exists.  That's the law, and

3    that's what we intend to do pursuant to Your Honor's ruling.

4           THE COURT:  Okay.  That begs the question.

5           MR. LIPSEY:  We have Dr. Pliszka, who will be our

6    first witness.

7           THE COURT:  I just want to make sure that we have

8    our witnesses.

9           MR. LIPSEY:  Oh.  Yes.  We have them.

10          THE COURT:  That's all I care about.

11          MR. LIPSEY:  We have two, actually, Your Honor.

12   We have plenty of witnesses.

13          THE COURT:  I want to make sure we cover the day.

14          MR. LIPSEY:  I think we can.

15          MR. RAKOCZY:  The day will be covered.

16          Your Honor, may I ask for a quick clarification?

17          THE COURT:  Yes.

18          MR. RAKOCZY:  Every attorney at this table

19   represents a different company Defendant.  We have obviously

20   been dividing duties up so we don't duplicate.

21          YOUR Honor mentioned something about only one

22   objection.

23          THE COURT:  Oh, no, no.

24          MR. RAKOCZY:  My concern, for the record --

25          THE COURT:  What I'm saying is, the person that

1    does the direct examination is going to be -- I'm not going

2    to have seven different lawyers jumping up and down to the

3    next person coming up.  And that goes on both sides.

4           MR. RAKOCZY:  Now, Your Honor, during the cross --

5    during Mr. Burwell's examination, I noticed Mr. Lipsey

6    couldn't help but exercise some type of in loco parentis

7    thing and interject himself into -- I'm not even sure what

8    was going on, Your Honor.  I just want to know, what are the

9    ground rules for --

10          THE COURT:  Well, I don't think we should be

11   referring to anyone as loco.

12          (Laughter)

13          MR. LIPSEY:  Except Mr. Lipsey.

14          (Laughter)

15          MR. RAKOCZY:  And, Your Honor --

16          THE COURT:  What will occur, if I wasn't clear,

17   I'll be clear now:  The attorney that does the questioning

18   will be the attorney that does the objecting thereafter.

19   Otherwise, I'll have things coming from 40 directions.  And

20   I'm not going to do it that way.

21          MR. RAKOCZY:  Understood, Your Honor.

22          THE COURT:  Now, if there's something outrageous

23   -- now, he sat back down before.  I'm not suggesting

24   somebody can't suggest to the attorney that there might be

25   something that's problematic.  But I can't have everybody

1    jumping up and down.  And it goes for both sides.  I don't

2    remember Mr. Lipsey doing that, but if he did, he won't do

3    it any more.

4        (Laughter)

5        MR. RAKOCZY:  Now, in Lilly's case-in-chief, we

6    are assuming that more than one Defendant will have the

7    right to cross-examine the witness.

8        THE COURT:  If you recall, at the beginning of the

9    case, I said, now, what order are we going to go?  I'm not

10   precluding any specific Defendant from doing that if that's

11   the situation.  That's fine.  That's different than having

12   the person doing the direct examination then having

13   everybody else making their objections.

14       MR. RAKOCZY:  Thank you, Your Honor.

15       MR. CLEMENT:  Thank you, Your Honor.

16       THE COURT:  That's a free-for-all, and one thing I

17   don't want to do is a free-for-all.

18       So back to the original question:  We will be

19   covered for tomorrow?  That is my point.

20       MR. RAKOCZY:  Yes.

21       MR. CLEMENT:  Yes.

22       THE COURT:  Okay.  That said:

23       You'll have to come back tomorrow.  I'm sure you

24   just can't wait.

25       (Laughter)

680

1              THE WITNESS:  Please.

2              What do I do with the books?

3              THE COURT:  What do you do with the books?  Leave

4      them there.

5              We'll see everyone tomorrow morning.  We'll start

6      at nine sharp.

7              Thank you.

8          (Matter adjourned until Tuesday, March 25, 2010,

9      commencing at 9 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>INDEX</u>

2                                                          **Further**
                      <u>Direct</u>   <u>Cross</u>   <u>Redirect</u>   <u>Recross</u>   <u>Redirect</u>

3
    **WITNESSES FOR**
4   **THE <u>DEFENDANTS</u>:**

5   **JAMES R. JOHNSON   490      650**

6

7

8

9   **<u>EXHIBITS</u>:**                              **<u>Marked</u>       <u>Received</u>:**

10  **DTX-3, 34, 42, 55, 86, 95, 165, 166                   646**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'

**'081** [16] - 495:21, 495:25, 498:13, 500:7, 500:21, 584:9, 584:14, 584:17, 588:5, 605:7, 672:14, 674:1, 674:3, 674:10, 675:1
**'092** [5] - 606:25, 609:19, 610:8, 612:9, 615:3
**'590** [53] - 490:13, 501:17, 501:19, 502:4, 502:5, 502:8, 502:10, 502:19, 504:1, 505:8, 520:17, 533:14, 533:19, 538:14, 539:11, 539:14, 544:19, 562:17, 562:24, 564:12, 564:24, 565:8, 565:14, 579:24, 583:7, 583:15, 587:12, 588:4, 588:8, 588:24, 601:3, 605:6, 609:18, 610:5, 625:1, 625:16, 627:10, 627:11, 627:19, 641:7, 642:19, 643:4, 644:23, 645:2, 645:5, 650:24, 653:6, 653:8, 656:22, 659:10, 660:5, 660:11, 660:14
**'624** [14] - 536:19, 537:3, 538:15, 539:18, 544:19, 563:13, 564:11, 564:23, 565:8, 582:14, 586:9, 586:17, 605:7, 625:2
**'95** [4] - 647:14, 647:17, 649:9, 655:15

# 0

**00769571** [1] - 630:8
**05** [1] - 608:23
**07-cv-3770-DMC** [1] - 486:4
**07068** [1] - 488:14
**07102-5311** [1] - 488:3
**08** [1] - 584:13
**08540** [1] - 487:18
**08543-5276** [1] - 487:4

# 1

**1** [15] - 502:11, 502:15, 503:21, 503:22, 503:25, 529:18, 529:20,

539:11, 577:17, 601:2, 651:14, 658:17, 658:19, 659:3
**1,181,430** [1] - 626:14
**10** [6] - 526:6, 608:23, 608:24, 635:9, 637:18, 644:1
**10016** [1] - 488:5
**10281** [1] - 488:9
**10th** [1] - 488:2
**11** [2] - 548:1, 645:1
**11955** [1] - 487:6
**11th** [17] - 505:17, 512:7, 514:1, 514:11, 517:12, 531:20, 532:20, 536:6, 544:25, 562:7, 565:23, 569:9, 579:13, 597:24, 599:13, 601:21, 625:4
**12** [3] - 610:20, 638:9, 638:14
**15** [2] - 538:3, 635:9
**15-minute** [1] - 646:2
**154** [1] - 663:23
**16** [1] - 539:11
**162** [4] - 628:23, 638:6, 638:23, 646:24
**165** [3] - 606:13, 646:15, 681:10
**166** [3] - 586:9, 646:16, 681:10
**17** [3] - 634:2, 662:18, 668:11
**18** [2] - 607:2, 653:4
**19** [1] - 663:24
**1982** [1] - 672:21
**1984** [1] - 673:1
**1985** [1] - 673:9
**1995** [34] - 491:19, 494:9, 494:10, 505:17, 512:7, 514:1, 514:11, 517:9, 517:12, 518:20, 519:10, 524:6, 526:24, 531:20, 532:20, 536:6, 544:25, 548:1, 562:7, 565:23, 569:9, 573:20, 579:14, 595:14, 597:24, 599:13, 601:22, 625:4, 645:1, 646:23, 647:4, 647:9, 647:12, 655:11
**1:30** [1] - 581:7

# 2

**2** [11] - 501:4, 501:11, 502:3, 533:19, 583:11, 583:12, 617:4, 617:15, 651:22, 653:22, 671:10
**20** [9] - 490:24, 526:7,

583:11, 583:12, 608:25, 619:21, 619:22, 634:2, 644:1
**20-milligram** [1] - 640:12
**2006** [3] - 647:12, 647:14, 648:8
**2007** [5] - 646:23, 647:8, 649:7, 649:8, 649:12
**2010** [2] - 486:13, 680:8
**20190-5675** [1] - 487:7
**202** [1] - 487:17
**21** [1] - 625:13
**22** [7] - 492:7, 492:9, 492:18, 505:3, 626:14, 626:15
**23** [1] - 663:24
**24** [13] - 486:13, 502:21, 502:24, 502:25, 503:14, 505:4, 507:11, 508:24, 511:6, 511:15, 532:3, 554:18, 554:19
**25** [13] - 502:24, 502:25, 503:14, 515:14, 517:17, 518:5, 520:21, 524:20, 528:1, 529:11, 589:17, 596:5, 680:8
**26** [4] - 533:13, 535:8, 536:1, 538:10
**27** [11] - 539:3, 540:8, 540:10, 541:16, 543:2, 544:3, 545:15, 547:19, 548:23, 561:19, 596:6
**28** [7] - 486:22, 533:19, 539:3, 555:2, 561:19, 583:11, 664:19
**29** [2] - 563:2, 563:18

# 3

**3** [4] - 486:7, 488:8, 607:2, 646:15
**30** [8] - 533:19, 566:7, 566:13, 569:17, 583:13, 583:14, 607:1, 636:6
**301** [1] - 487:3
**31** [8] - 495:24, 500:25, 570:10, 576:5, 579:22, 579:25, 580:9, 580:18
**32** [5] - 576:1, 579:22, 579:25, 580:9, 580:18
**33** [1] - 487:20
**34** [2] - 646:15, 681:10
**35** [6] - 487:13,

588:12, 591:16, 597:17, 599:9, 603:4
**36** [2] - 586:9, 599:23
**37** [1] - 608:19
**38** [3] - 612:19, 613:24, 624:16
**39** [1] - 616:1

# 4

**4** [4] - 606:22, 606:24, 607:1, 609:20
**4,314,081** [2] - 500:3, 584:10
**4,847,092** [1] - 606:14
**40** [5] - 490:24, 616:14, 636:4, 661:22, 678:19
**40-milligram** [1] - 640:13
**40-something** [1] - 501:12
**400** [1] - 487:3
**41** [4] - 495:6, 501:11, 632:13, 668:11
**42** [3] - 635:2, 646:15, 681:10
**43** [4] - 501:3, 501:4, 501:9, 501:10
**46/7** [1] - 609:16
**47** [3] - 607:1, 628:18, 629:25
**48** [3] - 635:4, 635:5, 635:16
**490** [1] - 681:5
**4:30** [1] - 674:17

# 5

**5** [11] - 488:13, 535:9, 535:24, 536:5, 536:15, 537:1, 537:12, 538:15, 606:22, 606:24, 609:20
**5,281,624** [1] - 535:12
**50** [2] - 560:19, 584:21
**500** [1] - 488:16
**53** [1] - 662:17
**54** [2] - 500:25, 502:15
**541** [1] - 639:4
**5450** [1] - 487:20
**55** [5] - 502:11, 586:10, 646:15, 670:17, 681:10
**555** [1] - 670:17
**57** [1] - 502:15
**570** [3] - 636:2,

637:18, 638:7
**571** [2] - 630:23, 632:2
**572** [1] - 635:19
**574** [1] - 633:8
**58** [1] - 501:15
**59** [2] - 496:3, 497:11
**591** [1] - 609:10

# 6

**6** [4] - 488:16, 563:19, 582:15, 583:5, 607:2
**60** [2] - 501:23, 537:17
**60601** [1] - 487:13
**60606** [1] - 487:21
**60654** [1] - 488:16
**61** [2] - 496:4, 497:11
**624** [1] - 540:7
**646** [1] - 681:10
**65** [1] - 584:21
**650** [1] - 681:5

# 7

**7** [6] - 586:11, 586:13, 587:3, 587:10, 588:5, 662:17
**753** [1] - 486:22
**769571** [1] - 630:9
**769574** [1] - 633:11

# 8

**8** [3] - 583:13, 608:24, 668:13
**80** [1] - 644:1
**86** [2] - 646:15, 681:10

# 9

**9** [3] - 583:11, 586:9, 680:9
**90** [1] - 488:5
**912** [1] - 489:14
**95** [2] - 646:15, 681:10

# A

**a.m** [1] - 680:9
**abeyance** [4] - 650:1, 650:7, 650:8, 676:13
**abiding** [1] - 651:6

683

**ability** [2] - 551:15, 552:1

**able** [16] - 499:16, 501:18, 501:24, 524:16, 544:25, 572:14, 602:14, 608:4, 613:11, 618:9, 619:4, 621:20, 622:4, 626:22, 634:22, 647:7

**ABRAHAM** [1] - 487:18

**ABRAMOWITZ** [1] - 488:11

**absolutely** [1] - 500:9

**absorb** [1] - 615:17

**absorbed** [7] - 511:13, 567:23, 567:24, 568:1, 608:13, 617:11, 652:4

**absorption** [15] - 531:10, 534:13, 534:19, 536:18, 541:24, 560:12, 560:13, 561:16, 567:7, 576:24, 577:11, 579:8, 617:20, 618:19, 624:10

**absorptive** [1] - 531:12

**abstracted** [2] - 667:7, 667:8

**accelerate** [6] - 557:11, 557:12, 557:14, 557:15, 601:24

**acceptable** [7] - 497:25, 500:22, 501:2, 501:5, 501:8, 501:12, 543:25

**according** [1] - 656:22

**accurate** [2] - 486:23, 648:23

**accurately** [2] - 503:3, 666:10

**achieve** [2] - 491:8, 530:25

**acid** [5] - 496:9, 496:22, 504:16, 537:18

**acting** [1] - 637:1

**active** [13] - 509:5, 519:14, 522:14, 537:17, 538:21, 541:13, 550:8, 553:6, 553:25, 556:21, 583:23, 587:25, 602:15

**ACTIVIS** [1] - 486:7

**actual** [1] - 501:13

**add** [3] - 572:2, 572:3, 609:3

**added** [3] - 492:20, 609:5

**adding** [1] - 609:7

**addition** [5] - 492:21, 496:9, 496:22, 638:23

**additional** [3] - 521:8, 553:11, 639:6

**additives** [1] - 592:6

**address** [1] - 631:3

**adequate** [3] - 552:8, 567:7, 589:18

**ADHD** [47] - 529:22, 531:23, 534:5, 536:8, 536:23, 538:19, 556:24, 560:20, 561:3, 562:11, 563:16, 571:11, 571:13, 579:17, 585:2, 586:24, 587:1, 587:23, 588:21, 603:1, 607:7, 607:18, 620:5, 625:9, 632:23, 632:24, 643:2, 651:16, 654:12, 655:2, 655:5, 655:13, 655:18, 655:25, 656:4, 656:7, 656:16, 656:18, 657:13, 657:16, 657:25, 658:5, 658:22, 659:17, 659:23, 660:10, 670:9

**adhere** [1] - 525:19

**adhesion** [2] - 525:16, 525:20

**adhesive** [27] - 504:21, 505:24, 506:12, 506:13, 506:25, 507:1, 514:13, 514:22, 514:23, 515:2, 515:4, 515:7, 515:10, 515:12, 515:18, 516:3, 518:24, 519:6, 520:25, 521:10, 521:12, 521:19, 521:24, 523:11, 527:24

**adhesives** [2] - 504:15, 507:23

**adjourned** [1] - 680:8

**adjust** [6] - 507:20, 510:19, 511:2, 516:20, 567:5, 568:5

**adjusting** [1] - 567:9

**administer** [12] - 508:10, 509:1, 518:1, 549:14, 567:16, 588:21, 591:12, 592:14, 611:8, 652:6, 652:12

**administered** [7] - 541:10, 584:24, 622:1, 622:6, 654:4, 656:12, 670:23

**administering** [8] - 533:15, 554:1, 651:16, 654:12, 654:13, 656:15, 659:18, 659:23

**administration** [7] - 561:8, 583:23, 585:8, 585:10, 652:5, 656:24, 658:6

**adolescents** [1] - 638:8

**adopted** [3] - 498:6, 661:8, 661:15

**adult** [1] - 636:4

**advanced** [5] - 674:9, 674:14, 674:15, 674:24

**adverse** [1] - 641:1

**affect** [13] - 510:21, 520:1, 520:3, 520:7, 528:6, 612:4, 612:5, 613:8, 613:9, 636:18, 637:17, 637:19, 637:24

**affected** [2] - 541:6, 573:7

**affects** [2] - 520:5, 638:1

**afternoon** [1] - 650:17

**age** [2] - 638:9, 638:12

**agent** [1] - 585:4

**ages** [1] - 553:18

**aggregate** [1] - 612:1

**AGNELLO** [1] - 488:13

**ago** [2] - 489:21, 522:12

**agree** [7] - 498:25, 652:17, 652:20, 653:17, 654:7, 656:10, 656:14

**agreed** [3] - 646:9, 649:21, 673:22

**agreement** [1] - 649:23

**ahead** [11] - 495:18, 499:13, 500:19, 523:1, 590:4, 592:24, 623:8, 635:11, 635:13, 651:12, 667:13

**ALAN** [1] - 488:9

**Albert** [1] - 629:19

**ALEXANDRA** [1] - 487:23

**allegation** [1] - 497:16

**Allen** [2] - 629:18, 629:19

**allergy** [1] - 593:20

**allow** [3] - 515:12, 607:5, 623:15

**allowed** [1] - 626:1

**allowing** [1] - 548:3

**allows** [1] - 517:8

**almost** [3] - 558:23, 558:24, 649:3

**ALSTON** [1] - 488:4

**Alza** [1] - 615:12

**amine** [3] - 501:12, 564:7

**amount** [43] - 498:20, 525:7, 527:14, 527:20, 527:23, 530:5, 530:9, 531:22, 536:7, 538:18, 558:2, 558:8, 558:13, 559:2, 559:3, 559:5, 560:20, 562:10, 568:19, 572:25, 573:4, 579:16, 587:7, 587:23, 591:25, 602:24, 603:12, 603:25, 607:7, 617:10, 617:11, 619:9, 620:7, 621:14, 623:9, 627:8, 628:11, 636:16, 637:11, 640:16, 642:15, 651:16, 659:23

**amounts** [3] - 628:2, 628:8

**analogized** [1] - 522:7

**analogy** [1] - 522:15

**analysis** [16] - 499:25, 511:7, 511:16, 515:21, 515:25, 530:8, 535:15, 563:24, 607:21, 607:23, 627:25, 628:19, 639:12, 640:3, 643:17, 671:11

**analytical** [1] - 509:4, 509:6, 509:8, 510:13, 540:11, 541:16, 599:17, 618:23, 672:9, 672:12, 672:13

**analyze** [4] - 524:16, 547:15, 548:19, 619:4

**analyzing** [3] - 543:19, 544:2, 591:14

**AND** [1] - 486:4

**ANDREA** [1] - 488:10

**animal** [22] - 520:8, 523:6, 523:13, 523:14, 524:4, 524:19, 525:2, 551:4, 552:3, 552:15, 575:10, 575:11, 575:19, 598:9, 600:6, 600:8, 600:15, 601:13, 603:20, 604:14, 607:18

**animals** [2] - 492:2, 538:25

**ANSWER** [4] - 662:25, 663:3, 663:5, 668:16

**answer** [9] - 585:12, 608:17, 608:18, 658:13, 664:6, 672:4, 674:20, 675:21

**answered** [1] - 664:4

**answers** [2] - 552:2, 663:7

**anticipate** [2] - 543:24, 571:15

**antidepressant** [1] - 585:3

**antifungal** [3] - 504:19, 512:19, 513:4

**antioxidant** [1] - 591:25

**antioxidants** [3] - 585:25, 587:21, 591:3

**apologize** [3] - 502:21, 590:3, 592:24

**Apotex** [1] - 488:12

**APOTEX** [1] - 486:9

**appear** [1] - 654:3

**appearance** [1] - 553:14

**APPEARANCES** [2] - 487:1, 488:1

**appetite** [1] - 640:25

**applicable** [1] - 535:21

**applies** [1] - 650:3

**apply** [1] - 649:3

**appropriate** [26] - 493:12, 493:16, 494:11, 505:13, 505:17, 506:15, 507:4, 516:8, 517:1, 539:15, 543:4, 544:21, 565:24, 566:4, 568:24, 569:14, 570:7, 578:22, 589:3, 608:8, 627:9, 634:23, 636:17, 656:15, 657:4, 676:22

**appropriately** [1] - 550:10

**approved** [3] - 601:5, 619:15, 655:12

**approximate** [1] - 575:14

**aqueous** [2] - 492:9, 492:10

**area** [8] - 504:17, 523:16, 525:5, 525:9, 531:10, 531:12, 619:21, 623:7

**areas** [1] - 623:5

**argument** [1] - 510:4

**arise** [1] - 631:14

**arm** [1] - 593:19

**ARNOLD** [1] - 488:3

**arrive** [4] - 528:25, 538:23, 574:9, 591:2

**arrow** [1] - 524:19, 529:7, 551:3, 556:15, 556:16, 600:11, 619:6

**arrows** [11] - 511:17, 511:18, 518:24, 546:23, 547:19, 555:10, 575:1, 597:9, 597:10, 612:19

**art** [149] - 491:19, 493:3, 493:9, 494:9,

684

499:4, 499:15, 499:16, 499:17, 503:4, 503:11, 503:16, 505:12, 505:16, 508:8, 508:12, 508:23, 509:2, 509:7, 509:25, 510:17, 510:24, 511:8, 511:21, 511:25, 512:6, 513:6, 514:16, 514:19, 515:24, 517:12, 517:19, 519:10, 519:12, 519:23, 520:9, 520:12, 522:18, 523:4, 523:25, 524:6, 526:11, 526:24, 527:17, 529:12, 530:13, 531:21, 532:19, 534:25, 536:6, 538:16, 539:4, 539:25, 540:20, 542:9, 544:5, 544:18, 544:20, 544:24, 545:5, 545:17, 545:19, 546:19, 547:8, 548:1, 549:6, 549:21, 550:7, 552:11, 554:21, 558:10, 558:19, 562:1, 562:9, 563:3, 564:13, 565:22, 566:9, 566:13, 567:8, 568:22, 569:8, 574:2, 575:9, 575:21, 576:3, 577:20, 577:25, 578:4, 578:15, 579:15, 582:20, 584:1, 585:7, 587:6, 587:11, 589:2, 589:22, 589:24, 590:24, 594:4, 594:13, 595:5, 595:17, 597:18, 597:24, 598:23, 600:3, 600:18, 601:21, 602:2, 606:4, 606:9, 606:12, 607:5, 608:3, 609:22, 610:16, 612:13, 613:15, 619:3, 620:11, 620:19, 621:18, 621:19, 622:4, 623:23, 624:20, 625:1, 625:3, 625:6, 625:16, 625:24, 625:25, 626:2, 626:21, 627:19, 628:14, 639:5, 639:6, 640:2, 643:8, 643:10, 644:18, 645:3, 647:6, 647:20, 653:2, 653:7, 671:20

**article** [5] - 639:24, 640:20, 647:20, 671:3, 671:4

**ascertain** [1] - 544:25
**aside** [1] - 663:2
**aspect** [13] - 511:19, 513:1, 519:24, 543:21, 548:7, 555:4, 566:25, 574:24, 576:7, 598:1, 601:9, 620:13, 670:2
**aspects** [2] - 569:5,

599:20

**assay** [6] - 573:21, 671:17, 671:20, 672:1, 672:9
**assays** [3] - 618:24, 619:1, 619:2
**assess** [13] - 523:25, 546:9, 547:8, 549:21, 554:21, 575:14, 576:23, 595:17, 595:18, 611:10, 611:22, 624:23, 628:19
**assessed** [2] - 573:19
**assessing** [9] - 518:23, 520:25, 541:18, 546:22, 549:7, 595:11, 596:3, 612:17, 645:7
**assessment** [9] - 546:10, 547:14, 567:20, 568:3, 569:13, 570:20, 611:5, 628:14, 648:19
**assessments** [5] - 545:18, 596:25, 598:12, 598:13, 618:22
**assistance** [1] - 533:1
**associated** [1] - 675:9
**assume** [11] - 533:7, 535:19, 537:7, 560:19, 627:25, 629:8, 666:23, 669:15, 676:5, 676:6, 676:22
**assuming** [7] - 524:7, 623:7, 627:13, 629:18, 631:19, 640:6, 679:6
**assumption** [1] - 628:17
**assumptions** [1] - 628:1
**Atlantic** [1] - 665:12
**Atomoxetine** [1] - 620:13
**atomoxetine** [158] - 493:13, 493:16, 493:18, 493:25, 494:3, 494:8, 494:11, 497:13, 499:3, 499:5, 499:18, 500:4, 501:25, 503:12, 503:24, 505:6, 505:13, 505:18, 506:3, 506:15, 506:22, 509:9, 511:22, 512:2, 512:25, 513:6, 516:9, 520:10, 520:13, 531:23, 532:12, 533:2, 533:16, 535:1, 535:6, 536:7, 536:12, 536:16, 536:25, 538:18, 539:15, 539:19, 540:1, 542:1, 543:8, 543:18, 544:13, 545:1, 545:5, 551:10, 556:13, 562:10, 563:7, 563:10,

565:12, 565:24, 568:8, 568:23, 569:7, 569:18, 570:2, 571:4, 572:8, 572:15, 574:21, 579:16, 582:21, 583:2, 584:3, 584:14, 584:18, 585:3, 585:7, 587:7, 588:11, 588:23, 589:3, 590:6, 590:9, 590:12, 591:14, 592:14, 597:15, 599:11, 602:3, 602:25, 606:5, 607:7, 609:3, 609:23, 610:4, 610:9, 610:14, 612:17, 621:24, 623:19, 624:15, 625:9, 625:18, 626:6, 628:5, 628:21, 628:22, 628:25, 629:12, 630:18, 631:15, 633:3, 633:6, 633:9, 636:1, 638:18, 640:7, 640:16, 645:6, 647:11, 647:21, 647:23, 648:18, 649:5, 651:17, 652:17, 652:21, 652:25, 654:13, 655:6, 656:19, 656:23, 657:14, 657:17, 657:22, 657:25, 658:24, 659:1, 659:18, 659:24, 660:24, 661:3, 661:9, 661:16, 662:7, 670:21, 670:23, 671:4, 671:21, 671:24, 672:2, 673:3, 673:12, 673:17, 674:6, 675:9, 675:13
**attach** [2] - 498:13, 498:18
**attached** [1] - 498:4
**attorney** [4] - 677:18, 678:17, 678:18, 678:24
**Attorneys** [6] - 487:11, 487:15, 487:24, 488:7, 488:12, 488:18
**attributes** [2] - 568:16, 594:15
**AUROBINDO** [1] - 486:9
**Aurobindo** [1] - 488:18
**author** [1] - 667:11
**authored** [1] - 640:21
**available** [9] - 499:18, 514:2, 514:11, 517:9, 517:15, 518:19, 595:14, 619:2, 655:23
**Avenue** [1] - 488:5
**average** [3] - 607:25, 608:1, 608:21
**avoid** [2] - 534:21, 534:23
**aware** [10] - 533:1, 534:4, 536:21, 607:19,

624:6, 654:11, 654:17, 655:4, 657:20, 658:5
**Ayerst** [1] - 664:14

---

## B

**Babies** [1] - 666:6
**background** [2] - 664:9, 666:19
**backing** [2] - 515:3, 523:11
**bag** [1] - 593:11
**BAJEFKSY** [1] - 667:14
**BAJEFSKY** [44] - 487:8, 494:12, 494:16, 495:4, 495:8, 497:9, 497:20, 500:5, 500:12, 509:11, 509:23, 510:5, 645:16, 646:3, 646:13, 646:21, 647:3, 647:6, 648:23, 649:7, 649:10, 649:21, 650:6, 650:10, 650:12, 650:16, 650:19, 650:21, 651:4, 651:13, 662:17, 663:23, 664:24, 665:25, 669:12, 669:16, 669:19, 670:7, 670:16, 674:16, 674:19, 674:22, 674:25, 676:1
**banner** [1] - 494:19
**barrier** [5] - 504:22, 507:6, 507:9, 515:7, 526:15
**base** [64] - 492:12, 493:25, 501:12, 502:20, 505:22, 506:2, 506:24, 507:4, 507:15, 507:21, 511:7, 511:16, 511:23, 512:3, 512:7, 512:12, 512:15, 512:16, 513:5, 516:2, 516:8, 532:5, 532:13, 533:6, 533:7, 535:20, 537:6, 537:7, 537:8, 537:10, 537:20, 540:3, 540:4, 540:9, 540:11, 541:16, 542:1, 542:6, 542:12, 543:10, 543:19, 544:2, 544:7, 544:14, 545:4, 546:2, 546:20, 548:7, 548:24, 549:5, 550:3, 550:8, 550:25, 551:9, 552:20, 552:22, 558:10, 565:4, 565:6, 661:10, 661:16, 662:9, 663:3
**based** [22] - 503:3, 512:5, 512:24, 530:11, 531:17, 544:18, 548:6, 561:21, 562:4, 568:21,

579:12, 605:5, 608:4, 624:1, 624:24, 625:2, 625:15, 627:18, 628:14, 633:24, 637:21, 638:21
**basic** [1] - 616:2
**basis** [2] - 510:4, 561:2
**bead** [4] - 614:11, 614:19, 614:20, 614:21
**beads** [8] - 614:7, 614:16, 614:21, 621:8, 622:17, 622:25
**Becker** [1] - 488:13
**become** [2] - 558:5, 558:16
**bed** [2] - 504:19, 504:21
**BEFORE** [1] - 486:16
**began** [1] - 506:24
**begin** [6] - 489:7, 506:23, 540:1, 540:2, 590:5, 610:16
**beginning** [1] - 679:8
**begs** [1] - 677:4
**behalf** [3] - 489:2, 489:6, 498:20
**behave** [1] - 622:5
**behind** [1] - 531:11
**below** [3] - 537:15, 610:22, 614:5
**bench** [2] - 667:25, 670:1
**best** [2] - 497:24, 591:2
**better** [3] - 517:8, 572:10, 638:8
**between** [11] - 490:24, 520:10, 521:20, 523:15, 542:16, 561:9, 584:21, 600:9, 600:21, 633:24, 640:15
**beyond** [1] - 648:18
**big** [6] - 516:18, 531:6, 559:21, 559:22, 560:14, 567:2, 567:11, 613:10, 613:13
**bigger** [1] - 523:10
**biggest** [4] - 560:11, 604:24, 636:3
**Bill** [1] - 676:25
**binder** [3] - 495:14, 495:17, 647:1
**binders** [1] - 584:22
**binding** [1] - 506:13
**bio** [1] - 666:1
**bioavailability** [3] - 550:17, 619:15, 636:20
**biopsy** [1] - 603:24
**BIRD** [1] - 488:4
**BISSELL** [1] - 488:8

bit [11] - 508:7, 554:13, 570:16, 595:2, 605:23, 608:10, 640:19, 651:24, 660:21, 664:8, 676:5

bitter [20] - 571:2, 571:3, 571:22, 572:7, 572:10, 572:14, 582:20, 631:3, 631:24, 632:5, 632:7, 632:10, 632:11, 647:13, 661:10, 661:16, 662:8, 663:1, 663:9, 663:10

bitter-tasting [1] - 647:13

bitterness [1] - 571:5

blaming [1] - 498:8

blend [2] - 574:9, 597:7

blood [37] - 523:14, 523:15, 523:22, 524:8, 524:11, 524:12, 524:15, 524:16, 528:15, 529:1, 529:3, 531:1, 550:14, 550:20, 552:7, 555:19, 556:12, 576:24, 577:7, 587:22, 587:25, 588:1, 595:8, 600:10, 600:21, 608:20, 617:23, 619:4, 619:13, 634:22, 640:15, 640:19, 640:24, 644:16, 671:21, 671:23, 672:1

bloodstream [5] - 504:7, 504:10, 508:6, 511:14, 547:2

body [6] - 492:23, 523:20, 530:24, 534:2, 577:6, 585:11

boiling [1] - 496:8

bolus [9] - 583:21, 592:14, 592:16, 593:1, 593:4, 603:5, 603:14, 603:15, 603:18

Bolus [1] - 592:10

book [4] - 499:20, 639:10, 650:24, 665:22

books [3] - 651:7, 680:2, 680:3

bottle [2] - 554:16, 573:12

bottom [5] - 507:25, 573:12, 573:14, 666:1, 666:3

box [3] - 508:18, 532:16, 592:9

boxes [3] - 592:10, 593:14, 614:6

bracket [1] - 618:13

brackets [1] - 638:14

breadth [3] - 494:20,

643:14, 644:18

break [7] - 538:1, 581:2, 581:6, 623:15, 635:12, 645:24, 646:2

BRENNER [1] - 487:4

bridges [1] - 666:1

brief [1] - 661:5

briefly [3] - 490:19, 614:8, 670:19

bring [6] - 554:17, 651:23, 658:16, 664:10, 665:21, 665:25

broadly [1] - 645:4

BRODY [1] - 488:13

buccal [3] - 631:10, 631:21, 632:14

buffer [11] - 526:12, 526:14, 591:22, 591:23, 591:24, 594:25, 596:23, 597:2, 597:4, 597:6

buffered [1] - 593:6

buffers [4] - 585:21, 587:20, 591:3, 591:19

building [1] - 592:5

bunch [1] - 675:3

burden [1] - 677:1

burning [1] - 594:16

burst [2] - 490:16, 490:22

BURWELL [3] - 487:8, 489:5, 489:17

Burwell [1] - 489:6

Burwell's [1] - 678:5

BY [21] - 487:4, 487:7, 487:14, 487:18, 487:21, 488:3, 488:6, 488:9, 488:14, 488:17, 490:3, 499:14, 500:20, 538:9, 560:5, 582:8, 635:15, 650:16, 651:13, 667:14, 670:7

BYRNE [1] - 488:13

---

## C

C.S.R [2] - 486:19, 486:25

caked [2] - 573:13

caking [3] - 570:12, 573:10, 573:11

CALMANN [1] - 488:3

Canadian [2] - 626:3, 626:5

capacity [3] - 591:23, 591:24, 597:6

caplets [1] - 641:13

caps [1] - 639:22

capsule [2] - 558:23, 559:15, 578:24, 606:17,

638:5, 638:8, 640:6, 652:13, 654:14, 657:22, 671:7

capsules [22] - 559:19, 562:23, 584:23, 607:12, 625:17, 626:9, 626:10, 627:21, 627:22, 627:23, 628:12, 628:15, 638:11, 638:13, 645:6, 652:18, 652:21, 653:10, 655:7, 655:13, 655:16, 670:24

care [3] - 666:5, 666:7, 677:10

career [1] - 665:5

CARELLA [1] - 488:13

Carnegie [2] - 487:3, 487:17

carried [13] - 520:6, 529:10, 543:8, 574:11, 574:12, 580:19, 580:20, 600:14, 600:18, 613:23, 622:12, 642:17, 642:23

carry [28] - 511:8, 511:12, 517:19, 519:24, 541:22, 552:11, 553:2, 557:6, 557:19, 569:5, 569:16, 572:15, 572:16, 577:3, 578:7, 588:7, 589:24, 590:13, 597:1, 597:18, 601:9, 602:13, 602:17, 619:3, 620:24, 624:20, 643:1, 643:7

carrying [10] - 503:21, 516:24, 524:4, 544:2, 550:24, 566:8, 569:23, 573:23, 580:7, 619:25

case [27] - 491:1, 508:14, 522:12, 541:5, 542:5, 547:15, 549:9, 549:19, 561:12, 566:20, 568:5, 572:16, 578:4, 590:6, 591:14, 591:15, 616:18, 622:22, 623:2, 627:24, 631:18, 638:15, 647:4, 676:11, 676:18, 679:5, 679:9

case-in-chief [2] - 676:18, 679:5

cases [2] - 578:3, 627:23

catch [1] - 501:6

category [2] - 558:17, 637:14

causes [1] - 559:1

CAVANAUGH [1] - 486:17

cavity [1] - 534:2

CECCHI [1] - 488:13

cell [4] - 507:24, 507:25, 515:23, 518:6

cells [1] - 614:22

cellulose [3] - 609:5, 609:7, 614:24

Center [4] - 487:3, 487:17, 488:2, 488:8

certain [13] - 498:20, 519:18, 520:6, 551:21, 551:25, 558:13, 569:5, 573:4, 595:23, 613:1, 613:2, 648:21, 658:12

certainly [6] - 509:19, 509:21, 549:3, 603:19, 651:10, 662:13

certified [1] - 486:22

Challenge [1] - 632:1

challenge [7] - 578:17, 578:20, 579:1, 579:7, 579:10, 634:16, 634:19

challenges [10] - 490:7, 490:10, 530:13, 560:8, 578:14, 604:19, 624:6, 636:14, 647:23, 647:24

Challenges [1] - 632:3

challenging [3] - 638:5, 638:8, 666:22

chance [1] - 619:14

change [12] - 511:5, 519:3, 554:23, 554:24, 572:1, 596:6, 597:3, 616:13, 616:14, 616:15, 637:16

changed [3] - 616:11, 616:12, 634:11

changes [5] - 510:21, 519:3, 596:7, 637:19, 637:23

changing [4] - 527:4, 618:4, 620:22, 622:15

characterization [1] - 648:24

characterize [3] - 534:13, 548:19, 614:1

characterizing [1] - 548:21

CHARLES [2] - 486:19, 487:7

chart [5] - 564:16, 564:17, 589:6, 631:1, 631:2

charts [2] - 493:4, 675:19

cheese [2] - 522:14, 522:20

chemical [1] - 557:14

chemist [2] - 672:10, 672:13

chemistry [2] - 569:13, 672:12

chew [1] - 632:14

chewable [4] - 632:14, 641:11, 641:12

chewable/chew [1] - 641:24

Chicago [3] - 487:13, 487:21, 488:16

chief [2] - 676:18, 679:5

children [5] - 638:5, 638:12, 638:13, 641:12, 655:22

children's [2] - 654:21, 663:16

choice [1] - 513:10

choose [9] - 501:24, 540:24, 565:5, 572:9, 589:19, 594:1, 634:24, 641:16

chose [1] - 593:25

Chouinard [5] - 639:8, 670:18, 672:23, 673:20, 674:5

CHRISTINE [1] - 488:17

chromatography [2] - 644:14, 644:15

chronic [2] - 530:1

circular [6] - 524:19, 529:7, 551:3, 556:16, 600:11, 619:6

circumstance [1] - 558:13

circumstance.. [1] - 654:5

cite [3] - 499:6, 500:14

cited [1] - 500:12

Civil [1] - 486:4

claim [19] - 494:20, 503:21, 503:22, 503:25, 529:18, 529:20, 530:4, 577:17, 601:2, 641:7, 644:19, 651:14, 651:15, 658:17, 658:19, 659:3, 659:6

claimed [2] - 643:2, 645:4

claims [10] - 490:13, 539:11, 643:14, 644:23, 653:8, 658:17, 659:10, 659:12, 659:16, 660:8

clarification [1] - 677:16

clarify [2] - 594:9, 674:12

Case 2:07-cv-03770-DMC -JAD   Document 729   Filed 09/21/10   Page 201 of 220 PageID: 35030

686

**clear** [7] - 515:1, 537:5, 577:2, 596:16, 642:19, 678:16, 678:17
**CLEMENT** [8] - 488:9, 489:16, 668:18, 668:20, 676:7, 676:12, 679:15, 679:21
**clinical** [7] - 670:21, 671:4, 674:4, 674:6, 675:12, 675:15, 675:17
**clinically** [1] - 633:20
**clinician** [1] - 656:2
**close** [5] - 489:11, 520:7, 591:10, 635:10
**closed** [1] - 513:22
**cloudy** [1] - 596:17
**Cmax** [3] - 637:16, 637:17, 637:19
**coat** [5] - 614:19, 614:20, 614:21, 615:18, 663:20
**coated** [5] - 615:13, 622:25, 623:11, 641:13, 641:23
**coating** [11] - 614:7, 614:9, 614:10, 614:13, 614:15, 615:12, 621:6, 621:8, 622:20, 623:14, 623:15
**coatings** [1] - 622:17
**coats** [1] - 547:5
**Code** [1] - 486:22
**coefficient** [4] - 540:17, 540:18, 542:8, 544:4
**collected** [1] - 575:20
**column** [18] - 496:3, 496:19, 500:23, 500:25, 501:3, 502:3, 502:11, 502:15, 533:19, 583:11, 583:12, 586:9, 607:1, 607:2, 632:1, 636:2, 651:22, 653:21
**combine** [1] - 595:7
**combined** [1] - 589:5
**COMBS** [1] - 487:10
**comfortable** [1] - 598:8
**coming** [5] - 523:18, 541:16, 545:25, 678:3, 678:19
**commencing** [1] - 680:9
**commensurate** [1] - 653:8
**comment** [1] - 644:8
**comments** [2] - 631:2, 631:3
**Comments** [1] - 632:2

**commercial** [2] - 601:5, 676:20
**commonly** [3] - 490:23, 518:21, 615:23
**companies** [1] - 648:14
**COMPANY** [1] - 486:4
**company** [1] - 677:19
**Company** [2] - 487:11, 489:6
**comparable** [8] - 521:14, 521:15, 622:21, 628:6, 641:23, 642:1, 642:6
**comparative** [2] - 619:5, 621:2
**compare** [1] - 595:12
**comparison** [1] - 617:18
**compartment** [2] - 508:5
**compatibility** [11] - 515:15, 515:21, 517:17, 518:4, 518:23, 519:8, 521:1, 545:8, 602:2, 602:14, 605:1
**compatible** [4] - 507:22, 515:12, 519:14, 547:11
**complete** [3] - 512:14, 544:6, 557:6
**completed** [2] - 529:12, 598:1
**completely** [2] - 552:24, 574:16
**complex** [2] - 521:7, 664:20
**complicate** [1] - 635:20
**complies** [1] - 577:16
**component** [1] - 521:11
**components** [6] - 515:1, 521:5, 521:7, 521:8, 528:4, 528:6
**composition** [1] - 614:13
**compound** [17] - 503:12, 509:9, 510:16, 510:22, 513:9, 518:2, 530:17, 572:14, 573:21, 583:2, 613:3, 647:13, 647:25, 658:24, 661:1, 675:15, 675:18
**compounds** [6] - 496:6, 569:3, 611:25, 661:19, 663:20, 675:4
**comprising** [10] - 503:11, 531:22, 535:1, 535:3, 538:18, 562:10,

606:5, 607:6, 628:22, 638:18
**concentrated** [1] - 603:17
**concentration** [5] - 587:20, 592:15, 598:8, 637:25, 638:1
**concentrations** [7] - 518:9, 575:22, 580:4, 616:3, 616:4, 671:12, 671:15
**concern** [1] - 677:24
**concerned** [3] - 580:15, 603:18, 616:18
**concerns** [1] - 603:11
**conclude** [1] - 626:21
**concluded** [1] - 625:17
**concluding** [1] - 608:3
**conclusion** [6] - 625:22, 625:24, 626:1, 628:15, 632:6, 645:1
**conclusions** [2] - 502:19, 607:4
**condition** [2] - 530:1, 563:14
**conditions** [4] - 508:20, 517:22, 595:20, 595:24
**conduct** [29] - 492:11, 507:13, 508:8, 508:14, 508:23, 510:17, 510:24, 513:7, 515:24, 517:24, 518:5, 519:24, 522:19, 523:5, 525:16, 538:17, 540:20, 540:21, 545:6, 545:19, 546:20, 556:10, 557:2, 564:14, 569:1, 575:13, 590:24, 592:3, 609:22
**conducted** [5] - 507:13, 508:13, 575:19, 600:22, 613:20
**conducting** [23] - 509:3, 511:22, 512:1, 519:14, 526:3, 527:18, 532:8, 532:20, 544:22, 545:2, 548:1, 554:14, 556:21, 566:14, 566:15, 568:23, 575:12, 577:22, 602:5, 602:16, 602:22, 603:1, 621:21
**confer** [1] - 639:2
**confidential** [1] - 630:4
**confirm** [7] - 507:15, 528:25, 572:17, 577:16, 590:19, 590:20, 602:12
**conform** [1] - 515:5

**confusing** [1] - 537:9
**conjugated** [1] - 495:24
**conjunction** [1] - 593:10
**connection** [22] - 490:11, 511:7, 515:17, 516:20, 520:24, 527:6, 527:22, 532:5, 532:11, 532:12, 544:12, 567:15, 569:17, 576:3, 579:25, 584:3, 599:11, 601:1, 604:3, 624:17, 643:17, 650:4
**consider** [32] - 494:10, 504:23, 516:10, 541:17, 551:13, 551:18, 552:4, 555:1, 555:3, 555:6, 563:21, 563:23, 571:18, 574:3, 574:5, 574:8, 574:21, 598:19, 598:22, 598:25, 599:12, 633:19, 638:19, 639:12, 639:23, 648:13, 648:21, 652:9, 667:22, 667:24, 670:6, 672:11
**consideration** [8] - 531:17, 562:5, 579:12, 605:5, 624:24, 632:22, 648:17, 677:2
**considerations** [2] - 645:8, 676:13
**considered** [5] - 498:19, 631:12, 633:16, 641:2, 641:10
**considering** [1] - 649:5
**consistent** [4] - 554:11, 555:16, 555:17
**consistently** [2] - 554:4, 623:14
**constant** [2] - 491:8, 491:11
**constellation** [1] - 662:23
**constituent** [1] - 553:6
**consultant** [1] - 665:12
**consuming** [1] - 601:25
**contain** [3] - 580:1, 580:2, 642:25
**contained** [5] - 538:14, 563:5, 588:4, 609:18, 642:20
**containing** [6] - 536:7, 587:6, 625:18, 626:6, 631:15, 652:21
**contaminated** [1] -

572:22
**content** [1] - 552:1
**context** [6] - 503:19, 539:7, 539:8, 551:24, 588:18, 596:2
**continually** [1] - 491:16
**continue** [4] - 510:7, 526:5, 549:23, 616:20
**CONTINUED** [1] - 490:2
**continuing** [1] - 517:16
**control** [10] - 516:6, 568:6, 614:10, 614:11, 614:12, 614:14, 614:21, 615:9, 615:17, 615:18
**controlled** [4] - 514:24, 516:14, 567:13, 648:15
**controlling** [2] - 492:20, 578:19
**conventional** [4] - 645:5, 653:9, 663:14, 664:3
**convey** [14] - 511:19, 519:1, 524:21, 529:8, 543:21, 547:20, 551:4, 555:11, 555:13, 556:16, 575:2, 600:12, 612:21, 619:7
**conveying** [1] - 597:10
**Coppertone** [3] - 666:6
**copy** [1] - 629:7
**core** [1] - 614:14
**corn** [2] - 504:15, 504:17
**corner** [1] - 630:3
**correct** [102] - 489:23, 493:10, 493:17, 497:20, 499:23, 502:11, 504:2, 510:23, 515:18, 520:4, 525:7, 530:6, 531:3, 531:4, 534:24, 537:1, 537:4, 542:2, 542:3, 545:14, 545:16, 546:4, 556:25, 558:14, 558:15, 563:8, 563:20, 565:13, 571:14, 576:6, 576:20, 577:19, 579:3, 586:12, 605:20, 606:15, 610:12, 618:24, 620:8, 621:16, 623:21, 626:16, 630:20, 632:4, 633:12, 633:14, 637:15, 640:22, 641:7, 641:8, 643:12, 651:17, 651:18, 652:1, 652:2, 652:7, 654:2, 654:5,

654:6, 654:9, 655:7, 655:8, 655:9, 655:10, 655:23, 655:24, 658:20, 658:23, 659:4, 659:5, 659:18, 660:7, 660:23, 661:11, 662:10, 664:17, 664:18, 664:19, 665:4, 667:18, 668:17, 669:16, 670:22, 670:25, 671:8, 671:11, 671:19, 671:22, 672:2, 672:16, 672:19, 672:20, 673:10, 673:15, 674:2, 674:8, 674:11, 675:10, 675:14

Correct [2] - 667:5, 675:8

correctly [1] - 610:25
correlate [1] - 608:18
correlates [1] - 628:8
correlation [7] - 492:3, 492:5, 520:9, 520:13, 561:9, 640:15
Coulter [1] - 517:14
Counsel [1] - 487:11
counsel [5] - 487:24, 494:17, 495:1, 538:1, 645:13
counter [3] - 517:13, 517:14, 665:9
counterpart [1] - 517:4
couple [2] - 584:20, 645:12
course [1] - 558:1, 596:21
court [1] - 645:25
COURT [125] - 486:1, 489:1, 489:15, 489:19, 489:24, 494:15, 494:17, 494:21, 494:24, 495:1, 495:11, 495:16, 495:18, 495:20, 496:2, 496:5, 496:13, 496:17, 496:20, 496:24, 497:2, 497:4, 497:18, 497:21, 498:3, 498:8, 498:10, 498:15, 499:7, 499:12, 500:7, 500:10, 500:18, 501:6, 501:9, 509:18, 510:3, 510:7, 512:22, 522:10, 522:20, 523:1, 538:1, 538:3, 538:6, 557:25, 558:4, 558:12, 558:16, 559:1, 559:6, 559:8, 559:10, 560:4, 561:6, 581:2, 581:6, 582:2, 582:4, 582:6, 593:1, 634:6, 635:4, 635:7, 635:11, 635:13, 645:19, 646:1, 646:5, 646:12,

646:14, 646:24, 647:2, 647:5, 648:1, 648:3, 648:7, 649:6, 649:8, 649:13, 649:20, 649:25, 650:9, 650:11, 650:13, 650:18, 651:2, 651:5, 654:25, 666:20, 667:3, 667:10, 667:13, 668:19, 668:23, 669:6, 669:8, 669:14, 669:17, 669:21, 674:14, 674:18, 674:20, 674:23, 675:21, 675:23, 676:3, 676:11, 676:15, 676:19, 676:24, 677:4, 677:7, 677:10, 677:13, 677:17, 677:23, 677:25, 678:10, 678:16, 678:22, 679:8, 679:16, 679:22, 680:3

Court [7] - 486:20, 492:25, 529:8, 536:10, 592:11, 593:3, 614:8
cover [3] - 513:20, 584:14, 677:13
coverage [1] - 633:17
covered [6] - 504:16, 624:13, 624:18, 641:7, 677:15, 679:19
cowards [1] - 581:4
crack [1] - 623:15
cream [2] - 522:14, 522:20
creams [1] - 641:14
create [6] - 599:19, 609:8, 609:12, 633:18, 660:24, 662:23
creation [1] - 649:1
credibility [1] - 564:8
Cross [1] - 681:2
CROSS [1] - 650:15
cross [3] - 489:11, 678:4, 679:7
CROSS-EXAMINATION [1] - 650:15
cross-examination [1] - 489:11
cross-examine [1] - 679:7
crystal [10] - 532:9, 543:11, 543:12, 566:2, 566:6, 567:14, 610:23, 611:5, 612:24, 613:23
crystalline [2] - 495:25, 496:8
crystallize [1] - 567:12
current [1] - 617:25
curve [1] - 619:21
CV [1] - 664:11

cycle [1] - 617:1
cycles [1] - 554:19

D

daily [4] - 633:17, 652:5, 656:12, 658:9
data [17] - 555:18, 558:9, 575:20, 577:5, 578:4, 579:24, 588:2, 607:11, 608:14, 636:4, 636:20, 642:18, 653:1, 653:2, 657:3, 657:5, 657:6
date [1] - 645:2
DAVID [1] - 488:11
days [5] - 490:25, 491:16, 636:6, 658:4, 658:6
deal [3] - 499:7, 559:22, 563:9
dealing [17] - 498:17, 511:15, 512:12, 518:3, 522:12, 543:7, 543:10, 545:20, 571:22, 579:1, 584:3, 587:24, 605:14, 613:17, 620:16, 631:12, 643:14
dealt [1] - 662:5
decide [2] - 532:15, 540:3
decided [1] - 491:14
decision [7] - 506:4, 552:8, 556:20, 574:9, 574:10, 599:2, 599:6
decisions [1] - 555:7
decomposition [1] - 567:17
decrease [1] - 546:16
decreased [1] - 640:25
Defendant [8] - 487:15, 487:24, 488:7, 488:12, 488:18, 677:19, 679:6, 679:10
Defendant's [1] - 646:19
DEFENDANTS [1] - 681:4
Defendants [6] - 486:11, 489:3, 629:6, 645:15, 646:18, 657:20
Defendants' [1] - 646:15
defense [1] - 646:8
defer [1] - 649:22
define [4] - 493:8, 524:2, 593:3, 660:8
defines [3] - 651:15,

658:19, 659:17
degradation [10] - 508:22, 509:4, 557:15, 570:12, 573:10, 573:18, 573:22, 595:22, 595:23, 627:7
degrade [1] - 627:5
degraded [4] - 508:11, 509:1, 591:12, 637:12
degree [5] - 493:5, 493:6, 509:21, 641:21, 642:8
degrees [1] - 616:14
delay [2] - 559:24, 633:17
delayed [3] - 635:20, 641:12, 641:22
delayed-release [1] - 635:20
deliver [1] - 637:11
delivering [3] - 503:24, 618:20, 636:16
Delivery [1] - 629:12
delivery [4] - 514:2, 631:9, 635:22, 667:20
demonstratives [2] - 649:22, 649:24
DENNIS [1] - 486:17
DEPKE [1] - 487:19
deposition [10] - 497:15, 560:17, 648:11, 648:20, 661:9, 662:14, 662:19, 663:22, 668:10, 676:8
depot [10] - 490:8, 490:11, 490:12, 492:10, 527:6, 653:23, 655:19, 655:22, 658:2, 658:4
depression [7] - 536:21, 563:15, 563:16, 586:22, 627:15, 628:5, 639:19
dermis [1] - 593:21
describe [18] - 504:13, 521:18, 521:20, 534:25, 535:3, 556:9, 558:7, 582:24, 583:1, 590:23, 593:8, 594:22, 596:24, 606:4, 614:8, 615:10, 618:17, 666:10
described [19] - 490:14, 494:2, 512:11, 520:24, 532:8, 532:12, 536:25, 563:13, 576:4, 591:16, 604:2, 621:14, 621:22, 622:19, 627:20, 644:6, 651:20, 672:19, 673:4
describes [3] -

585:14, 671:9, 673:3
describing [3] - 492:7, 584:3, 603:4
description [2] - 550:24, 668:7
design [3] - 623:25, 634:25, 670:9
designation [1] - 525:10
designations [1] - 676:8
desire [1] - 651:6
detail [2] - 621:9, 661:6
determination [1] - 498:24
determine [35] - 503:23, 505:21, 508:3, 510:1, 510:15, 511:4, 512:7, 524:17, 529:16, 529:24, 530:3, 530:15, 538:21, 539:10, 541:23, 542:6, 542:17, 550:9, 551:5, 551:10, 553:17, 555:20, 557:3, 566:3, 569:14, 570:17, 601:1, 601:2, 618:20, 620:1, 620:6, 635:25, 636:8, 660:23, 663:10
determines [1] - 530:23
determining [2] - 516:16, 541:25
develop [16] - 504:25, 509:4, 509:6, 524:8, 560:9, 588:10, 588:20, 589:6, 596:13, 600:9, 623:24, 626:22, 634:17, 642:23, 643:1, 643:9
developed [1] - 636:24
developing [36] - 490:8, 490:11, 490:12, 495:7, 509:15, 510:13, 515:18, 516:13, 518:23, 522:16, 523:2, 530:12, 532:4, 560:7, 562:1, 567:15, 570:23, 571:5, 573:2, 578:13, 594:19, 597:21, 603:12, 604:4, 604:18, 611:2, 612:13, 615:24, 620:16, 631:6, 631:9, 631:13, 632:12, 634:3, 634:14, 669:25
development [12] - 514:20, 519:8, 543:22, 559:13, 569:6, 574:25, 589:7, 598:2, 644:21, 662:13, 666:5, 668:3
deviation [1] - 608:23

688

**device** [5] - 504:4, 504:6, 507:25, 644:10, 644:15

**devices** [1] - 595:13

**diamond** [1] - 543:23

**diamonds** [1] - 513:14

**difference** [5] - 541:9, 554:9, 633:23, 634:8, 640:23

**differences** [5] - 521:18, 521:20, 546:3, 546:10, 633:16

**Different** [1] - 616:8

**different** [52] - 492:1, 501:25, 505:21, 507:17, 511:2, 516:23, 517:2, 517:22, 518:9, 521:22, 522:2, 525:6, 532:18, 541:4, 542:6, 560:3, 562:13, 566:6, 566:23, 567:10, 572:3, 584:20, 592:13, 594:11, 595:20, 595:21, 614:3, 615:7, 616:3, 616:10, 616:23, 620:17, 621:7, 624:17, 632:9, 633:18, 633:23, 633:25, 634:13, 634:16, 640:18, 641:17, 642:3, 648:15, 662:1, 663:17, 670:12, 672:2, 677:19, 678:2, 679:11

**difficult** [12] - 491:25, 492:19, 512:19, 513:4, 517:3, 521:3, 528:2, 532:14, 557:10, 604:23, 623:12, 638:3

**difficulty** [5] - 624:9, 631:8, 631:14, 641:22, 642:8

**diffuse** [4] - 505:25, 521:11, 609:13, 615:2

**diffuses** [1] - 504:16

**diffusion** [11] - 514:13, 515:2, 515:10, 515:18, 515:23, 518:6, 518:24, 519:6, 520:25, 521:19, 527:25

**diffusional** [1] - 521:10

**diluted** [1] - 594:17

**direct** [6] - 650:22, 651:19, 665:8, 670:19, 678:1, 679:12

**DIRECT** [1] - 490:2

**Direct** [1] - 681:2

**directed** [15] - 509:8, 536:2, 536:19, 536:23, 563:16, 585:1, 586:13, 586:14, 586:21, 586:24,

587:1, 627:21, 628:2, 628:15, 648:22

**direction** [8] - 503:1, 556:3, 561:21, 564:18, 605:16, 610:1, 613:2, 615:20

**directions** [2] - 612:20, 678:19

**directly** [1] - 594:15

**disability** [1] - 540:22

**disclose** [3] - 583:15, 626:5, 626:8

**disclosed** [1] - 563:4

**discloses** [1] - 606:16

**disclosure** [12] - 500:15, 582:18, 584:17, 585:5, 585:13, 587:10, 607:4, 608:5, 674:4, 674:9, 675:3

**discontinued** [1] - 636:5

**discuss** [4] - 524:25, 640:5, 649:9, 666:22

**discussed** [4] - 489:12, 513:12, 586:5, 595:1

**discusses** [2] - 584:21, 671:4

**discussing** [1] - 644:9

**discussion** [4] - 495:3, 499:2, 579:23, 639:3

**disease** [1] - 658:20

**disintegrating** [4] - 559:15, 632:13, 641:11, 641:24

**disorder** [2] - 536:20, 586:16

**disparity** [1] - 495:13

**dissolution** [31] - 492:20, 507:6, 507:25, 513:14, 517:4, 517:14, 545:24, 546:3, 546:20, 549:4, 549:20, 553:16, 566:3, 566:7, 566:23, 567:19, 570:13, 576:1, 610:24, 611:22, 612:4, 612:6, 614:1, 616:5, 616:9, 616:24, 617:7, 624:12, 624:14, 624:16

**dissolve** [8] - 516:6, 516:17, 567:3, 567:22, 579:6, 612:1, 614:22, 627:5

**dissolved** [1] - 516:3

**dissolving** [1] - 643:21

**distinct** [1] - 521:9

**DISTRICT** [2] - 486:1,

486:2

**dividing** [1] - 677:20

**doctor** [2] - 654:22, 654:25

**Doctor** [37] - 651:5, 651:22, 653:3, 653:15, 653:17, 653:18, 654:7, 654:11, 655:11, 655:23, 656:5, 656:8, 656:18, 657:2, 657:5, 657:18, 657:20, 658:11, 659:7, 659:10, 660:2, 660:7, 660:11, 660:20, 662:1, 662:14, 662:19, 663:9, 664:8, 664:19, 664:25, 667:15, 667:22, 668:5, 670:8, 670:19, 672:14

**document** [16] - 629:3, 629:7, 629:11, 629:14, 629:18, 630:17, 630:25, 631:25, 632:8, 633:14, 635:19, 637:21, 647:8, 648:11, 648:16, 648:24

**document's** [1] - 649:1

**documents** [7] - 645:23, 646:8, 648:1, 648:4, 648:9, 651:3, 651:11

**dog** [8] - 549:14, 549:19, 550:11, 550:14, 552:12, 552:14, 553:7, 607:16

**dogs** [4] - 607:10, 607:13, 608:15, 610:11

**done** [13] - 494:19, 497:15, 517:12, 552:17, 553:4, 570:19, 575:6, 577:13, 594:18, 627:14, 635:10, 639:1, 668:4

**dosage** [125] - 492:22, 493:11, 493:15, 495:7, 497:24, 499:2, 502:22, 503:17, 503:19, 509:16, 523:11, 523:12, 533:12, 533:15, 533:25, 533:5, 539:8, 545:25, 546:11, 546:22, 553:5, 560:9, 560:23, 562:2, 562:14, 565:19, 567:6, 571:7, 574:10, 580:25, 584:18, 585:8, 587:23, 588:10, 588:16, 588:19, 592:13, 594:5, 601:4, 603:9, 605:25, 606:2, 606:5, 608:12, 611:6, 611:15, 612:14, 612:19, 614:2, 616:13, 617:21, 618:19, 619:9, 621:15,

621:20, 621:25, 622:5, 624:2, 624:22, 624:23, 625:8, 626:22, 627:15, 628:8, 628:12, 628:13, 628:22, 631:16, 631:18, 631:19, 632:12, 632:18, 633:6, 634:20, 635:1, 636:16, 636:24, 638:18, 639:19, 641:6, 641:9, 642:1, 642:24, 643:9, 643:16, 643:23, 643:24, 644:21, 647:7, 648:12, 648:17, 649:3, 651:20, 651:24, 651:25, 653:7, 654:7, 654:21, 655:23, 656:11, 656:15, 656:19, 658:12, 659:3, 659:6, 659:9, 659:12, 660:2, 660:7, 660:8, 660:9, 660:12, 660:15, 660:16, 660:18, 662:4, 662:13, 667:23, 669:25, 670:3, 672:2

**dose** [58] - 490:6, 503:24, 523:16, 523:23, 528:21, 529:2, 530:17, 536:12, 536:14, 536:16, 536:18, 553:18, 556:13, 557:3, 557:4, 560:11, 561:5, 561:7, 561:8, 561:9, 565:21, 566:17, 568:18, 573:1, 573:3, 573:4, 574:17, 588:1, 593:6, 598:7, 600:9, 600:20, 600:21, 607:16, 611:2, 617:25, 619:20, 620:7, 620:21, 623:24, 624:8, 627:9, 627:10, 627:20, 627:23, 628:1, 628:4, 628:8, 631:3, 633:15, 636:11, 640:12, 640:13, 640:14, 641:24, 643:24, 644:4, 647:15

**Dose** [4] - 617:4, 617:15, 630:21, 631:5

**dosed** [2] - 572:25, 640:7

**doses** [4] - 619:23, 631:15, 640:14, 644:4

**dosing** [11] - 491:6, 529:2, 553:8, 575:22, 598:9, 627:11, 627:12, 627:14, 627:17, 628:11, 638:5

**doubt** [1] - 672:6

**down** [18] - 512:9, 524:18, 528:16, 540:13, 549:17, 550:5, 581:8, 606:3, 617:3, 618:6, 618:16, 619:17, 635:3,

636:7, 638:7, 678:2, 678:23, 679:1

**Dr** [69] - 489:20, 490:4, 490:6, 492:6, 492:24, 493:11, 498:6, 498:14, 499:15, 500:21, 501:1, 501:17, 502:18, 502:22, 502:24, 503:10, 505:2, 508:7, 512:5, 514:9, 518:22, 530:11, 531:17, 532:2, 533:4, 533:11, 533:14, 533:24, 535:8, 538:10, 538:13, 543:2, 548:6, 551:8, 560:6, 561:19, 562:4, 563:3, 564:10, 578:14, 579:21, 582:9, 582:11, 583:3, 590:3, 592:9, 593:25, 603:4, 605:5, 605:21, 609:17, 624:19, 624:24, 625:14, 633:21, 635:16, 638:15, 639:6, 642:13, 644:17, 645:10, 650:4, 650:17, 650:23, 661:8, 661:15, 665:10, 666:1, 677:5

**drawn** [1] - 509:20

**drip** [10] - 583:20, 587:21, 592:25, 593:8, 593:9, 594:1, 603:12, 604:2, 604:11, 604:13

**Drip** [1] - 592:10

**dripping** [1] - 593:11

**drips** [1] - 593:13

**Drive** [3] - 487:6, 487:13, 487:20

**driven** [1] - 635:21

**Drug** [1] - 629:12

**drug** [105] - 490:24, 491:22, 502:12, 504:5, 504:8, 504:20, 506:11, 508:1, 508:10, 508:25, 511:12, 513:19, 514:2, 515:12, 516:2, 517:23, 522:2, 522:4, 523:22, 524:12, 524:16, 525:7, 526:16, 528:23, 530:16, 533:25, 534:2, 534:7, 534:14, 534:23, 541:3, 542:7, 542:12, 542:17, 542:18, 545:24, 546:12, 546:22, 547:4, 547:15, 549:8, 549:15, 549:18, 549:24, 550:15, 552:8, 553:14, 554:2, 556:12, 561:13, 563:12, 566:23, 567:18, 573:1, 575:14, 575:15, 576:24, 577:1, 577:7, 578:23, 583:19, 593:5, 603:17, 606:2,

# E

606:23, 607:14, 608:22, 609:12, 611:8, 611:13, 614:20, 615:1, 615:8, 615:14, 615:17, 616:3, 616:19, 617:11, 618:3, 618:21, 619:4, 619:9, 619:13, 619:21, 620:2, 620:4, 620:21, 627:5, 630:16, 636:16, 637:2, 637:16, 637:19, 637:24, 638:1, 648:14, 649:4, 656:11, 656:15, 657:9, 670:9

**drug's** [1] - 573:13
**drugs** [3] - 567:17, 591:12, 637:12
**dry** [3] - 559:19, 626:24, 627:2
**DTX** [4] - 495:15, 502:8, 638:6, 670:17
**DTX-1** [6] - 502:10, 502:17, 533:20, 533:21, 533:22, 645:14
**DTX-162** [12] - 629:1, 629:25, 630:9, 630:22, 631:25, 633:7, 635:17, 636:1, 637:17, 638:22, 646:19, 646:25
**DTX-165** [2] - 609:20, 646:10
**DTX-166** [4] - 535:11, 563:13, 564:11, 646:10
**DTX-168** [1] - 653:4
**DTX-3** [11] - 495:19, 495:20, 499:22, 500:2, 584:9, 584:10, 645:15, 646:9, 672:17, 681:10
**DTX-34** [2] - 640:20, 646:9
**DTX-42** [1] - 646:10
**DTX-55** [4] - 639:10, 646:10, 672:24, 673:21
**DTX-86** [3] - 626:3, 626:15, 646:10
**DTX-95** [4] - 639:23, 646:10, 671:1, 673:8
**dumping** [1] - 490:7
**DUNNER** [1] - 487:5
**duplicate** [1] - 677:20
**during** [10] - 524:12, 560:17, 636:9, 646:22, 648:11, 651:19, 666:11, 668:24, 678:4, 678:5
**durometer** [1] - 557:13
**duties** [1] - 677:20
**dynamic** [1] - 579:9

**ear** [2] - 531:11, 531:14
**early** [2] - 623:17, 657:8
**easier** [1] - 651:10
**easiest** [3] - 505:23, 514:22, 514:24
**easy** [4] - 512:18, 572:21, 591:7, 597:7
**ed** [1] - 635:23
**edit** [2] - 667:10, 667:12
**effect** [15] - 491:10, 506:3, 527:8, 534:21, 534:23, 541:12, 553:12, 573:7, 596:6, 623:22, 631:6, 632:25, 638:8, 648:20, 659:1
**effective** [24] - 503:24, 530:4, 530:9, 531:1, 531:22, 536:7, 538:18, 556:21, 556:24, 560:19, 562:10, 565:20, 566:16, 574:9, 577:18, 579:16, 587:6, 603:1, 620:7, 627:8, 628:2, 637:11, 651:16, 659:23
**effectively** [1] - 560:20
**effervescent** [1] - 632:13
**efficacious** [1] - 539:10
**efficacy** [21] - 529:15, 529:17, 529:24, 530:3, 539:9, 555:20, 556:4, 556:21, 557:2, 557:22, 571:15, 577:15, 578:9, 600:24, 601:17, 602:20, 619:16, 619:18, 619:23, 620:1, 621:4
**effort** [1] - 663:10
**eight** [3] - 511:3, 583:14, 641:18
**either** [5] - 495:12, 552:13, 583:20, 615:7, 667:23
**elaborate** [1] - 528:22
**elevated** [1] - 616:17
**Eli** [3] - 487:11, 489:6, 648:1
**ELI** [1] - 486:4
**eliminated** [1] - 530:24
**elixirs** [1] - 641:15
**ELIZABETH** [1] - 486:7

**EM** [1] - 633:4
**embed** [1] - 607:14
**embedded** [2] - 606:3, 606:23
**employment** [1] - 664:13
**EMs** [2] - 633:18, 633:24
**emulsions** [1] - 641:15
**enable** [3] - 490:12, 509:25, 653:6
**enabled** [4] - 652:18, 652:22, 653:1, 654:8
**encompass** [1] - 490:7
**encounter** [6] - 530:14, 560:8, 578:15, 604:20, 624:7
**end** [6] - 501:14, 548:20, 566:15, 567:16, 661:12, 665:5
**ends** [1] - 559:17
**engaging** [1] - 512:8
**enhancer** [1] - 541:22
**enhancers** [1] - 511:11
**enroll** [1] - 636:22
**entail** [4] - 513:11, 513:17, 566:19, 566:20
**entails** [1] - 618:17
**entero** [2] - 641:13, 641:23
**entire** [3] - 500:14, 509:15, 664:15
**entitled** [1] - 486:23
**equipment** [1] - 517:2
**equivalent** [1] - 578:23
**ERIC** [1] - 487:18
**erratic** [4] - 534:15, 534:17, 534:20, 561:17
**escalation** [1] - 636:11
**especially** [3] - 498:17, 632:24, 637:22
**ESQ** [27] - 487:4, 487:7, 487:8, 487:8, 487:9, 487:10, 487:10, 487:14, 487:14, 487:15, 487:18, 487:21, 487:22, 487:22, 487:23, 487:24, 488:3, 488:6, 488:6, 488:9, 488:10, 488:10, 488:11, 488:11, 488:14, 488:17, 488:17
**essence** [1] - 659:20
**essentially** [3] - 498:7, 507:7, 508:5
**estimate** [4] - 512:25,

523:16, 533:4, 578:21
**evaluate** [2] - 517:8, 535:13, 549:9, 549:23, 595:5, 603:23, 620:2, 620:4, 635:22, 636:13, 672:7, 672:9
**evaluated** [10] - 513:5, 515:10, 545:4, 545:18, 564:24, 606:7, 621:18, 626:12, 626:17, 639:6
**evaluating** [2] - 569:21, 616:9
**evaluation** [15] - 535:17, 551:15, 564:10, 565:1, 584:1, 607:3, 607:11, 624:25, 625:3, 635:25, 636:8, 638:1, 638:22, 641:3, 644:18
**evaporation** [1] - 513:21
**event** [1] - 559:8
**events** [1] - 612:22
**eventually** [1] - 508:15
**evidence** [12] - 489:11, 489:14, 532:25, 552:19, 645:13, 645:15, 646:8, 646:11, 646:14, 646:16, 646:19, 649:19
**exacerbated** [1] - 636:11
**exactly** [4] - 490:14, 496:15, 497:8, 592:11
**examination** [4] - 489:11, 678:1, 678:5, 679:12
**EXAMINATION** [2] - 490:2, 650:15
**examine** [2] - 497:14, 679:7
**Example** [2] - 606:22, 606:24
**example** [19] - 490:22, 551:22, 552:23, 558:22, 562:24, 564:3, 580:2, 580:5, 585:15, 592:19, 602:3, 609:21, 613:7, 619:20, 633:17, 634:14, 641:22, 647:11, 647:18
**Examples** [1] - 609:20
**examples** [8] - 580:12, 580:13, 580:18, 580:22, 583:15, 606:22, 643:3, 643:5
**except** [2] - 676:21, 678:13
**exchange** [5] - 614:7,

615:15, 621:8, 622:17, 623:3
**excipient** [29] - 492:8, 492:12, 515:15, 515:21, 517:16, 518:4, 518:23, 519:8, 519:13, 521:1, 541:3, 545:13, 545:21, 547:9, 547:18, 548:9, 551:17, 570:4, 573:24, 574:4, 574:13, 575:1, 575:7, 592:8, 594:20, 598:21, 601:11, 602:11, 614:5
**excipients** [14] - 515:9, 540:25, 546:13, 548:2, 549:12, 570:6, 573:8, 573:13, 597:22, 597:23, 602:4, 611:21, 616:4, 622:10
**excluding** [2] - 645:5, 653:9
**excretion** [1] - 555:19
**excuse** [7] - 524:10, 528:5, 539:22, 582:25, 650:12, 671:14, 674:12
**exercise** [1] - 678:6
**Exhibit** [6] - 489:10, 489:14, 586:9, 606:13, 628:23, 646:19
**exhibit** [3] - 489:13, 498:4, 498:14
**Exhibits** [1] - 646:15
**exhibits** [1] - 676:9
**EXHIBITS** [1] - 681:9
**exist** [1] - 534:4
**exists** [2] - 513:24, 677:2
**expand** [2] - 509:21, 554:13
**expanding** [1] - 554:10
**expect** [2] - 555:8, 607:13
**expensive** [1] - 559:22
**experience** [15] - 493:6, 493:7, 503:4, 512:5, 512:24, 548:6, 568:21, 589:6, 604:18, 626:1, 626:20, 632:17, 633:21, 654:20
**experiences** [4] - 530:11, 560:7, 578:13, 641:1
**experimentation** [32] - 520:23, 527:15, 527:21, 527:23, 531:20, 532:1, 532:7, 562:8, 562:12, 579:14, 579:20, 580:16, 603:8, 603:10,

690

603:12, 604:1, 605:9, 605:13, 621:11, 622:18, 623:9, 625:5, 625:12, 625:19, 626:23, 639:14, 641:3, 643:17, 644:5, 644:22, 645:2, 653:9

**experiments** [9] - 538:16, 564:13, 578:1, 580:17, 580:19, 588:7, 609:21, 642:17, 642:23

**expert** [36] - 494:16, 494:18, 494:21, 495:10, 495:22, 495:23, 496:11, 497:10, 497:12, 497:16, 498:21, 498:23, 499:1, 509:12, 509:15, 509:20, 509:24, 510:2, 653:3, 660:22, 661:8, 661:15, 662:1, 662:2, 662:5, 662:7, 666:18, 666:21, 666:25, 667:23, 668:5, 668:14, 669:19, 670:6, 672:11

**expertise** [3] - 668:7, 668:15, 669:3

**experts** [1] - 498:17

**explain** [21] - 490:19, 506:6, 510:12, 530:22, 531:5, 536:10, 547:22, 550:12, 552:6, 568:11, 585:12, 589:15, 599:15, 607:22, 611:3, 617:4, 619:18, 625:21, 630:12, 630:13, 634:19

**extension** [2] - 648:11, 648:13

**Extension** [1] - 629:12

**extensions** [1] - 649:11

**extensive** [7] - 604:14, 604:16, 624:3, 633:3, 633:9, 640:18, 647:19

**extent** [9] - 550:15, 550:19, 560:12, 568:6, 577:11, 618:18, 647:14, 657:11, 676:21

**extremely** [3] - 576:11, 576:13, 576:17

---

**F**

**fabricate** [2] - 525:11, 525:13

**face** [1] - 490:11

**fact** [14] - 580:5, 580:13, 623:22, 652:20, 655:4, 655:5, 655:11, 655:21, 656:10, 656:22,

657:9, 661:7, 663:13, 664:2

**factor** [12] - 525:21, 525:23, 559:6, 559:7, 570:23, 571:5, 572:19, 580:7, 612:7, 643:14, 644:5

**factors** [11] - 531:18, 558:7, 562:5, 574:8, 579:12, 605:6, 624:25, 644:17, 644:19, 645:8, 645:9

**factual** [2] - 495:11, 645:7

**failed** [1] - 653:6

**fails** [1] - 575:4

**fair** [7] - 498:16, 599:7, 602:9, 621:14, 628:16, 637:1, 642:15

**fairly** [6] - 512:18, 517:3, 589:13, 599:5, 599:16, 611:25

**faith** [3] - 627:17, 628:6, 643:22

**fall** [2] - 592:20, 637:13

**familiar** [1] - 614:2

**far** [7] - 550:1, 580:14, 622:10, 637:7, 663:9, 670:12

**FARABOW** [1] - 487:5

**Farid** [8] - 639:24, 640:8, 647:20, 657:6, 671:3, 673:8, 673:18, 674:6

**Farm** [1] - 488:13

**fashion** [1] - 567:13

**fast** [18] - 508:4, 530:16, 531:15, 553:21, 559:15, 567:3, 567:22, 568:19, 578:22, 603:19, 623:1, 624:11, 633:25, 634:21, 634:24, 637:1, 643:21, 662:12

**fast-acting** [1] - 637:1

**fast-disintegrating** [1] - 559:15

**fast-dissolving** [1] - 643:21

**faster** [4] - 516:17, 530:24, 617:9, 634:13

**fat** [1] - 593:21

**fatal** [1] - 497:2

**fatty** [1] - 537:18

**favor** [1] - 644:5

**favors** [1] - 580:16

**FDA** [2] - 601:5, 611:8

**February** [1] - 672:21

**feedback** [2] - 636:15, 636:23

---

**feeding** [1] - 567:4

**felt** [2] - 617:8, 666:14

**few** [1] - 607:12

**field** [1] - 634:10

**fifth** [2] - 638:7

**fifty** [2] - 501:15, 670:17

**fifty-five** [1] - 670:17

**fifty-nine** [1] - 501:15

**Figure** [1] - 671:10

**files** [2] - 629:15, 648:6

**filing** [1] - 645:2

**film** [1] - 631:9

**films** [1] - 641:14

**final** [1] - 645:1

**finalize** [1] - 528:13

**Financial** [1] - 488:8

**fine** [4] - 641:10, 641:25, 646:1, 679:11

**finish** [3] - 525:2, 533:6, 650:18

**finished** [3] - 574:14, 575:7, 642:13

**FINNEGAN** [1] - 487:5

**first** [40] - 490:25, 502:7, 502:23, 504:18, 505:3, 505:5, 513:13, 514:17, 514:21, 519:21, 532:14, 532:18, 534:21, 534:23, 539:24, 540:1, 540:22, 544:15, 544:20, 569:6, 583:24, 594:4, 594:13, 602:6, 610:13, 622:9, 624:21, 629:20, 636:5, 650:25, 652:3, 659:15, 666:1, 666:3, 668:23, 669:4, 671:2, 673:6, 676:17, 677:6

**First** [1] - 676:5

**first-pass** [3] - 534:21, 534:23, 583:24

**five** [12] - 493:6, 511:4, 553:13, 566:5, 568:18, 578:10, 608:14, 614:3, 614:6, 630:1, 634:1, 670:17

**flavor** [2] - 572:10, 582:24

**flavors** [3] - 572:3, 582:16, 583:1

**FLAX** [1] - 488:14

**flood** [2] - 595:20, 595:21

**floor** [1] - 488:2

**flow** [4] - 589:7, 613:9, 613:13, 675:19

**flowable** [1] - 515:5

**focus** [7] - 505:2,

---

520:19, 569:22, 621:13, 626:10, 664:13, 673:16

**focused** [1] - 509:15

**focuses** [1] - 673:11

**focusing** [3] - 501:1, 519:6, 620:17

**follow** [1] - 555:9

**following** [2] - 486:22, 540:8

**follows** [1] - 489:4

**FOR** [2] - 486:2, 681:3

**force** [1] - 571:9

**forces** [1] - 615:14

**forever** [1] - 621:10

**forget** [1] - 669:6

**Form** [1] - 620:13

**form** [147] - 492:22, 493:12, 493:15, 493:16, 493:18, 493:20, 494:3, 494:5, 494:11, 495:23, 496:7, 496:8, 496:14, 496:25, 497:7, 502:20, 502:22, 503:17, 503:20, 505:6, 505:13, 505:17, 506:2, 506:22, 507:4, 512:8, 513:5, 516:8, 516:9, 523:11, 523:12, 531:23, 533:12, 533:15, 533:25, 537:6, 539:5, 539:8, 539:15, 539:19, 541:5, 543:8, 543:17, 543:19, 544:13, 544:20, 545:22, 545:25, 546:11, 546:23, 550:3, 550:22, 551:1, 551:10, 553:12, 554:22, 560:10, 560:23, 562:10, 562:14, 565:9, 565:24, 567:6, 568:7, 568:23, 569:7, 569:17, 570:2, 571:7, 574:10, 574:20, 579:16, 580:25, 583:22, 584:19, 585:8, 585:18, 588:10, 588:16, 588:19, 588:23, 589:3, 590:5, 591:13, 594:5, 599:11, 601:5, 606:1, 606:2, 606:5, 610:4, 610:9, 610:14, 611:3, 611:6, 611:15, 612:14, 612:17, 612:19, 614:2, 618:19, 619:9, 621:25, 622:5, 623:24, 624:2, 624:8, 624:15, 624:22, 624:23, 625:8, 628:9, 628:12, 632:18, 633:6, 634:4, 634:20, 635:1, 636:16, 636:24, 643:9, 643:16, 647:15, 648:15, 655:23, 656:11, 656:15,

---

656:20, 657:17, 657:24, 659:4, 659:6, 659:9, 659:12, 660:2, 660:7, 660:8, 660:12, 660:15, 660:16, 660:18, 662:13, 669:25, 670:24, 671:7

**form's** [1] - 631:17

**formed** [3] - 531:19, 562:6, 579:13

**forming** [1] - 633:6

**forms** [51] - 494:8, 495:7, 495:25, 497:24, 499:2, 499:18, 500:4, 509:16, 553:5, 557:12, 559:19, 562:22, 565:19, 588:10, 592:13, 603:5, 608:12, 614:25, 616:13, 616:16, 617:21, 621:7, 621:15, 626:22, 627:23, 628:13, 628:22, 632:12, 638:18, 641:9, 642:1, 642:24, 643:24, 647:7, 648:12, 648:17, 649:3, 651:20, 651:24, 651:25, 652:14, 653:7, 654:7, 654:21, 658:13, 660:10, 662:4, 667:23, 670:3, 672:2

**formula** [12] - 525:6, 526:8, 537:15, 538:23, 541:1, 551:6, 555:3, 555:13, 556:1, 557:7, 564:1, 598:4

**formulate** [3] - 585:7, 648:14, 667:25

**formulated** [1] - 614:22

**formulating** [11] - 503:11, 547:7, 584:22, 623:17, 624:7, 628:21, 636:14, 638:17, 664:16, 670:2, 670:9

**Formulation** [16] - 535:9, 535:24, 536:5, 537:12, 538:15, 563:19, 575:25, 582:15, 586:11, 586:13, 587:3, 587:10, 588:5, 598:10, 616:8

**formulation** [91] - 492:8, 492:11, 513:25, 515:10, 520:25, 522:17, 523:3, 525:1, 526:20, 527:1, 527:8, 527:16, 527:18, 527:25, 528:11, 535:1, 535:3, 535:18, 536:2, 536:14, 536:25, 537:1, 538:17, 545:8, 545:11, 545:20, 547:9, 547:17, 548:3, 548:9, 548:11, 548:22, 550:6,

---

551:16, 552:10, 553:7, 563:21, 563:23, 564:5, 564:15, 564:23, 570:4, 573:24, 574:4, 574:13, 574:25, 575:7, 576:7, 576:22, 577:21, 577:25, 578:11, 586:14, 587:4, 592:5, 592:8, 594:20, 597:22, 598:5, 598:20, 599:22, 599:24, 600:2, 600:5, 601:10, 601:20, 602:11, 604:4, 606:17, 607:3, 607:6, 608:4, 609:2, 609:4, 609:23, 614:5, 616:2, 621:20, 628:25, 633:15, 634:17, 635:20, 637:5, 647:23, 648:22, 660:24, 661:3, 662:24, 664:20, 664:21

**formulations** [18] - 514:17, 569:21, 605:24, 613:25, 616:6, 616:23, 620:17, 624:17, 626:6, 626:8, 626:12, 626:17, 626:19, 635:21, 641:6, 641:17, 657:22

**formulator** [2] - 555:9, 622:24

**forth** [2] - 524:22, 554:19

**forward** [3] - 493:1, 574:11, 581:1

**four** [26] - 513:13, 529:23, 529:25, 531:9, 531:14, 553:13, 554:19, 566:5, 571:14, 592:10, 594:10, 617:22, 630:1, 632:24, 634:1, 635:24, 636:8, 636:12, 636:21, 650:11, 650:13, 653:4, 666:3, 668:2, 674:17, 674:18

**Franz** [1] - 507:24

**free** [4] - 623:8, 627:6, 679:16, 679:17

**free-for-all** [2] - 679:16, 679:17

**freebase** [5] - 493:18, 493:20, 495:23, 496:7, 545:1

**Freedom** [2] - 487:6, 487:6

**freeze** [2] - 553:12, 596:11

**freeze/thaw** [5] - 554:13, 554:14, 557:13, 594:24, 596:9, 596:11

**freezer** [3] - 554:17, 554:18

**FROEHLICH** [1] -

488:10

**front** [8] - 499:20, 519:21, 548:20, 626:3, 661:12, 662:15, 663:22, 668:10

**FUCHS** [1] - 487:22

**fulfill** [2] - 529:18, 573:4

**full** [2] - 644:23, 651:23

**fully** [1] - 577:1

**function** [4] - 510:14, 510:15, 611:19, 611:20

**fungal** [1] - 504:18

## G

**GAIL** [1] - 487:15
**GARRETT** [1] - 487:5
**Gateway** [1] - 488:2
**gel** [3] - 615:1, 615:2
**gelatin** [1] - 584:23
**gels** [1] - 641:15
**Gelucire** [1] - 609:16
**general** [4] - 657:6, 662:5, 674:3, 674:9
**generally** [1] - 491:18, 493:11, 519:16, 519:18, 521:20, 566:19, 590:23, 596:2, 596:24, 618:2, 623:6
**generated** [2] - 579:24, 642:18
**generating** [1] - 577:5
**generic** [1] - 675:3
**genotypic** [1] - 633:16
**gentleman** [1] - 640:21
**given** [14] - 523:16, 538:13, 545:17, 556:14, 564:11, 565:1, 588:3, 593:20, 609:17, 609:20, 621:18, 640:16
**GLENMARK** [1] - 486:7
**glycerides** [1] - 537:19
**goal** [2] - 551:25, 619:25
**GOODIN** [1] - 488:11
**Goolkasian** [1] - 489:12
**grade** [2] - 525:10, 609:16
**gram** [1] - 631:17
**grants** [1] - 667:8
**granules** [2] - 641:10, 641:25

**great** [2] - 580:3, 621:9
**green** [1] - 511:17
**grind** [2] - 560:18, 560:21
**ground** [1] - 678:9
**group** [9] - 559:14, 559:16, 616:6, 634:25, 638:9, 638:12, 640:23
**grouped** [1] - 559:17
**groups** [3] - 624:1, 635:1, 643:20
**growth** [4] - 570:14, 572:18, 572:21, 576:2
**guess** [6] - 500:25, 526:25, 602:9, 615:5, 643:23, 650:3
**guidance** [6] - 505:9, 539:14, 539:18, 565:15, 588:24, 610:5
**guide** [1] - 611:13
**guinea** [1] - 513:18, 513:19, 523:10
**gut** [3] - 578:25, 579:8, 579:10

## H

**half** [2] - 519:21, 633:25
**half-life** [1] - 633:25
**HAMILTON** [1] - 487:2
**hand** [1] - 609:21
**handmade** [1] - 526:1
**HANER** [1] - 487:23
**hard** [1] - 557:15
**hear** [4] - 668:23, 669:8, 669:10, 672:4
**heard** [3] - 497:19, 522:6, 522:24
**heat** [1] - 508:21, 527:8, 598:18
**heated** [1] - 606:23
**help** [6] - 533:1, 536:9, 541:21, 572:9, 580:3, 678:6
**helpful** [2] - 564:4, 564:6
**helps** [3] - 558:22, 570:17, 611:13
**HENDERSON** [1] - 487:5
**high** [12] - 491:1, 496:7, 551:14, 597:6, 608:7, 629:21, 630:11, 630:15, 631:3, 631:20, 647:15
**High** [3] - 630:13,

630:21, 631:5
**higher** [2] - 511:4, 592:15
**highly** [8] - 504:24, 534:17, 667:16, 667:19, 667:24, 669:24, 669:25, 670:6
**HILL** [1] - 487:17
**himself** [1] - 678:7
**hit** [1] - 576:12
**hits** [1] - 614:25
**hold** [8] - 515:6, 553:15, 556:5, 573:12, 649:25, 650:7, 650:8, 676:13
**hole** [2] - 615:13, 623:13
**homogeneity** [1] - 553:25
**homogeneous** [1] - 553:23
**homogeneously** [1] - 554:3
**homogenous** [1] - 553:20
**HON** [1] - 486:17
**Honor** [67] - 489:5, 489:16, 489:17, 489:18, 490:1, 494:12, 494:18, 495:8, 495:14, 496:1, 497:9, 497:20, 498:13, 498:25, 499:11, 500:5, 500:9, 500:13, 500:17, 509:11, 509:13, 509:14, 509:23, 510:6, 538:2, 538:8, 580:24, 582:5, 582:7, 635:6, 635:14, 639:1, 646:3, 646:7, 646:11, 646:13, 646:17, 646:21, 647:1, 647:4, 647:10, 647:18, 648:11, 648:23, 649:7, 649:10, 649:16, 649:21, 650:8, 650:10, 650:19, 651:4, 666:17, 667:2, 668:20, 670:16, 674:16, 676:25, 677:11, 677:16, 677:21, 678:4, 678:8, 678:15, 678:21, 679:14, 679:15
**Honor's** [1] - 677:3
**hook** [1] - 593:12
**hooked** [2] - 593:10, 593:11
**hope** [1] - 555:23
**hour** [5] - 525:9, 525:10, 528:24, 581:7, 676:2
**hours** [5] - 554:18, 610:20, 617:22, 634:1, 634:2

**house** [1] - 487:24
**housekeeping** [1] - 489:7
**Hubbard** [1] - 488:16
**Human** [1] - 617:3
**human** [42] - 525:5, 525:12, 525:14, 526:25, 528:13, 528:17, 529:4, 529:10, 539:9, 555:14, 556:1, 556:4, 556:5, 556:10, 556:18, 556:21, 557:7, 557:19, 557:22, 575:23, 576:23, 577:3, 577:13, 577:15, 578:7, 578:9, 600:16, 600:24, 601:8, 601:15, 601:17, 602:19, 602:20, 607:16, 618:7, 618:23, 619:5, 619:23, 620:25, 621:2, 621:4
**humans** [1] - 555:17
**hundred** [2] - 591:9, 599:18
**hundreds** [2] - 666:12, 668:4
**HURST** [1] - 487:14
**hydrated** [1] - 615:1
**hydro** [1] - 615:24
**hydrochloric** [1] - 543:14
**hydrochloride** [39] - 506:15, 533:2, 589:8, 589:19, 590:5, 590:12, 591:15, 597:15, 602:3, 602:25, 610:10, 610:17, 610:21, 621:25, 625:18, 626:6, 627:24, 628:22, 628:25, 630:19, 638:19, 640:4, 640:7, 640:16, 645:6, 652:18, 652:22, 653:1, 653:2, 653:15, 654:13, 655:6, 657:17, 670:21, 671:5, 673:5, 673:14, 674:7
**hydrogel** [8] - 614:7, 614:23, 615:4, 615:21, 615:25, 622:19, 623:10
**hydrogels** [1] - 623:1
**hydrophilic** [5] - 506:20, 534:1, 609:11, 615:8, 616:5
**hydrophilicity** [1] - 507:20
**hydrophobic** [8] - 492:13, 506:25, 507:21, 534:1, 542:12, 542:13, 542:22, 616:5
**hydrophobicity** [4] - 542:16, 542:17, 542:23, 554:6

692

# I

**idea** [17] - 525:8, 526:23, 542:11, 544:9, 557:18, 557:22, 560:22, 563:12, 597:17, 607:15, 608:25, 611:12, 617:12, 620:21, 631:19, 643:24, 661:23
**identified** [16] - 490:6, 496:23, 505:3, 505:5, 562:21, 564:23, 589:23, 592:10, 630:17, 633:5, 638:17, 647:11, 651:19, 661:14, 661:18, 662:8
**identifies** [2] - 582:16, 662:2
**identify** [13] - 493:25, 499:17, 500:3, 500:23, 501:3, 553:10, 565:8, 606:11, 628:24, 630:3, 630:4, 661:24, 661:25
**identifying** [3] - 574:3, 647:23, 651:25
**II** [3] - 607:2, 608:19, 608:20
**Illinois** [3] - 487:13, 487:21, 488:16
**illustrate** [1] - 564:25
**illustrating** [4] - 503:15, 503:16, 539:4, 588:14
**IM** [4] - 583:20, 592:11, 592:22, 593:22
**imbalance** [1] - 586:19
**immediate** [11] - 617:17, 617:20, 625:17, 645:5, 648:18, 652:17, 652:20, 653:10, 654:13, 655:7, 657:21
**immediate-release** [1] - 653:10
**immediately** [1] - 618:4
**impact** [11] - 520:5, 545:23, 546:14, 580:11, 633:19, 635:22, 637:4, 637:13, 640:2, 640:3, 643:16
**impeachment** [1] - 668:21
**impermeable** [1] - 513:21
**important** [24] - 491:4, 492:21, 517:25, 530:21, 530:22, 541:5, 546:9, 546:25, 547:7, 553:20, 554:2, 566:25,

567:15, 567:20, 568:3, 570:16, 573:2, 577:1, 587:25, 612:7, 632:22, 637:8, 637:9, 637:10
**impression** [1] - 640:13
**improper** [1] - 668:20
**improve** [1] - 633:17
**improved** [1] - 541:23
**IN** [1] - 486:1
**in-house** [1] - 487:24
**in-the-body** [1] - 577:6
**inadequate** [1] - 552:9
**INC** [7] - 486:7, 486:8, 486:9, 486:9, 486:10, 486:10
**Inc** [3] - 487:24, 488:7, 488:12
**inch** [4] - 523:17, 525:9, 528:24, 531:14
**inches** [3] - 523:18, 531:9
**include** [3] - 549:2, 668:6
**included** [5] - 502:13, 535:18, 579:24, 609:3, 625:1
**including** [4] - 544:19, 626:20, 645:8, 666:5
**incompatible** [1] - 605:3
**inconsistent** [2] - 668:21, 668:22
**increase** [2] - 546:16, 631:8
**INDEX** [1] - 681:1
**indicate** [4] - 544:3, 660:12, 660:17, 662:21
**indicated** [3] - 556:15, 599:23, 667:16
**indicates** [3] - 652:3, 652:11, 660:6
**indicating** [4] - 511:17, 511:18, 599:24, 668:24
**indication** [2] - 563:12, 657:7
**indications** [1] - 575:2
**individual** [2] - 648:25, 649:2
**individually** [1] - 539:2
**individuals** [1] - 623:18
**Industries** [1] - 487:15

**INDUSTRIES** [1] - 486:8
**industry** [2] - 664:14, 664:20
**inferences** [1] - 509:20
**influence** [1] - 530:7
**information** [47] - 501:18, 501:21, 519:19, 519:22, 520:12, 520:16, 520:17, 529:2, 538:13, 538:14, 552:19, 554:7, 558:9, 558:21, 558:24, 564:12, 580:1, 580:2, 580:4, 580:23, 582:19, 584:7, 585:16, 585:18, 586:8, 587:19, 588:3, 588:4, 588:5, 609:17, 609:19, 613:14, 625:23, 625:25, 626:20, 627:10, 627:11, 627:12, 627:14, 628:20, 639:16, 639:18, 640:1, 642:17, 642:20, 642:25, 643:6
**ingredient** [10] - 519:14, 522:14, 537:17, 538:21, 541:13, 550:8, 554:1, 583:23, 587:25, 602:15
**ingredients** [15] - 508:15, 538:21, 538:23, 540:25, 541:20, 545:7, 545:9, 547:11, 564:2, 572:6, 572:10, 595:7, 602:10, 611:15, 613:5
**inhibitors** [1] - 586:18
**initial** [4] - 490:20, 491:4, 491:20, 491:23
**initiation** [2] - 490:16, 636:10
**inject** [8] - 490:21, 583:20, 585:11, 592:17, 593:6, 597:5, 603:19, 603:23
**injectable** [18] - 582:12, 583:4, 583:6, 583:16, 583:18, 584:4, 584:8, 586:6, 587:24, 589:3, 602:25, 603:5, 604:19, 605:10, 605:14, 653:21, 653:23, 656:8
**injected** [3] - 596:10, 600:21, 622:1
**injection** [11] - 490:8, 490:11, 490:12, 490:17, 492:10, 583:21, 586:6, 655:19, 655:22, 656:10, 656:14
**injections** [4] - 527:6, 653:23, 658:2, 658:4

**inquisitive** [1] - 498:10
**inserted** [2] - 533:25, 534:10
**inside** [2] - 522:14, 622:6
**insight** [1] - 517:6
**insoluble** [13] - 497:22, 497:23, 497:24, 516:1, 565:3, 565:5, 566:21, 573:17, 575:15, 576:25, 579:5, 611:15, 642:2
**instead** [2] - 532:16, 542:25
**instruction** [1] - 561:21
**instructions** [1] - 537:13
**instruments** [1] - 517:15
**insulin** [1] - 592:20
**intact** [5] - 509:1, 518:2, 547:15, 549:9, 573:21
**integrity** [3] - 525:21, 525:25, 623:14
**intellectual** [1] - 552:1
**intend** [3] - 529:8, 612:21, 677:3
**intended** [5] - 524:20, 551:4, 556:16, 600:12, 619:7
**intending** [1] - 575:2
**interact** [1] - 602:4
**interest** [1] - 667:1
**interject** [1] - 678:7
**international** [1] - 666:7
**Internet** [2] - 661:4, 661:5
**intestine** [1] - 568:1
**intramuscular** [4] - 592:23, 593:24, 603:6, 604:7
**intramuscularly** [1] - 584:24
**intravenous** [2] - 586:14, 587:6
**intravenously** [3] - 584:24, 592:18, 593:6
**invention** [14] - 496:7, 529:19, 587:11, 588:8, 605:10, 645:4, 659:15, 659:16, 659:17, 659:22, 660:2, 660:6, 660:15, 660:18
**investigations** [1] - 674:5

**involve** [1] - 527:7
**involved** [9] - 515:21, 555:2, 556:9, 559:22, 571:25, 621:15, 660:6, 664:16, 664:20
**involvement** [1] - 670:9
**involves** [2] - 555:7, 660:2
**ion** [5] - 614:7, 615:15, 621:8, 622:17, 623:3
**IR** [3] - 617:4, 617:15
**irritability** [3] - 513:9, 513:17, 513:24
**irritate** [3] - 506:12, 506:14
**irritating** [6] - 506:21, 513:9, 528:19, 543:14, 552:9, 657:11
**irritation** [15] - 490:17, 506:3, 506:10, 523:24, 523:25, 524:5, 524:20, 528:17, 528:18, 529:5, 529:11, 552:25, 560:13, 594:16, 603:18
**isotonic** [3] - 591:4, 595:7, 597:6
**isotonicity** [2] - 594:24, 595:4
**issue** [9] - 527:12, 530:20, 531:3, 559:21, 560:14, 608:2, 638:14, 646:18, 647:3
**issued** [1] - 672:21
**issues** [4] - 560:2, 631:3, 636:10, 647:11
**items** [1] - 630:2
**iterations** [1] - 644:20
**iterative** [22] - 491:24, 511:20, 519:4, 526:21, 547:20, 547:22, 555:21, 556:17, 568:9, 574:21, 576:8, 576:10, 577:9, 591:16, 597:11, 599:25, 600:13, 613:18, 616:24, 618:6, 619:11, 619:12
**itself** [4] - 566:24, 573:8, 587:4, 660:15
**IV** [22] - 587:21, 592:10, 592:14, 592:16, 592:17, 592:25, 593:1, 593:4, 593:8, 593:10, 593:12, 594:1, 603:5, 603:12, 603:14, 603:15, 603:18, 604:2, 604:11, 604:13, 656:14

693

# J

**JAMES** [3] - 487:14, 487:14, 681:5
**January** [27] - 491:19, 494:10, 505:16, 512:7, 514:1, 514:11, 517:9, 517:12, 519:10, 524:6, 526:24, 531:20, 532:20, 536:6, 544:25, 548:1, 562:7, 565:22, 569:9, 573:20, 579:13, 595:14, 597:24, 599:13, 601:21, 625:4, 645:1
**jellyfish** [1] - 665:3
**JERSEY** [1] - 486:2
**Jersey** [5] - 486:13, 487:4, 487:18, 488:3, 488:14
**JOHN** [1] - 487:4
**Johnson** [61] - 489:20, 490:4, 490:6, 492:6, 492:24, 493:11, 499:15, 500:21, 501:1, 501:17, 502:18, 502:22, 502:24, 503:10, 505:2, 508:7, 512:5, 514:9, 518:22, 530:11, 531:17, 532:2, 533:4, 533:11, 533:14, 533:24, 535:8, 538:10, 538:13, 543:2, 548:6, 551:8, 560:6, 561:19, 562:4, 563:3, 564:10, 578:14, 579:21, 582:9, 582:11, 583:3, 590:3, 592:9, 593:25, 603:4, 605:5, 605:21, 609:17, 624:19, 624:24, 625:14, 633:21, 635:16, 638:15, 639:6, 642:13, 644:17, 645:10, 650:17, 650:23
**JOHNSON** [1] - 681:5
**Johnson's** [2] - 650:4, 666:1
**jolt** [1] - 491:2
**JOSEPH** [2] - 487:22, 488:10
**judge** [2] - 613:4, 618:9
**judgment** [1] - 552:25
**jumping** [2] - 678:2, 679:1

# K

**KATHLEEN** [1] - 487:22
**keep** [5] - 506:8,

506:9, 507:21, 622:14, 633:1
**keeping** [1] - 506:8
**KEITH** [1] - 487:21
**kid** [1] - 571:10
**kids** [1] - 638:10
**Kids** [1] - 666:6
**kill** [1] - 522:24
**KIM** [1] - 488:11
**kind** [24] - 507:5, 507:9, 507:24, 508:2, 513:16, 515:4, 517:7, 523:8, 524:22, 538:23, 547:5, 550:10, 559:12, 559:16, 560:2, 586:19, 587:20, 591:4, 596:13, 598:15, 623:13, 626:25, 630:24, 643:9
**knowing** [1] - 587:25, 654:18
**knowledge** [11] - 491:24, 493:21, 503:4, 512:24, 530:12, 536:16, 552:3, 584:15, 589:6, 649:1, 658:1
**knowledgeable** [7] - 504:24, 667:16, 667:20, 667:24, 669:24, 669:25, 670:6
**known** [3] - 502:12, 645:9, 647:20

# L

**LABORATORIES** [1] - 486:10
**laboratory** [2] - 661:1, 668:2
**lack** [1] - 558:9
**laid** [12] - 515:17, 547:18, 548:23, 555:2, 555:8, 559:13, 569:16, 580:9, 580:17, 594:18, 598:21, 616:1
**laser** [2] - 517:4, 517:13
**last** [11] - 492:7, 492:25, 494:13, 510:8, 531:18, 562:5, 637:18, 643:13, 652:11, 653:5, 667:8
**lasts** [1] - 658:10
**laughter** [5] - 576:18, 581:5, 678:12, 678:14, 679:25
**Laughter** [6] - 489:22, 522:11, 522:22, 650:20, 665:17, 679:4
**LAURA** [1] - 487:9

**law** [1] - 677:2
**lawsuit** [1] - 657:21
**lawyers** [1] - 678:2
**layer** [16] - 506:13, 508:1, 508:3, 508:4, 508:16, 513:16, 514:23, 515:3, 515:6, 516:3, 521:10, 522:4, 523:11, 593:21
**layers** [1] - 522:2
**laying** [2] - 499:1, 601:4
**LCMS** [3] - 644:9, 644:10, 644:11
**leaches** [1] - 504:5
**lead** [1] - 570:2
**leads** [1] - 569:2
**leap** [3] - 627:17, 628:6, 643:22
**least** [13] - 519:24, 544:17, 550:10, 564:22, 565:12, 569:19, 574:1, 610:20, 612:17, 617:6, 618:22, 646:9, 670:4
**leave** [1] - 680:3
**led** [2] - 625:24, 626:21
**left** [1] - 490:6
**length** [1] - 636:18
**less** [19] - 513:2, 528:8, 532:11, 552:24, 558:20, 603:14, 603:22, 604:3, 604:5, 604:6, 604:8, 604:10, 619:22, 622:20, 623:10, 657:11, 657:12
**letters** [2] - 593:14, 593:22
**Leuprolide** [2] - 490:22, 491:1
**level** [27] - 523:15, 524:9, 524:11, 527:21, 527:23, 528:15, 529:1, 529:3, 531:1, 550:14, 551:14, 552:7, 555:19, 569:12, 587:25, 588:1, 599:8, 600:10, 600:21, 603:13, 604:1, 618:14, 621:12, 624:15, 633:23, 636:4, 640:19
**levels** [16] - 511:2, 523:14, 550:20, 556:12, 576:24, 577:7, 587:22, 608:20, 617:24, 619:13, 634:22, 640:16, 640:18, 671:21, 671:23, 672:1
**LIDDELL** [1] - 488:8
**lidocaine** [1] - 512:16
**life** [1] - 633:25
**light** [12] - 508:21,

527:8, 541:4, 541:7, 591:5, 591:6, 594:25, 595:21, 596:15, 596:18, 598:18
**likely** [9] - 572:21, 574:10, 577:10, 597:3, 611:14, 617:1, 622:8, 633:16, 633:18
**Lilly** [5] - 487:11, 489:1, 489:6, 638:15, 648:12
**LILLY** [1] - 486:4
**Lilly's** [6] - 629:15, 648:1, 648:6, 648:17, 677:1, 679:5
**limitation** [1] - 653:14
**LIMITED** [1] - 486:8
**limited** [2] - 640:10, 645:8
**limiting** [1] - 516:7
**line** [15] - 500:23, 500:25, 501:2, 501:4, 501:9, 501:10, 501:11, 502:11, 583:11, 617:12, 636:7, 648:10, 648:13, 649:11, 663:24
**Line** [1] - 629:12
**lines** [13] - 496:3, 497:11, 500:13, 502:15, 533:19, 583:12, 584:21, 586:9, 607:1, 607:2, 662:17, 666:3, 668:11
**lingual** [1] - 631:10, 641:14, 641:25
**Lipsey** [3] - 678:5, 678:13, 679:2
**LIPSEY** [9] - 487:7, 645:24, 676:17, 676:21, 677:5, 677:9, 677:11, 677:14, 678:13
**liquid** [14] - 494:6, 518:11, 518:13, 559:20, 562:16, 571:1, 572:20, 592:15, 596:10, 601:23, 604:22, 644:14, 644:15
**liquids** [1] - 613:4
**list** [17] - 495:9, 497:25, 499:9, 499:10, 500:3, 500:22, 501:14, 501:23, 537:7, 629:21, 638:5, 645:17, 645:19, 649:3, 668:14, 675:6
**listed** [16] - 496:11, 496:13, 496:15, 496:17, 496:24, 497:6, 500:8, 500:10, 556:6, 570:8, 575:24, 630:21, 631:24, 633:2, 637:16, 638:4
**listing** [2] - 498:3, 501:13

**lists** [4] - 499:5, 501:4, 501:7, 660:9
**literature** [11] - 532:25, 558:22, 569:2, 569:13, 572:5, 572:9, 572:11, 584:2, 589:4, 589:5, 590:21
**litigation** [2] - 629:4, 629:8
**live** [1] - 523:13
**LLC** [3] - 486:7, 487:19, 488:2
**LLP** [6] - 487:2, 487:12, 487:17, 488:4, 488:8, 488:15
**located** [1] - 583:10
**LOCKE** [1] - 488:8
**loco** [2] - 678:6, 678:11
**long-term** [1] - 574:18
**look** [81] - 491:21, 496:18, 496:25, 497:4, 501:1, 507:18, 507:22, 507:23, 508:19, 513:15, 513:22, 515:11, 516:22, 517:22, 523:12, 523:14, 527:22, 528:19, 535:8, 539:2, 540:23, 540:24, 541:4, 541:7, 541:13, 541:14, 542:9, 543:15, 545:23, 545:24, 547:13, 549:3, 549:4, 549:6, 549:8, 550:14, 553:13, 553:14, 553:16, 556:11, 558:7, 558:19, 566:22, 570:11, 570:12, 577:15, 582:11, 590:4, 591:1, 591:2, 591:4, 591:19, 591:22, 591:23, 594:4, 594:5, 596:3, 596:7, 597:13, 603:24, 609:24, 611:17, 611:23, 614:1, 617:20, 618:18, 651:6, 651:10, 651:21, 651:22, 653:3, 653:14, 659:14, 668:13, 671:1, 673:6, 673:8
**looked** [11] - 504:18, 505:20, 510:11, 512:15, 522:13, 561:20, 564:22, 564:24, 588:13, 656:23
**looking** [36] - 504:17, 506:22, 513:8, 513:12, 517:5, 518:3, 520:8, 526:15, 527:7, 527:25, 528:16, 541:25, 542:4, 542:8, 546:6, 547:9, 550:19, 566:8, 566:9, 566:14, 566:21, 572:23,

577:5, 577:6, 577:7, 585:5, 595:23, 622:11, 630:5, 630:8, 633:18, 650:23, 651:9, 653:22, 657:6

**looks** [3] - 564:6, 657:8, 667:7

**LORD** [1] - 488:8

**lose** [1] - 548:20

**loving** [2] - 542:25

**low** [1] - 587:20

**lower** [1] - 640:19

**lozenges** [1] - 641:14

**LTD** [1] - 486:9

**Ltd** [2] - 487:16, 488:18

**lucky** [5] - 492:15, 576:11, 576:13, 576:17, 576:19

**lunch** [3] - 581:1, 581:2, 581:6

**luncheon** [1] - 581:10

**LYONS** [2] - 487:19, 487:22

# M

**maintains** [1] - 600:5

**managed** [1] - 665:9

**manipulate** [1] - 651:8

**manufacture** [1] - 564:2

**March** [1] - 680:8

**MARK** [1] - 487:10

**mark** [1] - 576:12

**marked** [1] - 646:16

**Marked** [1] - 681:9

**market** [1] - 658:5

**marketing** [1] - 601:6

**mask** [2] - 572:7, 572:14

**masked** [3] - 663:11, 663:14, 664:2

**masking** [3] - 571:22, 571:25, 582:20

**mass** [4] - 570:18, 615:1, 641:12, 644:15

**MASUROVSKY** [1] - 487:9

**material** [23] - 504:20, 507:17, 509:5, 512:20, 513:21, 515:5, 540:2, 540:24, 544:8, 553:6, 565:25, 569:20, 569:23, 575:15, 578:24, 590:18, 590:19, 590:20, 603:19, 606:23, 611:21, 624:21

**materials** [5] -

545:22, 565:1, 591:20, 591:21, 615:7

**matrix** [13] - 505:24, 507:19, 508:15, 516:5, 517:21, 534:1, 553:19, 606:3, 609:8, 615:6, 615:13, 635:21, 641:13

**matter** [4] - 489:1, 489:7, 498:16, 552:25, 559:16, 680:8

**maximum** [3] - 574:17, 637:24, 637:25

**MAZZOCHI** [1] - 488:15

**McGUIRE** [2] - 486:19, 486:25

**mean** [47] - 490:19, 495:11, 498:19, 498:22, 503:19, 509:14, 510:13, 521:18, 521:19, 524:15, 528:18, 528:22, 539:7, 542:24, 550:18, 561:9, 565:19, 572:19, 572:24, 573:11, 573:15, 579:9, 580:15, 588:18, 589:15, 591:21, 592:11, 592:25, 594:8, 599:3, 608:11, 608:17, 617:5, 618:2, 622:11, 622:12, 630:13, 634:5, 634:6, 647:13, 647:16, 648:13, 663:23, 666:21, 671:12, 671:15, 674:15

**meaning** [1] - 634:9

**means** [4] - 542:25, 550:19, 634:11, 638:10

**meant** [6] - 508:17, 526:15, 534:23, 590:2, 607:22, 674:24

**measure** [8] - 518:12, 524:11, 542:20, 542:21, 542:22, 624:22, 671:21, 671:23

**measurement** [1] - 523:22

**measuring** [1] - 517:2

**media** [3] - 511:1, 511:10, 526:13

**medical** [1] - 654:25

**medicament** [4] - 504:4, 573:4, 593:12, 596:21

**medication** [1] - 592:17

**medium** [3] - 526:10, 526:11, 526:14

**meet** [1] - 622:7

**MELISSA** [1] - 488:14

**melt** [3] - 541:10, 546:6, 546:11

melted [1] - 547:5

**melted..** [1] - 537:19

**melting** [6] - 545:23, 546:7, 546:9, 546:14, 546:16, 547:4

**melts** [1] - 557:11

**membrane** [5] - 508:2, 513:16, 518:10, 518:14, 526:18

**membranes** [2] - 518:10, 518:17

**mention** [3] - 550:17, 585:21, 659:12

**mentioned** [22] - 497:22, 523:21, 523:24, 531:2, 537:5, 542:23, 566:18, 567:14, 572:18, 573:10, 573:18, 603:5, 606:16, 607:20, 614:16, 624:12, 624:14, 624:16, 653:21, 653:22, 658:3, 677:21

**mentions** [2] - 584:8, 647:18

**merely** [2] - 559:6, 666:20

**mesh** [1] - 537:17

**metabolism** [3] - 583:24, 633:2, 633:23

**metabolite** [2] - 671:13, 671:16

**metabolites** [1] - 671:24

**metabolize** [1] - 623:19

**metabolized** [2] - 561:14, 647:21

**metabolizer** [5] - 624:3, 624:4, 633:8, 634:25

**metabolizers** [15] - 561:13, 633:4, 633:9, 634:1, 634:2, 634:16, 634:21, 640:9, 640:19, 647:19, 662:11, 662:12

**method** [15] - 524:9, 524:11, 529:22, 540:11, 541:17, 546:21, 564:2, 599:17, 651:15, 658:19, 659:17, 659:22, 665:2, 672:9

**methylcellulose** [1] - 614:24

**methylphenidate** [2] - 534:8, 658:9

**micro** [6] - 514:14, 520:20, 521:13, 521:19, 527:14, 528:7

**micro-reservoir** [6] - 514:14, 520:20, 521:13,

521:19, 527:14, 528:7

**microbial** [4] - 570:14, 572:18, 572:21, 576:2

**microgram** [1] - 608:21

**microparticles** [1] - 492:17

**middle** [3] - 489:20, 521:24, 636:2

**might** [4] - 490:16, 492:15, 497:15, 501:24, 507:20, 507:22, 508:15, 508:20, 522:2, 522:4, 528:2, 532:15, 541:1, 542:16, 543:13, 543:15, 552:13, 566:4, 567:3, 567:11, 569:14, 572:14, 573:25, 575:15, 583:20, 583:21, 592:13, 596:4, 597:5, 602:12, 612:2, 613:5, 616:13, 616:14, 628:25, 651:9, 661:16, 676:5, 678:24

**migrate** [1] - 542:14

**mill** [1] - 567:11

**milligram** [2] - 525:9, 589:17

**milligrams** [2] - 560:19, 596:6

**mind** [3] - 558:6, 558:18, 571:23

**minor** [1] - 489:7

**minus** [3] - 608:14, 608:23, 608:24

**minute** [2] - 522:20, 660:20

**minutes** [2] - 538:4, 635:9

**misshapen** [1] - 553:15

**mix** [6] - 513:19, 540:25, 541:3, 554:1, 613:5, 613:13

**mixed** [2] - 554:3, 584:22

**mixing** [1] - 551:23

**ml** [4] - 589:17, 596:6, 598:8, 608:22

**mls** [1] - 568:18

**mobility** [1] - 627:4

**model** [5] - 523:9, 550:11, 607:17, 607:18, 617:12

**models** [2] - 518:17, 520:8

**modifications** [1] - 575:5

**modified** [6] - 614:20, 633:15, 634:3, 634:4,

634:9, 634:12

**modify** [3] - 615:7, 619:8, 657:10

**moisture** [4] - 554:7, 604:24, 623:16, 627:2

**moisture-sensitive** [1] - 554:7

**molecules** [1] - 586:18

**MOLINO** [1] - 488:15

**moment** [1] - 497:12

**month** [8] - 491:16, 491:17, 557:16, 574:18, 604:16, 616:15, 658:4, 658:7

**months** [46] - 492:15, 512:19, 513:2, 519:11, 524:7, 526:25, 527:2, 527:3, 529:6, 544:7, 544:17, 548:10, 548:11, 548:13, 548:16, 548:20, 557:8, 557:17, 557:21, 557:23, 559:25, 569:19, 569:20, 569:25, 574:1, 575:18, 578:8, 578:10, 578:12, 597:20, 597:25, 601:12, 601:14, 601:16, 601:18, 601:23, 602:6, 616:15, 620:15, 620:20, 620:23, 621:1, 621:3, 621:5, 636:22

**months-plus** [1] - 557:23

**morning** [8] - 489:5, 489:18, 489:19, 490:4, 490:5, 562:6, 658:3, 680:5

**most** [18] - 490:23, 491:7, 507:21, 569:14, 570:7, 573:16, 578:2, 593:19, 594:6, 608:14, 617:1, 623:2, 630:1, 651:2, 666:14, 669:25, 670:3

**mostly** [3] - 519:4, 526:1, 605:2

**mother** [1] - 522:23

**mouse** [1] - 518:16

**mouth** [2] - 567:4, 567:22

**move** [16] - 502:22, 527:7, 532:2, 533:11, 549:10, 550:5, 562:13, 583:3, 605:21, 645:12, 645:15, 646:8, 646:11, 646:18, 649:18, 675:15

**moved** [1] - 489:11

**moving** [2] - 562:4, 676:9

**MP** [3] - 546:2, 546:7

**MR** [142] - 489:5, 489:16, 489:17, 489:18, 489:23, 490:1, 490:3, 494:12, 494:16, 494:18, 494:23, 494:25, 495:2, 495:4, 495:5, 495:8, 495:14, 495:17, 495:19, 495:21, 496:3, 496:6, 496:15, 496:18, 496:21, 497:1, 497:3, 497:8, 497:9, 497:20, 498:6, 498:9, 498:13, 498:25, 499:11, 499:14, 500:5, 500:9, 500:12, 500:20, 501:10, 502:21, 509:11, 509:14, 509:23, 510:5, 510:8, 522:12, 522:23, 538:2, 538:8, 538:9, 560:5, 562:19, 563:2, 580:24, 582:5, 582:7, 582:8, 583:5, 593:2, 625:13, 628:18, 634:7, 635:5, 635:9, 635:12, 635:14, 635:15, 639:1, 639:4, 645:10, 645:16, 645:18, 645:24, 646:3, 646:7, 646:13, 646:17, 646:21, 646:25, 647:3, 647:6, 647:10, 648:2, 648:5, 648:10, 648:23, 649:7, 649:10, 649:16, 649:21, 650:3, 650:6, 650:7, 650:10, 650:12, 650:16, 650:19, 650:21, 651:4, 651:13, 662:17, 663:23, 664:24, 665:25, 666:17, 667:2, 667:14, 668:18, 668:20, 669:12, 669:16, 669:19, 670:7, 670:16, 674:16, 674:19, 674:22, 674:25, 676:1, 676:7, 676:12, 676:17, 676:21, 676:25, 677:5, 677:9, 677:11, 677:14, 677:15, 677:18, 677:24, 678:4, 678:13, 678:15, 678:21, 679:5, 679:14, 679:15, 679:20, 679:21
**mucosa** [4] - 534:16, 547:2, 547:5, 561:17
**multidose** [2] - 619:14, 624:11
**multiple** [16] - 514:7, 514:9, 514:10, 521:25, 530:2, 532:16, 566:22, 568:13, 616:22, 617:21, 618:14, 619:22, 620:17, 624:17, 640:12, 640:13
**Multiple** [1] - 616:7
**multiple-size** [1] -

568:13
**multitude** [1] - 514:3
**muscle** [4] - 592:22, 593:21, 593:24, 594:15
**must** [1] - 547:11
**MYLAN** [1] - 486:8
**Mylan** [1] - 488:7
**MYOKA** [1] - 488:11

# N

**nail** [3] - 504:18, 504:19, 504:21
**name** [4] - 609:14, 629:18, 629:20
**named** [1] - 640:21
**names** [1] - 594:23
**nasal** [1] - 632:15
**nausea** [2] - 657:7, 657:9
**near** [1] - 617:12
**nearest** [1] - 618:14
**nearly** [1] - 608:13
**necessarily** [5] - 549:16, 551:23, 649:4, 666:24, 675:9
**necessary** [6] - 536:13, 539:12, 558:8, 558:13, 642:25, 643:1
**need** [43] - 508:8, 508:23, 510:17, 511:9, 515:9, 515:24, 516:20, 523:9, 524:11, 528:23, 538:16, 541:23, 546:20, 547:8, 556:10, 556:11, 557:3, 559:21, 560:15, 564:13, 565:2, 565:25, 566:1, 588:7, 589:24, 590:13, 592:1, 594:16, 596:17, 596:18, 609:22, 612:13, 617:13, 618:23, 619:1, 619:2, 619:4, 622:8, 633:16, 633:19, 643:7, 643:9, 651:8
**needs** [2] - 568:3, 611:6
**negate** [1] - 666:24
**neurological** [1] - 586:19
**never** [10] - 495:9, 497:11, 497:14, 497:19, 655:2, 663:9, 666:16, 667:6, 670:8
**new** [11] - 502:22, 509:18, 517:5, 559:21, 590:18, 639:14, 660:2, 660:7, 660:15, 660:18, 674:19
**NEW** [1] - 486:2

**New** [9] - 486:13, 487:4, 487:18, 488:3, 488:5, 488:9, 488:14
**Newark** [2] - 486:13, 488:3
**next** [58] - 492:4, 512:8, 513:6, 519:5, 522:18, 523:4, 524:18, 524:19, 525:2, 525:3, 528:11, 529:7, 529:13, 532:2, 544:11, 545:5, 548:3, 549:11, 550:6, 551:3, 552:10, 552:17, 552:18, 553:2, 553:3, 554:5, 555:25, 556:2, 556:3, 556:18, 570:3, 574:12, 574:14, 575:8, 575:9, 575:20, 576:22, 577:14, 588:9, 592:4, 598:2, 598:3, 600:3, 600:4, 600:11, 600:15, 600:23, 609:24, 613:22, 613:24, 615:25, 617:3, 618:10, 618:16, 649:15, 664:12, 676:4, 678:3
**Next** [1] - 669:2
**NIH** [1] - 667:8
**nine** [4] - 501:15, 548:11, 548:13, 680:6
**Nitroderm** [1] - 514:6
**nitrogen** [1] - 541:8
**nitroglycerin** [2] - 514:6, 514:25
**noes** [4] - 518:25, 543:21, 555:11, 612:20
**none** [5] - 509:12, 520:16, 613:14, 657:24, 659:12
**nonwoven** [1] - 504:19
**norepinephrine** [1] - 586:17
**normally** [1] - 537:23
**nortomoxetine** [1] - 671:16
**notations** [1] - 547:19
**nothing** [6] - 500:16, 500:17, 509:24, 660:1, 660:5, 667:3
**notice** [1] - 592:9
**noticed** [1] - 678:5
**Number** [1] - 584:10
**number** [17] - 490:15, 490:18, 500:24, 535:12, 586:18, 599:20, 628:23, 630:4, 631:2, 633:9, 633:14, 641:1, 654:15, 662:2, 665:19, 672:18
**numbers** [1] - 608:24
**numerous** [1] -

651:15

# O

**oath** [1] - 489:25
**objected** [2] - 494:13, 646:21
**objecting** [1] - 678:18
**objection** [17] - 489:15, 489:16, 494:12, 499:12, 500:5, 509:11, 646:12, 646:20, 647:2, 647:3, 649:14, 649:20, 666:18, 668:18, 668:19, 669:1, 677:22
**objections** [5] - 645:13, 645:20, 645:22, 668:25, 679:13
**objective** [3] - 575:12, 600:25, 619:18
**obligated** [1] - 665:19
**obligation** [2] - 498:20, 676:18
**obtain** [1] - 573:24
**obviously** [1] - 677:19
**occasions** [1] - 651:15
**occur** [1] - 678:16
**occurred** [1] - 649:9
**octanol** [2] - 542:19
**OF** [2] - 486:2, 486:5
**offering** [1] - 676:9
**Official** [1] - 486:20
**often** [6] - 490:21, 526:12, 576:14, 604:21, 604:22, 604:24
**oil** [11] - 492:13, 493:20, 494:1, 494:2, 494:6, 495:23, 513:20, 542:25, 564:7, 564:9, 565:7
**oil-loving** [1] - 542:25
**oils** [1] - 496:8
**ointments** [1] - 641:14
**OLSTEIN** [1] - 488:13
**once** [29] - 513:5, 522:16, 523:2, 525:1, 525:2, 526:8, 545:4, 547:5, 550:6, 553:4, 555:25, 570:1, 575:6, 575:19, 597:9, 597:13, 598:1, 599:21, 600:2, 600:22, 602:6, 602:7, 604:21, 604:22, 613:22, 619:8, 622:6, 652:4, 656:24
**once-a-day** [1] -

656:24
**one** [225] - 490:7, 490:10, 490:12, 490:15, 490:23, 491:15, 491:18, 493:2, 493:8, 498:1, 503:4, 503:15, 503:16, 503:21, 504:17, 505:12, 505:16, 505:21, 506:7, 506:8, 507:12, 508:8, 508:12, 508:23, 509:2, 509:17, 509:19, 510:17, 510:24, 511:8, 511:21, 511:25, 513:6, 514:5, 514:16, 514:19, 514:21, 514:22, 514:25, 515:24, 516:6, 516:24, 516:25, 517:5, 517:11, 517:18, 518:5, 518:10, 519:9, 519:12, 519:13, 519:23, 522:1, 522:18, 523:4, 523:17, 523:25, 524:5, 524:12, 525:9, 526:10, 526:23, 527:2, 527:16, 529:12, 530:13, 532:2, 532:16, 536:5, 538:16, 539:4, 540:19, 540:23, 541:14, 541:17, 544:5, 545:9, 545:19, 546:19, 547:8, 547:13, 547:25, 549:5, 549:15, 549:20, 550:1, 550:7, 552:11, 552:13, 552:23, 552:24, 553:1, 554:14, 554:20, 556:2, 557:1, 557:9, 558:24, 558:25, 559:6, 559:7, 559:10, 560:8, 560:11, 561:25, 565:15, 565:22, 566:1, 566:9, 571:18, 571:21, 573:19, 574:2, 575:4, 575:8, 575:21, 576:3, 577:20, 577:24, 578:14, 580:14, 582:19, 584:8, 584:20, 587:5, 587:10, 588:7, 588:14, 588:15, 589:2, 589:22, 589:24, 590:3, 590:23, 593:6, 593:14, 594:1, 594:3, 594:10, 594:12, 595:4, 595:17, 596:25, 597:9, 597:18, 597:23, 598:11, 598:22, 600:3, 600:17, 601:7, 601:21, 601:23, 602:1, 604:20, 604:24, 605:8, 607:5, 608:9, 609:5, 609:21, 610:15, 611:4, 611:7, 612:12, 614:4, 615:16, 615:22, 616:14, 616:17, 617:8, 617:9,

618:14, 619:2, 620:10, 620:18, 621:19, 622:4, 623:23, 624:1, 624:2, 624:6, 626:21, 627:23, 628:5, 631:14, 633:9, 634:20, 635:1, 639:2, 639:18, 640:4, 643:8, 645:3, 647:6, 649:1, 650:24, 653:6, 653:17, 658:4, 658:6, 661:18, 664:21, 665:21, 667:23, 670:2, 671:20, 677:21, 679:6, 679:16

**One** [2] - 488:2, 489:7

**ones** [7] - 492:25, 594:11, 615:23, 648:21, 649:5, 666:14

**opinion** [21] - 531:19, 531:25, 536:4, 536:8, 560:6, 561:25, 562:7, 579:13, 579:19, 587:4, 587:9, 587:14, 605:8, 605:12, 625:4, 625:11, 644:25, 645:7, 652:9, 653:5

**opinions** [4] - 492:24, 493:2, 498:17, 644:21

**Opportunities** [1] - 629:13

**opportunity** [1] - 497:14

**oral** [9] - 559:14, 559:15, 562:22, 567:6, 619:13, 641:11, 641:24, 643:21, 655:23

**orally** [5] - 641:24, 652:4, 652:6, 654:12, 670:23

**orange** [1] - 511:18

**order** [6] - 538:17, 564:14, 588:7, 609:22, 675:17, 679:9

**ordinarily** [1] - 517:11

**ordinary** [92] - 491:18, 493:2, 494:9, 503:16, 507:12, 511:21, 511:25, 512:6, 514:19, 517:19, 518:5, 519:9, 519:12, 519:23, 522:18, 523:4, 526:11, 526:23, 527:17, 529:12, 530:13, 531:21, 532:19, 539:4, 539:25, 540:20, 541:17, 542:9, 544:5, 544:20, 544:24, 545:19, 547:14, 547:25, 549:21, 550:2, 550:7, 554:21, 556:2, 560:8, 562:1, 562:9, 566:13, 568:22, 569:8, 569:16, 573:19, 575:8,

575:21, 576:3, 577:20, 577:24, 578:14, 579:15, 580:14, 582:19, 585:6, 587:5, 587:11, 588:15, 590:24, 594:3, 594:13, 595:4, 596:25, 597:18, 597:24, 598:12, 598:22, 599:13, 600:3, 600:17, 601:21, 602:2, 607:5, 608:3, 610:15, 611:7, 612:12, 619:2, 620:11, 620:19, 621:19, 622:4, 623:23, 624:7, 624:19, 625:6, 626:21, 645:3, 647:6, 653:7

**organic** [1] - 542:18

**origin** [1] - 648:8

**original** [1] - 679:18

**osmotic** [10] - 595:8, 595:12, 614:7, 615:10, 615:12, 615:14, 621:8, 622:17, 623:3, 623:11

**otherwise** [2] - 492:15, 678:19

**outcome** [2] - 602:21, 622:13

**outrageous** [1] - 678:22

**over-the-counter** [1] - 665:9

**overall** [1] - 644:21

**overemphasize** [1] - 513:23

**own** [1] - 625:25

**oxidation** [7] - 527:10, 541:7, 594:25, 596:19, 596:20, 604:21, 662:9

**oxidation's** [1] - 527:12

**oxidize** [3] - 661:11, 661:17, 663:3

**oxidized** [1] - 591:7

**oxygen** [2] - 508:21, 595:21

## P

**P.C** [1] - 488:13

**package** [2] - 525:24, 591:5

**pads** [1] - 504:15

**page** [24] - 500:25, 502:7, 626:14, 626:15, 633:8, 635:19, 636:2, 637:18, 638:7, 653:4, 662:17, 663:23, 664:12, 665:23, 666:2, 666:4, 668:11, 671:2, 671:9,

671:10

**pages** [3] - 628:23, 630:2, 630:6

**palatable** [8] - 571:8, 571:17, 571:19, 632:16, 632:17, 633:1, 663:18, 663:21

**paper** [2] - 640:8, 657:8

**paragraph** [13] - 495:24, 496:10, 496:23, 636:3, 637:18, 638:7, 651:21, 651:23, 651:24, 653:4, 653:22, 668:13, 668:15

**paragraphs** [3] - 495:5, 495:6, 509:16

**parallel** [1] - 524:8

**parameters** [4] - 568:15, 616:3, 640:11, 640:24

**pardon** [4] - 514:18, 582:10, 629:5, 659:19

**parent** [1] - 513:9

**parenteral** [2] - 585:8, 585:10

**parentis** [1] - 678:6

**Park** [1] - 488:5

**parker** [1] - 668:24

**Parker** [2] - 497:11, 500:14

**PARKER** [72] - 488:6, 489:18, 489:23, 490:1, 490:3, 494:18, 494:23, 494:25, 495:2, 495:5, 495:14, 495:17, 495:19, 495:21, 496:3, 496:6, 496:15, 496:18, 496:21, 497:1, 497:3, 497:8, 498:6, 498:9, 498:13, 498:25, 499:11, 499:14, 500:9, 500:20, 501:10, 502:21, 509:14, 510:8, 522:12, 522:23, 538:2, 538:8, 538:9, 560:5, 562:19, 563:2, 580:24, 582:5, 582:7, 582:8, 583:5, 593:2, 625:13, 628:18, 634:7, 635:5, 635:9, 635:12, 635:14, 635:15, 639:1, 639:4, 645:10, 645:18, 646:7, 646:17, 646:25, 647:10, 648:2, 648:5, 648:10, 649:16, 650:3, 650:7, 666:17, 667:2

**part** [10] - 495:8, 498:19, 499:24, 510:3, 525:17, 535:15, 563:24, 601:19, 628:19, 667:8

**particle** [33] - 492:21, 515:22, 515:25, 516:4, 516:6, 516:10, 516:12, 516:15, 516:20, 516:22, 516:23, 516:24, 517:1, 517:3, 517:6, 517:13, 566:2, 566:6, 566:25, 567:5, 567:9, 567:10, 568:16, 570:17, 570:18, 610:24, 612:3, 612:9, 613:7, 613:10, 613:23

**particles** [4] - 516:5, 516:17, 516:18, 568:14

**particular** [31] - 505:9, 513:1, 516:25, 519:9, 532:21, 536:20, 540:14, 548:7, 563:23, 565:9, 572:6, 572:14, 584:18, 585:1, 585:3, 585:18, 586:16, 587:1, 588:18, 591:15, 594:14, 602:4, 611:6, 620:13, 621:25, 628:8, 640:17, 654:5, 654:17, 659:3, 662:22

**particularly** [2] - 607:17, 611:23

**particulate** [1] - 516:2

**parties** [1] - 649:23

**partition** [4] - 540:17, 540:18, 542:8, 544:4

**pass** [11] - 534:21, 534:23, 535:20, 537:20, 537:24, 537:25, 547:1, 564:9, 567:21, 583:24

**passed** [1] - 537:17

**passing** [1] - 564:7

**past** [1] - 642:16

**patch** [38] - 503:5, 503:11, 504:3, 504:11, 504:25, 505:10, 505:13, 505:18, 506:16, 507:4, 511:23, 512:3, 513:18, 513:22, 514:6, 514:20, 522:16, 523:2, 523:17, 523:19, 525:7, 528:21, 530:12, 530:16, 531:2, 531:6, 531:22, 532:5, 532:22, 533:3, 533:6, 534:4, 534:5, 647:16, 648:15, 657:14, 658:9

**patches** [11] - 504:13, 506:7, 506:9, 514:11, 525:11, 525:14, 526:7, 529:14, 531:11, 642:5

**Patent** [5] - 487:11, 500:3, 535:12, 584:10, 606:14

**patent** [132] - 490:13, 495:21, 496:1, 498:14,

499:4, 500:2, 500:8, 500:15, 500:16, 500:21, 501:3, 501:4, 501:7, 501:17, 501:19, 501:22, 502:1, 502:4, 502:5, 502:10, 502:19, 504:1, 505:8, 520:17, 533:14, 533:18, 533:19, 535:13, 535:17, 536:19, 537:2, 537:3, 538:14, 538:15, 539:12, 539:14, 539:18, 544:19, 556:23, 558:9, 562:17, 562:21, 562:24, 563:13, 564:11, 564:12, 564:23, 564:24, 565:8, 565:14, 577:16, 579:24, 580:1, 582:14, 583:7, 583:9, 583:15, 584:6, 584:9, 584:13, 584:14, 584:18, 585:1, 586:9, 587:1, 587:12, 588:4, 588:6, 588:8, 588:24, 601:3, 605:6, 605:7, 605:8, 606:21, 606:25, 609:18, 609:19, 610:5, 610:8, 615:3, 625:1, 625:16, 626:3, 626:5, 626:14, 627:9, 627:10, 627:11, 627:20, 628:2, 628:7, 628:10, 630:4, 641:7, 642:19, 642:22, 643:4, 644:23, 645:2, 645:5, 650:24, 651:21, 653:6, 653:8, 653:19, 654:8, 656:22, 656:23, 659:10, 659:14, 660:6, 660:7, 660:11, 660:14, 664:21, 664:23, 664:25, 665:2, 665:5, 672:15, 672:19, 672:21, 672:25, 674:1, 674:3, 674:10, 675:1

**patent's** [1] - 628:5

**patents** [7] - 493:22, 494:1, 496:15, 584:2, 623:5, 623:7, 625:2

**path** [2] - 555:9, 589:7

**pathway** [1] - 588:9

**patient** [23] - 503:24, 588:21, 597:8, 622:1, 622:2, 622:6, 635:25, 636:9, 636:22, 640:17, 651:17, 654:11, 655:4, 655:5, 655:18, 655:25, 656:4, 656:7, 656:18, 657:13, 657:16, 658:12

**patients** [12] - 560:15, 571:19, 636:4, 636:5, 636:23, 638:9, 656:3,

656:21, 657:15, 657:19, 658:14, 658:15
**paucity** [1] - 643:5
**pay** [2] - 665:15, 665:16
**PEARL** [1] - 487:24
**peel** [1] - 515:7
**penetrate** [5] - 504:21, 507:2, 511:11, 511:12, 515:13
**penetration** [7] - 504:18, 511:11, 520:10, 520:13, 523:12, 541:22, 553:16
**people** [14] - 493:5, 529:14, 531:6, 553:8, 554:11, 565:21, 566:17, 571:7, 623:2, 632:21, 633:1, 640:7, 640:11, 640:23
**PEPPER** [1] - 487:2
**per** [13] - 523:16, 525:5, 525:8, 525:9, 528:24, 573:1, 589:17, 596:6, 598:8, 608:22
**percent** [10] - 490:24, 591:9, 599:18, 608:14, 619:21, 619:22, 636:5, 644:1, 644:2
**perform** [1] - 552:1
**performance** [1] - 624:23
**period** [11] - 491:12, 508:22, 558:1, 571:12, 635:25, 636:8, 636:17, 637:8, 664:15, 666:11
**periods** [3] - 530:3, 616:16, 658:3
**permeability** [4] - 507:24, 513:8, 513:11, 513:15
**permeability/ irritability** [1] - 512:10
**person** [20] - 494:9, 504:23, 512:6, 531:21, 532:19, 539:25, 544:20, 544:24, 547:25, 558:19, 562:8, 564:13, 579:15, 585:6, 625:5, 636:13, 668:25, 677:25, 678:3, 679:12
**perspective** [4] - 493:2, 493:5, 543:18, 574:2
**pH** [26] - 507:18, 507:20, 510:18, 510:20, 510:21, 510:24, 512:13, 532:10, 566:7, 568:2, 568:5, 585:23, 591:1, 591:2, 592:3, 596:7,

596:8, 599:10, 602:7, 602:18, 611:19, 611:20, 635:3, 635:17, 635:19, 635:22
**Pharma** [1] - 488:18
**PHARMA** [1] - 486:9
**pharmaceutical** [4] - 498:1, 562:22, 652:13, 664:16
**Pharmaceutical** [1] - 487:15
**PHARMACEUTICAL** [1] - 486:8
**pharmaceutically** [5] - 500:22, 501:2, 501:4, 501:7, 501:11
**pharmaceuticals** [1] - 655:12
**Pharmaceuticals** [2] - 488:7, 665:12
**PHARMACEUTICALS** [4] - 486:7, 486:8, 486:9, 486:10
**pharmacist** [3] - 560:18, 560:20, 561:2
**pharmacodynamic** [1] - 640:24
**pharmacokinetic** [1] - 640:10
**pharmacy** [1] - 493:5
**phase** [5] - 512:14, 519:8, 542:21, 551:17, 636:10
**phases** [1] - 569:6
**phenylproplyamine s** [1] - 661:21
**phenylpropylamine** [1] - 502:12
**phobic** [1] - 615:8
**phosphate** [1] - 526:12
**phrase** [3] - 530:4, 558:2, 571:22
**pHs** [4] - 511:2, 566:22, 566:23, 602:9
**physical** [7] - 553:12, 554:22, 557:12, 557:13, 557:15, 568:16, 599:5
**physician** [1] - 561:2
**pick** [13] - 511:10, 513:24, 548:18, 552:12, 552:20, 565:25, 572:11, 594:10, 605:3, 614:2, 617:8, 618:14, 668:1
**picking** [1] - 578:16
**pictures** [1] - 517:6
**piece** [2] - 606:9, 606:11
**pieces** [2] - 518:15, 518:16

**pig** [1] - 523:10
**pigs** [1] - 513:19
**Pilot** [1] - 617:3
**pilot** [5] - 617:9, 618:7, 618:23, 620:25, 621:1
**PK** [40] - 523:13, 523:21, 524:4, 524:14, 524:19, 526:25, 528:13, 528:17, 529:4, 529:10, 551:4, 552:3, 552:15, 556:5, 556:10, 556:18, 557:19, 575:11, 575:19, 575:23, 576:23, 577:4, 577:13, 578:7, 600:7, 600:8, 600:15, 600:16, 600:22, 601:8, 601:13, 601:15, 602:19, 618:18, 618:23, 619:5, 621:2, 671:10
**place** [3] - 531:9, 531:11, 660:15
**placed** [2] - 504:5, 534:1
**places** [3] - 531:15, 584:20, 632:9
**Plaintiff** [4] - 486:5, 487:11, 489:6, 638:15
**Plaintiff's** [1] - 489:14
**Plaintiffs** [1] - 646:20
**plan** [1] - 658:1
**plasma** [2] - 640:15, 671:12
**plaster** [1] - 531:7, 531:14
**plastics** [1] - 518:18
**play** [1] - 580:6
**plaza** [1] - 671:15
**plenty** [1] - 677:12
**Pliszka** [1] - 677:5
**Plough** [4] - 664:14, 665:9, 666:4, 666:11
**plus** [8] - 533:10, 557:23, 574:1, 578:10, 597:20, 608:13, 608:23, 608:24
**PMs** [2] - 633:19, 633:24
**point** [36] - 495:1, 497:12, 500:13, 507:3, 519:22, 523:7, 527:11, 527:12, 529:1, 542:2, 543:13, 544:9, 545:23, 546:7, 546:9, 546:14, 546:17, 549:12, 549:13, 553:1, 555:23, 558:12, 569:21, 574:15, 579:21, 589:20, 590:13, 591:24, 602:17, 617:7, 618:8, 620:12, 633:13, 638:12,

667:10, 679:19
**pointed** [9] - 495:9, 497:11, 498:17, 500:14, 531:18, 603:11, 666:24, 675:18
**pointer** [1] - 507:14
**pointing** [1] - 666:23
**points** [2] - 608:14, 666:25
**polymer** [1] - 635:21
**polymer-driven** [1] - 635:21
**poor** [4] - 624:3, 633:4, 633:8, 647:19, 662:12
**population** [4] - 633:3, 633:22, 634:15, 640:23
**populations** [3] - 623:18, 640:9, 647:21
**porosity** [4] - 609:8, 609:10, 609:12, 615:7
**portion** [7] - 499:6, 502:18, 518:4, 540:10, 543:2, 543:9, 613:17
**portions** [1] - 651:19
**pose** [2] - 631:11, 636:14
**position** [3] - 638:16, 670:13, 670:14
**positive** [1] - 669:2
**possibility** [1] - 648:22
**possible** [6] - 510:21, 536:5, 580:3, 585:6, 587:5, 633:5
**possibly** [1] - 600:13
**potency** [1] - 566:24
**potential** [12] - 533:15, 550:8, 605:1, 628:24, 630:12, 630:18, 633:5, 649:11, 662:8, 662:9, 672:18
**potentially** [1] - 649:4
**pouch** [1] - 525:21
**pound** [1] - 631:17
**pour** [3] - 553:20, 568:18, 568:20
**pouring** [1] - 551:22
**powder** [4] - 537:25, 604:23, 613:9, 631:17
**powders** [1] - 613:10
**practical** [3] - 498:16, 565:3, 565:6
**practice** [8] - 490:13, 529:18, 587:11, 588:7, 605:10, 643:2, 644:23, 645:4
**precipitate** [1] - 596:14

**preclude** [1] - 500:11
**precluding** [1] - 679:10
**predict** [24] - 511:21, 511:25, 512:2, 519:13, 519:18, 527:17, 532:20, 544:20, 547:23, 548:1, 560:16, 568:22, 577:25, 578:2, 602:2, 602:14, 602:18, 602:21, 602:24, 617:8, 621:24, 622:5, 622:12, 622:13
**predictability** [3] - 559:4, 602:1, 603:8
**predictable** [3] - 491:9, 491:10, 561:15
**prediction** [3] - 602:12, 622:7, 634:23
**predictions** [2] - 519:20, 519:22
**predictive** [1] - 622:15
**predominate** [1] - 636:10
**preferred** [1] - 652:12
**preliminary** [30] - 492:7, 492:11, 522:17, 523:3, 538:23, 545:10, 545:18, 545:20, 547:9, 547:17, 548:2, 548:8, 551:16, 569:21, 570:4, 573:24, 574:4, 574:13, 574:25, 575:7, 592:5, 592:8, 594:20, 597:19, 597:21, 598:20, 601:10, 602:10, 613:25, 614:5
**prepackaged** [1] - 598:15
**prepare** [15] - 498:7, 503:5, 503:17, 531:21, 538:17, 539:5, 556:4, 562:9, 564:14, 579:15, 601:4, 607:6, 609:22, 625:8, 662:3
**prepared** [18] - 500:4, 502:25, 503:7, 503:8, 522:17, 523:3, 561:20, 561:23, 564:17, 581:1, 605:15, 605:18, 605:19, 607:12, 610:1, 648:3, 649:6, 649:8
**preparing** [8] - 493:11, 493:15, 539:19, 588:15, 598:20, 621:15, 631:8, 660:21
**Prescription** [1] - 636:4
**present** [4] - 589:5, 627:3, 634:16, 647:24
**presentation** [1] -

698

579:23
**presented** [2] - 628:21, 633:5
**preservative** [3] - 594:25, 596:23, 602:15
**preservatives** [2] - 586:2, 587:21
**pressure** [4] - 595:8, 595:12, 615:14, 640:25
**pretty** [14] - 491:1, 553:19, 561:12, 569:12, 594:2, 594:7, 608:15, 614:14, 620:20, 622:23, 640:22, 661:23, 663:15
**previous** [1] - 576:5
**previously** [3] - 489:3, 537:19, 649:22
**primarily** [1] - 614:12
**primitive** [1] - 523:11
**Princeton** [2] - 487:4, 487:18
**problem** [22] - 490:17, 491:2, 506:10, 559:20, 578:21, 597:4, 603:24, 604:21, 604:22, 605:1, 607:15, 623:12, 630:12, 630:15, 630:18, 631:11, 631:12, 632:11, 633:5, 633:6, 644:3, 662:13
**problematic** [1] - 678:25
**problems** [24] - 490:15, 490:18, 506:7, 557:9, 604:25, 628:21, 628:24, 638:16, 638:17, 657:7, 657:12, 660:25, 661:4, 661:23, 661:24, 661:25, 662:3, 662:5, 662:6, 662:8, 662:24
**proceed** [5] - 489:25, 524:24, 548:3, 582:6, 650:9
**PROCEEDINGS** [1] - 486:6
**proceedings** [1] - 486:23
**process** [48] - 491:24, 491:25, 511:19, 512:11, 518:22, 519:9, 526:21, 532:18, 540:14, 543:3, 543:22, 547:16, 547:18, 547:20, 547:22, 548:8, 555:4, 555:22, 568:9, 569:7, 569:8, 573:25, 574:3, 574:22, 574:25, 575:3, 576:8, 576:10, 577:9, 591:16, 597:11, 597:23, 598:2, 599:24, 599:25, 601:4, 601:10,

601:19, 613:18, 616:21, 616:25, 618:6, 619:11, 619:12, 620:11, 620:14
**produce** [1] - 567:10
**produced** [5] - 629:4, 629:8, 629:9, 648:6, 648:8
**product** [7] - 560:9, 566:16, 571:15, 572:2, 573:22, 649:11, 668:3
**products** [10] - 509:5, 643:21, 663:16, 664:16, 665:9, 665:10, 666:5, 666:8
**profiles** [1] - 633:18
**program** [1] - 522:5
**projects** [2] - 665:19, 666:12
**promise** [1] - 650:21
**promising** [1] - 552:20
**pronounce** [1] - 673:20
**propanol** [1] - 661:21
**properly** [2] - 613:12, 618:11
**properties** [6] - 543:24, 611:24, 660:24, 661:2, 661:7, 662:23
**property** [2] - 661:14, 662:23
**proposing** [2] - 657:21, 657:24
**propylamine** [7] - 535:4, 535:6, 535:19, 563:5, 563:7, 563:25, 586:6
**propylamines** [1] - 661:20
**protect** [3] - 591:6, 596:18, 597:3
**protecting** [1] - 665:2
**provide** [12] - 505:9, 520:9, 520:12, 533:1, 539:14, 539:18, 562:24, 565:14, 585:15, 588:24, 610:5, 639:16
**provided** [3] - 492:25, 639:18, 640:10
**provides** [2] - 627:9, 627:11
**providing** [1] - 493:1
**pseudoephedrine** [2] - 663:16, 663:17
**pseudoephedrines** [1] - 661:20
**psychotropic** [1] - 585:4
**PT** [1] - 644:9
**PTX** [1] - 670:17

**PTX-1** [3] - 650:24, 653:20, 658:16
**PTX-1411** [1] - 664:24
**PTX-1412** [1] - 664:10
**PTX-413** [1] - 665:21
**publication** [5] - 596:5, 670:20, 671:18, 672:23, 675:11
**publications** [7] - 627:16, 627:22, 673:16, 673:19, 673:23, 674:4, 674:5
**published** [3] - 584:2, 673:1, 673:9
**pull** [1] - 669:19
**pulmonary** [2] - 631:10, 631:13
**pure** [9] - 507:16, 540:24, 567:17, 590:20, 591:9, 591:11, 596:21, 611:8, 612:24
**purify** [1] - 612:24
**purity** [20] - 507:18, 508:24, 509:3, 510:15, 512:13, 532:9, 543:12, 559:24, 566:2, 566:6, 567:14, 590:10, 591:8, 592:4, 597:16, 599:10, 599:16, 610:23, 611:5, 613:23
**purport** [1] - 618:21
**purported** [1] - 564:1
**purpose** [4] - 498:23, 554:20, 609:7
**purposes** [3] - 612:18, 620:3, 627:25
**pursuant** [3] - 502:25, 564:17, 677:3
**Pursuant** [1] - 486:22
**pursue** [1] - 550:8
**pushing** [1] - 537:10
**put** [59] - 498:3, 504:4, 504:21, 505:25, 506:25, 508:1, 508:16, 508:20, 511:1, 513:20, 514:23, 515:8, 517:22, 518:9, 518:10, 522:3, 525:5, 526:5, 529:14, 531:13, 531:15, 538:24, 541:3, 542:5, 542:18, 545:7, 545:22, 553:7, 554:15, 554:16, 554:17, 554:18, 561:10, 591:4, 591:5, 592:22, 593:5, 593:18, 593:24, 595:9, 595:19, 596:12, 597:4, 611:15, 613:10, 615:13, 616:14, 627:18, 631:17, 662:16, 662:17, 664:24, 667:25, 676:18, 676:23,

677:1
**puts** [1] - 522:20
**putting** [9] - 500:6, 516:5, 566:20, 567:4, 598:20, 599:4, 645:23, 651:2

## Q

**qualifications** [1] - 666:22
**qualified** [2] - 666:18, 666:20
**quality** [1] - 526:5
**quant** [1] - 520:23
**quantity** [10] - 520:6, 527:14, 527:20, 527:23, 568:18, 603:7, 603:10, 604:1, 621:11, 622:18
**QUESTION** [2] - 663:2, 663:4
**questioning** [2] - 668:25, 678:17
**questions** [4] - 643:13, 645:11, 658:11, 663:6
**quick** [3] - 531:13, 636:21, 677:16
**quickly** [7] - 549:25, 574:19, 595:3, 595:16, 596:24, 611:4, 642:14
**quite** [5] - 490:21, 492:14, 541:5, 612:1, 640:19

## R

**RAKOCZY** [12] - 488:15, 488:17, 676:25, 677:15, 677:18, 677:24, 678:4, 678:15, 678:21, 679:5, 679:14, 679:20
**Rakoczy** [1] - 676:25
**range** [6] - 528:21, 529:6, 627:16, 627:17, 627:20, 639:19
**ranges** [2] - 549:15
**rapid** [1] - 636:11
**rat** [2] - 523:9, 574:17
**rate** [36] - 490:20, 491:5, 491:9, 491:11, 491:20, 491:23, 516:7, 516:14, 516:19, 516:23, 523:13, 526:9, 528:14, 530:20, 536:18, 549:23, 550:15, 550:19, 554:25, 560:12, 560:16, 574:16, 575:14, 576:23, 576:24, 577:7, 612:4, 612:6,

614:14, 616:9, 616:19, 618:4, 618:19, 619:10, 634:11
**rate-limiting** [1] - 516:7
**Rates** [1] - 616:8
**rates** [8] - 492:2, 616:23, 616:24, 617:8, 618:13, 620:18, 624:16, 624:18
**rather** [2] - 614:22, 638:9
**rational** [1] - 523:8
**rats** [1] - 513:18
**ravioli** [3] - 522:7, 522:13, 522:21
**raw** [16] - 509:5, 540:2, 540:23, 540:24, 544:7, 553:6, 565:25, 569:20, 569:22, 590:18, 590:19, 591:20, 591:21, 611:21, 624:21
**reach** [7] - 587:3, 587:9, 607:4, 625:3, 637:25, 644:21, 649:23
**reached** [1] - 645:7
**react** [3] - 627:3, 627:5
**reaction** [1] - 595:10
**read** [13] - 510:8, 510:10, 537:16, 540:15, 545:18, 564:1, 570:9, 610:25, 645:16, 645:19, 668:14, 669:8, 669:11
**readily** [1] - 652:4
**reading** [5] - 493:22, 494:1, 625:16, 630:25, 633:24
**ready** [7] - 489:25, 524:13, 582:9, 582:10, 613:21, 650:9
**realize** [1] - 498:15
**realized** [1] - 489:10
**really** [41] - 491:7, 492:14, 512:15, 513:22, 518:1, 523:6, 524:2, 525:25, 546:11, 548:18, 549:8, 553:1, 554:8, 556:11, 557:14, 564:3, 565:25, 567:12, 574:15, 576:25, 587:19, 602:12, 607:12, 608:15, 614:10, 615:6, 618:8, 627:6, 628:10, 640:11, 642:14, 643:20, 647:12, 647:22, 647:24, 648:16, 649:1, 654:16, 672:7
**reason** [9] - 491:7, 557:1, 570:25, 600:8, 652:5, 654:4, 655:21,

657:1, 672:6

**reasonable** [1] - 571:17

**rebuttal** [2] - 676:14, 676:22

**received** [2] - 664:21, 664:25

**Received** [1] - 681:9

**receiver** [2] - 508:4, 508:5

**recess** [3] - 538:5, 581:10, 646:4

**recite** [2] - 530:4, 537:14

**recited** [2] - 659:6, 659:9

**recognize** [1] - 665:23

**recollection** [1] - 669:12

**recommended** [1] - 652:14

**reconfirm** [1] - 596:4

**record** [9] - 486:23, 495:3, 510:10, 533:22, 594:21, 606:11, 639:3, 669:11, 677:24

**Recross** [1] - 681:2

**rectal** [4] - 534:16, 547:2, 561:13, 561:17

**rectally** [1] - 534:10

**rectum** [3] - 534:14, 534:19, 560:13

**redirect** [2] - 676:6, 676:7

**Redirect** [2] - 681:2

**redissolve** [1] - 596:14

**reduces** [1] - 564:8

**refer** [8] - 497:9, 499:4, 499:22, 503:25, 523:21, 608:17, 618:1, 651:9

**reference** [8] - 499:24, 563:9, 599:19, 639:7, 639:16, 640:1, 670:17, 670:18

**referenced** [2] - 562:5, 562:6

**references** [2] - 563:4, 586:5

**referred** [7] - 497:10, 561:16, 583:3, 632:7, 639:7, 644:9, 654:8

**referring** [23] - 491:13, 492:6, 498:22, 503:25, 505:18, 507:11, 515:14, 535:24, 545:10, 548:8, 584:7, 584:11, 586:11, 588:12, 606:25,

609:20, 629:1, 629:25, 633:10, 637:21, 653:2, 673:19, 678:11

**refers** [5] - 495:22, 495:25, 496:3, 496:21, 523:22

**Refine** [2] - 575:25, 598:10

**refine** [22] - 525:6, 526:8, 526:20, 527:1, 527:16, 527:17, 527:25, 528:2, 538:24, 551:6, 553:5, 575:22, 576:21, 577:21, 577:25, 598:4, 598:5, 598:7, 599:24, 600:2, 600:5, 601:20

**refined** [8] - 525:1, 528:10, 548:11, 548:22, 550:6, 555:15, 556:1, 599:21

**refining** [7] - 549:13, 552:10, 555:3, 555:13, 557:7, 576:7, 578:11

**reflect** [2] - 503:3, 561:25

**reflected** [1] - 647:12

**reflecting** [1] - 647:22

**reflection** [2] - 647:24, 648:16

**reflects** [2] - 647:8, 648:24

**refreshing** [1] - 669:12

**regard** [2] - 566:2, 644:25

**regarding** [1] - 503:11

**regimens** [1] - 633:15

**regroup** [1] - 543:25

**regular** [3] - 537:11, 663:14, 664:2

**regularly** [1] - 502:13

**reject** [1] - 654:16

**relate** [6] - 523:19, 523:23, 552:7, 588:1, 607:16, 628:12

**related** [9] - 493:6, 529:2, 614:25, 617:10, 627:13, 641:21, 646:22, 647:8, 649:11

**relates** [1] - 556:12

**relating** [1] - 628:20

**relationship** [1] - 523:15, 542:15, 555:18, 600:9, 600:21

**relative** [4] - 526:9, 528:14, 604:11, 639:18

**relatively** [4] - 595:3, 613:3, 636:20, 642:4

**Release** [1] - 616:8

**release** [133] - 490:16, 490:20, 490:22, 490:23, 491:5, 491:9, 491:11, 491:16, 491:20, 491:22, 491:23, 492:2, 492:20, 492:23, 514:24, 516:19, 516:23, 520:2, 520:3, 520:5, 522:5, 523:16, 525:7, 526:9, 528:6, 528:14, 530:20, 534:2, 546:11, 546:24, 550:15, 550:19, 550:20, 552:7, 552:23, 554:25, 555:18, 556:11, 560:16, 576:24, 577:6, 578:19, 578:21, 578:23, 578:25, 605:23, 605:25, 606:3, 606:4, 606:17, 607:6, 607:14, 607:17, 608:4, 609:23, 610:19, 611:2, 612:13, 612:18, 614:11, 614:12, 614:15, 614:20, 615:9, 615:18, 615:19, 616:13, 616:19, 616:23, 617:17, 617:20, 617:21, 617:23, 617:25, 618:1, 618:2, 618:9, 618:13, 618:19, 619:9, 619:13, 619:20, 620:2, 620:18, 620:21, 621:7, 621:15, 621:20, 622:5, 623:24, 623:25, 624:2, 624:10, 624:11, 624:17, 625:8, 625:17, 634:3, 634:4, 634:9, 634:15, 634:24, 635:20, 635:21, 637:17, 637:19, 637:23, 638:2, 638:25, 641:12, 641:22, 641:24, 644:2, 645:5, 648:15, 648:16, 648:18, 652:17, 652:20, 653:10, 654:13, 655:7, 655:15, 656:19, 656:7, 657:14, 657:17

**Requires** [2] - 630:21, 631:5

**requires** [8] - 529:20, 530:2, 551:14, 569:12, 652:4, 655:25, 656:19, 656:23

**rerun** [1] - 551:6

**research** [1] - 661:2

**reservoir** [22] - 514:4, 514:13, 514:14, 520:20, 521:2, 521:3, 521:9,

**released** [17] - 524:17, 525:5, 525:8, 546:22, 547:1, 547:4, 550:9, 575:16, 577:1, 617:11, 617:13, 617:14, 618:5, 618:10, 634:11, 637:24, 657:9

**releases** [4] - 547:6, 549:24, 554:4, 608:13

**releasing** [3] - 492:22, 617:13, 618:4

**relevance** [1] - 666:19

**relevant** [1] - 564:3

**rely** [1] - 549:11

**remain** [1] - 547:12

**remained** [1] - 517:23

**remember** [3] - 536:22, 623:20, 679:2

**rendering** [1] - 652:9

**repeat** [13] - 492:5, 493:14, 505:14, 507:16, 519:17, 520:11, 524:23, 534:18, 559:25, 577:12, 587:8, 660:3, 661:12

**repeating** [1] - 613:2

**replicate** [1] - 619:12

**report** [42] - 494:14, 494:16, 494:19, 494:22, 495:10, 495:22, 495:24, 496:12, 497:10, 497:12, 497:16, 497:17, 497:19, 498:4, 498:7, 498:14, 499:1, 500:8, 500:16, 500:17, 509:12, 509:15, 509:19, 509:22, 509:24, 510:2, 653:3, 653:12, 661:9, 661:15, 662:1, 662:2, 662:5, 662:7, 668:5, 668:14, 669:19, 674:4, 674:6

**reported** [3] - 623:6, 640:24, 671:17

**Reported** [1] - 486:19

**Reporter** [1] - 486:20

**reporting** [2] - 675:12

**reports** [2] - 498:23, 509:21, 670:20

**represents** [1] - 677:19

**reproduce** [1] - 617:25

**reproducible** [3] - 672:3, 672:5, 672:6

**request** [1] - 573:5

**require** [9] - 493:12, 493:15, 556:23, 577:18, 605:13, 613:2, 625:18, 642:23, 659:3

**required** [15] - 531:21, 562:8, 579:14, 605:9, 625:5, 636:8, 636:12, 644:22, 645:3, 647:15, 655:19, 656:5, 656:7, 657:14, 657:17

521:11, 521:13, 521:16, 521:19, 521:23, 521:25, 522:6, 522:13, 527:13, 527:14, 527:22, 528:7, 528:9

**reservoirs** [1] - 522:1

**resides** [1] - 542:21

**resin** [3] - 615:17, 615:18

**resins** [1] - 615:16

**resort** [1] - 643:10

**respect** [74] - 492:17, 492:24, 502:23, 502:24, 503:14, 504:24, 509:17, 512:12, 517:17, 520:13, 521:1, 521:13, 526:14, 527:16, 539:15, 541:15, 543:17, 544:12, 546:19, 546:24, 547:3, 547:17, 548:7, 548:14, 549:25, 550:1, 550:3, 550:24, 552:3, 555:13, 557:18, 561:19, 565:1, 565:12, 566:12, 567:19, 568:2, 574:24, 576:2, 579:7, 579:22, 580:17, 586:4, 591:8, 591:13, 592:2, 592:7, 597:21, 599:9, 601:19, 602:19, 603:7, 603:10, 603:25, 605:14, 608:2, 608:18, 610:8, 618:23, 619:5, 622:18, 626:2, 627:8, 631:5, 638:25, 639:5, 639:23, 643:16, 644:17, 644:20, 646:7, 646:17, 649:16, 676:19

**responder** [1] - 636:9

**responding** [1] - 636:13

**response** [3] - 607:16, 635:24, 635:25

**responsibilities** [1] - 666:11

**responsible** [1] - 666:4

**rest** [3] - 559:17, 593:12, 612:25

**Reston** [1] - 487:7

**result** [1] - 671:17

**results** [4] - 513:13, 517:8, 555:17, 555:24

**resumed** [5] - 489:3, 538:7, 582:3, 646:6, 650:14

**resuspend** [1] - 573:14

**resuspendability** [4] - 570:13, 572:23, 573:6, 575:25

700

**resuspendable** [1] - 573:1

**retain** [3] - 525:24, 553:19, 566:24

**retained** [1] - 665:15

**retard** [1] - 607:14

**review** [16] - 489:9, 498:24, 499:15, 499:17, 500:2, 539:11, 563:3, 587:3, 605:6, 605:7, 625:15, 627:18, 627:19, 630:17, 672:10

**reviewed** [4] - 499:24, 501:17, 502:18, 639:7

**reviewing** [1] - 640:20

**RICHTER** [1] - 487:14

**ricotta** [2] - 522:24, 522:25

**Ritalin** [1] - 658:8

**Road** [1] - 488:13

**ROBERT** [1] - 487:8

**ROCKEY** [2] - 487:19, 487:21

**role** [2] - 516:12, 660:21

**room** [2] - 596:12, 651:7

**Roseland** [1] - 488:14

**rough** [1] - 542:21

**roughly** [3] - 548:13, 557:5, 578:23

**route** [2] - 561:7, 561:13

**routine** [15] - 551:11, 551:13, 551:18, 551:22, 551:24, 552:4, 555:4, 555:6, 569:7, 569:8, 574:5, 598:22, 598:25, 599:5, 599:12

**rule** [1] - 648:20

**ruled** [1] - 646:22

**rules** [1] - 678:9

**ruling** [2] - 676:19, 677:3

**run** [5] - 513:14, 553:16, 614:3, 617:19, 617:23

**running** [1] - 553:11

---

# S

**s/CHARLES** [1] - 486:25

**safe** [3] - 530:19, 554:11, 565:20

**SAIBER** [1] - 488:2

**salicylic** [1] - 504:16

**Salt** [1] - 620:13

**salt** [87] - 494:3, 494:5, 494:8, 494:11, 495:7, 495:24, 496:12, 497:25, 498:2, 499:3, 499:18, 500:3, 501:16, 501:25, 502:13, 502:20, 505:10, 505:22, 505:24, 506:2, 506:16, 506:19, 516:9, 532:11, 532:15, 532:21, 533:9, 540:3, 543:4, 543:7, 543:13, 543:19, 544:12, 544:20, 545:4, 546:2, 546:20, 548:14, 548:17, 548:18, 548:19, 548:24, 549:25, 550:3, 550:21, 551:1, 552:22, 559:21, 559:23, 565:3, 565:5, 565:9, 565:15, 566:1, 566:21, 568:23, 576:25, 578:16, 579:5, 580:3, 585:18, 587:20, 589:8, 589:11, 589:19, 590:9, 591:15, 610:14, 610:19, 610:21, 612:17, 624:15, 627:24, 642:2, 657:18, 659:1, 659:2, 673:3, 673:4, 673:11, 673:14, 673:17, 675:13

**salts** [36] - 495:9, 495:10, 496:9, 496:10, 496:22, 497:10, 497:13, 497:23, 498:1, 499:5, 499:8, 500:17, 500:22, 501:2, 501:5, 501:8, 501:12, 501:13, 501:18, 501:23, 502:1, 502:13, 532:16, 532:18, 533:2, 533:3, 543:16, 544:9, 548:21, 569:14, 672:18, 675:6

**sample** [1] - 607:12

**samples** [1] - 599:4

**SANDOZ** [1] - 486:8

**Sandoz** [1] - 487:24

**sandwiches** [1] - 522:3

**sat** [1] - 678:23

**satisfactory** [4] - 552:13, 555:24, 599:3, 599:7

**satisfy** [1] - 601:2

**saturated** [2] - 504:20, 537:18

**saw** [1] - 615:3

**SC** [2] - 592:10, 593:14

**scale** [1] - 523:10

**schematic** [1] - 543:9

**schematics** [4] -

**588**:13, 612:16, 642:15, 649:18

**Schering** [5] - 664:14, 665:6, 665:9, 666:4, 666:11

**Schering-Plough** [4] - 664:14, 665:6, 666:4, 666:11

**Scholl's** [1] - 665:10

**scope** [2] - 644:23, 653:8

**scopolamine** [1] - 531:12

**SCOTT** [1] - 487:8

**Scott** [1] - 489:5

**screen** [7] - 535:20, 537:10, 537:11, 538:22, 651:3, 651:9, 662:16

**search** [2] - 661:4, 661:5

**searches** [1] - 661:5

**Sears** [1] - 487:20

**seated** [3] - 538:6, 582:2, 646:5

**second** [11] - 490:16, 597:14, 624:21, 637:18, 639:2, 651:23, 666:2, 669:6, 669:14, 671:9

**secondary** [2] - 676:12, 677:1

**section** [3] - 602:11, 640:5

**Section** [1] - 486:22

**sedimentation** [2] - 573:11, 573:15

**see** [38] - 492:2, 505:6, 505:23, 506:25, 508:21, 515:15, 515:20, 526:1, 526:15, 528:19, 529:15, 535:9, 537:12, 543:4, 563:19, 571:15, 572:12, 582:16, 588:5, 589:4, 591:5, 591:6, 595:2, 595:22, 596:6, 602:5, 616:6, 616:11, 616:12, 617:10, 617:23, 630:4, 632:25, 641:5, 652:16, 667:12, 673:7, 680:5

**segregate** [1] - 613:11

**select** [9] - 516:22, 545:9, 574:10, 580:3, 589:8, 590:9, 614:2, 615:21, 635:23

**selected** [3] - 570:1, 570:2, 675:13

**Selecting** [1] - 620:12

**selecting** [34] - 493:12, 493:16, 494:10,

505:5, 505:12, 505:17, 506:2, 506:22, 516:25, 539:15, 543:3, 543:8, 543:17, 543:18, 543:19, 544:12, 544:13, 547:12, 551:10, 551:16, 565:23, 568:7, 569:6, 569:17, 574:4, 574:20, 588:22, 589:2, 599:11, 610:13, 612:16, 622:10, 624:15

**selection** [34] - 492:8, 492:12, 495:7, 496:12, 499:3, 501:16, 505:9, 540:1, 540:14, 543:3, 545:13, 545:21, 547:10, 547:18, 548:9, 549:25, 551:17, 570:5, 573:24, 574:4, 574:13, 575:1, 575:7, 588:23, 588:25, 591:13, 592:8, 594:20, 597:22, 598:21, 601:11, 610:3, 610:6, 614:6

**semipermanent** [1] - 508:2

**semipermeable** [3] - 513:15, 518:17, 526:18

**sense** [9] - 535:21, 552:21, 573:25, 575:17, 578:6, 594:6, 594:9, 620:24, 630:25

**senses** [1] - 641:21

**sensitive** [1] - 554:7

**sentence** [5] - 652:3, 652:11, 653:5, 654:3, 673:6

**separate** [3] - 521:23, 542:20, 613:11

**separated** [1] - 521:22

**separates** [1] - 553:21

**series** [7] - 544:3, 553:9, 570:8, 575:24, 594:18, 610:22, 658:11

**seriously** [1] - 513:23

**session** [1] - 489:10

**set** [1] - 531:18

**settle** [4] - 567:2, 568:17, 568:19, 573:17

**settling** [1] - 568:16

**seven** [6] - 491:15, 491:16, 511:4, 658:4, 658:6, 678:2

**seven-day** [1] - 491:15

**several** [7] - 505:20, 559:22, 591:22, 617:2, 620:23, 651:25, 666:5

**shake** [2] - 542:19, 568:17

**shape** [6] - 553:15, 610:24, 612:3, 612:10, 613:7, 613:24

**shaped** [1] - 549:16

**shapes** [1] - 517:7

**sharp** [1] - 680:6

**short** [2] - 538:1, 593:7

**shorten** [1] - 676:1

**shorter** [2] - 548:15, 650:21

**shots** [1] - 593:20

**show** [4] - 630:24, 635:17, 636:4, 640:15

**showed** [3] - 640:8, 640:18, 642:15

**showing** [1] - 500:6

**shown** [3] - 543:20, 649:17, 650:4

**shows** [1] - 582:15

**Shukla's** [4] - 498:6, 498:14, 661:8, 661:15

**side** [3] - 498:23, 543:1, 636:7

**sides** [2] - 678:3, 679:1

**sieve** [4] - 537:18, 537:21, 564:8, 564:9

**SIEW** [1] - 487:24

**significant** [4] - 490:17, 491:2, 506:11, 666:15

**similar** [12] - 493:7, 503:12, 509:9, 528:9, 538:20, 548:25, 595:2, 604:9, 624:9, 642:4, 661:19, 663:20

**simple** [1] - 552:9, 589:11, 594:2, 594:7, 615:22, 626:24, 643:22

**simpler** [1] - 594:17

**simply** [6] - 560:18, 560:21, 609:2, 651:25, 655:15, 659:17

**simulate** [1] - 507:9

**simulates** [1] - 523:12

**site** [1] - 603:24

**sitting** [3] - 518:11, 572:13, 664:1

**situation** [6] - 495:11, 516:19, 541:6, 647:16, 676:20, 679:11

**situations** [1] - 559:23

**SIWIK** [2] - 488:15, 488:17

**six** [39] - 492:15, 511:4, 512:19, 513:2, 519:11, 526:25, 529:6,

701

529:23, 529:25, 531:9, 531:14, 544:7, 548:11, 548:13, 557:21, 557:23, 562:19, 571:14, 578:8, 578:10, 601:16, 601:18, 617:22, 620:20, 621:3, 621:5, 632:25, 633:13, 633:14, 635:24, 636:8, 636:12, 636:21, 636:22, 638:9, 638:14, 641:18, 668:11

**six-week** [3] - 529:23, 529:25, 635:24

**size** [33] - 492:21, 515:22, 515:25, 516:4, 516:6, 516:10, 516:12, 516:13, 516:15, 516:20, 516:25, 517:1, 517:2, 517:3, 523:19, 528:21, 531:2, 566:2, 566:6, 566:25, 567:5, 567:9, 567:10, 568:13, 570:17, 610:24, 612:3, 612:10, 613:7, 613:24, 619:9, 638:5, 638:8

**sizes** [4] - 516:22, 516:23, 517:7, 525:6

**skill** [101] - 491:19, 493:2, 493:8, 494:9, 503:16, 507:12, 511:21, 511:25, 512:6, 514:19, 517:11, 517:19, 518:5, 519:10, 519:12, 519:23, 522:18, 523:4, 526:11, 526:24, 527:17, 529:12, 530:13, 531:21, 532:19, 536:5, 539:4, 539:25, 540:20, 541:17, 542:9, 544:5, 544:20, 544:24, 545:19, 547:14, 547:25, 549:21, 550:2, 550:7, 551:14, 554:21, 556:2, 560:8, 562:1, 562:9, 564:13, 566:13, 568:22, 569:8, 569:12, 569:16, 573:20, 575:8, 575:21, 576:3, 577:20, 577:24, 578:15, 579:15, 580:14, 582:19, 585:7, 587:5, 587:11, 588:15, 590:24, 594:3, 594:13, 595:5, 596:25, 597:18, 597:24, 598:12, 598:22, 599:8, 599:13, 600:3, 600:18, 601:21, 602:2, 607:5, 608:3, 609:22, 610:15, 611:7, 612:12, 619:2, 620:11, 620:19, 621:19, 622:4, 622:23, 623:23, 624:7, 624:19, 625:6, 626:21, 645:3, 647:6,

653:7

**skilled** [32] - 503:4, 505:12, 505:16, 508:8, 508:12, 508:23, 509:2, 510:17, 510:24, 511:8, 513:6, 514:16, 515:24, 523:25, 524:6, 538:16, 545:5, 546:19, 547:8, 549:5, 552:11, 558:19, 565:22, 566:9, 567:8, 574:2, 589:2, 589:22, 589:24, 595:17, 643:8, 671:20

**skills** [2] - 668:2, 668:3

**skin** [40] - 504:5, 504:6, 504:8, 505:25, 506:1, 506:13, 507:6, 507:10, 507:24, 508:3, 508:16, 511:9, 511:10, 511:11, 511:12, 511:13, 512:9, 512:18, 513:8, 513:11, 513:16, 513:17, 513:20, 515:5, 515:6, 515:13, 518:15, 518:16, 518:17, 520:10, 520:14, 521:12, 525:19, 526:17, 528:19, 528:24, 530:25, 531:13, 666:5, 666:7

**skip** [1] - 578:3

**slide** [92] - 492:6, 492:9, 492:18, 494:13, 496:11, 496:16, 500:6, 502:21, 502:23, 502:24, 503:7, 503:8, 505:3, 505:4, 505:19, 507:11, 508:24, 511:6, 511:15, 515:14, 517:17, 518:4, 520:21, 524:20, 528:1, 529:11, 532:3, 533:23, 535:8, 536:1, 538:10, 539:3, 540:8, 540:10, 541:15, 543:1, 543:2, 543:20, 544:3, 545:15, 547:18, 548:23, 550:17, 555:2, 562:19, 563:2, 563:18, 564:25, 566:7, 566:13, 569:17, 570:10, 576:1, 576:5, 579:25, 582:11, 583:5, 588:9, 588:12, 590:3, 591:16, 593:25, 597:17, 598:6, 599:9, 599:23, 603:4, 605:14, 605:15, 608:19, 609:24, 609:25, 612:19, 613:17, 613:24, 614:17, 616:1, 624:16, 625:13, 628:18, 629:25, 630:12, 632:13, 635:2, 635:4, 635:5, 635:16

**slides** [13] - 502:24, 502:25, 503:3, 503:14, 503:15, 539:3, 561:19, 561:20, 579:22, 580:9, 649:17, 650:4

**slightly** [2] - 507:20, 670:12

**slow** [8] - 567:22, 568:17, 578:23, 614:22, 634:1, 634:20, 634:25, 662:12

**slower** [2] - 617:9, 634:13

**slowly** [3] - 516:5, 593:9, 615:2

**slows** [1] - 606:3

**Small** [1] - 637:16

**small** [6] - 516:17, 567:3, 613:12, 637:19, 637:23

**so..** [1] - 601:8

**softer** [1] - 553:17

**solid** [16] - 494:5, 494:7, 495:25, 537:6, 559:14, 562:16, 575:15, 599:17, 605:25, 611:2, 612:18, 612:19, 623:24, 624:8, 625:8, 656:19

**solids** [1] - 496:8

**Solubility** [2] - 630:13, 635:17

**solubility** [44] - 507:17, 507:19, 508:17, 510:18, 510:25, 511:5, 512:13, 532:9, 532:10, 538:22, 540:15, 541:15, 541:18, 541:19, 542:4, 542:4, 566:3, 566:7, 568:2, 568:6, 589:18, 589:23, 590:9, 590:21, 591:1, 592:3, 594:24, 596:1, 596:4, 597:16, 599:10, 602:7, 602:8, 610:23, 611:10, 611:13, 611:18, 629:22, 630:11, 630:15, 635:3, 635:19, 635:22

**Solubility-Suspension** [1] - 630:13

**solubility/stability** [1] - 512:13

**solubilize** [1] - 512:20

**soluble** [6] - 505:24, 506:19, 541:20, 566:1, 578:24, 579:6, 589:12, 589:13, 589:15, 589:17, 610:20, 611:14, 611:25, 612:14, 614:14, 614:19

**solution** [22] - 492:13, 516:14, 542:7, 574:16,

579:11, 583:16, 583:18, 583:19, 584:4, 584:8, 586:6, 587:6, 587:24, 589:3, 593:5, 596:13, 602:25, 604:19, 605:10, 630:16, 656:8

**solutions** [7] - 582:13, 583:4, 583:6, 603:5, 605:15, 613:4, 653:23

**solved** [1] - 662:3

**solvent** [15] - 504:20, 505:24, 507:1, 507:22, 511:1, 511:6, 511:8, 512:13, 512:17, 515:11, 532:10, 541:21, 542:18, 599:12

**solvents** [5] - 507:18, 508:19, 508:20, 511:10, 542:6

**someone** [8] - 542:9, 588:9, 592:19, 599:12, 624:19, 655:22, 666:21, 666:24

**sometimes** [2] - 518:16, 666:23

**somewhat** [4] - 498:21, 594:17, 604:13, 609:11

**somewhere** [1] - 490:24

**sooner** [1] - 599:6

**sophisticated** [1] - 599:16

**sorry** [28] - 493:24, 502:4, 502:10, 505:4, 508:17, 519:17, 521:6, 522:23, 525:2, 525:13, 534:16, 534:18, 540:15, 548:12, 560:9, 583:12, 590:2, 622:1, 634:7, 635:5, 654:19, 663:19, 663:24, 670:17, 671:10, 672:4, 673:24, 674:22

**sort** [6] - 490:22, 491:8, 491:21, 534:2, 542:12, 545:7

**South** [1] - 487:20

**SPATARO** [1] - 488:6

**speaking** [1] - 576:1

**spec** [1] - 644:15

**special** [4] - 628:21, 631:12, 638:16, 638:17

**specific** [13] - 498:21, 500:13, 608:10, 645:21, 658:19, 658:24, 662:6, 673:3, 673:4, 673:11, 673:17, 675:12, 679:10

**specifically** [5] - 563:9, 586:21, 627:12,

628:11, 652:25

**specification** [10] - 580:6, 642:20, 651:20, 653:6, 659:14, 659:20, 660:1, 660:5, 660:11, 660:14

**specifications** [2] - 660:9, 675:7

**specified** [1] - 590:21

**spent** [2] - 512:21, 670:1

**Sport** [1] - 666:6

**spray** [3] - 512:16, 631:22, 632:14

**sprays** [1] - 631:10

**Square** [1] - 487:6

**square** [4] - 523:18, 525:9, 528:24

**ST** [1] - 630:4

**stability** [75] - 508:8, 508:13, 508:14, 508:17, 510:22, 511:5, 515:22, 517:18, 517:25, 527:4, 527:5, 532:9, 538:22, 540:15, 540:19, 540:25, 541:13, 544:3, 545:25, 546:3, 547:7, 547:8, 547:13, 549:3, 549:6, 549:12, 553:13, 554:8, 557:9, 557:12, 559:20, 566:2, 566:6, 566:8, 566:12, 566:18, 570:6, 570:11, 570:15, 573:10, 575:25, 585:16, 587:19, 589:25, 590:9, 591:5, 592:3, 594:24, 595:16, 596:7, 597:16, 598:11, 598:17, 599:10, 600:6, 601:24, 602:8, 604:21, 604:24, 607:11, 610:23, 611:16, 611:17, 611:19, 611:20, 616:10, 616:18, 616:19, 616:24, 620:23, 622:11, 637:4, 637:14

**stable** [9] - 510:20, 517:23, 540:5, 547:12, 552:23, 566:16, 590:1, 590:22, 616:16

**stage** [5] - 492:8, 543:8, 547:10, 548:9, 614:6

**stages** [1] - 524:13

**stand** [11] - 489:4, 489:24, 538:7, 582:3, 592:12, 593:15, 593:23, 617:16, 644:10, 646:6, 650:14

**standard** [3] - 526:6, 608:22, 649:3

**standards** [1] -

702

599:19
**STANDISH** [1] - 487:15
**standpoint** [2] - 623:17, 636:14
**stands** [1] - 546:7
**starch** [1] - 584:22
**start** [14] - 520:8, 533:6, 539:25, 553:11, 575:5, 588:22, 590:2, 592:5, 610:3, 610:17, 610:21, 625:23, 650:23, 680:5
**starting** [5] - 549:17, 589:20, 590:13, 614:9, 674:19
**starts** [2] - 501:13, 636:3
**state** [6] - 507:21, 584:1, 594:21, 624:25, 625:3, 660:14
**statement** [3] - 638:19, 668:21, 668:22
**statements** [1] - 509:20
**STATES** [1] - 486:1
**States** [1] - 486:22
**states** [5] - 584:20, 654:3, 654:8, 656:25, 660:1
**station** [2] - 599:4, 599:5
**statistical** [3] - 607:11, 607:21, 607:23
**stay** [3] - 542:14, 567:5, 570:18
**stayed** [1] - 549:8
**staying** [3] - 501:16, 538:10, 540:8
**stays** [1] - 596:21
**stenographically** [1] - 486:23
**step** [60] - 492:4, 492:11, 492:12, 499:2, 499:3, 505:3, 505:5, 506:23, 509:17, 512:8, 512:10, 513:6, 515:15, 517:17, 519:5, 522:18, 523:4, 524:18, 525:2, 525:3, 526:20, 527:1, 527:25, 528:11, 529:13, 545:5, 545:20, 548:4, 548:23, 549:11, 550:6, 551:3, 551:4, 551:11, 552:10, 552:18, 553:2, 553:3, 555:25, 556:18, 557:6, 570:3, 574:13, 574:14, 575:8, 575:20, 581:8, 592:4, 592:8, 598:2, 600:4, 610:13,

613:22, 613:24, 615:25, 616:8, 617:3, 618:16, 624:15
**steps** [10] - 503:4, 516:7, 519:4, 538:20, 543:23, 551:8, 551:22, 551:23, 599:3, 668:3
**sterile** [2] - 598:14, 598:16
**sterility** [4] - 589:23, 598:11, 598:15, 600:6
**STEWART** [1] - 487:10
**stick** [1] - 540:19
**sticking** [1] - 553:25
**still** [15] - 489:24, 510:20, 512:25, 519:24, 526:8, 528:16, 567:6, 580:19, 590:13, 593:1, 596:5, 665:14, 665:19, 666:21, 666:25
**sting** [2] - 595:9, 597:5
**stings** [1] - 665:3
**stir** [1] - 518:11
**stomach** [1] - 567:25
**storage** [2] - 637:8, 637:9
**stored** [1] - 584:23
**STPAT** [1] - 633:10
**Strattera** [2] - 636:5, 636:9
**STRAWN** [1] - 487:12
**Street** [1] - 488:16
**strength** [1] - 553:19
**strike** [3] - 540:7, 584:13, 660:13
**structures** [1] - 661:19
**studied** [1] - 675:18
**studies** [70] - 507:6, 507:22, 511:6, 511:8, 512:14, 513:11, 513:17, 519:2, 520:8, 524:4, 525:2, 528:13, 528:17, 529:4, 529:5, 529:10, 529:23, 529:25, 546:1, 550:12, 552:4, 553:16, 555:14, 556:1, 556:5, 556:10, 556:19, 556:22, 557:2, 557:7, 557:9, 557:19, 557:22, 575:20, 577:4, 577:13, 577:15, 578:7, 578:9, 600:15, 600:18, 600:22, 601:1, 601:8, 601:13, 601:15, 601:17, 602:19, 602:20, 602:21, 604:14, 616:6, 618:7, 618:14, 618:23, 619:5, 619:15, 619:16,

619:18, 620:23, 620:25, 621:2, 621:4, 622:14, 644:9, 644:16, 675:15, 675:17
**Studies** [1] - 617:4
**study** [38] - 513:14, 519:20, 524:5, 524:14, 524:19, 525:12, 525:15, 525:20, 525:25, 528:21, 529:1, 529:11, 539:9, 550:14, 551:4, 552:12, 552:14, 552:15, 552:18, 553:7, 556:4, 575:23, 576:23, 580:7, 598:9, 600:7, 600:8, 600:16, 600:24, 603:20, 605:2, 616:10, 617:9, 617:20, 618:18, 621:1, 636:20, 673:18
**stuff** [1] - 500:15
**sub** [4] - 592:10, 631:10, 641:14, 641:25
**sub-boxes** [1] - 592:10
**sub-lingual** [3] - 631:10, 641:14, 641:25
**subcutaneous** [8] - 583:20, 592:22, 593:16, 603:6, 603:21, 603:23, 604:4, 604:9
**subcutaneously** [2] - 584:25, 593:20
**subject** [5] - 508:21, 528:20, 596:20, 598:14, 598:18
**subjective** [2] - 559:8, 559:9
**sublingual** [2] - 631:21, 632:14
**subsequent** [7] - 673:16, 673:23, 673:24, 674:4, 674:5, 675:11
**subsequently** [1] - 492:22
**substantial** [1] - 654:15
**substantially** [3] - 633:25, 652:12, 654:8
**successfully** [1] - 572:7
**sufficient** [12] - 531:10, 582:18, 582:19, 585:6, 585:13, 587:10, 607:5, 607:7, 607:23, 623:15, 625:9, 631:15
**sufficiently** [1] - 555:15, 572:7, 590:22
**suggest** [3] - 645:24, 651:5, 678:24
**suggested** [1] -

497:12
**suggesting** [3] - 579:23, 642:19, 678:23
**suitability** [1] - 512:2
**suitable** [22] - 503:21, 510:1, 511:23, 512:8, 522:17, 523:3, 532:21, 539:9, 542:1, 545:1, 548:2, 551:11, 553:7, 555:20, 565:9, 575:22, 575:23, 577:11, 585:7, 617:8, 624:3, 636:25
**Suite** [3] - 487:3, 487:20, 488:16
**summary** [3] - 659:15, 659:16, 659:20
**Sun** [1] - 487:15
**sun** [1] - 666:7
**SUN** [1] - 486:8
**suncare** [1] - 665:10
**supervision** [4] - 503:1, 564:18, 605:15, 610:1
**supplies** [1] - 556:4
**suppositories** [8] - 533:12, 533:15, 541:10, 549:18, 653:24, 667:17, 668:1, 668:6
**suppository** [44] - 533:24, 534:9, 534:19, 534:25, 535:3, 535:18, 536:3, 536:6, 536:17, 538:17, 539:16, 539:20, 541:22, 544:21, 545:2, 545:22, 546:13, 546:14, 546:24, 547:3, 548:3, 549:14, 549:17, 550:16, 553:22, 553:25, 554:1, 554:2, 554:15, 555:3, 555:19, 556:12, 556:14, 556:23, 557:11, 560:7, 560:22, 561:11, 561:20, 562:2, 562:9, 601:25, 656:1
**susceptible** [1] - 595:22
**suspect** [1] - 676:2
**suspendability** [1] - 570:12
**suspended** [2] - 537:18, 562:16, 570:18
**suspending** [1] - 566:21
**Suspension** [1] - 630:13
**suspension** [35] - 492:9, 492:10, 562:15, 562:25, 563:4, 563:25, 564:1, 564:14, 565:2, 565:4, 565:10, 565:16,

565:19, 565:20, 565:24, 566:16, 567:1, 567:5, 567:15, 568:24, 570:6, 570:24, 570:25, 571:6, 571:18, 573:2, 573:7, 573:8, 578:13, 579:1, 579:8, 579:15, 629:22, 630:16, 656:5
**suspensions** [5] - 562:15, 562:17, 562:23, 574:15, 642:1
**sustain** [3] - 499:12, 610:19, 649:13
**sustained** [39] - 530:2, 605:23, 605:25, 606:4, 606:16, 607:6, 607:17, 608:4, 609:23, 611:2, 612:13, 612:18, 617:23, 617:25, 618:1, 618:2, 621:7, 621:15, 621:20, 622:5, 623:24, 623:25, 624:2, 624:7, 624:10, 625:8, 641:23, 634:23, 635:20, 637:23, 638:2, 638:25, 641:23, 644:2, 648:15, 655:15, 656:19, 657:1, 657:3
**sustained-release** [1] - 623:25
**swallow** [1] - 638:13
**swallowing** [1] - 638:10
**sweeteners** [1] - 572:2
**sweetness** [1] - 572:2
**swell** [1] - 525:20
**sworn** [1] - 489:3
**SYNTHON** [1] - 486:10
**syrups** [2] - 663:14, 664:3
**system** [46] - 491:22, 507:1, 512:17, 513:14, 515:2, 515:11, 515:18, 517:21, 518:8, 518:12, 519:6, 520:20, 521:2, 521:7, 521:24, 522:6, 523:7, 527:13, 527:14, 528:9, 530:10, 541:21, 554:23, 555:20, 559:19, 572:20, 588:20, 591:4, 614:2, 615:3, 615:4, 615:6, 615:12, 623:3, 623:4, 623:16, 624:1, 624:10, 626:25, 631:7, 631:13, 634:24, 637:23, 644:1, 670:1
**systems** [31] - 490:21, 491:6, 514:1, 514:7, 514:10, 514:21,

521:18, 521:21, 521:25, 522:13, 549:16, 591:23, 597:2, 603:16, 603:20, 614:9, 615:10, 615:11, 616:10, 621:7, 622:16, 626:24, 631:9, 642:4, 643:1, 667:20, 668:6

**T**

**tab** [4] - 650:24, 665:21, 670:16, 671:1
**Table** [3] - 607:2, 608:19, 608:20
**table** [1] - 677:18
**tablet** [20] - 558:22, 558:23, 559:15, 560:18, 560:19, 560:21, 561:10, 579:2, 614:12, 623:11, 627:9, 628:3, 632:13, 632:14, 641:25, 648:19, 652:13, 654:14, 655:15
**tablet/capsule** [1] - 641:22
**tablets** [23] - 562:23, 584:22, 623:11, 624:11, 625:17, 626:9, 626:11, 627:21, 628:16, 641:11, 641:13, 641:14, 641:25, 645:6, 652:18, 652:20, 653:10, 655:7, 655:13, 655:16, 661:22
**talks** [2] - 495:6, 496:12
**taste** [22] - 570:13, 570:23, 571:1, 571:4, 571:22, 571:25, 572:7, 572:15, 576:2, 582:20, 582:21, 631:4, 631:24, 632:6, 632:7, 632:11, 661:16, 662:9, 663:9, 663:10
**taste-masking** [1] - 582:20
**tasting** [1] - 647:13
**technical** [2] - 493:6, 498:16
**Technical** [2] - 632:1, 632:3
**technique** [3] - 517:4, 517:5, 517:9
**techniques** [4] - 509:4, 509:7, 510:13, 510:14
**technology** [3] - 635:22, 646:23, 647:8
**telescoping** [1] - 584:23
**temperature** [2] -

595:20, 596:12
**temperatures** [2] - 541:4, 616:17
**Tennessee** [1] - 670:13
**tenured** [1] - 670:14
**term** [3] - 502:13, 574:18, 586:19
**terms** [9] - 565:15, 569:4, 579:9, 580:7, 594:19, 598:19, 623:8, 623:19, 647:20
**test** [38] - 492:2, 507:17, 508:14, 513:18, 513:22, 515:23, 516:21, 516:25, 518:6, 525:16, 526:6, 545:8, 548:2, 554:8, 554:14, 566:1, 566:8, 566:12, 566:14, 570:9, 574:17, 574:18, 575:10, 575:11, 589:25, 590:17, 592:3, 592:4, 598:4, 598:15, 599:16, 602:5, 602:16, 619:24, 620:18
**testified** [8] - 489:4, 534:9, 623:18, 625:14, 648:25, 649:2, 665:8, 667:19
**testify** [1] - 500:18
**testifying** [1] - 511:16
**testimony** [17] - 489:21, 499:8, 503:7, 550:2, 557:25, 561:23, 564:20, 605:18, 605:19, 623:20, 646:22, 648:12, 648:20, 650:5, 654:1, 667:15, 672:17
**testing** [34] - 508:9, 508:13, 508:18, 508:24, 509:3, 509:8, 510:18, 510:25, 513:1, 517:18, 519:25, 520:6, 532:9, 532:10, 541:2, 542:8, 544:22, 545:2, 550:21, 554:10, 555:2, 557:16, 558:4, 566:18, 570:11, 570:19, 577:22, 599:5, 617:7, 621:14, 674:6
**testings** [2] - 512:12, 546:20
**tests** [72] - 506:8, 507:12, 507:23, 511:22, 512:1, 515:20, 517:19, 518:19, 519:15, 526:4, 527:18, 532:21, 540:14, 540:20, 540:22, 543:6, 543:7, 543:9, 544:3, 544:6, 548:25, 550:25, 551:6, 551:17, 553:9,

553:11, 557:13, 557:19, 558:8, 566:6, 568:23, 569:1, 569:3, 569:16, 569:23, 570:6, 570:8, 572:15, 572:16, 573:23, 575:13, 575:24, 576:4, 578:3, 589:23, 590:8, 590:14, 590:25, 594:19, 594:21, 594:23, 595:1, 597:16, 597:18, 598:11, 598:17, 598:19, 598:21, 599:10, 601:24, 603:2, 610:22, 613:2, 613:21, 616:7, 619:3, 619:19, 620:1, 621:21, 622:11, 622:13, 624:20
**TEVA** [1] - 486:9
**thaw** [1] - 553:12
**THE** [150] - 486:1, 486:2, 486:17, 489:1, 489:15, 489:19, 489:24, 494:15, 494:17, 494:21, 494:24, 495:1, 495:11, 495:16, 495:18, 495:20, 496:2, 496:5, 496:13, 496:17, 496:20, 496:24, 497:2, 497:4, 497:18, 497:21, 497:22, 498:3, 498:5, 498:8, 498:10, 498:15, 499:7, 499:12, 500:7, 500:10, 500:18, 501:6, 501:9, 509:18, 510:3, 510:7, 512:22, 512:23, 522:10, 522:20, 523:1, 538:1, 538:3, 538:6, 557:25, 558:3, 558:4, 558:6, 558:12, 558:15, 558:16, 558:18, 559:1, 559:3, 559:6, 559:9, 559:8, 559:9, 559:10, 559:12, 560:4, 561:6, 561:7, 581:2, 581:6, 581:9, 582:2, 582:4, 582:6, 593:1, 634:6, 635:4, 635:7, 635:11, 635:13, 645:19, 646:1, 646:5, 646:12, 646:14, 646:24, 647:2, 647:5, 648:1, 648:3, 648:7, 649:6, 649:8, 649:13, 649:20, 649:25, 650:9, 650:11, 650:13, 650:18, 651:2, 651:5, 654:25, 655:1, 666:20, 667:3, 667:6, 667:10, 667:12, 667:13, 668:19, 668:23, 669:5, 669:6, 669:7, 669:8, 669:10, 669:14, 669:17, 669:21, 669:22, 674:14, 674:18, 674:20, 674:23, 675:21,

675:22, 675:23, 676:3, 676:11, 676:15, 676:19, 676:24, 677:4, 677:7, 677:10, 677:13, 677:17, 677:23, 677:25, 678:10, 678:16, 678:22, 679:8, 679:16, 679:22, 680:1, 680:3, 681:4
**themselves** [2] - 501:13, 592:20
**theories** [1] - 509:18
**thereafter** [1] - 678:18
**thin** [2] - 631:9, 641:13
**third** [3] - 636:7, 671:10
**THOMAS** [1] - 488:6
**three** [53] - 490:25, 492:1, 493:5, 515:20, 519:11, 521:18, 521:21, 522:1, 524:7, 527:2, 527:3, 532:17, 532:18, 533:10, 540:14, 544:7, 544:17, 548:10, 548:16, 548:20, 553:13, 557:8, 557:17, 557:21, 559:24, 569:19, 569:20, 569:25, 574:1, 575:18, 578:8, 578:12, 590:8, 590:24, 597:20, 597:25, 599:10, 601:12, 601:14, 601:16, 601:23, 602:6, 604:12, 607:10, 608:15, 620:15, 620:20, 621:1, 621:3, 636:22, 668:2, 671:1
**throughout** [5] - 496:11, 554:3, 616:16, 642:16, 664:15
**throw** [1] - 560:21
**time-consuming** [1] - 601:25
**tips** [1] - 558:16
**tissue** [2] - 511:13, 593:19
**tissues** [1] - 547:2
**Title** [1] - 486:22
**title** [1] - 629:11
**Tmax** [2] - 633:17, 637:19
**today** [15] - 489:8, 493:1, 503:8, 534:5, 561:23, 564:20, 572:13, 605:18, 605:19, 642:16, 658:6, 658:19, 664:1, 667:19, 669:24
**together** [10] - 522:3, 538:14, 545:7, 545:22, 559:16, 574:9, 592:6, 598:20, 609:18, 665:18

**tolerability** [1] - 636:10
**tolerated** [1] - 574:17
**tomorrow** [4] - 675:25, 679:19, 679:23, 680:5
**tomoxetine** [11] - 495:22, 502:11, 502:14, 502:20, 636:13, 637:1, 640:4, 652:4, 652:13, 671:13, 671:15
**TONYA** [1] - 487:10
**took** [2] - 494:19, 504:19
**top** [5] - 515:7, 518:11, 520:21, 602:6, 666:2
**topic** [1] - 670:12
**topical** [2] - 512:16, 642:4
**total** [1] - 533:4
**touch** [1] - 670:18
**tough** [1] - 641:18
**toward** [2] - 536:19, 585:2
**Tower** [1] - 487:20
**tox** [1] - 575:10
**toxicity** [1] - 574:17
**training** [1] - 551:14
**transcript** [3] - 486:22, 489:9, 662:14
**TRANSCRIPT** [1] - 486:5
**transdermal** [38] - 503:5, 503:11, 504:3, 504:11, 504:25, 505:10, 505:13, 505:18, 506:7, 506:13, 506:16, 507:4, 511:23, 512:3, 512:17, 513:25, 514:1, 514:10, 514:20, 522:16, 523:2, 530:10, 530:12, 531:22, 532:4, 532:22, 533:3, 533:6, 534:4, 534:5, 631:6, 631:9, 642:4, 643:25, 647:15, 657:14, 667:20, 668:6
**transferred** [1] - 507:5
**translate** [1] - 513:13
**translated** [1] - 512:20, 523:15, 523:23, 526:2, 528:14
**transported** [3] - 528:23, 530:23, 530:25
**transports** [4] - 504:8, 518:12, 523:20, 531:15
**treat** [14] - 531:23, 560:20, 561:3, 562:11,

704

579:17, 586:19, 588:21, 603:1, 607:7, 620:4, 625:9, 631:15, 660:10, 670:9

**treated** [6] - 563:14, 571:12, 654:12, 655:2, 655:5, 655:6

**treating** [15] - 534:5, 536:19, 536:23, 556:24, 586:16, 592:19, 632:22, 639:19, 643:2, 651:16, 656:2, 656:16, 658:19, 659:17, 659:23

**treatment** [20] - 529:22, 530:2, 536:7, 538:19, 585:2, 636:6, 636:9, 637:7, 655:12, 655:19, 656:1, 656:5, 656:8, 656:20, 657:14, 657:18, 657:25, 658:5

**TRIAL** [1] - 486:6

**Trial** [3] - 489:10, 489:14, 646:15

**trials** [2] - 670:21, 671:4

**tried** [6] - 493:4, 505:21, 513:13, 559:13, 589:4, 589:6

**trouble** [1] - 638:10

**true** [6] - 631:21, 638:19, 657:2, 667:22, 668:5, 676:21

**truly** [1] - 535:22

**try** [28] - 505:23, 506:11, 507:23, 508:3, 524:3, 528:25, 529:23, 543:13, 544:10, 552:12, 552:19, 558:6, 567:12, 572:12, 575:14, 576:23, 594:13, 595:7, 597:7, 600:6, 600:9, 614:1, 617:6, 617:7, 617:11, 649:23, 657:10, 676:1

**trying** [30] - 491:7, 491:8, 491:15, 511:19, 514:22, 516:2, 519:1, 530:15, 538:20, 543:21, 546:21, 547:20, 549:10, 555:11, 555:12, 558:10, 569:13, 573:3, 600:25, 617:24, 620:1, 620:12, 623:23, 634:17, 637:22, 669:15, 669:22

**Tuesday** [1] - 680:8

**turn** [6] - 539:24, 651:14, 653:4, 659:14, 670:16, 671:9

**turning** [2] - 527:13, 543:1

**twenty** [1] - 583:14

twenty-eight [1] - 583:14

**Two** [1] - 487:6

**two** [33] - 490:25, 492:1, 496:3, 496:19, 500:25, 522:1, 523:18, 531:8, 531:9, 532:16, 532:18, 533:8, 533:10, 557:8, 557:17, 558:24, 561:13, 569:25, 589:23, 601:14, 603:16, 614:4, 614:18, 616:7, 616:15, 617:21, 623:18, 640:9, 640:14, 643:13, 643:20, 670:4, 677:11

two-plus [1] - 533:10

**type** [11] - 504:13, 518:19, 540:3, 550:12, 570:19, 577:5, 619:1, 631:13, 634:17, 656:11, 678:6

**types** [10] - 549:4, 561:13, 589:23, 590:8, 603:9, 614:4, 614:8, 619:1, 619:3, 661:21

**typically** [19] - 491:21, 491:25, 492:1, 516:14, 534:10, 534:11, 534:15, 534:20, 537:20, 541:7, 568:10, 593:9, 597:12, 598:15, 606:2, 610:19, 617:19, 622:15, 627:4

**U**

**U.S** [2] - 500:3, 537:18

**U.S.D.J** [1] - 486:17

**ultimate** [1] - 619:25

**ultimately** [1] - 567:2

**unadulterated** [1] - 611:9

**uncertain** [1] - 561:12

**uncertainty** [2] - 559:4, 559:18

**under** [18] - 489:25, 526:15, 531:14, 541:8, 558:13, 575:24, 593:18, 593:21, 595:23, 605:15, 610:1, 619:21, 631:2, 632:1, 632:2, 637:14, 644:19

**undergo** [1] - 583:22

**underlying** [1] - 551:17

**underneath** [4] - 598:6, 598:10, 614:6, 616:7

**understood** [2] - 674:23, 678:21

**undertake** [2] - 514:16, 514:19

**undertaken** [2] - 503:5, 550:13

**undue** [26] - 531:20, 532:1, 532:7, 558:2, 558:5, 558:11, 558:17, 558:21, 559:1, 562:7, 562:12, 579:14, 579:20, 580:16, 605:9, 605:13, 625:4, 625:12, 625:18, 626:23, 641:3, 643:17, 644:5, 644:22, 645:2, 653:9

**unexpected** [1] - 517:8

**unhelpful** [1] - 564:4

**uniformity** [4] - 570:13, 572:23, 573:6, 576:1

**unique** [3] - 517:7, 611:23, 666:7

**unit** [3] - 525:5, 525:9, 598:8

**UNITED** [1] - 486:1

**United** [1] - 486:22

**units** [1] - 528:25

**universe** [1] - 499:10

**University** [1] - 670:13

**unless** [4] - 516:1, 576:11, 651:6, 651:8

**unlikely** [1] - 559:20, 626:25, 627:6

**unpredictability** [16] - 520:24, 527:21, 527:24, 532:8, 559:4, 559:18, 560:14, 603:11, 603:13, 604:2, 621:12, 621:13, 622:19, 623:9, 642:9, 642:11

**unpure** [1] - 507:17

**unsatisfactory** [1] - 599:7

**unstable** [3] - 518:1, 613:3, 626:25

**untoward** [2] - 595:9, 596:13, 612:22

**unusual** [1] - 611:24

**unwanted** [1] - 623:16

**up** [54] - 492:16, 499:10, 499:16, 500:6, 507:12, 508:7, 511:3, 513:20, 513:24, 524:25, 527:15, 535:8, 535:23, 542:19, 553:24, 559:17, 560:18, 560:21, 573:12,

574:19, 577:23, 581:4, 592:16, 593:10, 593:11, 593:12, 603:9, 603:25, 606:23, 608:19, 614:16, 615:5, 615:14, 621:12, 621:20, 633:10, 642:14, 643:8, 645:25, 651:3, 651:23, 653:19, 658:16, 662:16, 662:17, 664:10, 664:24, 665:21, 665:25, 669:19, 677:20, 678:2, 678:3, 679:1

**USA** [3] - 486:7, 486:9, 486:10

**useful** [1] - 491:2

**usefully** [1] - 654:4

**uses** [1] - 607:10, 611:9

**usual** [1] - 562:22

**utilize** [3] - 597:8, 601:8, 660:16

**utilized** [1] - 597:8

**V**

**variability** [5] - 560:13, 608:6, 608:7, 608:9, 634:21

**variance** [1] - 518:9

**variation** [1] - 608:25

**varies** [1] - 633:3

**variety** [6] - 501:23, 517:15, 572:1, 591:19, 660:9, 661:19

**various** [21] - 494:8, 495:7, 499:2, 508:20, 509:15, 512:12, 549:3, 549:16, 555:2, 570:21, 573:23, 595:12, 595:19, 597:22, 602:9, 612:20, 628:24, 647:21, 648:12, 648:17, 675:19

**vary** [1] - 616:2

**vehicle** [2] - 542:13, 542:15

**vehicles** [1] - 542:16

**versus** [6] - 558:7, 579:1, 591:1, 617:20, 619:14, 633:18

**viable** [20] - 503:17, 503:19, 524:3, 530:17, 538:17, 539:5, 539:8, 560:9, 560:23, 560:24, 560:25, 564:14, 565:18, 565:19, 565:24, 571:18, 588:15, 588:19, 609:23, 632:18

**vials** [2] - 595:19, 596:16

**VICTORIA** [1] - 488:6

**view** [15] - 526:21, 529:21, 537:20, 555:22, 560:22, 560:23, 561:4, 568:8, 579:25, 594:12, 624:2, 625:15, 627:20, 632:18, 642:22

**viewed** [1] - 639:20

**Virginia** [1] - 487:7

**vis-à-vis** [1] - 669:2

**viscometer** [1] - 570:21

**viscosity** [5] - 570:13, 570:16, 570:22, 576:2

**vitro** [10] - 491:21, 515:22, 518:6, 523:7, 526:3, 546:20, 549:4, 549:20, 550:10, 617:7

**vivo** [4] - 545:24, 546:3, 550:10, 577:6, 598:4

**VOLUME** [1] - 486:7

**vs** [2] - 617:4, 617:15

**W**

**Wacker** [2] - 487:13, 487:20

**wait** [7] - 494:21, 501:6, 512:22, 522:20, 636:21, 669:14, 679:24

**walk** [1] - 616:20

**WALLACK** [1] - 487:17

**Wands** [10] - 531:18, 558:7, 562:5, 579:12, 605:6, 624:25, 643:14, 644:17, 644:19, 645:9

**Water** [1] - 542:19

**water** [8] - 542:19, 542:25, 566:21, 589:17, 602:8, 609:12, 614:25, 627:6

**water-loving** [1] - 542:25

**water-soluble** [1] - 589:17

**wax** [8] - 553:19, 607:14, 609:3, 609:12, 609:14, 615:6, 615:7

**waxes** [1] - 554:23

**waxy** [1] - 606:23

**WAYDA** [1] - 488:10

**ways** [3] - 505:21, 614:18, 675:18

**wear** [4] - 506:7, 506:8, 531:7, 531:8

**web** [1] - 665:23

**Wednesday** [8] -

489:21, 492:7, 492:25, 531:19, 625:15, 642:16, 644:8, 667:15

**Wednesday's** [1] - 489:9

**week** [6] - 494:13, 529:23, 529:25, 562:6, 635:24, 636:8

**weeks** [4] - 571:14, 632:25, 636:12, 636:21

**weigh** [1] - 631:17

**weighing** [1] - 551:22

**West** [2] - 487:13, 488:16

**white** [2] - 495:25, 496:8

**whole** [8] - 498:22, 499:10, 510:3, 553:9, 645:16, 645:19, 651:21, 675:3

**WILLIAM** [1] - 488:17

**WINSTON** [1] - 487:12

**withdraw** [2] - 489:13, 510:5

**WITNESS** [22] - 497:22, 498:5, 512:23, 558:3, 558:6, 558:15, 558:18, 559:3, 559:7, 559:9, 559:12, 561:7, 581:9, 655:1, 667:6, 667:12, 669:5, 669:7, 669:10, 669:22, 675:22, 680:1

**witness** [14] - 489:2, 489:13, 495:17, 499:20, 538:7, 582:3, 635:8, 646:6, 646:25, 650:14, 675:25, 676:4, 677:6, 679:7

**WITNESSES** [1] - 681:3

**witnesses** [3] - 676:8, 677:8, 677:12

**word** [4] - 542:23, 611:8, 632:5, 674:13

**words** [18] - 496:18, 507:19, 513:22, 522:3, 526:6, 531:10, 553:14, 553:18, 576:13, 578:22, 595:8, 596:11, 607:22, 612:23, 614:13, 622:25, 631:16, 637:18

**works** [2] - 547:4, 572:12

**World** [1] - 488:8

**worry** [2] - 594:16, 603:17

**worthwhile** [1] - 574:11

**wrap** [1] - 642:14

**written** [2] - 586:17, 632:9

**wrote** [2] - 661:8, 662:7

## Y

**year** [9] - 492:16, 512:21, 512:22, 513:3, 558:20, 559:10, 559:25, 638:9

**years** [9] - 533:8, 533:10, 558:24, 571:16, 632:25, 661:22, 664:19, 668:2, 670:1

**years'** [1] - 493:6

**yeses** [1] - 555:11

**yield** [1] - 548:2

**York** [4] - 488:5, 488:9

**YOUR** [1] - 677:21

**yourself** [4] - 504:11, 504:23, 667:23, 672:11

## Z

**Zerbe** [3] - 640:21, 657:8, 673:18

**zero** [2] - 617:22

**ZYDUS** [1] - 486:10